ZENITH RADIO CORPORATION,
Plaintiff,

v.

MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al. Defendants.

NATIONAL UNION ELECTRIC CORPORATION, Plaintiff,

v.

MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al. Defendants.

In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION.

Civ. A. Nos. 74–2451, 74–3247.
MDL 189.

United States District Court,
E. D. Pennsylvania.

March 27, 1981.

As Amended May 13, 1981.

Blank, Rome, Comisky & McCauley, by Edwin P. Rome, William H. Roberts, John Hardin Young, Arnold I. Kalman, Kathleen H. Larkin, Norman E. Greenspan, Lawrence S. Bauman, Philadelphia, Pa., for Zenith Radio Corp. and National Union Elec. Corp., plaintiffs.

Philip J. Curtis, John Borst, Jr., Glenview, Ill., for Zenith Radio Corp., plaintiff.

Mudge Rose Guthrie & Alexander by Donald J. Zoeller, John P. Hederman, Thomas P. Lynch, Howard C. Crystal, Robert A. Jaffe, Shelly B. O'Neill, Mark K. Neville, Jr., New York City, Drinker, Biddle & Reath by Patrick T. Ryan, Philadelphia, Pa., for Tokyo Shibaura Elec. Co., Ltd. and Toshiba America, Inc., defendants; defense coordinating counsel.

Duane, Morris & Heckscher by Henry T. Reath, Terry R. Broderick, Philadelphia, Pa., Crummy, Del Deo, Dolan & Purcell by John T. Dolan, Arnold B. Calmann, Newark, N.J., Seki, Jarvis & Lynch by Hoken S. Seki, Richard O. Briggs, Chicago, Ill., for Mitsubishi Elec. Corp. and Mitsubishi Elec. Sales America, Inc.

Reid & Priest by Charles F. Schirmeister, Robert J. Lynch, New York City, L. Peter Farkas, Washington, D.C., for Mitsubishi Corp. and Mitsubishi Intern. Corp., defendants.

Weil, Gotshal & Manges by Ira M. Millstein, A. Paul Victor, Joel B. Harris, Kevin P. Hughes, Robert K. Hood, H. Adam Prus-

sin, Harry M. Davidow, Jeffrey L. Kessler, Stuart Peim, Lenore Liberman, Gayle E. Hanlon, Makoto Matsuo, New York City, Morgan, Lewis & Bockius by Raymond T. Cullen, Philadelphia, Pa., for Matsushita Elec. Indus. Co., Inc., Matsushita Elec. Corp. of America, Matsushita Electronics Corp., Matsushita Elec. Trading Co., and Quasar Electronics Corp., defendants.

Metzger, Shadyac & Schwarz by Carl W. Schwarz, Michael E. Friedlander, William H. Barrett, Stephen P. Murphy, William B. T. Mock, Jr.; Tanaka, Walders & Ritger by H. William Tanaka, Lawrence R. Walders, B. Jenkins Middleton, Washington, D.C., Hunt Kerr Bloom & Hitchner, by Charles J. Bloom, Philadelphia, Pa., for Hitachi, Ltd., Hitachi Sales Corp. of America, and Hitachi Kaden Hanbai Kabushiki Kaisha, defendants.

Wender, Murase & White by Peter J. Gartland, Gene Yukio Matsuo, Peter A. Dankin, Lance Gotthoffer, New York City, for Sharp Corp. and Sharp Electronics Corp., defendants.

Whitman & Ransom by Patrick H. Sullivan, Dugald C. Brown, James S. Morris, Kevin R. Keating, Michael S. Press, New York City, Hunt Kerr Bloom & Hitchner by Charles J. Bloom, Philadelphia, Pa., for Sanyo Elec., Inc., Sanyo Elec. Co., Ltd., Sanyo Mfg. Corp. and Sanyo Elec. Trading Co., Ltd., defendants.

Arnstein, Gluck, Weitzenfeld & Minow by Louis A. Lehr, Jr., Stanley M. Lipnick, John L. Ropiequet, Chicago, Ill., for Sears, Roebuck & Co., defendant.

Rosenman, Colin, Freund, Lewis & Cohen by Asa D. Sokolow, Renee J. Roberts, Marc Rowin, Kaye, Scholer, Fierman, Hays & Handler by Joshua F. Greenberg, Randolph S. Sherman, Daniel D. Chazin, New York City, Wolf, Block Schorr & Solis-Cohen by Franklin Poul, Philadelphia, Pa., for Sony Corp. and Sony Corp. of America, defendants.

Kirkland & Ellis by Thomas P. Coffey, E. Houston Harsha, Karl F. Nygren, Chicago, Ill., for Motorola, Inc., defendant.

## TABLE OF CONTENTS

(Summary Judgment Motions Related to Plaintiffs' Sherman Act,
Wilson Tariff Act, Clayton Act and Robinson-Patman Act
Claims) Pretrial Order No. 307

| | | |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 1117 |
| II. | THE ANATOMY OF PLAINTIFFS' CONSPIRACY CLAIMS | 1124 |
| III. | THE FPS, FINAL STAGE CASE MANAGEMENT, AND THE SUMMARY JUDGMENT RECORD | 1130 |
| IV. | SUMMARY OF PRETRIAL EVIDENTIARY RULINGS | 1135 |
| V. | STANDARDS GOVERNING SUMMARY JUDGMENT | 1139 |
| VI. | LEGAL PRINCIPLES AFFECTING PLAINTIFFS' SHERMAN ACT § 1 AND WILSON TARIFF ACT CONSPIRACY CASE | 1144 |
| | A. Sherman Act § 1 | 1144 |
| | 1. Introduction and Basic Principles | 1144 |
| | 2. Price Agreements | 1146 |
| | a. The "Price Necessary to Get the Sale" | 1147 |
| | b. Agreement to Increase Market Share | 1147 |
| | c. Agreement to Fix Minimum Prices | 1147 |
| | d. Agreement to Price Predatorily | 1148 |
| | e. Agreement to Fix Low or Depressed Prices | 1148 |
| | f. Agreement to Fix Minimum Prices and a Second Agreement to Violate the First | 1148 |
| | g. Agreement to Deceive Government Authorities With Respect to Price | 1148 |

| | | |
|---|---|---|
| 3. | Market Allocation | 1148 |
| 4. | Membership in Trade Associations and Attendance at Meetings | 1149 |
| 5. | Exchange of Information Concerning Prices, Production and Inventory Figures, and Joint Forecasting | 1149 |
| 6. | Product Standardization and Technical Research Exchange | 1153 |
| 7. | Secret Rebates | 1154 |
| 8. | Joint Activities in Promoting Public and Governmental Relations and Joint Legal Action in Response to Common Problems | 1155 |

B. Statutory Antitrust Standing Under § 4 and § 16 of the Clayton Act 1157

C. The Wilson Tariff Act 1162

D. The Law of Conspiracy in an Antitrust Context 1165

 1. In General 1165
 2. Fragmentation of the Plaintiffs' Conspiracy Allegations 1166
 3. The "Slight Evidence" Rule 1169
 4. The Requisites of Circumstantial Proof of Conspiracy by Inference from Consciously Parallel Business Behavior 1170

 (a) Introduction 1170
 (b) General Principles Concerning Inferences from Circumstantial Evidence on Summary Judgment Motions 1170
 (c) Inferring Conspiracy from Parallel Conduct 1172

 5. Vicarious Liability of Coconspirators: The *Pinkerton* Doctrine and Robinson-Patman Act and Clayton Act § 7 Violations 1176
 6. Requisites for Admissibility of Coconspirator Declarations 1178

VII. PLAINTIFFS' SHERMAN ACT § 1 AND WILSON TARIFF ACT CONSPIRACY CASE AS TO TELEVISION RECEIVERS—EVIDENTIARY REVIEW AND DISCUSSION OF LEGAL SUFFICIENCY 1180

A. Introduction 1180

B. The Technological Development of Consumer Electronic Products and the Industrial Organization of Japanese Electronics Firms on the Foundation of Borrowed Technology 1182

C. The Closed Japanese Market 1183

D. Plaintiffs' Expert Reports 1186

E. Plaintiffs' Allegations About the Combined Economic Power of the Defendants and their Cartel 1186

F. The Manufacturers' Agreements and the JMEA Rules; Operation of the Minimum Price Agreements and the "Five Company Rule" 1187

 1. General Background; Operation of the Minimum Price Provisions 1187
 2. Operation and Significance of the "Five Company Rule" 1189
 3. The Agreements as Evidence of Conspiracy 1190
 4. The Role of MITI 1191

G. Activities of Certain Groups and Associations in Japan 1195

 1. Introduction; General Background 1195
 2. The Sub Rosa "Conspiratorial" Meetings of Executives Revealed by the Six Company Case 1196

 (a) Introduction; General Background 1196
 (b) Evidence of the Home Market Aspect of the "Unitary" Conspiracy; the Plaintiffs' "War-chesting" Claims 1202
 (c) Evidence of the Export Aspect of the "Unitary" Conspiracy 1209
 (d) The Six Company Case—Conclusion 1213

 3. The EIAJ 1215

 4. The JMEA and the Television Export Council 1221

 5. The Market Stabilization Council, The Nine Essential Points of 1223
 Implementation, and the Four Associations Conference

 H. The "Connection" Documents 1226

 I. The "Intent" Documents 1230

 J. Plaintiffs' Allegations of Below Cost Sales 1235

 K. Evidence of International Price Discrimination Between the United 1235
 States and Japanese Markets

 L. Plaintiffs' Evidence of the Operation of the "Predatory Export 1241
 Rebate System for Collusive Concealment of Dumping"

 1. Elements of the Rebate Scheme 1241

 2. Alleged Collusion in the Export Rebate System 1245

 M. Plaintiffs' Evidence Concerning the Depletion and Destruction of 1251
 the United States CEP Industry

 N. Plaintiffs' Claims Concerning Defendants' Acquisitions of U.S. 1253
 Manufacturers and Their Establishment of Manufacturing Facilities
 in the United States

 1. Introduction 1253

 2. The Quasar Acquisition 1254

 3. The Warwick Acquisition 1256

 4. The Sanyo-Fisher Acquisition 1258

 5. The Philips-Magnavox Acquisition 1258

 6. Plaintiffs' Claims About Establishment of United States Manu- 1259
 facturing Facilities by the Japanese Defendants

 O. Plaintiffs' Evidence Concerning "Defendants' Systematic Price Dis- 1259
 crimination in the U.S."

 P. Plaintiffs' Contentions Based Upon the "Undisputed Facts and 1260
 Legal Propositions" Identified by Plaintiffs' Counsel in the Course
 of Summary Judgment Argument on August 28, 1980

 Q. Evidence of the Participation of Individual Defendants in the Con- 1265
 spiracy

 1. Introduction 1265

 2. The Matsushita Defendants 1266

 3. The Toshiba Defendants 1271

 4. The Hitachi Defendants 1274

 5. The Sanyo Defendants 1275

 6. The Sharp Defendants 1278

 7. Melco & Melco Sales, Inc. (MSI) 1279

 8. Sony 1281

 9. MC and MIC 1284

 10. Sears 1289

 11. Motorola 1293

 12. The Sales Subsidiaries 1296

 R. Preliminary Determination of Sufficiency of Conspiracy Evidence 1298
 under F.R.E. 104(a)

 S. Summary of Conclusions as to Plaintiffs' Sherman § 1 and Wilson 1299
 Tariff Act Case as to Television Receivers

VIII. PLAINTIFF'S EVIDENCE WITH RESPECT TO NON–TELEVISION 1311
 PRODUCTS

 A. Radios 1311

 B. Tape and Stereo Products 1314

 C. Components; the Alleged Matsushita-Philips Component Complex 1315
 and International "Industrial Cooperation" System

IX. PLAINTIFFS' SHERMAN § 2 CLAIMS—LEGAL PRINCIPLES AND APPLICATION ... 1318

 A. Introduction; the "Individual Monopolization" Claims ... 1318

 B. Monopolization by Combination; Attempted Monopolization by Combination; Conspiracy to Monopolize ... 1319

 C. The Question of Defendants' Aggregate U.S. Market Share of Television Receivers ... 1321

X. ZENITH'S ROBINSON–PATMAN CASE—LEGAL PRINCIPLES AND APPLICATION ... 1323

 A. Introduction ... 1323

 B. Zenith's Standing to Assert Claims Under the Robinson-Patman Act ... 1325

 C. Zenith's Failure to Show Substantial Incipient Injury to Competition ... 1327

 D. Conclusion ... 1328

XI. ZENITH'S CLAYTON § 7 CASE—LEGAL PRINCIPLES AND APPLICATION ... 1329

XII. CONCLUSION ... 1331

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This opinion addresses defendants' motions for summary judgment as to plaintiffs' conspiracy claims under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, as well as their claims under § 2 of the Sherman Act, 15 U.S.C. § 2, § 73 et seq. of the Wilson Tariff Act, 15 U.S.C. § 8 et seq., § 7 of the Clayton Act, 15 U.S.C. § 18, and the Robinson-Patman Act, 15 U.S.C. § 13(a). For reasons which will be set forth herein at length, we will grant defendants' motions.[1] As will be seen, the touchstone of this decision lies in the fact that our intensive examination of the enormous record in this case has revealed that, despite years of discovery, the plaintiffs have failed to uncover any significant probative evidence that the defendants entered into an agreement or acted in concert with respect to exports to the United States in any manner which could in any way have injured the plaintiffs.

The mission of the summary judgment procedure is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Note to 1963 Amendment of Fed.R.Civ.P. 56(e). In this case that mission has become a veritable odyssey, one upon which we embarked some twenty-three months ago, in April of 1979, when motions for summary judgment addressed to plaintiffs' conspiracy claims were first

---

1. Proof of conspiracy is essential to plaintiffs' claims under Section 1 of the Sherman Act and under the Wilson Tariff Act by virtue of the language of those statutes. In addition, for reasons explained fully *infra*, proof of conspiracy is also essential to the particular claims plaintiffs have asserted under Section 2 of the Sherman Act, the Robinson-Patman Act, and § 7 of the Clayton Act. The only claims in plaintiffs' case which do not require proof that the defendants conspired are those under the Antidumping Act of 1916, 15 U.S.C. § 72, which we have already dismissed, with minor exceptions, for other reasons. Opinion and Order (1916 Antidumping Act), 494 F.Supp. 1190 (E.D.Pa.1980), *appeal pending*, No. 80–2080 (3d Cir.). Since we also dispose of the few remaining dumping claims herein, *see* n. 372 *infra*, our grant of summary judgment on the issue of conspiracy disposes of all the plaintiffs' outstanding claims.

During the course of this opinion we shall also make a preliminary determination, pursuant to Federal Rule of Evidence 104(a), that plaintiffs have not adduced sufficient independent evidence of the existence of a conspiracy among the defendants to permit any evidence in the nature of coconspirator declarations to be admissible against alleged coconspirators under F.R.E. 801(d)(2)(E). This determination further undermines the plaintiffs' conspiracy claims.

heard. At that time consideration of the summary judgment motions was postponed because the record was as yet too amorphous to permit its meaningful consideration. That situation has now changed. Thorough scrutiny of plaintiffs' proof has been made possible by the filing, with preclusionary effect, of plaintiffs' voluminous Final Pretrial Statement (FPS), setting forth the facts they intend to prove at trial; by the holding of five weeks of evidentiary hearings which considered the admissibility of plaintiffs' key evidence; and by an intensive period of preparation for and a seven-day argument of the conspiracy summary judgment motions.[2]

The pretrial evidentiary or *"in limine"* hearings were primarily designed to evaluate the admissibility of the principal evidence that plaintiffs advanced in opposition to the defendants' motions for summary judgment respecting plaintiffs' conspiracy claims. The hearings were necessary because a summary judgment motion must be decided upon evidence that would be admissible or usable at trial, and defendants had challenged the admissibility of much of plaintiffs' proposed evidence.[3] In addition, the hearings were designed to afford plaintiffs the opportunity to present sufficient evidence *aliunde* of the existence of a conspiracy and its membership to permit the admission into evidence of the hearsay statements of coconspirators under F.R.E. 801(d)(2)(E). *See* Part VI.D.6, *infra*.

The hearings spawned a trilogy of lengthy and extremely detailed opinions. The first, filed August 7, 1980, 505 F.Supp. 1125, addressed the admissibility of certain public records and reports under F.R.E. 803(8)(C); the second, filed September 29, 1980, 505 F.Supp. 1190, concerned the admissibility of materials relating to activities in Japan; and the third, filed December 10, 1980, 505 F.Supp. 1313, dealt with the admissibility of plaintiffs' expert testimony. Because these opinions, which will be summarized in Part IV, *infra*, exclude the most critical evidence in plaintiffs' case, they impact significantly upon the present summary judgment motion. Therefore, we consider the evidentiary trilogy an integral part of this opinion and hereby incorporate it by reference herein.[4]

We shall not herein discourse upon the complexity of this case. Our opinion on the jury trial issue, 478 F.Supp. 889 (E.D.Pa. 1979), and that of the Court of Appeals, 631 F.2d 1069 (3d Cir. 1980), as well as our opinion on subject matter jurisdiction, 494 F.Supp. 1161 (E.D.Pa.1980), which served to introduce the summary judgment motions, more than adequately protray the complexity of the issues and sketch the contours of that other facet of the case's complexity— the paper mountain which it has generated. The evidentiary trilogy expands upon that sketch and this opinion, which concentrates upon the record, completes the picture in replete detail. We shall, however, take the time in this Preliminary Statement to de-

**2.** The clerk informs us that from January 1, 1980 to October 1, 1980, the parties filed some 114 briefs or memoranda, two of which (filed by plaintiffs) were roughly five hundred pages each in length. We have not counted, but estimate the total brief pages alone filed during 1980 to be in excess of 7500. Virtually all of them related to issues affecting summary judgment, including evidentiary matters. In one 10-week period (surrounding the pretrial evidentiary hearings) 59 briefs were filed.

**3.** We note that Rule 56 does not in terms require that only admissible evidence may be considered in connection with a summary judgment motion. Rule 56(c) permits judgment to be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" fail to raise a genuine issue of material fact. Rule

56(e), in detailing the form of affidavits to be filed pursuant to a summary judgment motion, requires that they "set forth such facts as would be admissible in evidence," but there is no similar specific admissibility requirement for matters contained in the other materials listed in Rule 56(c). Nonetheless, the case law is plain that only materials which would be admissible or usable at trial may be considered. *See generally* 6 Moore's Federal Practice ¶ 56.-11, at 56–197 to 56–209; 10 Wright & Miller, Federal Practice and Procedure, §§ 2721–24.

**4.** For a recent example of a case in which important evidentiary rulings were made in connection with a motion for summary judgment, *see Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539 (5th Cir. 1980).

scribe again, albeit briefly, the parties and the issues.

The plaintiffs in this action are Zenith Radio Corporation ("Zenith") and National Union Electric Corporation ("NUE"). NUE, the corporate successor to Emerson Radio Co., one of the pioneer manufacturers in the radio and television industry, ceased all production of television receivers in February of 1970.[5] That December it filed the first of these suits,[6] alleging that the Japanese defendants and others had conspired to take over the American consumer electronic products (CEP) industry[7] and thereby to drive NUE out of business. In 1974 Zenith filed an action making similar allegations.[8] The NUE action was then transferred to this district for coordinated or consolidated pretrial proceedings with the Zenith ac-

tion;[9] the transfer was later made unconditional and the actions were consolidated for trial.[10]

The ten principal defendants are seven Japanese manufacturers of consumer electronic products (Matsushita Electric Industrial Co., Ltd. ("MEI"); Toshiba Corporation; Hitachi, Ltd.; Sharp Corporation; Sanyo Electronic Co., Ltd.; Sony Corporation; and Mitsubishi Electric Corporation ("MELCO"));[11] a Japanese trading company (Mitsubishi Corporation) ("MC"); and two American companies (Sears, Roebuck & Co. and Motorola, Inc.). Fourteen other defendants are subsidiaries of the principal Japanese defendants. Of the twenty-four defendants, fifteen are defendants in both suits, seven in the Zenith action only, and two in the NUE action only.[12]

---

**5.** After ceasing production of television receivers, NUE resold television receivers purchased from other manufacturers until discontinuing its television business entirely in 1972. The corporate history of NUE as it relates to this action is related in detail in our opinion concerning antitrust standing under the *Bangor Punta* doctrine, 498 F.Supp. 991 (E.D.Pa.1980).

**6.** *National Union Electric Corp. v. Matsushita Electric Industrial Co.*, Civil No. 1706–70 (D.N.J., filed December 21, 1970).

**7.** Although we refer herein to CEP's, this opinion deals mainly with television receivers, both color and monochrome (*i. e.*, black & white), because that evidence constitutes the overwhelming bulk of plaintiffs' case. The NUE suit is limited to television receivers; the Zenith complaint also encompasses radios, phonographs, tape and audio equipment, televisions, and electronic components. As is demonstrated in Part VIII, *infra*, plaintiffs have not seriously advanced a case with respect to other CEP's.

**8.** *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, Civil Action No. 74–2451 (E.D.Pa., filed Sept. 20, 1974).

**9.** *In Re Japanese Electronic Products Antitrust Litigation*, 388 F.Supp. 565 (Jud.Pan.Mult.Lit. 1975).

**10.** Pretrial Order No. 182, filed June 6, 1979 in M.D.L. 189.

This case was transferred to our docket in November 1977 from the docket of Judge A. Leon Higginbotham, Jr., following his elevation to the Court of Appeals. Although the progress of the case had been slowed by the illnesses and deaths of two judges to whom the case had previously been assigned, Judge Higginbotham moved the litigation forward vigorously. One of the most important events of Judge Higginbotham's stewardship was the filing of three opinions disposing of the defendants' challenges to jurisdiction and venue, to the constitutionality of the 1916 Antidumping Act, and to the extension of the Robinson-Patman Act to international price discrimination. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 251 (E.D.Pa.1975) (opinion on constitutionality of antidumping act); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 262 (E.D.Pa.1975) (opinion on personal jurisdiction and venue); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 244 (E.D.Pa.1975) (opinion on international application of Robinson-Patman Act).

**11.** This group of defendants will be frequently referred to herein as the "Japanese manufacturing defendants."

**12.** Sony Corporation and its sales subsidiary, Sony Corporation of America ("SONAM"), were originally named in both suits. However, they were dismissed from the Zenith action after settling with Zenith in April 1977, and are defendants now only in the NUE action.

Seven other principal Japanese defendants are named in both actions, as are eight of their subsidiaries: Matsushita Electric Corporation of America ("MECA"); Toshiba America, Inc. ("TAI"); Hitachi Kaden Hanbai Kabushiki Kaisha ("Hitachi Kaden"); Hitachi Sales Corporation of America ("HSCA"); Sharp Electronics Corporation ("SEC"); Sanyo Electric Trading Co., Ltd.; Sanyo Electric Inc.; and Mitsubishi International Corporation ("MIC").

In addition to the twenty-four named defendants the plaintiffs have identified scores of alleged coconspirators whose business operations traverse the globe, ranging from small Japanese companies to such world industrial giants as N.V. Philips Gloeilampenfabrieken and General Electric. The majority of the alleged coconspirators are other Japanese manufacturers and American importers.

The particular offenses charged in the complaints span the range of the antitrust laws. The overall conspiracy is alleged to violate §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. Plaintiffs also allege actual and attempted monopolization and conspiracy to monopolize under § 2 of the Sherman Act. Additionally, they allege that the defendants have violated § 801 of the Revenue Act of 1916, better known as the 1916 Antidumping Act, 15 U.S.C. § 72, by "commonly and systematically," with predatory intent, selling their products in this country for substantially less than their actual market value or wholesale price in Japan.[13] The defendants are also charged with violating the Robinson-Patman Act, 15 U.S.C. § 13(a), by discriminating in price among American purchasers.[14] Finally, Zenith charges that Sears, Motorola, and the Matsushita and Sanyo defendants, along with their coconspirators, violated § 7 of the Clayton Act, 15 U.S.C. § 18, in connection with the Japanese companies' acquisitions of interests in United States consumer electronic products manufacturers.[15]

The plaintiffs' papers seek to portray a massive, continuing unitary worldwide conspiracy said to have lasted over a period of more than twenty years,[16] the purpose of which is said to be the destruction of the American consumer electronic products industry. Although plaintiffs have embellished this theme with numerous variations, to be described in Part II of this opinion, in general this objective is alleged to have been accomplished by means of a two-pronged "unitary" conspiracy: a (successful) conspiracy to charge artificially high prices to consumers in Japan which funded or "war-chested" a (successful) conspiracy to sell in the U.S. at artificially low prices.[17]

Sears and Motorola are named only in the Zenith suit, as are Melco Sales, Inc., Sanyo Manufacturing Corp., Matsushita Electronics Corporation, Matsushita Electric Trading Co., Ltd., and Quasar Electronics Corp., also a Matsushita subsidiary.

13. The major aspects of this claim have been dismissed. *See* Opinion and Order (1916 Antidumping Act) 494 F.Supp. 1190 (E.D.Pa.1980), *appeal pending*, No. 80–2080 (3d Cir.).

14. The original complaints included counts alleging that price discrimination between Japanese and American purchasers violated the Robinson-Patman Act. These counts were dismissed for failure to state a claim. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 244 (E.D.Pa.1975) (Higginbotham, J.).

15. Zenith challenges two acquisitions. The first is the 1974 sale by Motorola of its consumer electronic products division and its "Quasar" tradename to Matsushita. The other is the 1976 acquisition by the Sanyo interests of a majority interest in Warwick Electronics, Inc., a manufacturer of television receivers for sale to U.S. private label customers, the largest of which was Sears. Sears had owned 25% of Warwick's common shares, and after the transactions was 25% owner of Warwick's successor, Sanyo Manufacturing Corp. (an American corporation).

16. The period covered by this litigation stretches from the filing of the respective complaints backward the four-year statutory period to, in the case of Zenith, the late 70's by virtue of amendment to the complaint. NUE's damage claims were essentially cut off when they abandoned the television business.

17. Certain of the defendants have asserted counterclaims against Zenith, attacking Zenith on two fronts. First, they allege that Zenith, acting alone and in combination and conspiracy with others, engaged in territorial allocations, price discrimination, and horizontal and vertical price fixing arrangements, and effected certain "key dealer preferences" in violation of the Robinson-Patman Act and §§ 1 and 2 of the Sherman Act. Second, they accuse Zenith and its coconspirators of seeking to interfere with its competitors, including the counterclaimants, "by every means available, including the submission of complaints, petitions, testimony and other information to various federal governmental agencies and officials, federal courts, and the United States Congress which were based upon sham, false and misleading allegations and information, without regard to the truth or merits of the claims made." The coun-

The summary judgment motion which we address herein is but one of many which have been interposed. We have already heard argument on a number of motions addressed to other discrete issues, and have disposed of most of them. We have (1) denied a motion seeking summary judgment for lack of subject matter jurisdiction, *see* Opinion (Introduction to Summary Judgment Motions; Subject Matter Jurisdiction), *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 494 F.Supp. 1161 (E.D.Pa.1980); (2) granted in major part defendants' motion for summary judgment on those claims arising under § 801 of the Revenue Act of 1916, better known as the 1916 Antidumping Act, 15 U.S.C. § 72, *see* Opinion and Order (1916 Antidumping Act), *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 494 F.Supp. 1190 (E.D.Pa. 1980), *appeal pending*, No. 80–2080 (3d Cir.); (3) denied a motion for summary judgment brought by certain defendants against Zenith on the ground that Zenith was not directly injured and was therefore barred from recovery under the doctrine of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), *see* Opinion and Order (Indirect Injury—*Illinois Brick*), *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 494 F.Supp. 1246 (E.D.Pa.1980); (4) denied a motion asserting that NUE lacked standing to sue under the doctrine of *Bangor Punta Operations, Inc. v. Bangor & Aroostook R. Co.*, 417 U.S. 703, 95 S.Ct. 2578, 41 L.Ed.2d 418 (1974), *see* Opinion and Order (Antitrust Standing— *Bangor Punta*), *National Union Electric Corp. v. Matsushita Electric Industrial Co.*, 498 F.Supp. 991 (E.D.Pa.1980); (5) denied a motion by defendant Sears, Roebuck & Co. for summary judgment based on statute of limitation grounds, *see* Pretrial Order (PTO) 263, *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.*, M.D.L. No. 189 (May 23, 1980); and (6) denied a motion by

Sharp Electronics Corp. alleging that Zenith's claims under the 1916 Antidumping Act are barred by the Treaty of Friendship, Commerce and Navigation between the United States and Japan, 4 U.S.T. 2063, T.I.A.S. No. 2863 (1953); *see* Memorandum and Order, (1953 Treaty of Friendship Commerce and Navigation with Japan) *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 494 F.Supp. 1263 (E.D.Pa.1980).

A summary judgment motion asserting insufficiency of the evidence of monopolization and attempted monopolization against individual defendants under § 2 of the Sherman Act (the so-called "individual monopolization claims") has in major part dissolved. *See* pages 1318–1319, *infra*. A motion by Sony Corporation advancing its allegedly unique position as a high price, rather than a low price, seller of television sets was deferred following argument, and will be considered with the other conspiracy motions herein. We have heard argument on a motion asserting insufficiency of the evidence of price discrimination under the Robinson-Patman Act and on motions addressed to the claims under § 7 of the Clayton Act. We will decide these summary judgment issues in this opinion.

The summary judgment motions which we have just described were relatively self-contained. The present motion, on the other hand, implicates an enormous record which may be the largest summary judgment record ever developed. The anatomy of that record will be described in Part III of this opinion. That description will be followed (in Part IV) by a summary of the rulings contained in the evidentiary opinion trilogy. We shall then turn to a discussion of the applicable law, commencing in Part V with the legal standards governing the grant or denial of summary judgment, focusing on the complex case. The major portion of the legal discussion is found in

terclaiming defendants thus invoke the "sham litigation" theory of antitrust liability recognized in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). The counterclaims are asserted by certain of the Matsushita, Mitsubishi, Hitachi, Sharp, Sanyo, and Toshiba defendants. In ad-

dition, Sears asserts a counterclaim against Zenith based on § 43 of the Lanham Act, 15 U.S.C. § 1125, charging that Zenith falsely designated certain of its goods as originating in the U.S. instead of as having been manufactured in Asia.

Part VI, in which we engage in a discussion of the legal principles affecting plaintiffs' Sherman § 1 and Wilson Tariff Act conspiracy case. We will begin with a discussion of the law relating to plaintiffs' principal Sherman § 1 allegations, taking up: (1) agreements affecting prices; (2) market allocation; (3) membership in trade associations; (4) exchange of information concerning prices, production and inventory figures, and joint forecasting; (5) product standardization and technical research exchange; (6) secret rebates; and (7) joint activities in promoting public and governmental relations, and joint legal action in response to common problems. This section will be followed by a discussion of statutory standing under sections 4 and 16 of the Clayton Act, and then by a description of the Wilson Tariff Act, which we conclude essentially tracks the Sherman Act in the international trade context.

Another focal point of the legal discussion will be the law of conspiracy in the antitrust context, which will be our next order of business. Our primary emphasis will be upon the legal requisites of circumstantial proof of conspiracy, both in conspiracy cases in general and in antitrust conspiracy cases in particular. We will focus particularly upon the circumstances under which conspiracy can be inferred from parallel business behavior. We shall also consider other aspects of the law of conspiracy with special attention to plaintiffs' admonition against "fragmentation" of their "unitary" conspiracy, their invocation of the "slight evidence" rule, the viability of the doctrine of vicarious liability for the overt acts of coconspirators under the case of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), and the requisites for admissibility of coconspirator declarations under F.R.E. 104(a) and 801(d)(2)(E).

Having concluded our discussion of the law applicable to plaintiffs' Sherman § 1 claims, we will turn, in Part VII, to a review of the evidence offered in support of plaintiffs' Sherman Act § 1 (and Wilson Tariff Act) case as to television receivers. This is by far the longest segment of the opinion, for the evidence as to television receivers constitutes the overwhelming bulk of plaintiffs' case. That evidence will be described in detail and measured against the applicable law, which we will already have described. During the course of each phase of the discussion, conclusions as to the legal sufficiency of the evidence will be drawn. The evidentiary review will lead us through all of plaintiffs' significant admissible evidence.[18] In the course of this extensive evidentiary review we shall be concerned not just with plaintiffs' core allegations, but also with their discrete evidence against each of the twenty-four defendants, and we shall make a preliminary determination as to whether there is sufficient evidence of conspiracy to permit the introduction of coconspirator declarations. We will end this evidentiary review with a segment (Part VII.S) summarizing our conclusions as to plaintiffs' Sherman Act § 1 and Wilson Tariff Act case as to television receivers. Although we have some misgivings about a

---

**18.** While our evidentiary review will be comprehensive, it will be directed to those aspects of this evidence which are capable of creating a genuine issue of material fact or supporting an *in limine* finding of the existence of sufficient independent evidence of a conspiracy among the defendants to permit plaintiffs' conspiracy case to go forward through the use of coconspirator declarations. We have ignored background materials such as the plaintiffs' extensive workup identifying the defendants and that tracing the history of the technological development of CEP's. We have also omitted factual description of materials excluded by our evidentiary rulings because summary judgment motions turn on admissible evidence. We have made some exceptions to this approach, however, mainly in the area of "export references" in the JFTC materials. We have considered the impact of such references, assuming *arguendo* their admissibility, because of their enormous importance to plaintiffs' case. Neither have we included a recitation of the interrelationship, useful for purposes of agency or corporate veil-piercing analysis, between the Japanese defendants and their subsidiaries, a point stressed at length in the FPS and final summary judgment briefs, since we need not reach those matters herein. Finally, in view of our conclusion on liability, we need not summarize plaintiffs' evidence on injury and damage.

summary of such a detailed opinion, *see* p. 1299 *infra*, this section should be a useful reference for anyone who seeks a relatively concise summary of the major grounds of the grant of summary judgment.

In Part VIII we shall summarize plaintiffs' evidence with respect to each of the non-television products (radio, tape, audio, and stereo equipment, and components) about which allegations have been made and shall comment upon the sufficiency of plaintiffs' Sherman Act § 1 and Wilson Tariff Act case in these areas.

Having concluded our treatment of plaintiffs' Sherman Act § 1 (and, *a fortiori*, Wilson Tariff Act) claims, we shall take up, in Part IX, the applicable case law under § 2 of the Sherman Act and shall apply it to the record so as to assess plaintiffs' conspiracy to monopolize and actual and attempted monopolization claims. In similar fashion, we shall consider the summary judgment motions directed to plaintiffs' Robinson-Patman Act claims (Part X) and Clayton Act § 7 claims (Part XI). We shall conclude the opinion in Part XII with some final observations about plaintiffs' case and about the appropriate forum for the relief they seek.[19]

Having commented preliminarily upon both the size of the record and the breadth of our evidentiary review, a word is in order about our methodology. We have spent months and months in the tedious process of reading in chambers the significant non-background portions of plaintiffs' FPS, reviewing the sources cited for the various allegations contained therein, usually documents contained in the document depository,[20] and studying the voluminous memoranda addressing the evidence and arguing about its significance, *vel non*. Because of the plethora of FPS allegations and documents involved, it will not be possible to comment herein on more than a fraction of the materials we have reviewed—otherwise this enormously long opinion would have to be much longer. As a result, our conclusions on various points will often take the form of statements that we have reviewed various allegations and documents and find nothing therein which creates a genuine issue of material fact to support plaintiffs' allegations.[21]

We feel some discomfiture about the number of subparts and the length of this opinion. However, given the plaintiffs' invocation of their entire 17,000-page FPS, *see* Part III, *infra*, and the hundreds upon hundreds of issues raised in the summary judgment briefs, it is difficult to give the motions adequate treatment in a lesser space. Moreover, even if a brief (or briefer) opinion would suffice for purposes of disposition, in view of the certainty of ap-

19. Because the resolution of certain critical facets of the case is so clear and dispositive, we find it unnecessary to reach three of the issues upon which the parties have dwelt most over the years. First, we need not address the defendants' contention that the export control arrangements entered into by a number of the defendants, which plaintiffs, during much of this litigation, have asserted to constitute a per se violation of the Sherman Act, were mandated by the Japanese Ministry of International Trade and Industry ("MITI") and hence are immunized from antitrust scrutiny by reason of the doctrines of Act of State and sovereign compulsion and the imperatives of international comity. Second, we need not add our "two cents" to the ongoing controversy over the Areeda-Turner marginal (or average variable) cost theory of predatory pricing. *See* Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975). Neither need we reach the subject matter jurisdiction point raised by Melco though eschewed by all other defendants. *See* our earlier opinion addressed to that issue, 494 F.Supp. 1161 (E.D.Pa.1980).

20. *See* discussion at p. 1132, *infra*.

21. An observation is also in order about some of the ingredients of this opinion. This is the ninth major opinion we have filed in this case since April 14, 1979. These prior opinions total 883 (slip opinion) pages and yet, despite the excellence of the briefing by both sides, we have rarely drawn extensively from the parties' memoranda in constructing our opinions. However, in view of the vast compass of this opinion, the enormity of the record which we must canvass, and the number of arguments advanced, we have drawn from time to time upon the briefs of the parties when, after careful review, we have agreed with the statement at issue. Counsel are to be commended upon the excellence of their legal writing.

peal and the enormous burden thus thrust upon the Court of Appeals, we believe it important that we give that court a comprehensive picture of the entire record and of the legal premises which undergird our determination that there is no genuine issue of material fact.

We turn first to a description of the anatomy of the plaintiffs' conspiracy claims.

## II. *The Anatomy of Plaintiffs' Conspiracy Claims*

One would expect, after ten years of litigation,[22] that there would be no difficulty in describing plaintiffs' conspiracy claims. Regrettably that is not true in this case, for plaintiffs' theory of defendants' alleged conspiracy has shifted on numerous occasions during the recent course of this litigation. Indeed, as we shall explain, the most recent shift occurred *after* the August 1980 summary judgment arguments. Plaintiffs deny that they have altered their theory, and submit that there is a core theory which they have pressed throughout, although they would at least have to admit to having played variations on the theme. We will now attempt to state their core theory and will then explain its meanderings along the way.

Since the charter of plaintiffs' case is their FPS, we look there for a statement of their theory. We find it stated as follows:

> In its most basic form, the combination and conspiracy consisted, in part, of a concerted scheme to raise, fix and maintain price lines for consumer electronic products sold by defendants and their co-conspirators in Japan. At the same time, defendants and their co-conspirators conspired and combined to establish and coordinate artificially-low price levels for consumer electronic products exported by them to the United States. The defendants and co-conspirators implemented their combination and conspiracy by exporting to the United States and selling therein their consumer electronic

products at these concerted depressed price levels. This concerted scheme was systematically applied to each line and category of consumer electronic products manufactured by plaintiffs.

> Defendants and their co-conspirators developed and implemented the combination and conspiracy by meetings and communications among their executives at various levels of management, and through the means of trade association activities participated in and directed by defendants and their co-conspirators. Defendants and their co-conspirators agreed upon prices, rebates, discounts and allowances and other terms and conditions of sale of consumer electronic products, and upon the allocation of customers among themselves. Defendants and their co-conspirators further combined and conspired to restrict, expand and allocate among themselves the absolute volume of production and sale of consumer electronic products and the volume of production and sale of particular products within the lines and categories of consumer electronic products manufactured by them. The defendants and their co-conspirators then did those things which they conspired and combined to do.

FPS at 3453.

Plaintiffs' style their Japanese high price-U.S. low price conspiracy as a "unitary" conspiracy, with home market and export facets, the aim of which was to effect a complete takeover of the U.S. CEP market, thereby destroying the U.S. CEP industry. The home market portion of the conspiracy is said to have been conceived at and implemented by a host of "conspiratorial" meetings among officials of the Japanese defendants and of other Japanese CEP manufacturers. It is said to have been abetted by the closed Japanese market, a function of a skein of government regulations and economic traditions, which effectively shut off foreign competition in the home market and enabled the gouging of the Japanese

---

22. The tenth anniversary of the filing of the first complaint in this case occurred on December 21, 1980.

consumer to subsidize the export aspect of the conspiracy. The nexus between the home market and export aspects of the "unitary" conspiracy is supplied by the notion which we refer to as "war-chesting." In brief, the plaintiffs allege that the high price home market conspiracy supplied the funds with which to finance or "war-chest" the predatory export raid on the U.S. market.

The export portion of the conspiracy is said to be composed of two essential elements. The first is the Ministry of International Trade and Industry (MITI)-related export control arrangements or Manufacturers' Agreements, referred to by plaintiffs as "cartel agreements," which were signed by the Japanese manufacturing defendants and a number of other firms and which, *inter alia*, established minimum or "check" prices on the shipment of various CEP's to the U.S. As an adjunct to these agreements were certain rules of the Japanese Machinery Exporters Association (JMEA), most notably the "Five Company Rule" pursuant to which the Japanese exporter was purportedly limited to five U.S. customers at a time and was required to register his customers with the Association. Plaintiffs contend that these agreements have the intention and effect of affecting prices in the U.S., thus constituting a per se violation of the Sherman Act, and that the Five Company Rule constitutes a customer allocation or "split of product" in further violation thereof.

The second of the twin foci of plaintiffs' export conspiracy case is, *mirabile dictu*, an agreement by the Japanese defendant exporters and by American importers (including defendants and other alleged coconspirators) to *disregard* the check prices and to sell their products in the U.S. at lower prices through the vehicle of concealed rebates and discounts. The check price is thus referred to as a "reference" or "benchmark" price, although the plaintiffs never explain how one gets from the reference price to the actual selling price except by asserting that the defendants agreed to sell at "whatever prices were necessary to make the sale." [23] The concealment was intended both to hide from MITI the fact that the defendants were selling in the U.S. below the check prices and to deceive U.S. Customs as to the actual price. While the higher sales prices reported to Customs resulted in higher customs duty, in plaintiffs' submission defendants thereby avoided imposition of still higher dumping duties. Under plaintiffs' theory the rebate scheme was collusive, in that defendants agreed upon a program of concerted depressed pricing for the purpose of destroying the U.S. CEP industry. The scheme is said to have been aimed at the U.S. private label market and only at American manufacturers. The Japanese defendants are said to have acted as a unit and not to have competed among themselves.

Plaintiffs assert that defendants "dumped" their goods in the U.S., selling at predatory levels and at lower levels than for comparable goods in Japan. They also make allegations of sales below cost. Plaintiffs assert that defendants' practices resulted in the sharp lowering of "pricing points" in the U.S., rendering NUE unable to compete in its lower-price market niche and resulting ultimately in the elimination of numerous U.S. CEP manufacturers and the reduction of profitability levels of the others, including Zenith. Plaintiffs assert that defendants further implemented their scheme and consolidated their gains by the acquisition of a number of U.S. manufacturers and the establishment of manufacturing facilities in the U.S.

Although plaintiffs make some attempt to assert direct evidence of this "unitary conspiracy," for reasons which have already surfaced in our evidentiary trilogy and will further appear in this opinion, that effort has totally failed. It is plain (and essentially conceded by plaintiffs) that their case is a circumstantial one, built upon the moun-

---

**23.** This notion defendants find far more redolent of competition than of conspiracy. *See* Part VI.A.2(a) and Part VII.K, *infra*.

tain of documents referenced in their FPS. Plaintiffs seek to draw inferences of conspiracy from a plethora of sources, including those set forth in their most comprehensive and presumably definitive listing of the evidence of the alleged conspiracy, which appears at pp. 3474–77 of their FPS and includes the following:

1. the export control agreements entered into by the Japanese manufacturers of consumer electronic products;

2. the rules of the Japan Machinery Exporters' Association (JMEA), which implemented the export control agreements and included provisions allocating the U.S. market by restricting each manufacturer to five customers and requiring the registration of trademarks;

3. a number of speeches by high executives of Japanese defendants proclaiming the necessity of stabilizing the Japanese CEP market by cooperative action and evincing a desire to achieve preeminence in export trade with the United States and other countries;

4. the text of the "rationales" of various export control agreements explaining the necessity of stabilizing the export trade;

5. passages in a number of diaries of Japanese officials, in internal company memoranda seized by the Japanese Fair Trade Commission (JFTC), and in some other documents produced in discovery, all of which are said to be probative of agreements to fix prices or to allocate the market, hence of conspiratorial activities of a number of groups and associations to which executives of the Japanese manufacturing defendants belonged. (The allegedly offending groups include the Electronic Indus-

tries Association of Japan (EIAJ) and its committees and subdivisions; the JMEA and its committees and subdivisions; the Market Stabilization Council; the Four Associations Conference; the Okura Group; the Palace Group; the Palace Preparatory Group; the Twentieth Day Group; the Tenth Day Group; the MD Group; the TS Group; and the Television Export Council);

6. the mere fact of membership of various defendants in these groups, many of which concededly operated sub rosa;

7. the inference to be drawn from the "sharing" by groups and associations of "every vital piece of information in every phase of the business among the Japanese manufacturers of consumer electronic products";

8. the activities of the defendants in the Japan Light Machinery Information Center (JLMIC) in New York City;

9. the evidence before the JFTC in the "Six Company Case," Case No. 6, 1966, including documentary evidence, affidavits, testimony, admissions by respondents through their counsel, and findings of fact by trial examiners; [24]

10. various schemes by the defendants and their coconspirators fraudulently to conceal their conduct, including secret rebating; false submissions to United States Customs Service; plans to destroy documents, to keep from taking minutes, and to change the names of the conspiratorial groups in Japan; plans to thwart the investigation of the United States Tariff Commission by importers and private label purchasers; and the fraudulent reporting of statistics to the government of Japan;

---

**24.** The Six Company Case was a price-fixing case brought by the JFTC against six of the Japanese manufacturing defendants in this litigation, but which was terminated without disposition. We described this case in detail in our Japanese Materials Evidentiary Opinion, PTO 295, 505 F.Supp. 1190 at 1209 n.2. We discussed at length in that opinion the evidence from the Six Company Case which is proffered by plaintiffs in this litigation, and held that virtually all of it was inadmissible here. *See* Part VII.G., *infra.*

11. the findings of the JFTC in 1957 against the Market Stabilization Council and its participants;

12. the findings of the United States government, including the dumping findings by the Treasury Department and the finding by the International Trade Commission of injury sustained by U.S. manufacturers of television receivers;

13. the inference to be drawn from the "parallel, interdependent rebating schemes" in which the defendants and their coconspirators participated;

14. the inferences to be drawn from the materials which are said to evidence the knowledge of each defendant of the operation, including rebating practices, of the export systems of each other defendant, and their resulting knowing participation in the rebate scheme;

15. the inferences to be drawn from what is said to be the similar conduct of defendants in selling consumer electronic products in the United States at prices substantially lower than those at which the same merchandise is sold in Japan, and at below cost;

16. the inference to be drawn from the supposed fact that the Japanese defendants' United States subsidiaries similarly and consistently operated at a loss, as reported in their tax returns and financial statements;

17. the sealing off of the Japanese home market from outside competition;

18. the "pattern" of take-overs and acquisitions of U.S. CEP manufacturers by Japanese defendants, including Matsushita's acquisition of Motorola just before Motorola was to begin selling its console color television receivers in Japan;

19. alleged discriminatory pricing by the Japanese manufacturers of consumer electronic products to customers in the United States;

20. the opinion of plaintiffs' experts that defendants constituted a cartel and engaged in both the home market and export facets of the alleged conspiracy; and

21. the notions that it "belies reality" to believe that the defendants, with so much access to each other at trade association and other meetings, did not conspire and that otherwise an American company like Emerson (NUE's predecessor), with such a good name, would not have been driven out of business.

We will, of course review the evidentiary basis for all of these contentions, as well as others made in the FPS and in the briefs, *infra*. We have attached as Appendix C to this opinion the table of contents to the FPS, which lists all evidentiary areas covered therein.

Having set forth the many facets of plaintiffs' conspiracy theory, we must turn to our analysis of their core allegations, and the metamorphosis thereof, for those are critical matters. Shortly after the assignment of the case to our docket, in search of issue definition, we required counsel (PTO 88) to file detailed statements of their respective positions in the case in the form of preliminary pretrial memoranda (PPTM). In plaintiffs' PPTM, filed in two stages and consuming some 410 pages, and in their contemporaneous comments at pretrial conferences, plaintiffs characterized this as a "simple price-fixing case," with the MITI-related export control arrangements as its "heart," "foundation," and "starting point." [25] The outer layers of plaintiffs' theory consisted of the allegations referenced above that, through conspiratorial meetings supposedly documented in the diaries and other documents seized by the JFTC (and certain other documents produced in discovery), the Japanese manufactur-

25. *See* PTO 113 at 33 (statement of Edwin P. Rome). Indeed, at one point, when the case was pending in the District of New Jersey, plaintiffs actually moved for summary judgment based upon these arrangements alone, but later withdrew that motion.

ing defendants had acted in concert to fix prices at a high level in Japan in order to finance or "war chest" the predatory export raid on the U.S. market. Both the PPTM and Plaintiffs' Brief in Reply to the Motion for Summary Judgment of Melco and Melco Sales, Inc., filed October 16, 1978, are dominated by this theory.[26] There is but scant mention of what later came to dominate plaintiffs' theory of the case—the practice by Japanese manufacturers of granting rebates to American purchasers—although certain rebate transactions are mentioned.

By the time of the April 1979 summary judgment arguments, plaintiffs' theory had changed. Although the conspiratorial activities of the groups and associations were still stressed, the "rebate scheme" had emerged as a co-equal factor in the conspiracy. But when pressed as to the price or price level or price formula at which the predatory low price conspiracy operated, plaintiffs would say only that defendants sold at "whatever price was necessary to get the sale."

By the time final summary judgment argument arrived in August 1980, emphasis on the rebates had increased while mention of the direct conspiratorial evidence and "war chesting" had decreased markedly. As plaintiffs' lead counsel, Edwin P. Rome, put it:

> I suggest that the cartel agreements and the rebate system as a unitary entity constituted a mechanism, the mechanism which enabled the defendants to pursue a course of conduct for depressing prices in the United States, as the result of which, aided by their five-company rule, they were permitted and enabled to concentrate each particular defendant's competitive thrust against a particular mass merchandise customer in the U.S. and thereby deny the capability of an American manufacturer to do business with that customer.

PTO 291 at 128. Under this theory, the export control arrangements and conspiratorial group meetings play an entirely different role from that alleged in the PPTM and brief in reply to Melco's motion. Now, the export control arrangements, instead of being the "heart" of the conspiracy, merely provide a forum through which defendants agreed to a "system" of secret rebates designed to nullify those very same export control arrangements so as to take over the market for sales of television receivers to private label and original equipment manufacturers (OEM) in the United States.[27] As Mr. Rome explained, the export control arrangements and the existence of secret rebates are now the *sole* ingredients of the conspiracy claim:

> The Court: But be that as it may, I still don't see in terms of conspiracy proof what your theory is except by virtue of the conclusion that you draw as to the inextricable intertwining of the cartel agreements and the rebate system.
>
> Is that what you said? Did you have another ingredient in that?
>
> Mr. Rome: That is it.
>
> The Court: The cartel agreements and the rebates.

PTO 291 at 113.[28]

Under this formulation, the check price becomes a "reference price" or benchmark

---

**26.** That is plaintiffs' first brief addressed to a motion for summary judgment. Twenty of the 29 pages in the Statement of Facts contained in that brief are devoted to a description of the activities of the so-called conspiratorial groups—the Okura, Palace, Tenth Day, and Twentieth Day Groups, the Statistics Committee of the EIAJ, and the TV Export Council. The activities of these groups, extracted mostly from the JFTC documents, were said to prove both the home market and export conspiracies. The remaining 9 pages are devoted to the activities of the "cartel" in the U.S. (with emphasis

on Melco) and to the alleged effects of the conspiracy on plaintiffs and the U.S. industry.

**27.** Private label customers are retailers, such as Sears, Roebuck or J.C. Penney, who put their own label on the Japanese TV receiver. OEM customers are U.S. TV manufacturers, such as Motorola or GE, who put their label on a Japanese TV receiver of a size or model that they do not make or need more of (usually due to a shortage in production capacity, but sometimes for other reasons).

**28.** By this formulation plaintiffs may possibly have conceded sub silentio a massive portion of

price. Defendants are said to have sold above, at, and below the check price, but we are never told of the relationship between the check price and the actual price. Perhaps the best description of this theory, which we treat as plaintiffs' principal theory notwithstanding our comments *infra*, is that plaintiffs charge a conspiracy to sell in the U.S. at depressed or predatory prices. The role of the conspiratorial meetings in Japan, although not abandoned as a basis for plaintiffs' claim, is hardly mentioned.[29] Plaintiffs do, however, stress certain meetings in the U.S. of counsel for U.S. customers designed to formulate a common strategy to combat U.S. Treasury Department proceedings under the 1921 Antidumping Act. They also stress the alleged knowledge of each defendant and defendants' U.S.-importer customers about the rebate scheme and their alleged knowing participation in it. Little is said at this stage about "war-chesting," apparently because plaintiffs finally recognized that there is no evidence of it in the record.

We were also told by Mr. Rome at the final summary judgment argument that the conspiracy was "protean" (PTO 291 at 115). Perhaps nothing better explains the elusive nature of plaintiffs' conspiracy claims than Mr. Rome's use of the word "protean" to describe them. According to Webster, protean means "capable of change; exceedingly variable . . . readily assuming different shapes or forms . . . capable of acting many different roles; . . . possessed of infinite variety . . ." Although the formulation itself undermines the integrity of plaintiffs' claims, its usage was fitting.

■ Finally, in a post-argument submission in the form of an affidavit by their leading expert, Dr. Horace DePodwin, *see* Expert Testimony Opinion 505 F.Supp. 1313 at 1334 n.24, plaintiffs seem to revert to their original theory, for there is a clear emphasis upon the check price; the lower (net-net) price after deduction of rebates is said to be involved only in "selective" cases. Whether this reversion is ascribable, on the · one hand, to plaintiffs' discovery of a large number of sales at check price (*see* DePodwin affidavit at 4.9–.10) and the fact that the check price was itself lower than NUE's price (*see* DePodwin affidavit at 4.11–.12), or, on the other, because the first two opinions in our evidentiary trilogy held inadmissible the critical documents upon which much of plaintiffs' theory of conspiracy as stated in their first two summary judgment briefs rests, we cannot say. We do not dwell upon this theory in the opinion because it is plainly an afterthought, because it is outside the mainstream of plaintiffs' case, and because, in any event there is no evidence that the check price was itself a low price. *See* discussion *infra*.[30]

---

their case, for there is no evidence of rebates for any sales other than those to private label or OEM purchasers. At the very least, plaintiffs' claims of illegal collusive conduct concerning sales of defendants' branded products—which in Matsushita's case were a large percentage of total sales to the U.S. from 1968–1977 and which in Sony's case represent its entire U.S. sales—are undermined. However, because plaintiffs have advanced other theories which might be argued to support their non-private label/OEM claims, we do not consider them abandoned and will deal with them in this opinion.

**29.** We note however that in two post-final summary judgment argument submissions, the plaintiffs relied upon the conspiratorial meetings as extremely important. In one submission plaintiffs referred to the diaries of the Japanese executives seized by the JFTC (and excluded from evidence in our Japanese Materials Evidentiary Opinion) as the "Abscam vi-

deotapes" of this case. Plaintiffs' Supplemental Post-Argument Memorandum of Sept. 22, 1980 at 211. In the other, they again invoked Mr. Yajima's diary and other references to the *sub rosa* meetings described at length in Part VII.G, *infra*.

**30.** Having tried to the extent we can to explain what plaintiffs' theory is, it is important also to explain what their theory is not. Plaintiffs have not alleged a series of individual conspiracies between related companies such as, for example, Toshiba and TAI, or MEI, MET, and MECA. Indeed, it is probable that they could not, and still attempt to try all of them together as part of a single action. *See Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947); *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Cambindo Valencia*, 609 F.2d 603, 621–25 (2d Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d

Although in the latter stages of the proceedings the emphasis on the export control arrangements was reduced, those agreements remain important, for they form the cornerstone of plaintiffs' evidence of defendants' opportunity and intention to conspire. With the agreements as background, in plaintiffs' submission, all defendants' activities take on a conspiratorial hue.

The final facet of plaintiffs' conspiracy theory worth mentioning is a function of their approach to the burden of proof on a summary judgment motion. Plaintiffs have asserted time and again throughout the latter course of the proceedings that evidence of the existence of the alleged conspiracy is to be found in the *failure* of defendants to file affidavits to explain what went on at numerous meetings which defendants admit occurred and at which plaintiffs allege that conspiratorial activity took place. Indeed, in their final briefs plaintiffs set forth a litany of "critical issues" about which the defendants have been "silent," implying that defendants should have been required to produce information on these subjects even though the plaintiffs deliberately, throughout eight years of discovery, failed to take a single deposition of any individual who attended the allegedly conspiratorial meetings. *See* discussion at 1200–1202 *infra* regarding plaintiffs' litigation strategy. For reasons set forth *infra*, this approach is unavailing.

Because plaintiffs are entitled to the benefit of any theory that will get them past a summary judgment motion, we will consider all the variations on their theme.

Having described the nature and evolution of plaintiffs' conspiracy claims—at least as best we can—we turn to a description of the summary judgment record. This task will also require us to say something about the role of the more important case management orders we have entered.

III. *The FPS, Final Stage Case Management, and the Summary Judgment Record*

We have observed that this case is before us on what may be the most ample record for summary judgment purposes ever before a court. The keystone of this record is plaintiffs' roughly 11,500-page FPS, with its roughly 6000-page appendix, which cross-references approximately 250,000 pages of documents. In some respects, the length of the FPS is misleading. First, for reasons of convenience in preparation, plaintiffs limited many pages to a single point covering but 20 to 35 percent of the page. Second, extensive portions of the FPS are devoted to enormously detailed—and generally uncontested—background material which supplies historical, financial, and personnel-related detail about the various defendants.[31] Nonetheless, in terms of sheer size and effort of preparation, the FPS is a formidable document. Notwithstanding its domination by damning conclusory statements, which, as we shall see, are generally not substantiated by the referenced supporting documents, the FPS contains a valuable compendium of plaintiffs' allegations and of the critical documents upon which plaintiffs rely, many of them virtually rescribed in the FPS. It also contains important and

795 (1980); *United States v. Boyd*, 595 F.2d 120, 123 (3d Cir. 1978); *United States v. Continental Group, Inc.*, 456 F.Supp. 704, 716 (E.D. Pa.1978), *aff'd*, 603 F.2d 444 (3d Cir. 1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). While these cases all arose in the criminal context, they establish that, when the evidence shows no common, overriding goal or purpose among the various defendants in a conspiracy case, but instead is probative of multiple, discrete conspiracies with individual ends, those actions may not be tried simultaneously when substantial rights of the defendants might be affected. We shall not subject the evidence herein to the kind of anal-

ysis which would be required if plaintiffs were asserting such an approach. It is at all events too late to do so because of the strictures of PTO 154, *see* Part III, *infra*.

31. For example: (1) there are hundreds of pages describing the corporate hierarchy of each defendant; and (2) several of the voluminous appendices are devoted merely to listing the dates of meetings of various groups and associations to which various defendants belonged and the names of corporate officials who attended these meetings. These matters are not in dispute.

useful appendices, such as model by model comparisons of T.V. receivers and certain other CEPs, originally ordered in PTO 145.

The FPS, which has won the approbation of both parties as a necessary management tool (for this case), was required by PTO 154, our master case management order, which is reprinted at 478 F.Supp. 889, 946 (E.D.Pa.1979), and which was fashioned in collaboration with counsel.[32] Paragraph III.C. of PTO 154 orders the parties, both plaintiffs and defendants, to set forth:

> each fact that the party intends to prove at trial either affirmatively or by way of defense, together with a list of: (1) the witnesses (including expert witnesses) whose testimony will be advanced to prove that fact; (2) the documents . . . which will be offered to prove that fact; and (3) line by line references to any portions of depositions and to answers to interrogatories and requests to admit which will be offered to prove that fact. (footnote omitted).

Pretrial Order 154 continues:

> By this formulation we do not intend that the parties must provide a script for trial. We do, however, intend that the parties set forth in narrative form not just the ultimate facts, but all the facts they will prove, including all subsidiary or supporting facts. In so doing they will make, at a minimum, the kind of submission they would make if they were writing detailed requests for findings of fact setting forth what the evidence has established in a nonjury case. . . . In view of the primacy of the conspiracy claims in plaintiffs' case and defendants' counterclaims, the FPS shall itemize all overt acts to be proved at trial. In particular,

the FPS shall enumerate with specificity the facts (i. e. the evidence *aliunde*) upon which they rely to prove that each defendant . . . knowingly joined in the alleged conspiracy and all facts, separately as to each defendant, upon which they rely as to each defendant's participation in the alleged conspiracy. Where any facts will be offered against fewer than all parties, the FPS shall identify the parties against which the facts are or are not offered.

The FPS was required in part as a surrogate for inadequate responses to discovery by the plaintiffs, who had theretofore failed, despite several voluminous waves of interrogatories, including so-called "contention interrogatories" which we authorized for that purpose, to set forth adequately the specifics of their claims. Plaintiffs had never made specific allegations as to how and when this conspiracy was conceived, how it operated, and when and how each defendant became a participant, and had also failed to specify what evidence they had against each defendant. The FPS was designed to fill in these gaps and, under the preclusionary provision of PTO 154, no fact not set forth in the FPS could be adduced at trial except for good cause shown. Thus we now have something cognate to a trial record.[33]

No sooner had defendants' counsel commenced their reading of the FPS than they began vigorously to complain that it failed to accomplish its purpose. We thereupon, at our next regularly scheduled pretrial conference,[34] conducted an FPS "walk-through"—a detailed spot survey of the FPS. As we found at the walk-through

---

**32.** Given the problems which plaintiffs' FPS ultimately presented, *see infra*, the parties, after the fact, had some reservations about the requirement, as did we, *see infra*.

**33.** Defendants have also filed their counterclaim FPS. The time periods for the filing of the FPS's were staggered, and by order several months ago we stayed the requirement for filing response FPS's pending the filing of this opinion.

**34.** It became our practice to hold pretrial conferences with counsel at least 2 or 3 days per month. This enabled us to rule on countless disputes about discovery and other matters without the necessity of written motions. Some of the conferences were by telephone conference call, but all conferences were reported and denominated with PTO numbers. A PTO number may thus refer to a written order, or it may refer to a transcript of a pretrial conference or hearing at which we made a given ruling, or at which a particular argument was advanced.

and in our subsequent reading of the FPS, it contained for the most part conclusory statements keyed to references to large numbers of documents. Because plaintiffs' case rests basically upon those documents, and because the conclusory statements in the FPS were not helpful, resort to the documents themselves became necessary. As a result we ordered, by PTO 219, the creation of a document depository to be located in our jury room into which the parties were to deposit all the documents which they referenced in their summary judgment papers or upon which they would rely at summary judgment argument or at trial. As many of the documents were Japanese language documents, we also ordered that an English translation be attached.[35]

The parties negotiated over the manner of creating the depository and the division of the cost. Because the documents referenced in the FPS were at immediate issue, the plaintiffs assumed the onus of placing the documents in the depository, with the parties dividing the cost. The document depository was "completed" in the Spring of 1980. We surround "completed" with quotation marks because the summary judgment argument and our study of the record in conjunction with the preparation of this opinion have demonstrated that many documents relied upon by plaintiffs are not in the depository and that countless documents have not been translated. The

document depository with all its contents is, both for what it contains and for what it does not, an important part of the summary judgment record.[36]

Defendants' also complained, with justification, that the plaintiffs, despite the requirements of PTO 154, had failed to identify in their FPS, discretely as to each defendant, the evidence *aliunde* which linked it to the conspiracy. We therefore ordered plaintiffs to submit a list of their evidence *aliunde, i. e.*, of the key documents or other materials which constituted independent evidence of the existence of a conspiracy among the defendants. Regrettably, the results of that order were disappointing. Plaintiffs indeed filed an evidence *aliunde* list, but it consisted of some seven volumes piled over three feet high containing nothing but 250,000 or so numbers—the document numbers of virtually all the documents referenced in the FPS. Thus plaintiffs' list of evidence *aliunde*, intended to inform each defendant with particularity of the evidence against it, did not "advance the ball." Rather, it left the case where it had been for many years, with the plaintiffs invoking a boxcar full of documents as evidence against all defendants on the theory that they were coconspirators, but without any semblance of specificity.[37] The situation was complicated by the fact that, at least from the beginning of our stewardship in the case, the defendants persistently as-

---

**35.** In PTO 116, we had ordered the phased exchange by the parties of translations of documents on which they planned to rely. Because of persistent disputes over the quality of plaintiffs' translations, in PTO 143 we appointed two special translation masters, Dr. Toshio G. Tsukihira and Dr. Hiroshi Myaji, to resolve such disputes. It soon appeared that there were problems with both plaintiffs' and defendants' translations. However Drs. Tsukihira and Myaji did an excellent job in resolving the translation difficulties and thereby performed an important service to the Court. We hereby commend them and express our appreciation.

**36.** We cannot consider documents referenced in the FPS but not found in the depository. When plaintiffs have become aware of "missing" documents, they have asserted that because defendants' paralegals are the ones who used the depository, not plaintiffs', the respon-

sibility for missing documents (or translations) must lie with defendants. We have seen no evidence to support any claim of neglect by defendants' personnel and shall treat missing documents as plaintiffs' responsibility. Nor do we deem it incumbent upon us to call plaintiffs to request copies of missing documents. They have had more than enough time to supply them, and it would be disruptive of our work schedule to require us to do so and await the document before proceeding.

**37.** Melco moved to strike the evidence *aliunde* list. While there was much to be said for Melco's position, we declined to do so, relying on the then forthcoming pretrial evidentiary hearings and the anticipated labor of reviewing the critical documents as the means to flesh out plaintiffs' case.

serted not only that plaintiffs' documents were inconsequential, but also that the bulk of them were inadmissible in evidence. Melco had formally asserted these evidentiary objections in its Motion for Summary Judgment filed in March 1978.

■ In sum, despite our fervent and carefully considered case management efforts, which commenced with the PPTM and were codified in PTO 154,[38] neither the FPS nor the evidence *aliunde* list was helpful in giving plaintiffs' case the kind of sharp focus necessary for dealing with a motion for summary judgment, because neither of these submissions contained the precise marshalling of the evidence which we had ordered. Rather, each was little more than a carefully organized compendium of virtually every colorably relevant document which had been produced during discovery and copied by the plaintiffs. Moreover, plaintiffs took the position (to which they apparently still adhere) that it is not their burden to detail the evidence in support of their claims, but rather that "the Court must consider the entire FPS in reaching a determination on the issue of conspiracy and in evaluating defendants' Motion for Summary Judgment."[39] Although we are attempting to do just that, it is fundamental that the Court should not be required to do plaintiffs' job of marshalling the evidence to demonstrate a genuine issue of material fact which would preclude summary judgment.

Rule 56(e) requires that a party opposing a motion for summary judgment must, "by *affidavits* or as otherwise provided in this rule, ... *set forth specific facts* showing that there is a genuine issue for trial." (emphasis added).[40] It also ties summary judgment proceedings to admissible evidence, *see* note 26, *supra*. Mindful of those principles, we concluded early in 1980 that in order for us meaningfully to deal with the summary judgment motions, two devices would be especially helpful: (1) a pretrial evidentiary hearing; and (2) a summary judgment argument of sufficient length that plaintiffs would have an opportunity to call to the Court's attention any document in the record which would create a genuine issue of material fact. We proceeded to implement both.

As we have suggested, it was obvious to us by this time that only by examining the actual documents could we assess the viability of plaintiffs' case. Such an examination would enable us to evaluate each document's authenticity and admissibility as well as its efficacy in creating a genuine issue of material fact. The announced charter for the evidentiary hearings was thus to aid in determination of the summary judgment motions. However, prior to their commencement we clearly stated of record that they would also have a second purpose—to serve as *in limine* hearings pursuant to F.R.E. 104(a) so that we could make a pretrial determination whether there was sufficient independent evidence (evidence *aliunde*) of a conspiracy among

**38.** During the first two years of our stewardship in this case, case management was a subject at virtually every pretrial conference, and issue definition and contention description were constant topic of dialogue.

**39.** Letter to the Court from Edwin P. Rome at p. 2 (August 27, 1980).

**40.** Plaintiffs have made much of the alleged failure of defendants to move forward in the first instance with their own affidavits. It is not true, as plaintiffs suggest, that no defendants have done so. To the contrary, a number of defendants have filed affidavits. However, it is plain that a defendant is entitled to move for summary judgment, supported by accompanying memoranda, asserting that there is nothing

which has been produced in discovery or otherwise which supports plaintiffs' claims. *See* F.R.Civ.P. 56(b) ("A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment") and F.R.Civ.P. 56(e) ("... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.") We discuss standards for summary judgment, including burden of proof issues, in Part V, *infra*.

the various defendants to permit the introduction of "coconspirator" declarations under F.R.E. 801(d)(2)(E).[41] *See* Part VI.D.6, *infra.* This was an important matter since it was clear to all, and tacitly acknowledged by plaintiffs' counsel, that without the introduction of alleged coconspirators' declarations, plaintiffs might not be able to make out a conspiracy case against most, if not all, of the defendants. Acknowledging that such a charter for hearings might entitle, and indeed require, plaintiffs to put on much of their case-in-chief, or at least the most important parts of it, we placed no time limitation upon the hearings.[42]

The pretrial evidentiary or *"in limine"* hearings have been fully described in our Public Records Opinion (PTO 283). Suffice it to say that plaintiffs marshalled their key documents, assigning each a DSS (Document Submission Sheet) number,[43] and argued the admissibility of most of them to the Court. Defendants replied and extensive briefs were submitted by both sides. The hearings resulted in the three lengthy and extremely detailed opinions mentioned above, the results of which will be summarized in Part IV of this opinion. Since the DSS submissions are what plaintiffs have represented to be their most important doc-

uments, they are an important part of the summary judgment record.

At the outset of the August 1980 argument on the motions for summary judgment, we informed the parties that our principal concern at that time was not with the legal aspects of the case, but rather with its factual basis. We invited counsel to take as much time as was necessary to go through the entire record and call our attention to any documents, testimony, or other evidence which bore on the existence of a genuine issue of material fact. The defendants accepted our invitation and took over four days to analyze a very large number of the important documents proffered by plaintiffs, arguing that they created no genuine issue of material fact. We found that presentation most helpful. The plaintiffs, on the other hand, declined our invitation and studiously avoided dealing with any specific documentary evidence during their oral argument.[44]

The summary judgment record before us then is a "mixed bag." It includes the preclusive FPS with all its appendices, the documents referenced therein,[45] and all the DSS's. It also includes all the exhibits offered by plaintiffs in connection with the summary judgment proceedings in April

---

**41.** Although we had earlier labelled the hearings as "evidence *aliunde* hearings," we had abandoned that charter in favor of a more limited charter, *i. e.*, to aid in the disposition of the summary judgment motions. Then, on the eve of the commencement of the hearings, we reversed ourselves and established the scope of the hearings as set forth in the text.

**42.** The hearings lasted for five weeks, with frequent evening sessions, and it was understood that we would sit as long as necessary to receive any additional materials that the parties wished to offer. In addition, at the close of the hearings, we granted leave to plaintiffs to submit memoranda on those documents we did not reach during the hearings, as well as leave to submit, in connection with both facets of the pretrial evidentiary hearings, as many additional DSS's as they desired. Plaintiffs have made a number of submissions and defendants have replied thereto.

**43.** A sample of the DSS is attached to the Public Records Opinion. Actually, most DSS's contained a number of document pages.

**44.** Frustrated by this stratagem, particularly as it was accompanied by plaintiffs' customary blanket invocation of the entire FPS and the documents referenced therein, we offered to sit still longer to review any documents plaintiffs cared to present. *See* PTO 291 at 7–11. The offer was not accepted by the plaintiffs, who still declined to delve into specifics.

We will discuss the tenor of the plaintiff's summary judgment presentation in Part VII.P, *infra.* Notwithstanding their lack of specificity in the argument, plaintiffs, after its conclusion, submitted an additional list of documents upon which they were relying. Moreover, in their 439–page post-hearing brief, which supplemented their 578–page pre-hearing brief, they invoked still other documents. The results of our investigation into those documents is instructive and will be described *infra.*

**45.** This includes all the documents in the document depository (a rough count suggests well over 50,000).

1979,[46] and it includes the various affidavits submitted to us by both plaintiffs and defendants and the various appendices thereto, some of which are not contained in the document depository. We shall also consider the voluminous depositions submitted for our consideration, along with the even more voluminous answers of defendants to plaintiffs' interrogatories, the most "visible" of which are those relating to membership in and attendance at meetings of various groups and associations. Additionally, the record includes those portions of plaintiffs' expert reports which we held admissible in our Expert Testimony Opinion.

This description includes a veritable mountain of documents and other materials. However, not all of them have been demonstrated or even asserted to be of any significance on the summary judgment motion. Many of them relate to plaintiffs' damages and are not at issue at this stage; others are purely background material. Countless others, despite inclusion in the FPS, are plainly irrelevant, at least to our determination here. Even after elimination from consideration of those documents, there are many documents, cumulative, marginal, or otherwise, upon which plaintiffs do not seriously rely, notwithstanding their having been referenced in the FPS and placed in the depository. These documents we shall not seriously consider in our evidentiary review.

We do not pretend to have read all 250,-000 documents which plaintiffs have referenced in their FPS. We do not think it incumbent upon us to read documents whose importance plaintiffs have not in some way demonstrated. To posit the contrary would make a mockery of the litigation process and render the court hostage to any party who cavalierly sought to bury the court under a mountain of documents in a complex case. Accordingly, our attention will primarily be focused upon the documents (or categories of documents) called to our attention by plaintiffs' (and defendants') counsel in their oral arguments and extensive memoranda. However, we will also consider a considerable number of documents, not specifically relied upon, to which we were referenced by the FPS and which we found arguably germane.

## IV. Summary of Pretrial Evidentiary Rulings

For the reasons noted above, the three opinions which arose out of the pretrial evidentiary hearings are incorporated by reference in this opinion. Because of their great length, as a matter of convenience, we summarize herein the ultimate disposition of the major categories of evidence addressed therein.

In the first of those opinions, entitled "Admissibility of Public Records and Reports," Pretrial Order No. 283, 505 F. Supp. 1125 (filed Aug. 7, 1980), 6 Fed.Evid. Rep. 801 (cited herein as Public Records Opinion), we considered the admissibility of a number of public documents proffered principally under F.R.E. 803(8)(C). The first category of documents, promulgated by the U.S. Treasury Department and the U.S. Tariff Commission in connection with proceedings under the 1921 Antidumping Act, 19 U.S.C. § 160 et seq. (repealed 1980), included: (1) Treasury Department Determination of Sales at Less than Fair Value, 35 F.R. 18549 (1970); (2) Determination of Injury by the U.S. Tariff Commission Investigation No. AA1921–66 (undated); (3) The Treasury Department Finding of Dumping, 36 F.R. 4597 (1971); and (4) numerous Customs Forms 29's, appraising dumping duties against various defendants and other importers. The thrust of these documents as proffered by the plaintiffs was that: (1) television receivers

---

**46.** There are three important "subtractions" from the record as thus far enumerated. First, notwithstanding the requirements of PTO 116, see n. 35 supra, we have gone to the document depository on numerous occasions to search out a group of documents only to find no translation. We fail to understand how plaintiffs can seriously rely upon documents whose translation they have not bothered to place in the depository; hence we shall not consider them. Second, we cannot consider documents referenced in the FPS but not lodged in the document depository. See n. 36, supra. Third, we shall not consider those documents which we have held inadmissible in our evidentiary opinion trilogy.

from Japan were being sold in the United States at less than fair value; (2) an industry in the United States was being injured by reason of such sales; (3) dumping had thus occurred in violation of the 1921 Antidumping Act; and (4) dumping duties had been assessed against specific importers (on the Customs Form 29). The time frames of these documents are within the frame of reference of plaintiffs' claims. However, all of these documents were excluded: (1) as hearsay and not admissible under the relevant exception to the hearsay rule (F.R.E. 803(8)(C)); (2) as irrelevant to the present case; and (3) as at all events excludable under F.R.E. 403 on the grounds that any minimal probative value the documents may have had was far outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury, and by considerations of undue delay, waste of time, and needless presentation of cumulative evidence.

The second category of evidence addressed in the Public Records Opinion was composed of documents, including certain findings, promulgated by the U.S. Tariff Commission and its successor, the U.S. International Trade Commission (I.T.C.), and by the Secretaries of Labor and Commerce under §§ 301(b)(1) and (c)(1) and (2) of the Trade Expansion Act of 1962 and §§ 201(b) and 221 of the Trade Act of 1974. These documents contained various findings of injury to United States industry. All of the documents were excluded as hearsay, as irrelevant, and under F.R.E. 403.

Third, the Public Records Opinion dealt with certain purported findings and related documents arising out of proceedings in two cases before the Japanese Fair Trade Commission (JFTC). The first was a 1957 case brought against the Home Electric Appliance Market Stabilization Council, some of whose members are defendants in this action, alleging industry-wide price fixing. The second case, brought in 1967, alleged retail price maintenance against defendant MEI. In plaintiffs' submission, these materials are probative of the role of various defendants in the alleged home market aspects of the "unitary" conspiracy. How-

ever, all of them were excluded as hearsay and inadmissible under the 803(8)(C) exception to the hearsay rule. Moreover, certain "decisions" of the JFTC were also excluded as inadmissible under F.R.E. 408 and 410.

Plaintiffs also sought admission under F.R.E. 803(8)(C) of the findings of Judge A. Leon Higginbotham, Jr., our predecessor in this case, found at 402 F.Supp. 262 (E.D.Pa. 1975), regarding personal jurisdiction and venue. However, we held that Judge Higginbotham's findings did not come within the ambit of Rule 803(8)(C) and that they were therefore inadmissible.

Finally, we dealt in the Public Records Opinion with certain statistical data from the statistical office of the United Nations and a report of the Organization for Economic Cooperation and Development. We found this data, which is in part technological (relating to electronic components) and in part statistical (relating to television production figures of various countries), to be admissible.

The second opinion in our evidentiary trilogy was entitled Admissibility of Materials Relating to Activities in Japan, PTO 295, 505 F.Supp. 1190 (filed September 29, 1980), 6 Fed.Evid.Rep. 1329 (cited herein as Japanese Materials Evidentiary Opinion). That opinion dealt with the admissibility of three major groups of documents: (1) materials seized by the JFTC in "raids" on the offices of several of the defendants here who were respondents in the Six Company Case; (2) testimony and statements or "protocols" given by officials of the respondent companies during the course of the JFTC proceedings in the Six Company Case; and (3) materials produced in discovery from the files of the Japanese defendants and others relating to activities in Japan of Japanese manufacturers of consumer electronic products or of associations of manufacturers. Our rulings were all predicated on either Article VIII (hearsay) or Article IX (authentication) of the Federal Rules of Evidence.

We first dealt with the diaries or notebooks of officials of several of the Japanese

defendants, which were said to contain evidence of the alleged conspiracy.[47] We next considered the admissibility of a number of internal memoranda of certain of the defendants,[48] minutes of certain EIAJ officers' meetings, supposed minutes of the TV Export Council meetings, and the so-called Japan Victor document, allegedly emanating from the EIAJ Statistics Committee. We held all of these documents to be hearsay and inadmissible under any of the exceptions to the hearsay rule. As we have noted, we also considered the admissibility of the formal testimony of executives of the Japanese companies before the JFTC, as well as of the protocols given by them to the JFTC investigators. We held the JFTC testimony admissible against the defendants in the "Six-Company Case" only, except for any so-called "export" or "warchesting" references, which we held with minor exceptions to be inadmissible. We held that the protocols were admissible against the employer of the maker of the protocol only.

In the third opinion in our evidentiary trilogy, entitled Admissibility of Expert Testimony, PTO 301, 505 F.Supp. 1313 (filed December 10, 1980) (cited herein as Expert Testimony Opinion) we considered the admissibility of the opinions of five of the plaintiffs' expert witnesses, as set forth in compendious reports prepared by those experts. The reports at issue were: (1) "Economic Study of the Japanese Television Industry," by Dr. Horace J. DePodwin, Dr. David Schwartzman, and Marcio Teixeira of Horace J. DePodwin Associates, Inc., an economic consulting firm (the DePodwin Report); (2) "The Pervasive Use of Collusive and Company Group (*Keiretsu*) Activities in Achieving the Rapid Increase of Jap-

anese Exports of Television Receivers to the United States," by Professor Kozo Yamamura, Chairman, Japan Studies Program and Professor of Economics and East Asian Studies at the University of Washington (the Yamamura Report); (3) "Economic Analysis of Evidence Relating to Japanese Electronic Products Antitrust Litigation," by Stanley Nehmer of Economic Consulting Services, Inc. (the Nehmer Report); (4) "The Impact of Japanese Financial and Employment Practices on Japanese Production, Marketing, and Price Behavior," by Professor Gary R. Saxonhouse, Professor of Economics, University of Michigan (the Saxonhouse Report); and (5) "Vertical Restraint by Japanese Television Manufacturers: Anticompetitive Effects," by Professor John Owen Haley, Associate Professor of Law at the University of Washington (the Haley Report).[49]

We did not undertake to rule upon the admissibility of these experts' reports *qua* reports nor upon the admissibility of all of the opinions expressed in their reports. Rather, we culled from the reports the salient opinions of the experts with possible bearing upon the outcome of the motions for summary judgment. In terms of methodology, each of the experts had reviewed the documentary materials provided him by plaintiffs' counsel, drawn upon his economic knowledge, and then in essence concluded that defendants were engaged in precisely the conspiracy posited by plaintiffs.

In our Expert Testimony Opinion, we excluded the great bulk of these expert opinions, holding admissible only background materials relating to the structure of the Japanese market, including its trade barriers, the technological development of the

---

**47.** These included the diaries of Mr. Yajima of Toshiba, Messrs. Yamada and Yamamoto of Hitachi, Mr. Okuma of Melco, and Mr. Tokizane of Matsushita.

**48.** These included the so-called Shimizu Memorandum and various Toshiba internal memoranda.

**49.** Five additional expert reports referenced in plaintiffs' FPS were not the subject of dispute during the pretrial evidentiary hearings and

were not addressed in our Expert Testimony Opinion. These reports are an opinion of Milton L. Davies, Certified Public Accountant; an opinion with attachments by Morris J. Cohen & Co., Certified Public Accountant; a report of Walter Lukas, Consulting Engineer; a report of Karl Horn and Vito Brugliera, of Zenith Radio Corporation; and an opinion by the Japanese law firm of Braun, Moriya, Hoashi & Kubota concerning Japanese commodity tax law.

consumer electronic products industry, and basic economic principles and methodology.[50] We reserved our ruling on one calculation of price differentials between the Japanese and American market presented in Part V of the DePodwin Report. *See* Expert Testimony Opinion 505 F.Supp. 1313 at 1348. Most of the remaining material is attacked by defendants on relevancy grounds, and is discussed in the pertinent sections, *infra*.

Our Expert Testimony Opinion was two-pronged. To summarize, we first found that most of the experts' crucial opinions, notably those which concluded that defendants in this action were acting collusively, were so pervaded by reliance upon untrustworthy materials, including materials excluded from evidence in our two previous evidentiary opinions, as to render them inadmissible under F.R.E. 703. In addition, we concluded that the experts, by providing a narrative factual description and summary of the evidence before the court, and drawing (factual) conclusions upon which they in turn founded their opinions, were not utilizing any expertise in a manner helpful to the jury under F.R.E. 702, but were instead acting not as economists but as conspiracyologists engaged in inadmissible "oath-helping."

Our discussion at this juncture of the numerous documents and opinions which we have *excluded* from evidence is important because of the necessity for perspective. First, the excluded evidence includes the most important documents in plaintiffs' original submissions and, in a very real sense, an evaluation of the plaintiffs' case is aided by an understanding of the extent to which its original integral parts are now missing. Second, because of the importance of the excluded documents, we may have occasion from time to time to observe whether the outcome would have been different had the documents not been excluded. Third, the reason for the exclusion in the Japanese Materials Evidentiary Opinion of the most critical of these documents— lack of foundation—reflects upon the integrity of plaintiffs' conspiracy case, a subject upon which we will comment further *infra*.

Perhaps the most graphic description of the impact on plaintiffs' case of our trilogy of evidentiary opinions comes from analysis of a portion of Plaintiffs' Memorandum in Reply to the Motions for Summary Judgment of Certain Defendants,[51] Matsushita Defendants, and Sears, Roebuck & Co. (filed April 2, 1979), 8½ years after the filing of the NUE action. In Part III.B. of that memorandum the plaintiffs purported to review the evidence of the overall combination and conspiracy, advancing the view that the defendants had completely failed to rebut plaintiffs' evidence. The major categories of evidence which plaintiffs advanced at that time were:

1. Data on the early development of the Japanese electronics industry;

2. Matsushita-Philips' agreements creating Matsushita Electronics Corporation for the production, sale, and exportation of electronic components;

3. The formation of the defendants' trade associations, including the EIAJ and JMEA;

4. Excerpts from publications of the JMEA in its "Association News" and from the EIAJ's publication "Denshi";

5. The admission that there were meetings of the Chairmen of the Board and other officials of the defendant companies (the so-called conspiratorial groups), coupled with the evidence from the "Six-Company Case"; and

---

**50.** By PTO 305, 505 F.Supp. 1313, dated February 19, 1981, we denied plaintiffs' motion for reconsideration and clarification of the expert testimony opinion. That motion was addressed primarily to the admissibility of certain price comparisons in the DePodwin Report, described in n.201, *infra*.

**51.** "Certain Defendants" is the rubric under which a shifting group of defendants collaborated on briefs. The summary judgment motion referenced in the text was filed by the Toshiba, Hitachi, and Sanyo defendants, who generally formed the core of the "certain defendants" group. They were often joined by Sharp, MC, and MIC.

6. Evidence from the JFTC Market Stabilization Council Case.

Yet, the evidence from the Market Stabilization Council and from the "Six-Company Case" which includes the vast bulk of the evidence about the conspiratorial groups and all the "export references," have been excluded from evidence by our trilogy of evidentiary opinions.[52]

We consider in this opinion such admissible or significant evidence as is left from plaintiffs' presentation.[52A] The short of it, however, is that the evidentiary rulings we have just described have not just narrowed markedly the scope of the viable record before us, but have virtually emasculated plaintiffs' case.

We turn now to an explication of the legal principles which will govern our analysis of those portions of plaintiffs' case that remain.

## V. *Standards Governing Summary Judgment*

The parties, principally the plaintiffs, have devoted extensive portions of their briefs to descriptions of the law governing the grant or denial of summary judgment. For example, the plaintiffs, in their August 11, 1980, brief in opposition to defendants' summary judgment motion devoted eighteen pages to the point. The thrust of plaintiffs' argument is that summary judgment has almost never been granted in complex antitrust cases where "state of

mind" is an issue. We explain herein the principles in this area that we will apply.

The general principles governing the grant or denial of summary judgment are well known. We set forth those principles, at least as they have been announced in the Third Circuit, in our Opinion and Order (1916 Antidumping Act), 494 F.Supp. 1190, 1239–40 (E.D.Pa.1980):

Rule 56 of the Federal Rules of Civil Procedure permits the grant of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). The burden of demonstrating that there is no genuine issue of material fact rests on the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment may not be granted if there is "the slightest doubt" about material facts. *Tomalewski v. State Farm Life Insurance Co.*, 494 F.2d 882, 884 (3d Cir. 1974). Consequently, a motion for summary judgment may not be granted on the ground that if a verdict were rendered for the adverse party the court would set it aside as against the weight of the evidence. *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363, 1366 (3d Cir. 1979), *quoting Rosenthal v. Rizzo*, 555 F.2d 390, 394 (3d Cir.) *cert. denied*, 434 U.S. 892, 98 S.Ct.

---

**52.** The point is more dramatically made if we examine plaintiffs' reply to Melco's motion for summary judgment, filed October 16, 1978, when discovery was nearly complete, plaintiffs' Preliminary Pretrial Memorandum had been filed, and the case was almost eight years old. The principal items listed in plaintiffs' evidentiary review were: (1) the 1957 decision of the JFTC in the Market Stabilization Council case; (2) the "United States Treasury Department Less Than Fair Value" finding, dumping finding, and CF 29 assessments against Melco; and (3) the documents seized in the Six Company Case. Yet, *all* of these items have been excluded by the evidentiary opinions.

**52A.** We will have frequent occasion to observe that many of the documents referenced in the FPS and considered in this opinion (but not

taken up during the pretrial evidentiary hearings) are similar in character to those excluded in the Japanese Materials Evidentiary Opinion. In all such instances, we nonetheless assume the admissibility of those documents arguendo. We believe that we fairly could exclude these documents if we were disposed to make formal rulings thereon. In so declaring we do not, we think, assert that a party opposing a summary judgment motion must try his case pretrial and establish the admissibility of all the documents on which he relies. What we do say is that where, as in this case, the admissibility of these documents is actually, and in good faith, challenged, and where a strong showing of inadmissibility is made, the burden of establishing admissibility is fairly put on the party opposing the motion.

268, 54 L.Ed.2d 178 (1977). Similarly, summary judgment is not appropriate if the resolution of a material issue of fact turns on the credibility of witnesses. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Remak v. Quinn*, 611 F.2d 36 (3d Cir. 1979). All inferences from the evidence must be drawn in favor of the party opposing the motions— here, the plaintiffs. *Small v. Seldows Stationery*, 617 F.2d 992 (3d Cir. 1980). (footnote omitted).

■ In support of their position, plaintiffs rely mainly upon the famous decision in *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), in which the court stated:

> We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and

hostile witnesses thicken the plot. . . . Trial by affidavit is no substitute for trial by jury.

368 U.S. at 473, 82 S.Ct. at 491 (footnote omitted). While *Poller* has never been overruled, the gloss that plaintiffs place upon it has been significantly dulled in recent years. The number of antitrust cases in which the Supreme Court and courts in the Third Circuit have granted or upheld the grant of summary judgment on the merits, either partial or complete, since the *Poller* decision in 1962 is extremely large.[53] It is now settled that summary judgment is appropriate in those antitrust cases where plaintiffs, after having engaged in extensive discovery, fail to produce "significant probative evidence" in support of the allegations in their complaint. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). The *Cities Service* Court stated:

**53.** *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Mannington Mills, Inc. v. Congoleum Indus. Inc.*, 610 F.2d 1059 (3d Cir. 1979) (affirmed summary judgment for defendants on § 2 claims; reversed summary judgment on § 1 conspiracy claim); *Midwest Paper Prod. Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979); *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068 (3d Cir. 1978); *Evans v. S.S. Kresge Co.*, 544 F.2d 1184 (3d Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977); *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976); *Tripoli Co. v. Wella Corp.*, 425 F.2d 932 (3d Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); *Gold Fuel Serv., Inc. v. Esso Standard Oil Co.*, 306 F.2d 61 (3d Cir. 1962), *cert. denied*, 371 U.S. 951, 83 S.Ct. 506, 9 L.Ed.2d 500 (1963); *Daley v. St. Agnes Hosp.*, 490 F.Supp. 1309 (E.D.Pa.1980); *Sims v. Mack Truck Corp.*, 488 F.Supp. 592 (E.D.Pa.1980); *Herrin v. L.M. Collins & Assoc., Inc.*, 483 F.Supp. 288 (W.D.Pa.1980); *Indian Coffee Corp. v. Proctor & Gamble Co.*, 482 F.Supp. 1104 (W.D.Pa.1980); *Raitport v. General Motors Corp.*, 450 F.Supp. 1349 (E.D.Pa.1978); *Altemose Constr. Co. v. Building & Constr. Trades Council*, 443 F.Supp. 492 (E.D.Pa.1977); *Frankford Hosp. v. Blue Cross*, 417 F.Supp. 1104 (E.D.Pa.1976), *aff'd*, 554 F.2d 1253 (3d Cir.), *cert. denied*, 434 U.S. 860, 98 S.Ct. 186, 54 L.Ed.2d 133 (1977); *In re REA Express, Inc.*, 412 F.Supp. 1239 (E.D.Pa.1976); *V. & L. Cicione v. C. Schmidt & Sons, Inc.*, 403 F.Supp. 643 (E.D.Pa.1975), *aff'd*, 565 F.2d 154 (3d Cir. 1977); *Chuy v. Philadelphia Eagles*, 407 F.Supp. 717 (E.D.Pa.1976); *Famous Foods, Inc. v. General Foods Corp.*, 399 F.Supp. 705 (W.D. Pa.1972), *aff'd*, 538 F.2d 319 (3d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); *Doctors, Inc. v. Blue Cross*, 431 F.Supp. 5 (E.D.Pa.1975), *aff'd*, 557 F.2d 1001 (3d Cir. 1976); *Kaiser v. General Motors Corp.*, 396 F.Supp. 33 (E.D.Pa.1975), *aff'd*, 530 F.2d 964 (3d Cir. 1976); *Thomas v. Amerada Hess Corp.*, 393 F.Supp. 58 (M.D.Pa.1975); *Mogul v. General Motors Corp.*, 391 F.Supp. 1305 (E.D. Pa.1975), *aff'd*, 527 F.2d 645 (3d Cir. 1976); *Gasperi v. Cinemette Corp.*, 391 F.Supp. 826 (W.D.Pa.1975); *Goldinger v. Boron Oil Co.*, 375 F.Supp. 400 (W.D.Pa.1974), *aff'd*, 511 F.2d 1393 (3d Cir. 1975); *MDC Data Centers, Inc. v. IBM*, 352 F.Supp. 63 (E.D.Pa.1972); *Minersville Coal Co. v. Anthracite Export Ass'n*, 335 F.Supp. 360 (M.D.Pa.1971); *Record Club of America, Inc. v. CBS*, 310 F.Supp. 1241 (E.D.Pa.1970); *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F.Supp. 1291 (D.Del.1970); *Collidotronics, Inc. v. Stuyvesant Ins. Co.*, 290 F.Supp. 978 (E.D.Pa.1968), *aff'd*, 412 F.2d 1186 (3d Cir. 1969); *Peerless Dental Supply Co. v. Weber Dental Mfg. Co.*, 283 F.Supp. 288 (E.D. Pa.1968); *United States v. Johns-Manville Corp.*, 245 F.Supp. 74 (E.D.Pa.1965); *United States v. Johns-Manville Corp.*, 237 F.Supp. 885 (E.D.Pa.1964); *Fiumara v. Texaco, Inc.*, 204 F.Supp. 544 (E.D.Pa.), *aff'd*, 310 F.2d 737 (3d Cir. 1962). *See generally*, Rogers, *Summary Judgment in Antitrust Conspiracy Litigation*, 10 Loy. U. of Chi.L.J. 667 (1979).

Essentially all that the lower courts held in this case was that Rule 56(e) placed upon Waldron [the plaintiff] the burden of producing evidence of the conspiracy he alleged only after respondent Cities Service conclusively showed that the facts upon which he relied to support his allegation were not susceptible of the interpretation which he sought to give them. That holding was correct. To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigant's rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

391 U.S. at 291, 88 S.Ct. at 1593. *See also Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 579 (3d Cir. 1979).

The most recent case in this area is *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539 (5th Cir. 1980), where the plaintiff relied heavily upon *Poller* to argue that summary judgment may not be granted in a complicated antitrust case. After discussing the Supreme Court's holding in *Poller* and ascribing to *Cities Service* a significance equal thereto, the court proceeded to affirm the grant of summary judgment, noting:

It is clear that this circuit has heeded the language in *Cities Service*. When faced with defendants' sworn denial of the existence of a conspiracy, it is incumbent upon the plaintiff to produce significant probative evidence demonstrating that a genuine issue of fact exists as to this element of the complaint.

*Id.* at 554. We perceive the Third Circuit to be in accord.

The interpretation which these and other antitrust plaintiffs have attempted to give to *Poller* was criticized by the National Commission for the Review of Antitrust Laws and Procedures in its Report to the President and the Attorney General dated January 22, 1979, 80 F.R.D. 509, 566–67:

Rule 56 of the Federal Rules of Civil Procedure and the accompanying Advisory Committee notes indicate a uniform summary judgment standard for all cases and no special category for antitrust or other complex actions. Some courts, however, have been much more reluctant to grant summary judgment in antitrust cases. This result, in our opinion, stems from overly restrictive interpretation of certain Supreme Court cases.... This language [quoted *supra* at 1139–1140] may have served at the time to correct overly eager use of summary judgment in some antitrust cases, and the Commission is not recommending a return to pre-*Poller* practice. Some cases since *Poller*, however, appear to have gone to the opposite extreme.

Under *Poller* and other Supreme Court decisions, failure by the movant to disprove conclusively a disputed material fact or factual inference requires denial of a motion for summary judgment. This formulation has led to overly strict application in some instances. Some appellate courts have stated, for example, that summary judgment should not be granted if there is the "slightest doubt" as to any material fact. This is an unwarranted gloss on the "genuine issue" requirement. Opinions relying on the slightest doubt standard have been declining, however, and some circuits, including the Second Circuit, have explicitly rejected the more restrictive language found in older cases.[54]

---

54. The Third Circuit has, however, espoused the "slightest doubt" test. *See* pp. 1139–1140 *supra*.

The *Poller* decision, when properly applied, should discourage the use of summary adjudication only where such action encompasses subjective evidence such as motive, intent, credibility, and the like. In assessing the contribution of summary judgment to the expedition of complex antitrust cases, the Commission does not wish to invite the sort of abuses of summary judgment that the *Poller* decision effectively condemned. On the other hand, the appellate courts should more realistically evaluate the availability and proper application of summary judgment.

Since we view the present language of Rule 56 as compatible with more effective use of summary adjudication, we do not recommend a change in the Rule. If, however, future decisions do not enhance the availability of summary judgment, an amendment to the Rule may be needed.

(footnotes omitted). The Ninth Circuit put the point well in *Zweig v. Hearst Corp.*, 521 F.2d 1129, 1135–1136 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975):

Summary judgment has, as one of its most important goals, the elimination of waste of the time and resources of both litigants and the courts in cases where a trial would be a useless formality. Courts must, of course, proceed with caution in determining litigation by summary judgment; this is especially true where grave, important and novel questions of law are involved. *However, the mere fact that the issues may be complex is not a valid reason to deny summary judgment when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.* (emphasis added). We agree.

Against this background, the courts have repeatedly held that when, despite adequate discovery, plaintiffs cannot come forward with admissible and probative evidence of an antitrust violation, summary judgment is appropriate. *See, e. g., Comet Mechanical Contractors, Inc. v. E.A. Cowen Construction Inc.*, 609 F.2d 404 (10th Cir. 1980); *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102,

109–10 (2d Cir. 1975); *Consolidated Farmers Mutual Insurance Co. v. Anchor Savings Ass'n*, 480 F.Supp. 640 (D.Kan.1979), *aff'd*, 1980 Trade Cases ¶ 63,530 (10th Cir. 1980), *cert. den.*, —— U.S. ——, 101 S.Ct. 863, 66 L.Ed.2d 804; *Raitport v. General Motors Corp.*, 450 F.Supp. 1349, 1355 (E.D.Pa.1978) (summary judgment granted where plaintiff had "more than ample opportunity to conduct discovery" and yet "offered only unsubstantiated conspiratorial allegations in support of his claims"); *Merit Motors, Inc. v. Chrysler Corp.*, 417 F.Supp. 263 (D.D.C.1976), *aff'd*, 569 F.2d 666 (D.C.Cir.1977); *Chuy v. Philadelphia Eagles*, 407 F.Supp. 717, 721–22 (E.D.Pa.1976) (summary judgment granted where plaintiff had three years of discovery and "ample opportunity to cross-examine hostile witnesses," but had "turned nothing up"). Indeed,

[w]hen it becomes plain that the allegedly unlawful acts do not exist, and the plaintiffs' claims are without merit, the Court has a *duty* to grant summary judgment.

*Natrona Service, Inc. v. Continental Oil Co.*, 435 F.Supp. 99, 106 (D.Wyo.1977), *aff'd*, 598 F.2d 1294 (10th Cir. 1979) (emphasis added); *Capital Temporaries, Inc. v. Olsten Corp.*, 365 F.Supp. 888 (D.Conn.1973), *aff'd*, 506 F.2d 658 (2d Cir. 1974).

■ As we have noted, to avoid summary judgment, plaintiffs must advance "significant probative evidence" as to each of the elements of the antitrust conspiracy claim. *First National Bank of Arizona v. Cities Service Co., supra.* In order to be probative, the evidence must at least be admissible. *See* n. 3, *supra.* Moreover, the term "significant probative evidence" excludes speculation. Where speculative evidence is the only support for plaintiffs' claims, courts have not hesitated to grant summary judgment. In *Robin Construction Co. v. United States*, 345 F.2d 610, 614 (3d Cir. 1965), the Third Circuit upheld the grant of summary judgment where the plaintiff had nothing to offer but speculation and possibilities:

It is not enough to rest upon the uncertainty which broods over all human affairs or to pose philosophic doubts regarding the conclusiveness of evidentiary

facts. In the world of speculation such doubts have an honored place, but in the daily affairs of mankind and the intensely practical business of litigation they are put aside as conjectural. In the words of Judge Learned Hand in *DeLuca v. Atlantic Refining Co.*, 176 F.2d 421, 423 (2d Cir. 1949), *cert. denied*, 338 U.S. 943 [70 S.Ct. 423, 94 L.Ed. 581] (1950), ... "[b]ut if a motion for summary judgment is to have any office whatever, it is to put an end to such frivolous possibilities when they are the only answer."

Similarly, in *Bolt Associates, Inc. v. Alpine Geophysical Associates, Inc.*, 365 F.2d 742, 747 n.4 (3d Cir. 1966), the Third Circuit, citing *Robin Construction*, stated that "counsel's speculations are not sufficient to resist a motion for summary judgment." And in *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979), the court stated that:

[a] party opposing a motion for summary judgment must introduce "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing version of the truth at trial." *First National Bank v. Cities Service Co.*, *supra*, 391 U.S. at 288–289, 88 S.Ct. at 1592... A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation.

*See also United States v. Dibble*, 429 F.2d 598, 601 (9th Cir. 1970).[55]

■ Turning to the question of burden of proof, the law is clear that it is the burden of the moving party (in this case the defendants) to show that there is no genuine issue of material fact. On the other hand, it is clear from *Cities Service* that the burden of demonstrating that there is significant probative evidence is on the party opposing the motion, in this case the plaintiffs. Plaintiffs cannot attempt to shift that burden by the spurious claim that the defendants must show a lack of significant probative evidence. As will be seen, this is a case in which, despite more than adequate discovery—close to a decade's worth—the plaintiffs have failed to meet their burden of showing significant probative evidence of a conspiracy, as opposed to the fruits of mere speculation.

■ It is also important to observe that this is an exceptionally appropriate case for summary judgment treatment for several reasons. First, our description *supra* of the summary judgment record before us suggests that it may well be one of the most complete summary judgment records ever put before any court. Second, the trilogy of evidentiary opinions and this opinion taken together reflect extremely intense scrutiny. Third, plaintiffs' case is based primarily on documents, rather than on testimony, a factor which further narrows the distinction between summary judgment

---

**55.** The courts have also granted directed verdicts at the close of plaintiffs' case when the only evidence presented was speculative. *Lisa-Jet, Inc. v. Duncan Aviation, Inc.*, 569 F.2d 1044, 1048 (8th Cir.), *cert. denied*, 439 U.S. 828, 99 S.Ct. 100, 58 L.Ed.2d 121 (1978); *Shunk v. Bosworth*, 334 F.2d 309, 311–12 (6th Cir. 1964). In *Lisa-Jet*, where the issue was who was at the controls when the plane crashed, the court dismissed because the evidence was equally consistent with one theory as with another:

If the proven facts give equal support to each of two inconsistent inferences, then judgment must go against the party upon whom rests the necessity of sustaining one of these inferences. The essential inference cannot be left to conjecture and speculation.

569 F.2d at 1048, *quoting Ford Motor Co. v. Mondragon*, 271 F.2d 342 (8th Cir. 1959). Similarly, in *Shunk*, where the issue was which of two people shot the plaintiff, the court dismissed the case when plaintiff's evidence did not suffice to establish which was the guilty one. The court specifically rejected plaintiff's suggestion that defendants should be required to clear up the mystery:

To hold one of the defendants, or both of them, guilty of negligence in shooting the plaintiff, would only be wild speculation on the part of the jury. There is a complete lack of testimony or evidence from which the negligence of the defendant could be inferred....

*We find no basis or authority in this case for holding the burden of proof shifted from plaintiff to defendant.*

334 F.2d at 311–12 (emphasis added).

and, for example, a directed verdict, because of the limited potential here for credibility judgments.[56]

■ Although the plaintiffs have relied heavily upon *Poller*, resolution of the matters before us does not turn upon a liberal or grudging construction of the principles enunciated therein, for in this case, the plaintiffs have not come forth with sufficient evidence to put issues of motive or intent to the test. A motive or intent question does not arise simply because plaintiffs' counsel say that it does, or because plaintiffs proffer documents, statements, or expert opinions[57] which are inadmissible or which do not themselves put motive or intent genuinely in issue. There must be some evidence offered which will raise the motive or intent issue, and in this case there is none.[58]

Having set forth the standards we will apply to our summary judgment determination, we turn to an explication of the legal principles affecting plaintiffs' Sherman § 1 and Wilson Tariff Act claims.

## VI. Legal Principles Affecting Plaintiffs' Sherman Act § 1 and Wilson Tariff Act Conspiracy Case

### A. Sherman Act § 1

#### 1. Introduction and Basic Principles

We commence our discussion of the legal principles applicable to this case with Section 1 of the Sherman Act, 15 U.S.C. § 1, because the core of plaintiffs' case rests on allegations of combination or conspiracy in violation of that section. Unlike the manner in which we have detailed the applicable principles of law in our parallel series of evidentiary opinions, it is unnecessary to spell out in great detail the basic principles governing section 1 of the Sherman Act for two main reasons. First, these principles are exceedingly well-known, and have been set forth in a multitude of opinions and

---

**56.** It has been suggested that what we have before us is not summary disposition at all. Because of the presence of the FPS, in which plaintiffs' entire case is set forth with preclusive effect, the record before us on these motions has been said more closely to resemble that which is usually before a trial court on a motion for directed verdict under Rule 50(b) than that which is typically before the court on a summary judgment motion under Rule 56. Indeed, Melco has already moved for a directed verdict on the basis of the preclusive FPS. However, we do not equate the motion before us to a Rule 50 motion and consider the present motion under the traditional Rule 56 standards.

**57.** The parties have engaged in an extensive dialogue on the issue whether, in the absence of other evidence, an expert's opinion is sufficient to create a material issue of fact and to thereby defeat summary judgment. Defendants root their argument in the requirement of F.R.Civ.P. 56(e) that affidavits opposing a summary judgment motion must be based on "personal knowledge." An expert opinion based upon secondary sources, even if admissible, to explain or interpret matters bearing upon a factual issue, does not, in defendants' view, *create* that issue. In support of their theory, defendants urge upon us *Mapco, Inc. v. Carter*, 573 F.2d 1268 (Em.App.), *cert. denied*, 437 U.S. 904, 98 S.Ct. 3090, 57 L.Ed.2d 1134 (1978); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666 (D.C.Cir.1977); *Kern v. Tri-State Insurance Co.*, 386 F.2d 754 (8th Cir. 1967); and *United States v. Johns-Manville Corp.*, 259 F.Supp. 440

(E.D.Pa.1966). Plaintiffs counter with the Third Circuit case of *Paton v. La Prade*, 524 F.2d 862 (3d Cir. 1975), which they maintain totally undermines defendants' theory. Plaintiffs contend that their experts' opinions regarding the existence of a conspiracy are sufficient in and of themselves to defeat summary judgment.

This dialogue raises interesting questions which have not been definitively determined since enactment of the Federal Rules of Evidence. However, because we ruled the critical opinions of plaintiffs' experts inadmissible in our Expert Testimony Opinion (PTO 301, 505 F.Supp. 1313, Dec. 10, 1980), we need not reach this issue. The remaining admissible portions of the expert reports—the background materials and methodology—do not, as will be seen, give rise to an inference of conspiracy.

**58.** Although not a basis for any decision we make, a word about the other of *Poller's* twin foci, the notion of complexity, is in order. We agree that this case is complex, but we cannot help but observe that plaintiffs' *Poller*-based argument is at least partially "bootstrapped." That is because a significant part of the complexity of this case is a function of the plaintiffs having referenced some 250,000 documents in their FPS, the vast bulk of which have not even marginal relevance to the case, or at least to the core of the case, and many of which have never been translated.

treatises. Second, plaintiffs' case is more notable for the extent to which it does not fit the classical Sherman § 1 mold than for the extent to which it does.

The basic principles governing application of § 1 of the Sherman Act have been concisely stated by the Third Circuit:

> In order to sustain a cause of action under § 1 of the Sherman Act, the plaintiff must prove: (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets;[59] (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy. . . .
>
> Unless the particular restraint falls within a category that has been judicially determined to be illegal per se, the legality of a restraint challenged under § 1 of the Sherman Act must be assessed under the rule of reason. Under the rule of reason standard, only those restraints upon interstate commerce which are unreasonable are proscribed by § 1 of the Sherman Act.

*Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81–82 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978) (citations omitted).[60]

The per se approach, by which a type of conduct is viewed as per se violative of the Sherman Act without regard to its justification, has been applied in three basic situations: (1) price-fixing, *see United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); (2) market division agreements, *see United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); and, although less clearly, (3) group boycotts, *see Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 75 S.Ct. 705, 3 L.Ed.2d 741 (1959). Generally speaking, all other agreements are assessed using the rule of reason analysis. We emphasize that the core requirement of § 1 of the Sherman Act, and the one with which we are primarily concerned herein, is that there be a "contract, combination, or conspiracy"—*i. e.*, an agreement—in restraint of trade.

In this segment of the opinion, we shall explicate those facets of § 1 (as set forth in the applicable case law) which are called into play by the patterns of conduct said by plaintiffs to give rise to an inference of concerted action and therefore to constitute a basis for liability.[61] In Part VI.D., *infra*, we shall take up the related matter of the law of conspiracy in the antitrust context,

---

**59.** The requirements of proving the relevant product and geographic markets are not at issue in this case.

**60.** In *Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) (*Chicago Board of Trade*), Justice Brandeis stated what has become the classical formulation of the "rule of reason" analysis, which must be undertaken to determine whether a particular restraint is unreasonable and therefore unlawful:

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question, the court must ordinarily consider the facts peculiar to the business to which

the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

**61.** We shall not discuss the law in terms relevant to the determination whether defendants' activities in the Japanese domestic market would, if carried out in the U.S., constitute a violation of the Sherman Act. Rather, what we must enunciate are the principles applicable to the "unitary" conspiracy averred by plaintiffs and explained in Part II, *supra*.

explaining the means of proving an agreement in restraint of competition.

### 2. *Price Agreements*

■ It is often said that all agreements which "affect" price are per se illegal, but it is plain that such a formulation overstates the law. *Socony-Vacuum, supra,* explained that "[u]nder the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." 310 U.S. at 223, 60 S.Ct. at 844. Thus, the agreement must not only affect price, but must have been entered with the *purpose* to affect price. Moreover, the Sherman Act by its very terms requires that the agreement, to be unlawful, must be "in restraint of trade"—*i. e.,* the agreement must in some manner inhibit competition. As expressed by Professor Sullivan, "[t]he Act is not intended to make unlawful arrangements which affect price by improving competition." L. Sullivan, *Handbook of the Law of Antitrust* 200 (1977). Thus, while "naked" restraints described in *Socony-Vacuum* are indeed per se forbidden, agreements having only an indirect or "incidental" effect on price are not, and are examined utilizing something more akin to a rule of reason approach.

In making its determination whether conduct has the purpose or effect of restraining price competition as required by *Socony-Vacuum* in order to make the practice per se illegal, the court must carefully analyze the facts of the allegedly offending arrangement. Professor Sullivan has summarized the factual patterns of those cases in which such a purpose or effect to dampen price competition has been found as follows:

First, the practices examined are related to the market in such a way that if they have any effect at all they will have an effect on price formation. Second, they lack any significant degree of integration of functions among the competitors. Third, the arrangements are not ones which help to make or improve a market by facilitating trading, or exchanging information, or standardizing product, or the like, and which thus may aid competition. Since price formation is affected if there is any consequence at all, and since there is no improvement in the market and no integration, it is entirely fair and functionally accurate to treat arrangements like these as naked restraints.

L. Sullivan, *supra,* at 201–02 (footnote omitted). *See, e. g., Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *National Macaroni Manufacturers' Ass'n v. FTC,* 345 F.2d 421 (7th Cir. 1965); *United States v. Gasoline Retailers' Ass'n,* 285 F.2d 688 (7th Cir. 1961); *Plymouth Dealers' Ass'n v. United States,* 279 F.2d 128 (9th Cir. 1960); *Las Vegas Merchant Plumbers Ass'n v. United States,* 210 F.2d 732 (9th Cir.), *cert. denied,* 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954); *United States v. Nationwide Trailer Rental System, Inc.,* 156 F.Supp. 800 (D.Kan.), *aff'd per curiam,* 355 U.S. 10, 78 S.Ct. 11, 2 L.Ed.2d 20 (1957); *United States v. United Liquors Corp.,* 149 F.Supp. 609 (W.D.Tenn. 1956), *aff'd per curiam,* 352 U.S. 991, 77 S.Ct. 577, 91 L.Ed. 884 (1957).

■ In contrast, arrangements which have some effect on price but which also may have the purpose and effect of making or improving a market are not per se illegal, even though they may indirectly affect price, and are judged under a rule of reason standard. The leading case in this area is *Chicago Board of Trade,* quoted at n.60 *supra,* which set forth the classical rule of reason formulation.[62] Other cases which

---

**62.** The Chicago Board of Trade had established a "call rule" which required members of the commodity exchange to purchase, or offer to purchase, grain "to arrive" during off-hours at the same price as the closing bid price of that day's last "call" session, which immediately followed the regular floor sessions. Although the rule thus "fixed" the night and weekend price, it did not fix the level of that price, and was upheld by the Court. Justice Brandeis explained that the rule had "no appreciable effect on general market prices" and that it did not "materially affect the total volume of grain coming to Chicago." Instead, it helped to improve market conditions by, *inter alia,* regulating the exchange's hours of business, limiting

have adopted a rule of reason approach on the grounds that the questioned conduct improves the competitive market include those dealing with regulation of tobacco auction warehouses, *see, e. g., Danville Tobacco Ass'n v. Bryant-Buckner Assoc., Inc.,* 372 F.2d 634 (4th Cir.), *cert. denied,* 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 624 (1967); *Winn Ave. Warehouse, Inc. v. Winchester Tobacco Warehouse Co.,* 339 F.2d 277 (6th Cir. 1964), and those involving bid depositories for the building trades, *see e. g., Mechanical Contractors Bid Depository v. Christiansen,* 352 F.2d 817 (10th Cir. 1965), *cert. denied,* 384 U.S. 918, 86 S.Ct. 1365, 16 L.Ed.2d 439 (1966).

■ A second major category of cases which escape per se treatment despite having some effect on price is that in which economies of scale can be achieved through partial integration of competitors' functions. Such arrangements include joint selling agencies, *see, e. g., Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933), and joint purchasing arrangements, *see, e. g., Instant Delivery Corp. v. City Stores Co.,* 284 F.Supp. 941 (E.D.Pa.1968); *Parmelee Transportation Co. v. Keeshin,* 186 F.Supp. 533 (N.D.Ill.1960), *aff'd,* 292 F.2d 794 (7th Cir.), *cert. denied,* 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961). To qualify for rule of reason treatment on this "economies of scale" theory, a price restraint must be a direct result of the integration of functions, and must not significantly reduce marketwide competition. *See generally* L. Sullivan, *supra,* at 206–10. When the integration of functions could be accomplished without the price restraint, the restraint which results will still be per se illegal. *See United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967).

Plaintiffs in this litigation have at various times espoused a number of different theories as to behavior by defendants which is alleged to be "price-fixing" and therefore per se violative of the Sherman Act. We address each of these theories, applying the foregoing principles, but we do so only briefly, for we find the result in each case to be plain.

### (a) The "Price Necessary to Get the Sale"

■ As described in Part II, *supra,* plaintiffs have often characterized defendants' alleged conspiracy as one in which defendants agreed to charge "whatever price was necessary to make the sale." We agree with defendants that if such an agreement could be proved, it would merely be an agreement to compete, and hence would improve, rather than restrain, competition. Such an agreement would not have the purpose or effect of "raising, depressing, fixing, pegging, or stabilizing" prices, as required by *Socony-Vacuum.*

### (b) Agreement to Increase Market Share

■ Plaintiffs have also averred that defendants are guilty of agreeing to increase their market share. We see such an agreement, if it could be shown, as little different from (a) above; a mere decision to obtain a greater share of the business by competing would not violate the Sherman Act. For example, if a group of companies "agreed" to have a price war so as to increase their market share, this would not violate the antitrust laws in the absence of some agreement to raise prices again after successful market penetration. As will be seen *infra,* plaintiffs have offered no evidence that defendants' prices rose after they achieved market penetration. Thus, in the absence of some other related agreement, we see an agreement to attempt to increase market share as another form of an agreement to compete.

### (c) Agreement to Fix Minimum Prices

■ An agreement to fix a minimum price would also be a per se violation of section 1 of the Sherman Act. While a consumer or the government might bring an action to attack such an agreement, as we explain in Part VI.B., *infra,* competitors,

---

the advantage previously held by those few dealers doing business at night (thus improving

the chances of county dealers and farmers), and making the daytime market more perfect.

such as the plaintiffs, have no standing to attack such agreements, for they can show no antitrust injury flowing therefrom.

#### (d) *Agreement to Price Predatorily*

■ Plaintiffs further allege that defendants agreed to engage in collusive predatory pricing, although without fixing any particular price. Such an agreement, we believe, would be a per se violation of § 1, in that it would, in *Socony-Vacuum* terms, have the intent and effect of depressing the price. We note, however, that in the absence of direct proof, such an agreement may be impossible to prove by indirect evidence under the standards set forth by the Third Circuit in *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309 (3d Cir. 1975) and *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), discussed in Part VI.D., *infra.*

#### (e) *Agreement to Fix Low or Depressed Prices*

■ An agreement to charge "low" or depressed prices, as opposed to an agreement to fix a particular price, would nonetheless have the effect of stabilizing prices, and would, if proved, be per se illegal. Such an agreement is, of course, similar but not identical to an agreement to price predatorily.

#### (f) *Agreement to Fix Minimum Prices and a Second Agreement to Violate the First*

■ Plaintiffs allege that defendants agreed to fix minimum prices—an agreement which, as we explain in Part VI.B., *infra*, plaintiffs have no standing to attack. They further allege, however, that defendants then agreed to violate that price-fixing agreement by engaging in a scheme of secret rebates in varying amounts which resulted in a net price lower than the minimum price. Such an agreement, if it existed, would be in intent and purpose the same as an agreement to compete, discussed in (a), *supra*. An agreement to violate a price-

fixing agreement by returning to the competitive *status quo* can only enhance competition. *See also* Part VI.A.7, *infra.*

#### (g) *Agreement to Deceive Government Authorities With Respect to Price*

■ Plaintiffs finally have alleged that an agreement to commit customs fraud by misleading government authorities as to the actual price charged is violative of the Sherman Act. We do not believe such an agreement, if proved, is one that affects price. Such agreements are discussed at VI.A.7, *infra.*

### 3. *Market Allocation*

Plaintiffs contend that the Five Company Rule, promulgated by the JMEA and discussed in detail *infra*, which purports to restrict each Japanese exporter to five U.S. customers, is a horizontal market division which is per se illegal under section 1 of the Sherman Act. They thus invoke *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), in which the Supreme Court explicitly ruled that market divisions are per se illegal, whether or not they are ancillary to some price-fixing or other competition-restraining agreement. *See also United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

We need not discuss this principle in detail, however, for as will be seen *infra*, the Five Company Rule did not operate to divide the market. Rather, because each manufacturer could include its American subsidiary as one of its five customers, and because the subsidiary had no concomitant market restrictions but could sell to anyone, the rule was without practical effect. *See* Part VII.F.2, *infra*. Moreover, plaintiffs could not have been injured by an agreement such as the Five Company Rule whose effect would be to reduce competition and keep prices up. *See* Part VI.B., *infra*.

### 4. Membership in Trade Associations and Attendance at Meetings

While to our knowledge plaintiffs have never explicitly contended that mere active membership in a trade association constitutes an agreement which violates section 1 of the Sherman Act, they have, on numerous occasions, implied that such a principle obtains in the present context. Arguing almost by innuendo, they appear to be suggesting that, given the fact that virtually all the Japanese manufacturing defendants were conferees, participation in meetings of groups such as the Tenth Day Group or even the EIAJ can give rise to an inference of collusive activity on the grounds that it is impossible to imagine what else was being accomplished at such meetings. We therefore consider the potential antitrust import of such membership.

 It is plain that mere membership in a trade association, including attendance at meetings, is insufficient without more to give rise to an inference of conspiracy. *See, e. g., Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *Kline v. Coldwell, Banker & Co.,* 508 F.2d 226 (9th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975); *Northern California Pharmaceutical Ass'n v. United States,* 306 F.2d 379 (9th Cir.), *cert. denied,* 371 U.S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99 (1962); *Metropolitan Bag & Paper Distributors Ass'n v. FTC,* 240 F.2d 341, 344 (2d Cir. 1957), *cert. denied,* 355 U.S. 819, 78 S.Ct. 24, 2 L.Ed.2d 35 (1957); *Trist v. First Federal Savings & Loan Ass'n,* 466 F.Supp. 578, 587 (E.D.Pa.1979); *Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 231 (S.D. N.Y.1978), *aff'd mem.,* 610 F.2d 806 (2d Cir. 1979); *Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.,* 408 F.Supp. 1251, 1280 (S.D.N.Y.1976); *Vandervelde v. Put & Call Brokers & Dealers Ass'n, Inc.,* 344 F.Supp. 118, 155 (S.D.N. Y.1972); *cf. Venzie Corp. v. United States Mineral Products Co.,* 521 F.2d 1309, 1312– 13 (3d Cir. 1975) (mere contact through phone calls insufficient).

All of these cases, in rejecting the notion that mere membership in a trade association gives rise to an inference of conspiratorial conduct by a particular member, even when the association itself has been found to have engaged in illegal conduct, emphasize that there must be proof of knowing, intentional participation in the illegal scheme. The Ninth Circuit has stated, for example:

> It thus clearly appears that in order for a member of a trade association to become guilty in a criminal case or liable in a treble damage case he must have "knowingly, intentionally and actively participated in an individual capacity in the scheme."

*Kline v. Coldwell, Banker & Co., supra,* 508 F.2d at 232, *quoting Northern California Pharmaceutical Ass'n v. United States, supra.* Similarly, Judge Weinfeld stated:

> [M]ere association with conspirators and presence at the scene of a conspiracy, even coupled with knowledge that wrongful conduct by others is being engaged in, are not by themselves sufficient to support the inference of knowing and intentional attachment to an illegal enterprise.

*Hunt v. Mobil Oil Corp., supra,* 465 F.Supp. at 231.

Nor can plaintiffs attempt to draw an inference of conspiracy from the fact that the meetings provide a forum for collusive action. "Opportunities to conspire are not probative of whether firms did in fact conspire; an opportunity to conspire will exist always." *Brown v. Cameron-Brown Co.,* 1980–2 Trade Cases ¶ 63,400 at p. 76,040 (E.D.Va.1980).

 These quotations typify the thrust of the case law. In the absence of proof of knowing, intentional participation in illegal activities, plaintiffs cannot draw an inference of conspiratorial conduct from the active membership by defendants in various trade associations.

### 5. Exchange of Information Concerning Prices, Production and Inventory Figures, and Joint Forecasting

Plaintiffs have stressed time and time again that, as they put it in their final

post-argument brief, "one aspect of the overall conspiracy which demonstrates its pernicious effect on competition is defendants' exchange of information." In plaintiffs' submission, the various groups and associations of which defendants were members functioned as fora for the exchange of information on past, current, and future prices, production, shipments, export levels, inventory levels, and conditions of sale. The information was then used by defendants, plaintiffs' theory continues, to coordinate future production and prices. Plaintiffs contend that this information exchange is per se illegal under the Sherman Act, citing, *inter alia, United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

Plaintiffs' suggestion that defendants' information exchange is a per se violation of the Sherman Act can charitably be viewed only as disingenuous, for no case—including *Container Corp.*—has ever held mere exchange of information, without an associated price-fixing agreement (which has on occasion been inferred from certain information exchanges), to be per se illegal.[63] Rather, the question is whether the information exchange has a tendency unreasonably to restrain competition. Hence, the cases that address data dissemination do so employing a "rule of reason" analysis.

The Third Circuit has succinctly summarized the case law in this area:

> The Supreme Court has dealt several times with the limits imposed by the Sherman Act on exchanges of information among competitors. In *American Column & Lumber Co. v. United States*, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921), the Court held that section 1 of the Sherman Act condemned the exchange of specific price information with regard to specific customers, where the clear purpose was to stabilize prices. The Court reached the same result in *United States v. American Linseed Oil Co.*, 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035

(1923). Then in 1925, two cases upheld the exchange of information among competitors. In *Maple Flooring Ass'n v. United States*, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925), the Sherman Act was held to permit the exchange of average cost data relating only to closed transactions, despite an apparent stabilizing effect on price, where no intent to constrain individual competitive activity was found. And the Court in *Cement Manufacturers Protective Ass'n v. United States*, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104, approved the exchange of specific price information concerning specific customers, despite possible effects on prices, where the purpose of the dissemination scheme was to prevent buyers from defrauding sellers.

> The Supreme Court has drawn a narrow line in deciding the data dissemination cases under section 1 of the Sherman Act. The difficulty derives from the fact that in competitive markets, information exchanges promote competition, while in oligopolistic markets, they depress competition. *United States v. Container Corp. of America*, 393 U.S. 333, 342–43, 89 S.Ct. 510 [515], 21 L.Ed.2d 526 (1969) (Marshall, J., dissenting); P. Areeda, Antitrust Analysis 13–16 (1974). Thus, the Court has attempted to fashion rules that will reach the latter, yet not amount to broad proscriptions embracing the former.

*United States v. United States Gypsum Co.*, 550 F.2d 115, 122 (3d Cir. 1977), *aff'd*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978).

> *United States Gypsum* was concerned only with the exchange of pricing information. The cases discussed therein, however, also considered the exchange of other types of information. Thus, *American Column & Lumber Co. v. United States*, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921), invalidated a program of a trade association in the hardwood industry which called for daily reporting of not just prices, but of sales,

---

**63.** While there was some hint that *Container Corp.* might have established such a rule, subsequent Supreme Court cases explicitly dis-

pelled the suggestion. *See* discussion at pp. 1152-1153, *infra*.

purchases, production, shipment, and inventory data as well, all subject to audit by association representatives. The Court inferred an agreement in restraint of trade from the elaborate nature of the scheme, concluding that the "purpose and effect . . . were to restrict competition . . . by concerted action in curtailing production and in increasing prices." 257 U.S. at 411–12, 42 S.Ct. at 121.

The court relied upon *American Column* to invalidate an even more comprehensive system of information exchange in *United States v. American Linseed Oil Co.*, 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035 (1923). But in *Maple Flooring Manufacturers Ass'n v. United States*, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925), the court employed a similar purpose and effect analysis to reach a contrary result, where the information exchanged was averaged and disseminated without identification of the particular member or transaction, and where the prices were not uniform. No agreement to affect production, or to fix or maintain prices, or to conform to published averages, was ever alleged. The Court explained:

> Persons who unite in gathering and disseminating information in trade journals and statistical reports on industry, who gather and publish statistics as to the amount of production of commodities in interstate commerce, and who report market prices, are not engaged in unlawful conspiracies in restraint of trade merely because the ultimate result of their efforts may be to stabilize prices or limit production through a better understanding of economic laws and a more general ability to conform to them, for the simple reason that the Sherman Law neither repeals economic laws nor prohibits the gathering and dissemination of information.

268 U.S. at 584, 45 S.Ct. at 585. *American Column* and *American Linseed* were distinguished on the basis that they presented situations in which the activity "necessarily" resulted in illegal concerted action. The Court recognized that information dissemination could be the basis of concerted action in restraint of trade, as in those earlier cases, but held:

> We decide only that trade associations or combinations of persons or corporations which openly and fairly gather and disseminate information as to the cost of their product, the volume of production, the actual price which the product has brought in past transactions, stocks of merchandise on hand, approximate cost of transportation from the principal point of shipment to the points of consumption as did these defendants and who, as they did, meet and discuss such information and statistics without however reaching or attempting to reach any agreement or any concerted action with respect to prices or production or restraining competition, do not thereby engage in unlawful restraint of commerce.

*Id.* at 586, 45 S.Ct. at 586. We will refer to *Maple Flooring* on a number of occasions in Part VII, *infra*, because its holding, and the quoted language, is apposite to this record.

*Maple Flooring's* companion case, *Cement Mfrs.' Protective Ass'n v. United States*, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925), went one step further, upholding a scheme which was essentially similar, but in which specific sales were identified and which had resulted in production limitation and substantial price uniformity. The Court was persuaded that price uniformity could "inevitably result from active, free and unrestrained competition" when the product is fungible and the buyers knowledgeable. *Id.* at 592, 45 S.Ct. at 587. Moreover, the Court believed that when the data exchanged enabled sellers to counter the fraudulent practices of some dealers, as was the case in the *Cement* case, the exchange could not be held to be an unlawful restraint. Ultimately, the Court rested on its *Maple Flooring* reasoning: there was no agreement, and in the absence thereof, the information exchange activities were not in themselves unlawful. *See also Sugar Institute, Inc. v. United States*, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936), in which the court reaffirmed its *Maple Flooring* position to the effect that

competition does not become less free merely because of the distribution of knowledge of the essential factors entering into commercial transactions. The natural effect of the acquisition of the wider and more scientific knowledge of business conditions on the minds of those engaged in commerce, and the consequent stabilizing of production and price, cannot be said to be an unreasonable restraint or in any respect unlawful.

297 U.S. at 598, 56 S.Ct. at 642. *The Sugar Institute* Court explained the difference between the *American Column* cases and the *Maple Flooring* cases as follows:

[W]hile the collection and dissemination of trade statistics are in themselves permissible and may be a useful adjunct of fair commerce, a combination to gather and supply information as a part of a plan to impose unwarrantable restrictions, as, for example, to curtail production and raise prices, has been condemned.

*Id.* at 599–600, 56 S.Ct. at 642–643.

Professor Sullivan has summarized the rules of these early cases as follows:

Where there is no commitment to comply with published prices, where individual transactions are not identified, where information goes to buyers as well as sellers, and where no audit procedure, common analysis or suspicious exhortation is associated with price reporting, a purpose and effect analysis focused only on program details will tend to validate the program.

*L. Sullivan, supra,* at 269.

Perhaps the most troubling of the Supreme Court's opinions in this area is *United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), upon which plaintiffs rely heavily. *Container Corp.* invalidated an arrangement in the corrugated container industry whereby each defendant requested from its competitors the most recent price charged or quoted, whenever it needed such infor-

mation and the information was not otherwise available. The information requested was generally provided, with an expectation that reciprocal information would be furnished when needed. The result was a downward stabilization of price. Justice Douglas' two-page opinion briefly examines the market structure, noting that defendants accounted for 90% of the market, that the product was essentially fungible and the demand inelastic, and that entry costs were low, and concludes that the "inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition." 393 U.S. at 337, 89 S.Ct. at 512. Price was held to be "too critical . . . to allow it to be used in an informal manner to restrain competition." *Id.* at 338, 89 S.Ct. at 513. To this final statement was appended a footnote which pointed out, *inter alia,* that *Socony-Vacuum* had held all forms of price fixing to be per se violative of the Sherman Act.

This final footnote, with its textual statement, led to confusion as to whether the *Container Corp.* majority was obliquely announcing a per se rule banning all exchange of pricing information. Justice Fortas, concurring, joined the majority opinion on the explicit understanding that no such rule was being enunciated. Justices Marshall, Harlan, and Stewart, however, dissented because they disagreed with what they read as the majority's use of a per se rule.

■ This confusion was subsequently dispelled by the explicit statement that "the dissemination of price information is not itself a per se violation of the Sherman Act." *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975), citing *Maple Flooring, Cement Mfrs.,* and *Container Corp.* itself. *See also United States v. United States Gypsum Co.,* 438 U.S. 422, 441 n.16, 98 S.Ct. 2864, 2875 n.16, 57 L.Ed.2d 854 (1978).[64] Thus we know, contrary to

---

**64.** We do not read the Court's statement in *Great Atlantic & Pacific Tea Co. v. FTC,* 440 U.S. 69, 80, 99 S.Ct. 925, 933, 59 L.Ed.2d 153 (1979), that "the court has held that the exchange of price information by competitors violates the Sherman Act," citing *Container Corp.*

plaintiffs' suggestion, that information exchange, including the exchange of price information, remains subject to a rule of reason analysis.

The *Container Corp.* opinion is, at best, opaque, and the line it draws between information exchange programs which violate the Sherman Act and those which do not is indistinct.[65] Plaintiffs rely on *Container Corp.* primarily for the per se point, which, as we have seen, has been repudiated. In any event, *Container Corp.* is clearly distinguishable from the case at bar on its facts, in that it involved the exchange, upon request, of specific, current, identifiable price data. Because the fact patterns are so different, and because *Container Corp.* plainly did not overrule *Maple Flooring* and *Cement Mfrs.*, it is not helpful to plaintiffs. Accordingly, when we examine the record as to defendants' exchange of information, our focus will be on the reasonableness *vel non* of the conduct.

We note in summary that cases which have found violations have either involved an exchange of detailed, individually identifiable, actual price data, a concentrated industry, and a purpose or effect to restrain competition, or some other evidence of an actual agreement to restrain competition. Exchange of aggregate data and most non-price data, such as market conditions, trends, and forecasts, has generally been permitted, at least in the absence of some evidence of an agreement to use the information to fix prices, adjust production, or allocate market shares.

### 6. Product Standardization and Technical Research Exchange

Plaintiffs have also suggested that defendants' efforts at product standardization and exchange of technical research are indicative of conspiratorial activity violative of the Sherman Act. Product standardization alone, without a related price-fixing allegation, has not been frequently litigated. Those courts that have considered the issue have found standardization programs that improve product quality or reduce costs, eliminate waste, and provide the basis for easier price comparison by consumers, thus enhancing increased price competition, to be reasonable. *See, e. g., Tag Mfrs. Institute v. FTC*, 174 F.2d 452 (1st Cir. 1949); *Structural Laminates, Inc. v. Douglas Fir Plywood Ass'n*, 261 F.Supp. 154 (D.Or.1966), *aff'd*, 399 F.2d 155 (9th Cir. 1968), *cert. denied*, 393 U.S. 1024, 89 S.Ct. 636, 21 L.Ed.2d 569 (1969); *United States v. Johns-Manville Corp.*, 259 F.Supp. 440 (E.D. Pa.1966).

On the other hand, programs have been ruled unreasonable, hence illegal, when pursued for an anticompetitive purpose, or when linked with other factors to become tantamount to price-fixing. In *National Macaroni Manufacturers Ass'n v. FTC*, 345 F.2d 421, 426 (7th Cir. 1965), for example, the court agreed with the FTC that "where all or the dominant firms in a market combine to fix the composition of their product with the design and result of depressing the price of an essential raw material, they violate the rule against price-fixing agreements as it has been laid down by the Supreme Court." Similarly, the court in

as stating a per se rule. It is plain that *some* exchanges of information do indeed violate the Sherman Act.

**65.** The case might be read to say that liability can rest upon a showing of anticompetitive effect, without proof of anticompetitive purpose, at least in an oligopolistic industry. *See U. S. Gypsum, supra*, 438 U.S. at 446, n.22, 98 S.Ct. at 2878, n.22. And *Container Corp.* can perhaps be harmonized with the earlier cases by noting Justice Douglas' use of the language quoted above: "The inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry." 393

U.S. at 337, 89 S.Ct. at 512. This language can be viewed as analogous to the distinction drawn in *Maple Flooring* to the effect that *American Column* and *American Linseed* were situations where the activity "necessarily" implied illegal conduct. While *Container Corp.* focused on the anticompetitive effect and the earlier cases had drawn inferences of anticompetitive purpose, it may be that together they could be interpreted as saying that when the conduct or effect cannot be otherwise explained, an anticompetitive agreement can be inferred from exchange of detailed current price information.

*Bond Crown & Cork Co. v. FTC*, 176 F.2d 974, 979 (4th Cir. 1949), explained that product standardization "would be innocent enough by itself but not when taken in connection with standardization of discounts and differentials, publication of prices with agreements not to charge less than a minimum . . ., freight equalization . . . and such uniformity of prices throughout the industry as to leave no price competition of any sort anywhere." *See also C–O Two Fire Equipment Co. v. United States*, 197 F.2d 489 (9th Cir.), *cert. denied*, 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952); *Milk & Ice Cream Can Institute v. FTC*, 152 F.2d 478 (7th Cir. 1946).

### 7. Secret Rebates

█ Plaintiffs have, at various times and by way of a number of formulations, contended that defendants' practice of granting secret rebates was illegal under the Sherman Act, noting that the rebate scheme served to circumvent the MITI-related export control agreements and the 1921 Antidumping Act, and that it furthermore engendered widespread customs fraud against the United States. The problem with this theory is that it describes in ultimate essence a pro-competitive scheme: the rebates are, if proved, in contravention of provisions expressly designed to reduce competition, at least so long as there is no evidence of concerted rebate activity. An agreement to compete, as we said *supra*, cannot violate the Sherman Act.

A claim analogous to that presented by plaintiffs here was considered and rejected by the Supreme Court in *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). In that case, defendants, an Atlanta bank and its affiliated entities, embarked upon a program of *de facto* branching designed to circumvent the anti-competitive effect of Georgia state regulations which prohibited banks located in cities from opening branches in suburban areas. The defendants entered into *de facto* control arrangements with various banks in Atlanta suburbs and, after a change in state law, proceeded to acquire several of them. In response to a Justice Department challenge to the program, the Court held that the common control and sharing of information and facilities between the defendants and their *de facto* branches were an integral part of defendants' pro-competitive attempt to circumvent Georgia's anti-competitive regulatory scheme, and thus could not be considered unreasonable restraints of trade under the antitrust laws:

> To characterize these relationships as an unreasonable restraint of trade is to forget that their whole purpose and effect were to *defeat* a restraint of trade. Georgia's antibranching law amounted to a compulsory market division . . . .
>
> . . . C&S devised a strategy to circumvent this statutory barrier. By providing new banking options to suburban Atlanta customers, while eliminating no existing options, the *de facto* branching program of C&S has plainly been procompetitive.

422 U.S. at 118–19, 95 S.Ct. at 2117–2118.

Plaintiffs' claims here, that defendants conspired to offer prices which allegedly were lower than, and therefore in violation of, the minimum price provisions of the export control arrangements and dutiable under the 1921 Antidumping Act, are similar to the claims rejected by the Supreme Court in *Citizens & Southern National Bank*. Such an agreement—to circumvent government barriers to import competition—would, if proved, be pro-competitive in purpose and effect and could not support plaintiffs' antitrust claims.

Similarly, plaintiffs' attempt to cast anticompetitive aspersions upon defendants' alleged rebating is without foundation. The Supreme Court has noted the pro-competitive virtues of secret price cutting. *See, e. g., United States Gypsum Co., supra*, 438 U.S. at 456, 98 S.Ct. at 2883. ("Price concessions by oligopolists generally yield competitive advantages only if secrecy can be maintained; when the terms of the concession are made publicly known, other competitors are likely to follow and any advantage to the initiator is lost in the process."). Secret price cutting can be a pro-competi-

tive strategy to be encouraged, not condemned, under the antitrust laws.

Indeed, the contention that secret rebating to avoid anti-competitive, government-imposed regulatory schemes constitutes an antitrust violation was specifically rejected by the Third Circuit in *Knuth v. Erie-Crawford Dairy Cooperative Ass'n,* 463 F.2d 470 (3d Cir. 1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973). In that case, plaintiffs, milk producers, brought an antitrust action against the cooperative which sold their milk on consignment (of which plaintiffs were members) and the dairies which purchased the milk, on the ground that the cooperative was granting secret rebates to the dairies in order to sell the milk at prices below those established by the Pennsylvania Milk Control Commission. Despite the fact that the alleged rebates were illegal under Pennsylvania law, the court held that plaintiffs had failed to state a cause of action under the antitrust laws. *Id.* at 476.[66]

Thus the rebating scheme alone cannot, by virtue of its character as a device to circumvent governmental regulation, support a Sherman Act violation.

### 8. *Joint Activities in Promoting Public and Governmental Relations and Joint Legal Action in Response to Common Problems*

Plaintiffs allege that defendants violated Section 1 of the Sherman Act by virtue of their concerted dealings with the governments of both the U.S. and Japan. For example, plaintiffs claim that defendants (1) jointly sought to influence American and Japanese legislative regulation concerning export-import duties and commodity taxes; (2) conducted publicity campaigns to promote governmental relations; (3) participated in a joint defense of their rebate practices in actions brought by the Customs Office of the Department of Treasury un-

der the Antidumping Act of 1921; and (4) conspired to institute litigation to enjoin those actions. These allegations require that we consider the extent to which courts have considered concerted lobbying action with the legislative or executive branches of government, either by trade associations or similarly situated corporations, and concerted legal action in the courts to combat problems common to all companies in the trade or industry, as violative of Section 1 of the Sherman Act.

Concerted action by trade associations to influence or promote legislative, judicial, or administrative action has generally been regarded as necessary under the First Amendment to safeguard the free expression of political viewpoints and the right to petition government officials, and has been regarded as an exemption from antitrust liability. This exemption, which has come to be known as the Noerr-Pennington doctrine, applies even if the ultimate governmental action sought would limit economic competition in the industry.

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 864 (1961), a railroad association conducted a publicity campaign that consisted of the circulation of propaganda disparaging the trucking industry and included extensive lobbying for legislation injurious to the trucking industry, with the purpose of destroying trucking as competition in the long-distance freight business. The truckers alleged that the publicity campaign amounted to an illegal conspiracy to eliminate competition in violation of the Sherman Act. The Supreme Court dismissed the truckers' complaints, holding that a concerted but genuine attempt to influence legislation, even when conducted with an anti-competitive purpose, does not give rise to Sherman Act liability. Moreover, the Court extended the protec-

---

**66.** The court stated: "Such individual sales contracts, negotiated at arm's length without knowledge on the part of the purchasers of the prices being charged others similarly situated, cannot be regarded as contracts or combinations in restraint of trade. While the individual contracts may have been illegal under Pennsylvania law, they were not illegal under the antitrust laws." 463 F.2d at 476. *See also Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

tion of joint activities for governmental action even to deceptive public relations practices. The Court supported its holding on two grounds. First,

> In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of the Act.

365 U.S. at 137, 81 S.Ct. at 529. Secondly, the Court stated:

> The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.

*Id.* at 138, 81 S.Ct. at 530.

The Court repeated its Sherman Act exception for trade association activities aimed at influencing governmental action in *United Mine Workers v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965),[67] declaring that:

> Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.

Although the language of *Noerr* and *Pennington* sweeps broadly, the doctrine is not unlimited. The Court in *Noerr* recognized that the broad exemption from liability would not apply where trade activities purported to influence governmental action were a "mere sham," noting:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.

365 U.S. at 144, 81 S.Ct. at 533.

The Supreme Court elaborated on this "sham" exception to the Noerr-Pennington doctrine in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In that case, several highway carriers alleged that a competing truckers' association had conspired to institute sham administrative and judicial proceedings opposing their competitors' applications for operating rights. Plaintiffs maintained that as one result of the conspiracy they had been denied unlimited access to the courts and administrative agencies. The Court declared:

> A combination of entrepreneurs to harass and deter their competitors from having "free and unlimited access" to the agencies and courts, to defeat that right by massive, concerted, and purposeful activities of the group are ways of building up one empire and destroying another.... If these facts are proved, a violation of the antitrust laws has been established. If the end result is unlawful, it matters not that the means used in violation may be lawful.

404 U.S. at 515, 92 S.Ct. at 614. Yet while the Court found that attempts by trade associations to effectively bar opponents from equal participation in administrative and judicial proceedings were illegal, the Court at the same time reaffirmed and broadened the *Noerr-Pennington* doctrine by applying it in the administrative and judicial arenas. The Court concluded that:

> it would be destructive of rights of association and of petition to hold that groups

---

**67.** In *Pennington*, a coalition of mine operators and a miners' union successfully persuaded the Secretary of Labor to establish higher minimum wages for employees of smaller coal companies, in an effort to reduce competition in the industry. The Court held that this kind of activity was not subject to the Sherman Act regardless of whether the association had purposefully conducted its activities to cause an anti-competitive effect.

with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors.

*Id.* at 510–11, 92 S.Ct. at 611–612.[68]

The Court thus recognized that joint litigation by trade associations, if not pursued merely as a sham, is accorded the same immunity from Sherman Act liability as is given to the expression of political views in connection with legislative and executive actions. *A fortiori* the doctrine should apply to joint defense of legal proceedings as well. In applying the doctrine to judicial proceedings, lower courts have protected a trade association's right to bring a lawsuit against competitors and to attack a statute favorable to competitors, so long as the litigation has not been pursued in bad faith as a sham. *See e. g., Handgards, Inc. v. Ethicon Inc.*, 601 F.2d 986 (9th Cir. 1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); *Bracken's Shopping Center, Inc. v. Ruwe*, 273 F.Supp. 606 (S.D. Ill.1967).

Thus we see that a trade association's joint lobbying and legal activities are protected under the *Noerr-Pennington* doctrine unless those activities can be found to constitute a sham, even if they have an anticompetitive intent or effect. We turn now to a discussion of the requisites for standing under §§ 4 and 16 of the Clayton Act.

B. *Statutory Antitrust Standing Under § 4 and § 16 of the Clayton Act*

The statutory source of the antitrust treble-damage remedy is Section 4 of the Clayton Act, which specifically limits this remedy to "[a]ny person who shall be *injured* in his business or property *by reason of* anything forbidden in the antitrust laws." 15 U.S.C. § 15 (emphasis added).

This statute, by its terms, limits recovery to those plaintiffs who can show that their injury was caused by the defendants' violations. As the Supreme Court has recently stated, plaintiffs must show that their injury "flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Plaintiffs cannot prevail unless they can demonstrate, by direct or circumstantial evidence, that this "necessary causal relation" exists. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 697–700, 82 S.Ct. 1404, 1409–1411, 8 L.Ed.2d 777 (1962). *See also Bowen v. New York News, Inc.*, 522 F.2d 1242, 1255–56 (2d Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976); *Rea v. Ford Motor Co.*, 497 F.2d 577, 589 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974).

The Third Circuit has recently summarized the controlling principles of law:

Section 4 of the Clayton Act, 15 U.S.C. § 15 (1976), allows recovery only to a plaintiff who is injured "by reason of" a violation of the antitrust laws. The plaintiff has the burden of proving that the established illegality was a material cause of injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 [89 S.Ct. 1562, 1571–1572 n.9, 23 L.Ed.2d 129] (1969). As we said in *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96 (3d Cir.), *cert. denied*, 429 U.S. 860 [97 S.Ct. 161, 50 L.Ed.2d 137] (1976), "[e]ven if a defendant's acts are shown to be violative of the statute, . . . a plaintiff may not recover unless a nexus to its own injury is also demonstrated." *Id.* at 98. Similarly, in *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112 (3d Cir.), *cert. denied*, 414 U.S. 867 [94 S.Ct. 65, 38 L.Ed.2d 86] (1973), the district court di-

---

**68.** We note that certain defendants have filed a counterclaim in this case alleging that plaintiffs have engaged in sham litigation, thus invoking the theory of antitrust liability recognized in *California Motor Transport Co., supra*, and in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

rected a verdict for the defendant at the conclusion of the plaintiff's case because the evidence demonstrating the connection between the alleged antitrust violations and the damages was too speculative to submit to the jury. *Id.* at 1114. We affirmed, agreeing that although there was testimony about various reasons that might have caused the plaintiff's losses, no specific cause was assigned by the plaintiff's expert. *Id.* at 1117.

. . . . It is not enough that the public has been harmed by a violation of the antitrust laws. The plaintiff seeking to recover treble damages must further establish as a matter of proof that the illegal conduct was a material cause of its injury. *Rea v. Ford Motor Co.*, 497 F.2d 577, 589–90 (3d Cir.), *cert. denied*, 419 U.S. 868 [95 S.Ct. 126, 42 L.Ed.2d 106] (1974); L. Sullivan, Handbook of the Law of Antitrust § 251 (1978).

*Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 254–55 (3d Cir. 1980).[69]

■■■■ Plaintiffs in this case seek treble damages, but they also seek injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, which authorizes such relief for any person who demonstrates "threatened loss or damage by a violation of the antitrust laws." This provision imposes a lower threshold requirement than § 4 of the Clayton Act, which requires a showing of actual injury to "business or property." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885,

31 L.Ed.2d 184 (1972); *Bogus v. American Speech & Hearing Ass'n*, 582 F.2d 277 (3d Cir. 1978). *Cf. NAACP v. New York Clearing House Ass'n*, 431 F.Supp. 405 (S.D.N.Y. 1977). However, § 16 requires a plaintiff at least to demonstrate that any threatened loss or damage has been or will be proximately caused by the alleged violations, within the traditional legal concept of proximate cause. *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 591–92 (3d Cir. 1979). The causation and standing issues which we consider herein involve basic concepts of proximate causation, rather than niceties in the interpretation of any particular statute. Accordingly, our discussion of standing issues in this opinion is fully as applicable to plaintiffs' standing to seek injunctive relief under § 16 as it is to their standing to seek damage relief under § 4 of the Clayton Act.[70]

Defendants attack plaintiffs' standing under § 4 of the Clayton Act with respect to three different issues. First, they claim that the plaintiffs have no standing to attack the Manufacturers' Agreements and JMEA Rules, which set minimum prices for exports to the U.S. and purportedly limited the number of U.S. customers to which Japanese exporters could sell, because as competing manufacturers, plaintiffs could not have been injured by an agreement to set minimum prices or to limit the number of customers. Second, they claim that Zenith's failure to identify any damages flowing specifically from the defendants' al-

**69.** In the *Sound Ship* case quoted in *Van Dyk*, the Third Circuit affirmed the grant of summary judgment against a Sherman Act plaintiff solely because plaintiff failed to bring forward any evidence to support its allegation of a causal link between the alleged antitrust violation and its alleged damages. 533 F.2d at 98–100.

**70.** In *Van Dyk, supra,* the Court of Appeals did not use the term "standing," but rather spoke in terms of "causation" or "fact of injury." Nor did the Supreme Court in *Brunswick, supra,* which spoke in terms of "antitrust injury." Traditionally, however, proof of causal nexus between an alleged antitrust violation and injury resulting therefrom has been considered an aspect of plaintiff's standing under § 4. *See* 2 P. Areeda & D. Turner, *Antitrust Law* ¶¶ 334–35 (1978). Many courts do use "standing" ter-

minology. *See, e. g., Bowen v. New York News, Inc.*, 522 F.2d 1242 (2d Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976). It is of course true, as the Third Circuit has noted, that statutory antitrust standing is analytically distinct from constitutional Article III standing. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 447 n.6 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). We suspect that the different terminologies may be a function of the differences in procedural posture of particular cases, with objections based upon "standing" arising at earlier stages of the litigation than those based upon lack of injury or causation. The concepts, however, are virtually identical. We use the term "standing" herein as a synonym for "fact of injury" or "causation of damages."

leged violations of the Robinson-Patman Act, except insofar as it claims to have been injured by the alleged "unitary conspiracy" as a whole, is fatal to Zenith's claims under the Robinson-Patman Act. Finally, defendants reiterate the latter argument with respect to Zenith's claim under § 7 of the Clayton Act, contending that Zenith has failed to identify any injury to it as a result of the two acquisitions which it challenges under § 7. We discuss the first of these issues here, but defer our discussion of Zenith's standing to assert its claims under the Robinson-Patman Act and § 7 of the Clayton Act until our separate discussion of those claims in Parts X and XI *infra*, respectively.

Plaintiffs have aimed much of their rhetorical fire at the Manufacturers' Agreements and JMEA Rules, which they have characterized as "written cartel agreements." Defendants rejoin that plaintiffs have no standing to attack these agreements because the agreements set *minimum* prices for exports to the U.S. and *limit* the number of U.S. customers of the signatory companies.[71] Defendants contend that neither of these provisions could conceivably injure the plaintiffs who, as competing manufacturers, could only be benefitted by higher prices and fewer competitors. We turn to the customer-limitation provision first.

■ The customer-limitation provision of the JMEA Rules, the so-called Five Company Rule, apparently limited a Japanese exporter of television receivers to a total number of five U.S. customers. As we explain in our more extensive discussion of the Rule in Part VII.F.2, *infra*, it was in practice wholly ineffective because each of the defendants was able under the rule to register as one of its five customers its U.S. subsidiary, which could in turn resell to any customer without limitation. Even if the Rule had operated effectively, however, we believe the plaintiffs would lack standing to attack it.

The economic effect of a customer limitation provision is inevitably to keep prices up by reducing competition; accordingly, antitrust decisions which condemn horizontal market division speak in terms of injury to consumers because of reduced price competition. *See, e. g., Burke v. Ford*, 389 U.S. 320, 321–22, 88 S.Ct. 443, 444, 19 L.Ed.2d 554 (1967); *United States v. Sealy, Inc.*, 388 U.S. 350, 356, 87 S.Ct. 1847, 1852, 18 L.Ed.2d 1238 (1967); L. Sullivan, *Handbook of the Law of Antitrust*, § 82 (1978). In *Bowen v. New York News, Inc.*, 522 F.2d 1242, 1255–56 (2d Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976), the Second Circuit held that the plaintiff had no standing to attack an exclusive territory arrangement among some of its competitors because the only possible effect of that arrangement was to reduce competition, to the plaintiffs' benefit. *See also Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 20 (9th Cir. 1971); *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968). The same principle precludes plaintiffs' standing here to attack the Five Company Rule.

Plaintiffs' lead counsel, Mr. Rome, faced with this analysis during final summary judgment argument, sought to fend the point as follows:

Now, with that as a factor in connection with it, I suggest that the cartel agreements and the rebate system as a unitary entity constituted a mechanism, the mechanism which enabled the defendants to pursue a course of conduct for depressing prices in the United States, as the result of which, aided by their five-company rule, they were permitted and enabled to concentrate each particular defendant's competitive thrust against a particular mass merchandise customer in the U.S. and thereby deny the capability

---

**71.** The standing issues with respect to these Agreements and Rules arise only under § 4 of the Clayton Act. Plaintiffs' claim for injunctive relief is moot as it applies to these Agreements

and Rules, which are no longer in effect, and there is therefore no justiciable claim for injunctive relief under § 16 of the Clayton Act.

of an American manufacturer to do business with that customer.

Pretrial Order No. 291 at 128. And again:

Since under the five-company rule they really were not competing for a particular customer against each other—and Your Honor will recall that only Toshiba and Sanyo dealt with Sears as an example—there was no need to agree upon an amount of rebate. As a practical matter, there was only the need to focus the attention of the competition against any potential U.S. manufacturer who was not a member of the cartel. As long as a particular defendant could come in at a depressed price below that which the U.S. manufacturer was proffering to try to get the business, that was enough.

Pretrial Order No. 291 at 120. The problem with the argument is that, where there is less competition, prices are inevitably kept up. We know of no rational explanation, and, although we pressed for it, plaintiffs have offered us none, why decreased competition would tend to bring prices down; rather, it is only increased competition, which the plaintiffs maintain the Japanese manufacturing defendants were attempting to avoid by the Rule, which could bring prices down, the low price being the evil about which plaintiffs are complaining.[72] While a consumer, or the attorney general, would have standing to object to high prices brought about by a limitation rule, these plaintiffs cannot be injured thereby, and accordingly lack standing to attack the Rule.

■ Turning to matters of price, the plaintiffs, in effect, concede that they would have no standing to bring an action based solely on the so-called "cartel agreements." It is self-evident that an agreement which places a floor under the price one's competition can charge keeps the price up, leaving one free to compete above that price. While injuring the consumer, such an agreement cannot injure the competitor.

In *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972), for example, the Seventh Circuit, per Judge (now Justice) Stevens, upheld the defendants' antitrust counterclaim against the plaintiff under § 2 of the Sherman Act, but remanded on the question whether the plaintiffs' illegal conduct had injured the defendant so as to permit it to maintain a claim under § 4 of the Clayton Act, 15 U.S.C. § 15. 452 F.2d at 597–600. Notwithstanding the remand for further factual development as to several claims of injury, the court summarily rejected the defendants' claim that, as a competing manufacturer, it could have been injured by the plaintiffs' increased prices. Judge Stevens wrote:

Defendant has also argued that plaintiff's dominant position, coupled with its restrictive licensing practices, has enabled it to enhance the price level. If this be so, defendant, as a competing manufacturer of machines, would not have been injured.

*Id.* at 600 (footnote omitted). *Accord, Bendix Corp. v. Balax, Inc.*, 471 F.2d 149 (7th Cir. 1972), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973); *Kemp Pontiac-Cadillac, Inc. v. Hartford Automobile Dealers' Ass'n*, 380 F.Supp. 1382, 1386 (D.Conn.1974).

---

**72.** We came to this conclusion only after much reflection upon plaintiffs' argument that they may attack the Rule because it facilitated the coordination of defendants' efforts jointly to penetrate the U.S. market, for there is an initial attractiveness to it. Indeed, we found the point troubling and expressed our qualms at oral argument. We conclude, however, that it is plain that in purely price terms the Rule must be deemed pro-competitive, that is unless one starts with a (bootstrapping) assumption that the Rule is the product of a conspiracy. We note that plaintiffs' "facilitation" argument might be plausible if some other potential benefit to the Japanese manufacturers could be identified, such as marketing cost-savings from increased efficiency. However, plaintiffs have identified no evidence in the record to support such an argument, and we cannot hypothesize such a situation in an industry in which, as far as the record shows, competition was by price alone. Plaintiffs have just not elucidated their theory with any degree of clarity. We deal further with this point at p. 1213, *infra*.

Plaintiffs have never articulated any theory as to how the minimum-price provisions of the agreements injured them. Instead, they make three arguments in response to defendants' attack on their standing. First, they contend that the minimum price level set by the agreements was itself unduly low. Second, they say that the minimum prices were not actually minima, but were "benchmark" or "reference" prices which were used by the defendants as points of reference for some lower figure arrived at by deducting a rebate or discount. Finally, they argue that the agreements are only one part of a "unitary conspiracy," and that it is pointless to quibble over their standing to attack one piece of a vast conspiracy.

Plaintiffs' argument that they have standing to attack the agreements because of the allegedly low level at which the minimum prices were set is without merit. No matter at what level the prices were set, the parties to the agreements remained free to sell at any price which equalled or exceeded the minimum price. Thus, the agreements curtailed each signatory's independent freedom of action only insofar as it prohibited prices below the minima. The agreements had no impact on prices except in those instances when the signatories, if they had exercised their independent judgment, would have charged prices lower than the minima. In those instances, the agreements had the effect of raising prices. Since nothing in the agreements had the effect of lowering prices, no matter at what level the minimum prices were set, plaintiffs' contention that the minimum prices were unduly low is of no significance.

Nor can the plaintiffs derive standing to attack the agreements from the contention that the prices set in accordance therewith were not actually minimum prices at all. As we have indicated, the evidence shows that many of the defendants, although they were parties to the Manufacturers' Agreements or the JMEA Rules, paid rebates to their U.S. customers so that the actual transaction prices, taking the rebates into account, were lower than the official minimum prices set under those agreements. We will consider *infra* whether there is any significant probative evidence to support plaintiffs' contention that these rebates were made as the result of concerted action among the defendants.[73] In any case, the fact that some defendants, whether independently or in concert, violated the written minimum-price agreements does not affect the narrow issue which we are now considering: whether the plaintiffs have standing to base an antitrust action on the written agreements themselves. The agreements on their face plainly set only minimum prices, and plaintiffs produced no evidence that, despite their language, the intent and purpose of the agreements was to require each signatory to sell at or below the minimum. Thus, plaintiffs' suggestion that they have standing to attack the agreements themselves because some of the signatories violated them is without merit.

The plaintiffs' third and most vociferous ground of opposition to the challenge to their standing is based on their theory of "unitary" conspiracy. Plaintiffs argue that the written agreements are only one element of proof in their conspiracy case, and that it makes no sense to discuss their "standing" with respect to a single piece of the pie. Moreover, any such analysis of one part of their conspiracy case, they submit, is "fragmentation" forbidden by *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

██ Because plaintiffs' "fragmentation" argument is interposed with respect to their entire case, we have treated it separately in Part VI.D.2, *infra*. In that discussion, we conclude that *Continental Ore* does not bar a detailed analysis of plaintiffs' conspiracy case and supporting evidence. Accordingly, we hold that plaintiffs have no standing to attack the minimum price agreements or the Five Company Rule because it is inconceivable that they could be injured thereby. Since plain-

---

**73.** The defendants have not challenged the plaintiffs' standing to attack concerted rebating

practices maintaining, however, that no such concerted scheme for rebating existed.

tiffs have no standing to attack the minimum-price agreements, those agreements cannot form the "core" of their conspiracy case. The essence of the case must instead (as plaintiffs themselves now assert) lie in the alleged conspiracy to violate the agreements. Yet it is obvious that the agreements themselves cannot be evidence of a conspiracy to violate those same agreements. While the agreements may be admissible to provide background on the defendants' conduct, they are of no probative force in establishing the existence of the entirely different conspiracy which might indeed have injured the plaintiffs, if it existed, and which plaintiffs do have standing to attack.

## C. *The Wilson Tariff Act*

██ In addition to plaintiffs' claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, plaintiffs allege that certain defendants' conduct in importing electronic products into the United States violated § 73 of the Wilson Tariff Act, 15 U.S.C. § 8. Section 73 of the Wilson Tariff Act provides in relevant part that

> Every combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal and void when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into which such imported article enters or is intended to enter.

15 U.S.C. § 8. Plaintiffs have never clearly stated the nature of their claim under the Wilson Tariff Act. However, given the tenor of what the parties have written on the point, we appear to be confronted with

the constructional question whether the Wilson Tariff Act is broader than, narrower than, or co-extensive with the Sherman Act's antitrust provisions.

Plaintiffs intimate, though they do not clearly state, that the Wilson Tariff Act may have protectionist aspects, and hence a broader scope than the Sherman Act. In their scores of briefs, they devote only one short segment to explication of their interpretation of the Wilson Tariff Act. There they emphasize the remarks of the sponsor of Section 73 of the Wilson Tariff Act that the provision punishes "the intent to abuse the importation laws of the United States." 26 Cong.Rec. 7118 (1894). Defendants take a polar position, asserting that the Wilson Tariff Act is narrower in scope than the Sherman Act and applies only to high price conspiracies. They argue that Congress established in the Wilson Tariff Act its own per se rule as to price fixing conspiracies designed to *increase* the price of imports to the United States. This provision, they continue, only demonstrated the intention of the 1894 Congress to prevent unreasonably *high* import prices and not, as plaintiffs would have it, "unreasonably" *low* prices.

Although the position advocated by plaintiffs has been advanced before, the defendants' argument is novel. However, we have no difficulty with the points and reject both contentions in favor of the view that the Wilson Tariff Act is co-extensive with Sherman Act § 1 (in the international context).

We address plaintiffs' claims first. The legislative history of the Wilson Tariff Act confirms that the purpose of Section 73 was substantively identical to the Sherman Act. The Senate Reports on the bill designate Section 73 as an antitrust provision by referring to it as "a substitute" for Sections 1–3 of the Sherman Act. S.Rep.No.698; 53rd Cong. 2d Sess. (Aug. 20, 1894); S.Rep. No.707, 53rd Cong. 2d Sess. (Aug. 28, 1894). Senator Morgan of Alabama, sponsor of the amendments to the tariff bill that eventually became Sections 73–76 of the Wilson Tariff Act, repeatedly emphasized that the language of the amendments clearly and effectively accomplished "the end that is

desired—that is to say, the repression of trusts, as they are called, in respect of the importation of goods from foreign countries." 26 Cong.Rec. 7117, 53rd Cong. 2d Sess. (July 3, 1894). Senator Morgan went on to elaborate:

> So under the bill we are now considering is afforded distinct opportunity for the formation of thousands of trusts. You can not exclude them from this country except by means of direct and positive legislation which reaches the abuse of the importing right and prevents it from entering into such combinations with capital as will enable the importer or the person interested in imports to control the prices in the market; in other words, in common parlance, to monopolize the market.

*Id.*, 26 Cong.Rec. 7118 (1894). This is, of course, antitrust language. Nowhere in his speeches on the Senate floor did Senator Morgan mention any protectionist intent to aid American manufacturers.

The case law has been consistent in treating the Wilson Tariff Act as an antitrust statute, and as nothing more than that. Judge Schwartz gave an accurate description of prior case law under the Wilson Tariff Act in *Outboard Marine Corp. v. Pezetel*, 461 F.Supp. 384 (D.Del.1978). The plaintiff in *Pezetel*, an American manufacturer of electric golf carts, noting that the defendants, the manufacturer, importer, and distributors of golf carts made in Poland, had set prices for the carts in the American market against which most American manufacturers were unable to compete, alleged *inter alia* a violation of the Wilson Tariff Act. The plaintiffs argued that "since the Sherman Act by its terms applies to foreign trade, the scope of the Wilson Tariff Act is rendered superfluous unless it is interpreted independently of the Sherman Act." *Id.* at 407. Apparently this claim, like plaintiffs' claim in this case, was vague enough to imply that the Wilson Tariff Act was more than an antitrust statute, containing an intent to protect American manufacturers by outlawing conduct which the Sherman Act did not. The court dismissed plaintiffs' contention that the Wilson Tariff Act be given a wider scope than the Sherman Act:

> [A]lthough superficially attractive, the argument is without the support of either the legislative history or case law. Rather it appears that the Wilson Tariff Act sought to make clear that import trade was subject to the scrutiny of the antitrust laws—a subject on which the Sherman Act was silent.

*Id.*[74]

Judge Schwartz' opinion reflects the consensus among the commentators and in the case law that the Wilson Tariff Act is not broader than the Sherman Act.[75] Where courts have found sufficient allegations of violations of the Sherman Act in the import context, they have invariably found sufficient allegations of violation of the Wilson Tariff Act as well.[76] If allegations are insufficient to maintain an antitrust claim, the Wilson Tariff Act provisions also fail.[77]

---

**74.** While the court refused to accept plaintiff's position, it also refused defendants' motion to summarily dismiss the Wilson Tariff Act claim, so long as plaintiff was still able to prove a claim under Section 2 of the Sherman Act.

**75.** *See generally* Kintner and Joelson, *An International Antitrust Primer* 16 (1974): "The statute [the Wilson Tariff Act] has had little independent use and has, as we have seen, been utilized primarily to accompany Sherman Act allegations." *See also* L. Sullivan, *supra*, at 714 n.2.

**76.** *See U. S. v. Sisal Corp.*, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927) (government application for an injunction against companies conspiring to increase the price of sisal on the U.S. market was sufficient to allege a cause of action under both the Sherman and Wilson Tariff Acts); *U. S. v. General Dyestuff Corp.*, 57 F.Supp. 642 (S.D.N.Y.1944) and *U. S. v. General Electric Co.*, 80 F.Supp. 989 (S.D.N.Y. 1948) (indictment alleging purpose of conspiracy was to restrain import trade in violation of the Sherman Act was also sufficient to allege a violation under the Wilson Tariff Act, despite the lack of a specific allegation of actual intent).

**77.** *See Reliable Volkswagen Sales Service Co. v. Worldwide Automobile Corp.*, 182 F.Supp. 412 (D.N.J.1960) (failure to state a claim under the Sherman Act constitutes failure to state a claim under the Wilson Tariff Act); *Fosburgh v. California & Hawaiian Sugar Refining Co.*, 291 F. 29 (9th Cir. 1923) (contracts for the sale

Having concluded that the Wilson Tariff Act is not broader in scope than the Sherman Act, the second question presented, and not addressed in previous cases, is whether the Wilson Tariff Act applies only to alleged high price conspiracies and hence is narrower than the Sherman Act. Defendants bottom their argument that the purpose of the Wilson Tariff Act was only to prevent "unreasonably high import prices" and not "unreasonably low prices" upon certain observations by Judge Frank in his dissenting opinion in *Adams-Mitchell Co. v. Cambridge Distributing Co.*, 189 F.2d 913, 920 (2d Cir. 1951). Judge Frank therein stated:

> [The Wilson Tariff Act] was pro-consumer legislation, designed to cut the cost of living by lowering the high protective tariffs on imported goods. But if foreign monopolists could fix high prices on their products, manifestly the Act would fail of its purpose, for high prices, whether due to monopoly or tariffs, would permit domestic producers to charge non-competitive prices, far above cost, for their wares, thereby obtaining higher profits at the expense of the consumer.

The majority in *Adams-Mitchell* had held that the Miller-Tydings Amendment, which exempts from the Sherman Act retail price maintenance agreements when permitted by state law, superseded the Wilson Tariff Act as well, because "the Sherman Act and the Tariff Act each embraced like prohibitions on restraint of foreign commerce." *Id.* at 916. Judge Frank was alone in contending that the Wilson Tariff Act should apply to such resale price maintenance agreements when the Sherman Act would not.

Judge Frank's construction of the legislative history is buttressed by the following statement by Senator Morgan in the Senate debates on the amendments:

> This amendment relates to preventive justice. It prevents men, by penalties imposed upon their transactions, from

abusing the revenues of the United States, its dignity, its honor, its peace, and prevents them also from imposing heavy burdens upon those who must consume either imported articles or those which are made under the shelter of this law of taxation and of importation.

26 *Cong.Rec.* 7118 (1894). Care, however, must be taken to assure that Senator Morgan's comments are not used out of context or to offend the plain meaning of the statute. It is true that the text of the statute explicitly outlaws high price conspiracies, prohibiting importers from conspiring "to increase the market price in any part of the United States, of any article or articles imported ... into the United States, or of any manufacture into which such imported article enters or is intended to enter." 15 U.S.C. § 8. But that does not carry the negative implication that low price conspiracies are permissible, for the referenced clause is joined to the immediately preceding language by the disjunctive "or" which, closely paralleling the Sherman Act, prohibits conspiracies "intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce." That language reaches, as does the Sherman Act, conspiracies that result in both low and high prices in the American market.

We thus reach the conclusion that the Wilson Tariff Act is of the same scope as the Sherman Act, neither broader as plaintiffs would like, nor narrower as defendants claim. Plaintiffs' claims under Section 73 of the Wilson Tariff Act will therefore be treated in the same manner as their claims under the Sherman Act. If plaintiffs' Sherman Act § 1 claims are sufficient to survive summary judgment, then defendants' motions addressed to the Wilson Tariff Act claims should be denied. However, if plaintiffs' Sherman Act § 1 claims cannot so survive, neither can their Wilson Tariff Act case. Given this construction, we shall refer discretely to the Wilson Tariff Act in this opinion only occasionally; for the most part we shall speak in Sherman Act terms.

of sugar between a refiner and a candy manufacturer which agreed to use the sugar only for its own manufacturing needs held not to violate

Section 1 of the Sherman Act and therefore also not the Wilson Tariff Act).

**D.** *The Law of Conspiracy in an Antitrust Context*

**1.** *In General*

One of the essential elements of a cause of action under section one of the Sherman Act is proof of a "contract, combination, or conspiracy" in restraint of trade. (Similarly, the Wilson Tariff Act requires proof of a "combination, conspiracy, trust, agreement, or contract.") In addition, for reasons described more fully *infra*, because of the fashion in which they are stated, plaintiffs' claims under § 2 of the Sherman Act, § 7 of the Clayton Act, and the Robinson-Patman Act all require proof of the underlying conspiracy which plaintiffs attack in their Sherman Act § 1 claim.[78]

 It is the agreement among competitors itself which § 1 of the Sherman Act condemns, and no overt act need be proved in order to establish a violation.[79] *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59, 60 S.Ct. 811, 845 n.59, 84 L.Ed. 1129 (1940); *Nash v. United States*, 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913). Moreover, as the Supreme Court has stated, "[n]o formal agreement is necessary to constitute an unlawful conspiracy. . . . The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words." *American Tobacco v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). How-

ever, the fact which must be proved, whether circumstantially or directly, before any violation of the Sherman Act § 1 prohibition can be established is that two or more business firms reached some kind of agreement:

> The crucial question is whether respondents' conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express. To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. But this Court has never held that proof of parallel business behavior conclusively establishes agreements or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.

*Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540–41, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954) (citations and footnote omitted). *See* Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv.L.R. 655 (1962).

The U.S. Court of Appeals for the Third Circuit has recently reiterated these basic propositions of Sherman Act law. *Edward J. Sweeney & Sons v. Texaco, Inc.*, 637 F.2d 105, 110–11 (3d Cir. 1980). In affirming the district court's grant of a directed verdict

**78.** Briefly, plaintiffs' Sherman Act § 2 claims depend upon their establishing conspiracy because they do not claim that any defendant individually monopolized or attempted to monopolize, but only that the defendants conspired to monopolize and collectively monopolized or attempted to monopolize relevant markets. Zenith's Clayton Act and Robinson-Patman Act claims require proof of conspiracy because, *inter alia*, plaintiffs have alleged no separate damages from the Clayton or Robinson-Patman violations which they charge the defendants with having committed, except for the damages which they claim to have incurred as a result of the alleged conspiracy as a whole. NUE has advanced no domestic Clayton Act or Robinson-Patman claims.

In addition, Zenith has sought to establish the liability of all the members of the purported conspiracy for Clayton Act § 7 and Robinson-Patman Act violations committed by one or more of the members of the conspiracy, under the doctrine of vicarious liability of coconspirators which it finds in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). This point is discussed in Part VI.D.5, *infra*.

**79.** Of course, a private treble damage plaintiff must show that he was injured in his business or property by reason of the violation in order to have standing to bring an action. 15 U.S.C. § 15. *See* Part VI.B, *supra*.

for the defendant under the Sherman Act, the Court of Appeals said:

> Unilateral action, no matter what its motivation, cannot violate § 1. *United States v. Colgate & Co.*, 250 U.S. 300, 307 [39 S.Ct. 465, 468, 63 L.Ed. 992] (1919); *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1072 (3d Cir. 1978); *Tripoli Co. v. Wella Corp.*, 286 F.Supp. 264, 266 (E.D. Pa.1968), *aff'd*, 425 F.2d 932 (3d Cir.), *cert. denied*, 400 U.S. 831 [91 S.Ct. 62, 27 L.Ed.2d 62] (1970). By its terms, § 1 requires proof of a "contract, combination ... or conspiracy." 15 U.S.C. § 1. We have noted that the statutory language presents a single concept about common action, not three separate ones: " 'contract ... combination or conspiracy' becomes an alliterative compound noun, roughly translated to mean 'concerted action.' " *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 445–46 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086 [98 S.Ct. 1280, 55 L.Ed. 791] (1978) (quoting L. Sullivan, *Law of Antitrust* 312 (1977)).

To establish the existence of concerted action, appellants had to submit evidence from which a jury could reasonably infer that Texaco and others had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Klein v. American Luggage Works, Inc.*, 323 F.2d 787, 791 (3d Cir. 1963); *United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir. 1963). Direct proof of an express agreement is not required. On the contrary, the plaintiff may rely on an inference of a common understanding drawn from circumstantial evidence: "The picture of conspiracy as a meeting by twilight of a trio of sinister persons with pointed hats close together belongs to a darker age." *William Goldman Theatres v. Loew's, Inc.*, 150 F.2d 738, 743 n.15 (3d Cir. 1945). Nevertheless, appellants had the burden of adducing sufficient evidence from which the jury could find illegal concerted action on the basis of reasonable inferences and not mere speculation. *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1312 (3d Cir. 1975).

In this case, plaintiffs have attempted to prove the existence of a conspiracy both by circumstantial evidence and by putative direct proof.

There are several legal issues in dispute between the parties which relate specifically to the law of conspiracy in an antitrust context. First, the parties disagree on the significance of the Supreme Court's warning in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), against "fragmentation" of a plaintiff's proof of conspiracy. Second, the plaintiffs and defendants disagree on the meaning of the rule in this and other circuits which in plaintiffs' submission requires only "slight evidence" of a defendant's participation in an alleged conspiracy to make him liable for conspiratorial activity. Third, there is a dispute concerning the requisites of proof of conspiracy by inference from circumstantial evidence, and, in particular, on the requirements for proving conspiracy by means of consciously parallel business behavior. Fourth, there is a dispute concerning the vicarious liability of all members of the purported conspiracy for Robinson-Patman Act and Clayton Act § 7 violations committed by one or more members of the conspiracy, under the doctrine of vicarious liability of coconspirators which Zenith finds in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Fifth, the parties disagree as to the requisites for admissibility of coconspirator declarations. We address these five issues in the order stated.

### 2. *Fragmentation of the Plaintiffs' Conspiracy Allegations*

Repeatedly throughout this litigation, the plaintiffs have resisted attacks on the legal sufficiency of their conspiracy allegations by quoting the Supreme Court's admonition in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962):

> In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping

the slate clean after scrutiny of each. "... [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *United States v. Patten*, 226 U.S. 525, 544, 33 S.Ct. 141 [145–146], 57 L.Ed. 333 ...; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it." *American Tobacco Co. v. United States*, 147 F.2d 93, 106 (C.A.6th Cir.)

For example, the plaintiffs oppose the defendants' claim that plaintiffs lack standing to attack the Manufacturers' Agreements, arguing that defendants should not be permitted to isolate one part of what plaintiffs claim is a "unitary" conspiracy, thereby fragmenting plaintiffs' conspiracy case and denying them "the full benefit of their proof" in contravention of *Continental Ore*. As we shall explain, it is clear from the facts and reasoning of *Continental Ore* itself that the Supreme Court never intended the quoted language to bar a probing analysis of antitrust conspiracy claims. Accordingly, we reject plaintiffs' interpretation of the quoted language.

In *Continental Ore*, the Supreme Court reversed the decision of the Ninth Circuit, which had held that a verdict for the defendants should have been directed because the plaintiff failed to prove that the defendants were members of a conspiracy which was actionable under the Sherman Act. The plaintiffs in *Continental Ore* claimed that six defendants and others conspired to restrain and to monopolize trade and commerce in ferrovanadium and vanadium oxide, two compounds used chiefly in the manufacture of steel. Specifically, the complaint in *Continental Ore* alleged that the defendants' conspiracy had frustrated four different efforts which plaintiffs had made to enter and maintain themselves in the vanadium business, largely by obstructing plaintiffs' access to raw materials, and had also excluded the plaintiffs from the Canadian market.

The Court of Appeals had affirmed a jury verdict for the defendants, holding that the trial court should have directed a verdict for the defendants because there was insufficient evidence to justify a jury finding that the defendants' alleged illegal acts were in fact the cause of Continental's failure in the vanadium business. The Court of Appeals had analyzed separately each of the four incidents upon which the plaintiffs based their claim, finding that in each case the plaintiffs had failed to show that their failures in the vanadium business were causally connected to the defendants' obstruction of access to supplies. With respect to the fifth incident involving alleged interference with plaintiffs' Canadian sales, the Court of Appeals ruled that the claim was not "within the purview of the Sherman Act" because of the involvement of the Canadian government. 289 F.2d at 94.

The Supreme Court commented:

It is apparent ... that the Court of Appeals approached Continental's claims as if they were five completely separate and unrelated lawsuits. We think this was improper.

370 U.S. at 698–99, 82 S.Ct. at 1410. Immediately following this comment, the Court stated the warning against "compartmentalizing" a conspiracy case which we have previously quoted. The import of that admonition, read against the background of the *Continental Ore* decision, is that the jury, which "weighs the contradictory evidence and inferences," *id.* at 701, 82 S.Ct. at 1411, was entitled to give whatever weight it chose to the repetitive nature of the alleged injuries to the plaintiffs. We, of course, accept the import of that teaching here.

However, the *Continental Ore* warning plainly was not intended to preclude analysis of the legal basis of the conspiracy allegations of an antitrust plaintiff. In *Continental Ore* itself, the Supreme Court engaged in a detailed analysis of the record with respect to three of the four ventures which the Court of Appeals had addressed on their facts, concluding with respect to each of the three considered sepa-

rately that there was enough evidence of causation to preclude a directed verdict. *Id.* at 702–08, 82 S.Ct. at 1412–1415. If the warning against "compartmentalizing" an antitrust conspiracy case were meant to prevent a court from breaking down a plaintiff's allegation of a "unitary" conspiracy into its component parts for purposes of analysis, the Court would not have engaged in the "forbidden" analysis in the very same opinion in which it issued the warning. We conclude that the *Continental Ore* admonition against fragmentation of a conspiracy case does not preclude our analysis of the alleged "unitary" conspiracy.

Our conclusion is supported by the reasoning of other courts which have interpreted the *Continental Ore* warning. The most recent case is *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727 (9th Cir. 1979), in which the Ninth Circuit upheld the grant of a directed verdict against an antitrust plaintiff which claimed that it was injured by the defendant's violations of § 2 of the Sherman Act. After analyzing the evidence with respect to each of the acts upon which the plaintiff based his claim, and concluding that the district judge was correct in taking the case from the jury, the court commented:

> Nor does viewing the various acts of IBM collectively change our conclusion. The number of legal and evidentiary issues has required us to consider each instance of IBM's alleged monopolizing conduct separately for purposes of analytical clarity. However, we are mindful of the fact that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962); *see Knutson v. Daily Review, Inc.,* 548 F.2d 795, 814 (9th Cir. 1976). But there can be no synergistic result such as CalComp claims from a number of acts none of which show causal antitrust injury to CalComp.

613 F.2d at 746. We will have occasion to echo these comments *infra.*

In *Overseas Motors, Inc. v. Import Motors Ltd.,* 375 F.Supp. 499 (E.D.Mich.1974), aff'd, 519 F.2d 119 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975), the district court directed a verdict against the plaintiff, which alleged that it was injured by a conspiracy in violation of § 1 of the Sherman Act. That court observed:

> Establishing conspiracy as a permissible inference, like any empirical inquiry, is merely an exercise in inductive reasoning—inference based upon the cumulation of consistent data. It is true, as plaintiff points out, that the evidence should not be compartmentalized but should be viewed as a whole when making this determination. Certainly each fact is meaningful primarily as part of a pattern, and the total pattern is the most important datum of all. But for the system to be workable the units of cumulation must begin at a less ambitious and more manageable level than the "totality of the evidence" which plaintiff has so often urged to be the only proper measure of its case.

375 F.Supp. at 531–32 (footnote omitted). The Sixth Circuit affirmed the grant of a directed verdict, without specific discussion of "compartmentalization." 519 F.2d 119.

In *United States v. FMC Corp.,* 306 F.Supp. 1106 (E.D.Pa.1969), Judge Higginbotham analyzed the government's allegations and evidence in a civil conspiracy case under § 1 of the Sherman Act, finding after trial that some but not all of the alleged conspiratorial price increases were the result of an illegal conspiracy among competitors. Judge Higginbotham commented:

> The Government argued forcefully that the several incidents which it sought to establish as evidence of the conspiracy should not be viewed in isolation, but rather should be considered as "tiles in the mosaic of an over-all plan or conspiracy." And the Supreme Court has held that in cases involving alleged conspiracies in violation of the Sherman Act, "plaintiffs should be given the full bene-

fit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.... [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962). Nevertheless, because of the episodic nature of the incidents, separated in space and time; and the disparity of their respective elements, linked only by the cast of characters common to most of them; it is necessary to consider some of these incidents separately to define precisely the nature of the conspiracy.

306 F.Supp. at 1135.

Like Judge Higginbotham in the *FMC* case, we deem it necessary to analyze plaintiffs' conspiracy allegations in order "to define precisely the nature of the conspiracy." Consonant with the observations quoted above by the court in *Overseas Motors*, it is impossible in this case to begin with the "totality of the evidence."

In addition to the precedents discussed above, our construction of *Continental Ore* is also supported by reason and common sense. To give the *Continental Ore* warning the talismanic quality which the plaintiffs propose would be to permit any antitrust plaintiff to foreclose critical analysis of his allegations, merely by intoning the magic words "unitary" conspiracy and "totality of the evidence." Lawsuits in the federal courts are decided by proof, not sorcery. We cannot allow plaintiffs to erect such a barrier to probing examination of their claims.

Since *Continental Ore* does not prevent us from analyzing the plaintiffs' conspiracy allegations, we proceed to consider another specialized issue of conspiracy law which confronts us on these motions: the so-called "slight evidence" rule.

### 3. The "Slight Evidence" Rule

■ Plaintiffs contend that under the law of the Third Circuit, once the existence of a conspiracy is established only "slight evidence" is required to connect any given defendant with it. This so-called "slight evidence" rule has been stated as follows: "Where the government has established the existence of a conspiracy ..., 'slight evidence may be sufficient to connect a defendant with it.'" *United States v. Kates*, 508 F.2d 308, 310 (3d Cir. 1975), *quoting United States v. DeCavalcante*, 440 F.2d 1264, 1273 (3d Cir. 1971). An examination of the cases readily shows that, as followed in the Third Circuit, this principle is merely an application of the standard for appellate review of jury verdicts, and has no application to a district court determination of a summary judgment motion.

■ Once a jury has returned a guilty verdict on a conspiracy charge, the reviewing court's role is to determine whether there was sufficient evidence to sustain the conviction of conspiracy. The court will view the evidence in the light most favorable to the prosecution. *See, e. g., United States v. Allard*, 240 F.2d 840 (3d Cir.), *cert. denied*, 353 U.S. 939, 77 S.Ct. 814, 1 L.Ed.2d 761 (1957). The Third Circuit recently clarified the meaning of the slight evidence rule in light of these principles:

The reference to "slight evidence" ... is no more than a shorthand expression of the rule that, after a guilty verdict by a jury or a finding of guilt by a trial court, an appellate tribunal may not substitute its inferences from the evidence for those drawn by the factfinder, if there was sufficient evidence to submit to the factfinder in the first place.

*United States v. Cooper*, 567 F.2d 252, 253 (3d Cir. 1977). In fact, Judge Gibbons, writing for the court in *Cooper*, a criminal case, commented:

Clearly, it would be reversible error to charge a jury that, once the government has shown the existence of a conspiracy, it may connect a particular defendant to it by "slight evidence," rather than by evidence proving the connection beyond a reasonable doubt.

*Id.* *See also United States v. Schoenhut,* 576 F.2d 1010, 1027 (3d Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978); *United States v. Provenzano,* 620 F.2d 985, 999 (3d Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). The Ninth Circuit has also attempted recently to clarify the slight evidence rule, *United States v. Dunn,* 564 F.2d 348, 356–57 (9th Cir. 1977), and the Fifth Circuit has repudiated the rule entirely, *United States v. Malatesta,* 590 F.2d 1379 (5th Cir.) (en banc), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

Since the Third Circuit explained clearly and unambiguously in *Cooper, supra,* that the "slight evidence" rule is "no more than a shorthand expression" for the standards of appellate review of a jury verdict of guilt, which assumes sufficient probative evidence to go to the jury initially, that rule has no place here.[80] Accordingly, when we consider the evidence purportedly connecting particular defendants to the alleged conspiracy, we will do so under the pertinent evidentiary standards: whether there is a genuine issue of material fact, for purposes of our ruling on the summary judgment motions, *see* Part IV, *supra*; and whether that connection is established by the preponderance of the evidence, for purposes of our F.R.E. 104(a) determination on evidence *aliunde, see* Part VI.D.6, *infra.*

4. *The Requisites of Circumstantial Proof of Conspiracy by Inference from Consciously Parallel Business Behavior*

a. *Introduction*

Part of plaintiffs' purported proof that the defendants conspired with one another is evidence that the Japanese manufacturing defendants each charged significantly lower prices in the United States than in Japan for allegedly comparable products. *See* Part VII.J, *infra.* Thus plaintiffs' con-

spiracy case is premised in part on evidence of parallel price discrimination between two separate national markets. The plaintiffs also rely on other evidence of parallel conduct, such as the granting of rebates from the invoice price by many of the defendants, as circumstantial evidence of conspiracy.

The defendants contend that this and other evidence of parallel conduct offered by plaintiffs does not suffice to create a genuine issue of material fact with respect to the existence of conspiracy under the leading cases of *First National Bank of Arizona v. Cities Services, Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) and *Venzie Corp. v. United States Mineral Products Co.,* 521 F.2d 1309 (3d Cir. 1975). The plaintiffs reply that the choice between inferences which might flow from a showing of parallel price discrimination is properly a matter for the trier of fact, and cannot be made by the court in ruling on summary judgment motions. The defendants rejoin that the leap from a showing of parallel price discrimination to the ultimate fact of conspiracy is speculation, not inference, and is not permissible as a matter of law.

b. *General Principles Concerning Inferences From Circumstantial Evidence on Summary Judgment Motions*

■ In order to withstand defendants' summary judgment motions, plaintiffs must come forward with "significant probative evidence," *Cities Service, supra,* that the defendants had a "conscious commitment to a common scheme." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir. 1980); *Klein v. American Luggage Works, Inc.,* 323 F.2d 787, 791 (3d Cir. 1963). The circumstances under which evidence of parallel behavior is probative of conspiracy depend upon principles of general application governing the permissibility of factual inferences. If those principles preclude the trier of fact from inferring the ultimate

---

**80.** During oral argument, plaintiffs relied on *United States v. Tiche,* 424 F.Supp. 996 (W.D. Pa.), *aff'd mem.,* 564 F.2d 90 (3d Cir. 1977), where the District Court, stating its findings after a bench trial, said that slight evidence

may be sufficient to connect a defendant with a conspiracy, relying on *United States v. Kates, supra. Tiche* was decided prior to the Third Circuit opinion in *Cooper.*

fact of conspiracy from plaintiffs' evidence of parallel behavior, then plaintiffs' evidence is not probative of the conspiracy alleged in their complaint. If the evidence is not probative, then it cannot raise a genuine issue of material fact so as to defeat a Rule 56 summary judgment motion. In other words, in order to determine whether or not plaintiffs' circumstantial evidence is sufficient to create a genuine issue of material fact, we must determine whether or not the inference from the circumstantial evidence to the ultimate fact of conspiracy is permissible as a matter of law.

The Court of Appeals discussed the law of inferences in a recent case upholding a directed verdict for the defendant on a Sherman Act § 1 antitrust claim. Although the circumstantial evidence which the plaintiff offered in that case was not evidence of parallel business behavior, the principles governing permissible inferences are of general application. The Court of Appeals stated:

> When a trial court grants a directed verdict in a circumstantial evidence case, the court makes a legal determination that the narrative or historical matters in evidence allow no permissible inference of the ultimate fact urged by the opposing party. It decides that no reasonable person could reach the suggested conclusion on the basis of the hard evidence without resorting to guesswork or conjecture. To permit a jury to draw an inference of the ultimate fact under these circumstances is to substitute the experience of logical probability for what the courts describe as "mere speculation." *Galloway v. United States,* 319 U.S. [372] at 395 [63 S.Ct. 1077 at 1089, 87 L.Ed. 1458]; *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.,* 579 F.2d [20] at 25.

*Sweeney, supra,* 637 F.2d at 116. In an earlier case, also affirming a directed verdict for Sherman Act § 1 defendants, the Third Circuit said:

A jury is permitted to draw only those inferences of which the evidence is reasonably susceptible, and may not be permitted to resort to speculation. Therefore, we hold that the evidence was insufficient to support the claim that the distributors rejected superior bids of the plaintiff in furtherance of a common plan.

*Viking Theatre Corp. v. Paramount Film Distributing Corp.,* 320 F.2d 285, 296 (3d Cir. 1963), *aff'd by an equally divided court,* 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964).

Although these rulings were made in the context of appeals from directed verdicts, they were based upon general principles of the law of inferences, which apply equally to a motion for summary judgment, to a motion for a directed verdict, to a Rule 104(a) evidentiary determination, or to any other situation in which a party seeks to meet his evidentiary burden by means of an inference. "Mere speculation," in the form of an inference which is not supported by logic, is not sufficient to withstand a motion for summary judgment.[81] In *British Airways Board v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir. 1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979), for example, the Ninth Circuit affirmed a grant of summary judgment, holding that "a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation."

Similarly, in *American Telephone & Telegraph Co. v. Delta Communications Corp.,* 590 F.2d 100, 101–02 (5th Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979), the Fifth Circuit upheld the grant of summary judgment in an antitrust conspiracy case, stating:

> In passing on a motion for summary judgment, even where the underlying

---

**81.** The essential difference between summary judgment and a directed verdict is the unavailability of demeanor evidence at the summary judgment stage. *See* 6 Moore's Federal Practice ¶ 56.04[2]; Currie, *Thoughts on Directed Verdicts and Summary Judgments,* 45 U.Chi.L. Rev. 71, 79 (1977). The inferences which plaintiffs would propose to the trier of fact in this case have nothing to do with demeanor evidence.

facts are undisputed, it is hornbook law that the court must indulge every *reasonable* inference from those facts in favor of the party opposing the motion. Insofar as any weighing of inferences from given facts is permissible, the task of the court is not to weigh these against each other but rather to cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness, casting aside those which do not meet it and focusing solely on those which do. If a frog be found in the party punch bowl, the presence of a mischievous guest—but not the occurrence of spontaneous generation—may reasonably be inferred.

(emphasis in original). And in *Miller v. Schweickart*, 413 F.Supp. 1062 (S.D.N.Y. 1976), a securities case, in granting summary judgment Judge Weinfeld commented:

It is true that the inference to be drawn from an established fact must be left to the fact finder. But a precondition is that "the inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind and ... not one of two or more inferences, both or all of which are about equally probable."

*Id.* at 1066, *quoting NLRB v. Martin A. Gleason, Inc.*, 534 F.2d 466, 474 (2d Cir. 1976). *See also Eastern Engineering & Elevator Co. v. NLRB*, 637 F.2d 191, 199–200 (3d Cir. 1980); *Neely v. St. Paul Fire & Marine Insurance Co.*, 584 F.2d 341 (9th Cir. 1978); *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824, 826 (5th Cir. 1978); *Natrona Service Inc. v. Continental Oil Co.*, 435 F.Supp. 99, 106–07 (D.Wyo.1977), *aff'd*, 598 F.2d 1294 (10th Cir. 1979). *See generally* Part V, *supra.*

■ Thus to withstand a summary judgment motion, any inference from circumstantial evidence must be made "on the basis of the hard evidence without resorting to guesswork or conjecture." *Sweeney, supra.* We turn to the application of this principle to the special context of inferring a conspiracy in violation of the Sherman Act § 1 from circumstantial evidence of parallel business behavior.

### c. Inferring Conspiracy From Parallel Conduct

■ It is clear as a matter both of logic and of controlling precedent that evidence of consciously parallel conduct alone is not sufficient to support an inference of conspiracy. The reasons for this rule of inference were stated by Professor Donald Turner in an influential law review article:

The point is that conscious parallelism is never meaningful by itself, but always assumes whatever significance it might have from additional facts. Thus, conscious parallelism is not even evidence of agreement unless there are some other facts indicating that the decisions of the alleged conspirators were *interdependent*, that the decisions were consistent with the individual self-interest of those concerned only if they all decided the same way....

Even the fact that competitors have knowingly charged identical prices is a neutral fact in the absence of evidence which would lead one to expect that the prices would have been different if truly independent decisions had been made. Identical prices may be consistent with independent competitive decisions. A large number of producers of a standardized commodity selling under stable market conditions might be expected to charge the same price, a price set not by agreement but by market conditions. None could charge more and make any sales, and there would be no point in charging less because, under competitive assumptions, each could sell at the established market price all that his costs made it profitable to sell.

Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv.L.Rev. 655, 658–59 (1962) (emphasis in original).

The requirement that interdependence of business behavior be shown before an inference of conspiracy from consciously parallel conduct is legally permissible is well estab-

lished in the case law under the Sherman Act. In *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court upheld the grant of summary judgment in favor of an antitrust defendant on the issue of whether the defendant was a member of the conspiracy alleged in the complaint. The case arose from a dispute over the marketing of Iranian oil following the nationalization of Iran's oilfields by the Mossadegh government in 1951. The original plaintiff, Waldron, obtained a contract to purchase some of the output of the nationalized oilfields, but allegedly was unable to market the oil. He alleged that the defendants other than Cities Service Co. ("Cities") had conspired to prevent him from selling any of the Iranian oil; and that Cities, which initially had conducted extensive negotiations with him, broke off dealing and joined the conspiracy as the result of receiving a contract for the purchase of Kuwaiti oil at a favorable price from other conspirators. Waldron sought to prove Cities' membership in the alleged conspiracy by circumstantial evidence of Cities' refusal to deal with him, after breaking off the initial negotiations, and of its receipt of the Kuwaiti oil contract. After extensive discovery, Cities moved for summary judgment; after additional extensive discovery, the motion was granted.

In the Supreme Court, the plaintiff abandoned his argument relating to the award of a contract for Kuwaiti oil to Cities, as undisputed evidence showed that that contract was unrelated to the alleged conspiracy. His case against Cities was thus premised on Cities' alleged refusal to deal with him, conduct which was allegedly parallel with that of the other defendants. The Court found that parallel conduct insufficient to withstand Cities' motion for summary judgment. It distinguished a previous decision on conscious parallelism, *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939):

> In *Interstate Circuit* a group of motion picture distributors, at the request of two large first-run exhibitors, simultaneously imposed identical restrictions on subsequent showings of the films they distributed ... There was no direct evidence showing that the distributors agreed with one another to impose the identical restrictions, but it was shown that each distributor knew that all the other distributors had been approached with the same proposal and that the imposition of the restrictions would be feasible only if adhered to by all distributors. Finally, it was shown that the identical action taken had the effect of creating a likelihood of increased profits for each distributor. This Court held that on the foregoing facts a tacit agreement to restrain competition between the distributors could properly be inferred.

391 U.S. at 286–87, 88 S.Ct. at 1591–1592. Thus in *Interstate Circuit*, in addition to consciously parallel conduct, the plaintiffs had shown the essential elements of interdependence. First, they had shown that each of the alleged coconspirators knew that the restrictions "would be feasible *only if adhered to by all distributors*" (emphasis added). Second, they had shown that if all the distributors adhered to a common scheme, their adherence created "a likelihood of increased profits for each distributor." The *Cities Service* Court found these elements absent in the case against Cities:

> *Interstate Circuit* differs from the case at hand ... in the inferences of motive that can reasonably be drawn from the facts. The reason that the absence of direct evidence of agreement in Interstate Circuit was not fatal is that the distributors all had the same motive to enter into a tacit agreement. Adherence to such an agreement would enable them to increase their royalties by forcing a rise in admission prices without the danger of competitors enlarging their share of the subsequent-run market by refusing to impose similar restrictions....

Here Waldron is unable to point to any benefits to be obtained by Cities from refusing to deal with him and, therefore, the inference of conspiracy sought to be drawn from Cities' "parallel refusal to deal" does not logically follow.

*Id.* at 287, 88 S.Ct. at 1592 (footnote omitted). Since the inference of conspiracy did not logically follow, the Supreme Court affirmed the grant of summary judgment for Cities.

Subsequent decisions have refined the test of interdependence. The leading case in the Third Circuit is *Venzie Corp. v. United States Mineral Products,* 521 F.2d 1309, 1314 (3d Cir. 1975), which plainly controls our decision here. In *Venzie* the Court of Appeals, speaking through Chief Judge Seitz, affirmed a directed verdict for the defendants in a Sherman Act § 1 conspiracy case. The Court of Appeals ruled:

> [Plaintiffs'] evidence does not, however, include two elements generally considered critical in establishing conspiracy from evidence of parallel business behavior: (1) a showing of acts by defendants in contradiction of their own economic interests, *Delaware Valley Marine Supply Co. v. American Tobacco Co.,* 297 F.2d 199 (3d Cir. 1961), *cert. denied,* 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962); and (2) satisfactory demonstration of a motivation to enter an agreement, *First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 287, 88 S.Ct. 1575 [1592], 20 L.Ed.2d 569 (1968).
>
> The absence of action contrary to one's economic interests renders consciously parallel business behavior "meaningless, and in no way indicates agreement...."
> Turner, [*supra,* 75 Harv.L.Rev. at 681].

521 F.2d at 1314.

Also important is *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir. 1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), in which the Court of Appeals, again speaking through Chief Judge Seitz, vacated and remanded the district court's grant of pre-discovery summary judgment for the defendants on a complaint which alleged "a course of interdependent consciously parallel action." The Court of Appeals determined that the lower court had treated the summary judgment motion as the functional equivalent of a Rule 12(b)(6) motion to dismiss for failure to state a claim, and reviewed the lower court's order on the standard applicable to a motion to dismiss. 561 F.2d at 444. The Court of Appeals determined that the complaint was sufficient to state a cause of action under § 1 of the Sherman Act, and stated the law concerning inferring a conspiracy from consciously parallel interdependent action as follows:

> The law is settled that proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of rational independent choice less attractive than that of concerted action. *Compare Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), with *First National Bank v. Cities Service Co.,* 391 U.S. 253, 274–88, 88 S.Ct. 1575 [1585–1592], 20 L.Ed.2d 569 (1968). We recently articulated those circumstances in *Venzie Corp. v. United States Mineral Products Co.,* 521 F.2d 1309 (3d Cir. 1975):
>
> "(1) a showing of acts by defendants in contradiction of their own economic interests; and
>
> (2) satisfactory demonstration of a motivation to enter an agreement ..."

561 F.2d at 446.[82] Under this formulation, if the inferences of rational independent choice and concerted action are equally drawable, the proof is insufficient. We shall apply this formulation, which is an exercise in logical analysis, in Part VII, *infra.*

More recently, in *Sweeney, supra,* the Third Circuit upheld the grant of a directed verdict in favor of a defendant charged with participation in a conspiracy in viola-

---

**82.** Thus *Bogosian* states the general principle—that the circumstances under which the conduct occurred must make the inference of rational independent choice less attractive than that of concerted action—while *Venzie* refined that principle by specifying two particular circumstances that would generally be critical to a determination of conspiracy based upon parallel conduct.

tion of § 1 of the Sherman Act. In that case, the defendant, Texaco, Inc., had terminated the plaintiff, Edward J. Sweeney & Sons, Inc., as a distributor of Texaco products. The plaintiff alleged that the termination was the result of Texaco's combination with competing Texaco retailers. Texaco claimed that the plaintiff's agreement was terminated because Texaco was incurring a $58,000 annual loss by supplying the plaintiff with its products. The Court of Appeals found that the $58,000 figure was undisputed, and held that no conspiracy could be inferred because Texaco's action was in Texaco's own independent self-interest. The court stated:

> Putting aside the testimony of Rodden, Doherty, Murray and the others on which appellants rely, appellants have failed to show that Texaco's actions contradicted the refiner's economic self-interest. Speaking through Chief Judge Seitz, our court has isolated "two elements generally considered critical in establishing conspiracy from evidence of parallel business behavior: (1) a showing of acts by defendants in contradiction of their own economic interests ... and (2) satisfactory demonstration of a motivation to enter an agreement." *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1314 (3d Cir. 1975) (citations omitted). *Venzie* sets forth one means of establishing a conspiracy circumstantially. Clearly by lowering the hauling allowance, Texaco acted in its self interest, and was not proceeding contrary to its "own economic interests." The change saved it $58,000 per year on sales to Sweeney. This undisputed fact negates an inference of concerted action that might exist if both factors of *Venzie* were satisfied.

637 F.2d at 114 (footnote omitted).[83] *See also Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205 (3d Cir. 1980);

*Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 35 n.54 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

If the plaintiffs are unable to meet the *Venzie* test for circumstantial evidence of conspiracy, mere proof of parallel behavior added to evidence of meetings among the defendants will not suffice as proof of conspiracy. The defendants admit that they held meetings among themselves on various issues, ranging from discussions of price and demand in the domestic Japanese market, *see* Part VII.G, *infra*, to a common legal defense to the U.S. administrative proceedings under the 1921 Antidumping Act, *see* Part VII.L, *infra*. The plaintiffs have placed great weight on the existence of these admitted meetings among defendants, contending that the meetings offered the defendants an opportunity to engage in the low-price export conspiracy charged in their complaint. However, as we explained in Part VI.A.4, *supra*, proof of an "opportunity to conspire" is insufficient to give rise to an inference of conspiracy.

Although *Venzie* and *Sweeney* were decisions upholding the grant of directed verdicts, rather than summary judgment, and *Bogosian* merely announced the applicable rules of law, the principles of inference announced therein are fully applicable on a motion for summary judgment. First, as we have observed, principles governing the permissibility as a matter of law of inferences from circumstantial evidence apply at the summary judgment stage just as they do on motions for a directed verdict, or at or after trial. *See* p. 1171, *supra*. Furthermore, the Supreme Court upheld the grant of summary judgment in *Cities Service* because of the failure of plaintiff's evidence there of parallel conduct to support an inference of conspiracy. In addi-

---

**83.** Judge Sloviter dissented in *Sweeney*, largely on the basis that in her view the plaintiff had elicited enough evidence of Texaco's acting in contradiction of its own independent economic interests to require the issue to be submitted to the jury. 637 F.2d at 128–29. She did not disagree with the majority's statement of the

law on proof of interdependence, however, and even commented that evidence of actions in contradiction to the actor's independent self-interest is "the key to reconciliation of the [Supreme] Court's decisions in *Interstate Circuit* and *Theatre Enterprises*." *Id.* at 129.

tion, many other courts have granted or upheld the grant of summary judgment on the basis of the plaintiffs' inability to support an inference of conspiracy by proof of parallel conduct. *E. g., Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539 (5th Cir. 1980); *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102 (2d Cir. 1975); *Gold Fuel Service, Inc. v. Esso Standard Oil Co.*, 306 F.2d 61 (3d Cir. 1962), *cert. denied*, 371 U.S. 951, 83 S.Ct. 506, 9 L.Ed.2d 500 (1965); *Southway Theatres, Inc. v. Buena Vista Distribution Co.*, 1980–2 Trade Cases ¶ 63,546 (N.D.Ga. 1980); *Weit v. Continental Illinois National Bank & Trust Co.*, 478 F.Supp. 285 (N.D.Ill. 1979); *Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.*, 408 F.Supp. 1251 (S.D.N.Y.1976). Thus we must apply the rules of antitrust inference of *Venzie, Bogosian,* and *Sweeney* in our consideration of the instant summary judgment motions.

As we examine plaintiffs' evidence to determine whether or not plaintiffs have met the *Bogosian/Venzie* test for the inference of conspiracy from consciously parallel conduct, we will most often be applying the first part of the *Venzie* test: whether the defendants' parallel behavior is inconsistent with their own independent economic interests. Put differently, in ruling on the present motions for summary judgment, our inquiry will most often be whether the plaintiffs have adduced significant probative evidence sufficient to create a genuine issue of material fact as to this element of their proof. If the plaintiffs have not made such a showing, then the inference of conspiracy which they propose from what they assert to be consciously parallel behavior is not permissible as a matter of law, and their evidence of parallel conduct provides no support for their opposition to these summary judgment motions. We will, from time to time, also address the question in terms of the more fundamental *Bogosian* formulation—whether the circumstances make the inference of rational independent choice less attractive than that of concerted action, applying the same "showing of a genuine issue" standard.

To recapitulate, in applying the *Bogosian/Venzie* test to the evidence alleged by plaintiffs to be probative of conspiracy through consciously parallel interdependent action, we shall utilize one of the following formulations:

(1) whether the circumstances under which the behavior occurred "make the inference of rational independent choice less attractive than that of concerted action," *Bogosian*, 561 F.2d at 446;

(2) whether the inferences of rational independent choice and concerted action are equally drawable, in which case the *Bogosian* test has not been met;

(3) whether the conduct is contrary to defendants' economic self-interests and whether a motivation to enter an anti-competitive agreement has been shown. *Venzie, supra.*

We note that the *Bogosian/Venzie* test applies to situations in which plaintiff is attempting to prove collusion through evidence of consciously parallel business behavior. When we review evidence other than that which is alleged to show parallel behavior the broader general principles of the law of inferences will apply, and we shall draw all reasonable non-speculative inferences in favor of the plaintiffs.[84]

### 5. Vicarious Liability of Coconspirators: The *Pinkerton* Doctrine and Robinson-Patman Act and Clayton Act § 7 Violations

■ Zenith has sought to establish the liability of all the members of the purported conspiracy for Robinson-Patman Act and Clayton Act § 7 violations committed by

---

**84.** The same principles will control our determination under F.R.E. 104(a) as to whether the plaintiffs have made a sufficient showing of conspiracy to permit their coconspirator hearsay statements to be admissible against alleged coconspirators under F.R.E. 801(d)(2)(E). If the plaintiffs have not met the *Bogosian/Venzie* test by the relevant quantum of evidence *aliunde*, then the principles of inference which we have explained will bar us from accepting evidence of parallel conduct as proof of conspiracy.

one or more of the members of the conspiracy under the doctrine of vicarious liability of coconspirators which it finds in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Neither the Robinson-Patman Act nor § 7 of the Clayton Act refers to conspiracy, as does section 1 of the Sherman Act, and plaintiffs concede, as they must, that there is no separate antitrust violation for conspiracy to violate the Robinson-Patman Act or § 7 of the Clayton Act as such.

*Pinkerton* was a criminal case in which the Supreme Court held that a conspirator could be punished not only for the offense of conspiracy itself, but also for substantive offenses committed by his coconspirator in furtherance of their common conspiracy. Zenith admits that this principle has never been applied in a civil case, but argues forcefully that it should be so applied, and in this case. Zenith also relies upon a pre-*Pinkerton* case, *Sidney Morris & Co. v. National Association of Stationers*, 40 F.2d 620 (7th Cir. 1930), a civil treble-damage action under § 2 of the Clayton Act (the forerunner of the Robinson-Patman Act) which, in its submission, applied a rule of vicarious coconspirator liability.

The defendants, on the other hand, maintain that *Pinkerton* is inapplicable to civil cases in general and to civil antitrust cases such as this one in particular. Their position is best expressed in one of the memoranda filed by the Matsushita defendants,[85] which concludes that *Pinkerton* is inapplicable in a civil context on historical, conceptual, and policy grounds, and that only where the coconspirators wilfully participate in the conspiracy with knowledge of their coconspirators' acts can vicarious liability be imposed in a civil case.[86] The memorandum rejects *Sidney Morris* as being wrongly decided or aberrational and contrasts that decision with *Palmer News, Inc. v. ARA Services, Inc.*, 476 F.Supp. 1176 (D.Kan.1979), in which the court refused to hold coconspirators vicariously liable for acquisitions violative of § 7 of the Clayton Act. The memorandum suggests that, in light of the long history and sophisticated level of antitrust jurisprudence, the almost total absence of cases in which vicarious liability or aiding and abetting principles have been applied demonstrates their inapplicability in actions under Sections 2(a) or 7.

The defendants also advance a statutory construction argument. First, they say that neither the language of the Robinson-Patman Act nor § 7 of the Clayton Act nor their legislative history even hint that Congress intended to extend liability to persons other than the primary wrongdoers identified in each section—sellers who unlawfully discriminate in price and companies which unlawfully acquire others. They argue that if Congress had intended to have aiders and abetters and conspirators drawn into the net of treble damage liability under those laws, it could have easily found the words to express that intent, as it did in Sections 1 and 2 of the Sherman Act. The Matsushita defendants find further support for their argument that liability under § 7 of the Clayton Act and the Robinson-Patman Act should not be extended to persons other than the primary wrongdoers in what they describe as the "well established rule" that the antitrust laws "are to be strictly construed and not to be enlarged by construction." *Image and Sound Service Corp. v. Altec Service Corp.*, 148 F.Supp. 237, 239 (D.Mass.1956). Defendants also invoke the historical fact that actions for treble damages were unknown at common law and the principle that a "[p]laintiff has no right to sue for treble damages ... unless a federal

---

**85.** "The Matsushita Defendants' Supplemental Memorandum on Vicarious Liability, Submitted in Support of Their Motions for Summary Judgment on Zenith's Section 7 and Robinson-Patman Act Claims," dated July 3, 1980. The arguments contained in this brief are endorsed and adopted by the other defendants.

**86.** The memorandum distinguishes *Winkler-Koch Engineering Co. v. Universal Products Co.*, 79 F.Supp. 1013 (S.D.N.Y.1947), which purportedly announced the principle that "coconspirators are vicariously responsible for acts committed in furtherance of the joint venture," on the ground that it actually applied an evidentiary rule but confused it with one determinative of substantive liability.

statute has created that right."[87] While such matters may add force to their anti-vicarious liability arguments, the particular argument which they construct on this point appears to be flawed.[88]

Finally, the memorandum challenges the fabric of the present plaintiffs' conspiracy claims in the *Pinkerton* setting, asserting that it is unreasonable to consider the conspiracy alleged by plaintiffs as the equivalent of an agreement among defendants to participate in acquisitions violative of § 7 of the Clayton Act or to engage in specific acts of price discrimination violative of the Robinson-Patman Act. They posit a hypothetical which, in their submission, demonstrates the "absurdity" of Zenith's position on vicarious liability:

> For example, under Zenith's theory, Sears, as an alleged participant in the general conspiracy, would be vicariously liable for allegedly discriminatory sales which favored one of its direct competitors, such as Montgomery Ward or J. C. Penney. To take another example, under Zenith's theory, Toshiba, a supplier to Sears, would be vicariously liable for Sanyo's acquisition of the television business of Warwick, another supplier to Sears.

The foregoing arguments are well-considered and forceful. On the other hand, however it may have been ignored in recent years, and despite its never having been applied in a civil context, *Pinkerton* is a Supreme Court decision which has not been overruled. Under these circumstances, and because there is an alternative ground for dismissal of the plaintiffs' Clayton Act § 7

and Robinson-Patman Act claims, *see* Parts X and XI, *infra*, it is best that the question of the applicability of the *Pinkerton* doctrine in a civil antitrust context await another case and another day. We have extended the opinion to include this discussion of the vicarious liability issue so that the Court of Appeals will have the matter clearly set out before it without the necessity of rummaging through the huge record should it choose to reach an issue which we avoid.

6. *Requisites for Admissibility of Coconspirator Declarations*

The determination whether the plaintiffs have adduced sufficient evidence to raise a genuine issue of material fact with respect to the various defendants requires that we consider *all* the evidence, including any coconspirator statements which might be admissible under F.R.E. 801(d)(2)(E). As we have noted above, our pretrial evidentiary or *in limine* hearings were also intended as a vehicle for the making of a preliminary determination, pursuant to F.R.E. 104(a), of the admissibility of coconspirator statements.[89] That procedure accords with our view, that of a number of cases, and that of Professor Saltzburg that 104(a) is the appropriate device for making the preliminary determination of the existence, *vel non*, of independent evidence of a conspiracy required by the cases, described *infra*. *See generally* S. Saltzburg and K. Redden, *Federal Rules of Evidence Manual* at 43–45 (2d ed. 1977), and

---

**87.** *Nashville Milk Co. v. Carnation Co.,* 238 F.2d 86, 88 (7th Cir. 1956), *aff'd,* 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958).

**88.** Defendants premise this argument on their interpretation of the holding of *Nashville Milk, see* n. 87, *supra,* that in view of the drastic nature of the treble damages remedy and Congressional silence, *no private right of action* lies against those responsible even as primary violators of Section 3 of the Clayton Act. In defendants' submission, to infer such a right to proceed against those alleged to be *secondarily liable* for violations of other provisions of the same statute would violate the "most basic principles of statutory construction and subvert the overall legislative scheme." The problem

with this argument is that in *Nashville Milk,* the court actually held that there is no private right of action under § 3 of the Robinson-Patman (not Clayton) Act, 15 U.S.C. § 13a. That holding followed from the court's determination that § 3 of the Robinson-Patman Act, unlike § 1, did not amend the Clayton Act and therefore was not among the "antitrust laws" within the meaning of § 4 of the Clayton Act which private parties have standing to enforce.

**89.** In the Japanese Materials Evidentiary Opinion, 505 F.Supp. 1190 at 1213, we reserved the determination of the admissibility of coconspirator hearsay statements.

cases cited therein.[90] We now address the legal principles applicable to that admissibility determination.

Rule 801(d)(2)(E) [91] codifies the traditional rule, which admits into evidence statements of one coconspirator against another coconspirator as long as those statements were made during the course of and in furtherance of the conspiracy. There are two controversial questions in this area. The first, generated by the proviso of F.R.E. 104(a) that in making its determination the court is not bound by the Rules of Evidence (except with respect to privileges), is whether the coconspirator (hearsay) statements may, themselves, be used to establish the existence of the conspiracy. The second is whether the standard of proof required in making the preliminary determination is a "prima facie" or a "preponderance" standard. While there is a conflict in the circuits on these points, the Third Circuit's position is clear.

■ Notwithstanding the facial appeal of the proviso to Rule 104(a), the Third Circuit holds firmly to the view that the admissibility of coconspirator statements against the nondeclarant depends upon the determination by the trial judge whether it has been proved, by a clear preponderance of the evidence *independent of the hearsay statement*, that a joint undertaking existed at the time of the statement or action. This position was first embraced in the case of *United States v. Bey*, 437 F.2d 188, 191 (3d Cir. 1971), and has been reiterated in a line of cases including: *United States v. Trotter*, 529 F.2d 806 (3d Cir. 1976); *United States v. Trowery*, 542 F.2d 623 (3d Cir. 1976), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977); and *United States v. Continental Group, Inc.*, 603 F.2d 444 (3d Cir. 1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).[92] Thus, unless plaintiffs can show by independent evidence (evidence *aliunde*), that the conspiracy they have pleaded exists and that the declarants and the defendant against whom the statement is offered are members of that conspiracy, the hearsay statements of alleged coconspirators are inadmissible. As we shall see in Part VII.R., *infra*, this standard has not been met.

■ The second controversial question is whether the "prima facie" or "preponderance" standard is the proper standard of proof to be required of the proponent of coconspirator declarations. Under the prima facie test, the judge takes the evidence in the light most favorable to the offering party. As Professor Saltzburg explains, *Federal Rule of Evidence Manual* at 465, the preponderance standard differs from the prima facie test in that the preponderance test requires the judge to actually find facts, *i. e.*, to judge the credibility of witnesses and to make a finding based on a fair assessment of the evidence. In Professor Saltzburg's words: "in other words, before the test is satisfied, the Judge decides not whether some jury might believe the independent evidence, but whether he believes it." Although none of the courts adopting the preponderance test have expressly embraced the Saltzburg exemplar, the credibility judgment would appear to be an essential part of the factfinder's role,

---

**90.** *See also* Japanese Materials Evidentiary Opinion at 1229–1230, where we addressed the question whether the admissibility of hearsay under the hearsay exceptions is considered under Rule 104(a) or 104(b). We concluded that Rule 104(b) does not apply as it, by its terms, applies "when the relevancy of evidence depends on the fulfillment of a condition of fact." Hearsay exceptions do not generally raise questions of relevancy conditioned on fact. Accordingly, we determine the admissibility of evidence under the hearsay exceptions, including coconspirator hearsay declarations, under F.R.E. 104(a).

**91.** Rule 801(d)(2)(E) provides in relevant part:

(d) *Statements which are not hearsay.* A statement is not hearsay if . . .

(2) *Admission by party opponent.* The statement is offered against a party and is . . .

(E) A statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

**92.** A number of circuits concur with the Third Circuit's position and a number of others do not. For a comprehensive discussion of this area of the law, *see* Saltzburg & Redden, *supra*, 462–69, 1980 Cum.Supp. at 200–04.

that role to be exercised under F.R.E. 104(a). At all events, whatever its contours, the Third Circuit has plainly adopted the preponderance test in the line of cases from *Bey* to *Continental Group*, cited *supra*. For example, in *United States v. Trowery, supra*, the court stated:

To determine whether the evidence is competent against the nondeclarant, the trial judge determines whether it has been proved, *by a preponderance of the evidence*, that a joint undertaking existed at the time of the statement or action. (emphasis added)

542 F.2d at 627.[93]

In accordance with the foregoing discussion, in making the preliminary determination in Part VII.R of the admissibility of coconspirator declarations, we shall make factual findings as to whether plaintiffs have established the existence of the alleged "unitary" conspiracy and the membership therein of the declarant and each individual defendant against whom the statement is sought to be introduced by a preponderance of evidence independent of the coconspirators' statements sought to be introduced.

Having concluded our review of the applicable law, we now turn to the evidence of record.

VII. *Plaintiffs' Sherman Act § 1 And Wilson Tariff Act Conspiracy Case As to Television Receivers—Evidentiary Review and Discussion of Legal Sufficiency*

A. *Introduction*

This segment of the opinion analyzes the materials which constitute the sinews of plaintiffs' Sherman Act § 1 and Wilson Tariff Act conspiracy case with respect to television receivers. We will commence this evidentiary review with a discussion of plaintiffs' allegations about: (1) the technological development of consumer electronic products; (2) the industrial organization of Japanese electronics firms on the foundation of borrowed technology; (3) the "closed Japanese market"; and (4) "the combined economic power of the defendants and their cartel." The facts in these areas, supplied largely through the admissible portions of plaintiffs' expert reports, constitute background or "climate" material for the plaintiffs' subsequent presentation.

Our first major substantive discussion will be a description of plaintiffs' evidence respecting the Japanese manufacturers' export control arrangements, including their check price agreements and the associated JMEA Rules. We will then turn to a description of the activities of certain groups and associations in Japan. In the course of that discussion we will address both the home market and export aspects of the alleged "unitary" conspiracy, *i. e.*, the alleged high price home market "war-chesting" aspect and the alleged predatory low price export aspect thereof. The review will include a description of the evidence of the activities of certain trade associations and of certain "sub rosa" groups to which a number of defendants belonged, as well as consideration of a number of what plaintiffs style "connection" and "intent" documents. We will also consider what inferences may be drawn from this "Japan-side" evidence.

---

**93.** For a full discussion of this question, including citation of cases following the preponderance test, *see* Saltzburg and Redden at 462–69.

There is an interesting problem posed by the preponderance test. It is clear that a judge can make legal sufficiency rulings under various federal rules which result in the removal of matters from the consideration of the jury. However, where the judge assumes the role of fact-finder at the preliminary stage and makes rulings predicated in part on credibility judgments (using the same standard which a jury would subsequently use), it is arguable that a judicial determination, based partly on credibility judgments, that evidence which could be sufficient to meet a prima facie standard did not meet the preponderance test, might violate the Seventh Amendment rights of the proponent of the coconspirator statement which is thus excluded (possibly resulting in the demise of his conspiracy case). Fortunately we need not decide this difficult issue, for we have found that the plaintiffs have presented no genuine issue of material fact, thus dictating the 104(a) result and obviating the problem. While we shall make an independent decision on the F.R.E. 104(a) determination, it does not turn on credibility matters.

We will then turn to plaintiffs' allegations about below cost sales and about international price discrimination between the United States and Japanese markets, together with a discussion of what, if any, inferences may be drawn therefrom. This is followed by our review of another major component of plaintiffs' case—their allegations about the defendants' "predatory export rebate system for the collusive concealment of dumping" and the inferences to be drawn therefrom. Next we consider plaintiffs' allegations that an inference of conspiracy can be drawn from the alleged depletion and destruction of the U.S. CEP industry, followed by a discussion of the significance, *vel non*, of plaintiffs' allegations about certain acquisitions of various U.S. CEP manufacturers and manufacturing facilities by defendants. Additionally, we will consider plaintiffs' allegations about "defendants' systematic price discrimination in the U.S.," and we will deal extensively with the evidence of the participation of each individual defendant in the alleged conspiracy. In order to determine the admissibility of coconspirator declarations under F.R.E. 801(d)(2)(E), we shall then make a preliminary determination of the sufficiency of plaintiffs' conspiracy evidence pursuant to F.R.E. 104(a). We will end our review of plaintiffs' Sherman § 1 and Wilson Tariff Act case regarding television receivers in Part VII.S with a summary of our conclusions with respect thereto.

The evidentiary review which we have previewed will be in the nature of a summary of all categories of plaintiffs' important evidence, linked to an analysis of the evidence and a discussion of its legal sufficiency for summary judgment purposes as measured against the standards set forth in Parts V and VI, *supra*. A significant portion of this discussion will focus specifically on the question whether the Third Circuit standards for proof of conspiracy by circumstantial evidence have been met.

During the course of our evidentiary review we shall, as is required on a motion for summary judgment, consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiffs.[94] Except as is expressly indicated, nothing set forth as a fact in the evidentiary review is disputed of record. While plaintiff may *contend* that the true state of affairs is otherwise there are no *facts* to the contrary in the voluminous record, except as we have stated them.

As we explained in the Preliminary Statement, this review emanates from our tedious in-chambers review of the FPS and its supporting, or supposedly supporting, documents,[95] along with the voluminous briefs of the parties. Our insertion of the word "supposedly" is a function of three factors. First, numerous documents do not support the conclusory propositions for which they are cited in the FPS. Second, many documents cited in support of damning conclusory statements regarding conspiratorial activities were in the document depository only in Japanese. This is the case not only with numerous documents cited in the FPS, but even with documents submitted to us in the latest full-dress memorandum filed by the plaintiffs, their post-summary judgment argument memorandum, and with still later submissions in the nature of letter memoranda. Third, a number of other documents cited by plaintiffs as important could not even be found in the depository. These include matters which were commented on extensively by defendants' counsel in the final summary judgment argument.[96]

---

**94.** This approach is, of course, subject to our discussion in Part VI.D.4 relating to inferring conspiracy from parallel conduct.

**95.** This evidentiary review will deal almost exclusively with documents, because the significant aspects of plaintiffs' case are based almost exclusively upon documentary evidence.

**96.** On two occasions during the final summary judgment argument, Joel Harris, one of Matsushita's counsel, had a team of lawyers working in the depository late into the night in an attempt to locate documents which the plaintiffs had invoked the day before as being important to their case, only to find that they were either not in the depository or were untranslated from the Japanese.

We cannot consider in this evidentiary review documents that plaintiffs have not thought important enough to translate or to place in the depository. Nor have we considered the countless documents that are plainly irrelevant or cumulative. Repeating what we said in the Preliminary Statement, we can address herein only a fraction of the documents we have reviewed, covering the others by general reference, and choose to focus herein upon those documents called to our attention by counsel in their presentations and memoranda. We turn now to our review of the evidence on which plaintiffs rely to defeat summary judgment.

B. *The Technological Development of Consumer Electronic Products and the Industrial Organization of Japanese Electronics Firms on the Foundation of Borrowed Technology*

The plaintiffs have devoted some 232 pages of their FPS to a mini-exegesis of the technological development of consumer electronic products and to a description of how the Japanese electronic industry was built on the basis of borrowed—primarily American—technology. Although these materials may seem peripheral to the reader, we do not begin here arbitrarily, for this is where plaintiffs initiate their case.

Plaintiffs commence with a list of the prominent scientists and inventors who contributed to the development of television; all are American or European.[97] Although both the National Broadcasting Co. and the Columbia Broadcasting System operated experimental television stations as early as 1931, the British Broadcasting Co. was the leader in the commercialization of television. Plaintiffs explain that after 1946

most major technological developments in the television industry involved semiconductors, and provide a list of major inventions in that industry. All but one (originating with Sony) are by American or European firms. By the mid–1960's, according to plaintiffs' FPS, the U.S. was the world leader in television production, with worldwide technological superiority in the production of electronic components. Moreover, from 1963 to 1978, the vast majority of improvements in television receiver technology were made by U.S. companies, including a number by Zenith. Plaintiffs provide similar background for the radio and other CEP industries.[98]

Plaintiffs then go on to explain that by 1953 RCA had licensed over sixty Japanese manufacturers in the various fields, primarily in the television receiver field, and from that base extended its licensing arrangements and technical assistance so widely as virtually to give birth to the Japanese CEP industry. Plaintiffs proceed to demonstrate that the Japanese CEP industry rests almost entirely upon the foundation of patent licenses from RCA, Westinghouse, GE, Western Electric, and other American firms, and from a number of European firms including N.V. Philips. The FPS documents the vast royalties paid by Japanese manufacturers to American firms under patent licensing agreements which are still in effect. Finally, plaintiffs represent that in recent years the patent licensing agreements between the Japanese manufacturers and foreign patent licensors have been jointly negotiated under the aegis of the Foreign Patent License Committee of the EIAJ.

This is all very interesting, but hardly of value to the case.[99] Defendants do not dis-

97. Major treatises on the history of the television industry mention no specific Japanese scientific contributions to early television development.

98. We are treated in this segment to such interesting historical tidbits as the following: (1) magnetic recording was first accomplished in 1899 by a Danish engineer named Vladimir Poulsen, whose invention, the telegraphone, won a Grand Prix at the Paris Exposition in

1900; (2) in 1935 the German firm of Telefunken made the first modern tape recorder; (3) RCA was incorporated by GE in 1919 as its subsidiary operating in the radio field; and (4) by 1930 RCA had the exclusive rights to manufacture and sell under approximately 4,000 patents in the radio field.

99. *E. g.*, plaintiffs have also offered a series of press clippings which demonstrate the chronology of the introduction of personal size televi-

pute that their technology is American in origin, nor do they dispute that they manufacture under licensing agreements with American (and European) firms. But those facts have no bearing upon the predatory low-price export conspiracy which plaintiffs have alleged. Plaintiffs have not pleaded a conspiracy to injure American patent holders through collusive patent license negotiations. The technological evidence is purely background, and does not tend to establish any ingredient in the "unitary" conspiracy.

## C. The Closed Japanese Market

An important ingredient contributing to plaintiffs' theory of defendants' alleged conspiracy is the role played by Japanese trade barriers, which, in plaintiffs' submission, permitted the Japanese defendants to avoid competition in their home market. In plaintiffs' submission, this home market, effectively closed to competition by foreign imports and investment, provided the climate wherein defendants could successfully fix high prices, thereby facilitating their low-priced entry into the U.S. market by providing the necessary financial cushion.

Plaintiffs' evidence of the closed Japanese market is primarily contained in sections of their experts' reports which we have found to be admissible under the "or otherwise" clause of F.R.E. 702, which permits an expert to "give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts." [100] Advisory Committee Note to Rule 702. Plaintiffs' theory is explained in "Economic Analysis of Evidence Relating to Japanese Electronic Products Antitrust Litigation" by Economic Consulting Services, Inc. (the Nehmer Report) as follows:

A tightly "closed" Japanese consumer electronics market would indeed be essential to the success of Defendants' scheme in at least several important ways. First, by keeping foreign suppliers out of the high-priced Japanese market, the price-maximizing policies of the cartel in the domestic market could be maintained more easily. Second, the absence of foreign competition would make it easier for the members of the cartel to coerce Japanese distributors and retailers by threatening to restrict their sources of supply. Finally, the absence of foreign competition meant that the enforcement of the cartel's policies among the cartel's members would be simplified, and that the financial benefits of monopoly profits in Japan and the rewards of their anti-competitive activities abroad would be shared among fewer cartel members. In short, the fact that the Japanese market was effectively closed to foreign competition throughout the 1957–1977 period acted to "segment" the higher-priced Japanese market from the lower-priced and open U.S. market, thereby making the execution of discriminatory pricing policies, as well as other aspects of the cartel's anti-competitive behavior, possible, while excluding U.S. competition from the higher-priced Japanese market.

Nehmer Report at IV–1 & 2.

The Nehmer, DePodwin, and Yamamura Reports, and to a somewhat lesser extent the Haley Report, all set forth narrative descriptions of Japanese barriers to foreign imports and investment. Among them are such governmentally-imposed or supervised financial barriers as high tariff rates,[101] discriminatory ocean freight rates,[102] the Japanese commodity tax,[103] import deposits,[104]

---

sion receivers in the United States market from various sources.

**100.** *See* Expert Testimony Opinion at 505 F.Supp. 1313 at 1337, 1363, 1364–1366, 1371–1372, 1378.

**101.** According to the Nehmer Report, Japanese tariffs, unlike those of the U.S., include freight and insurance in dutiable value.

**102.** We are informed that discriminatory shipping rates result in freight costs *to* Japan roughly twice those *from* Japan.

**103.** The Japanese commodity tax is calculated as a percent of the c. i. f. (cost plus insurance plus freight) price, plus tariff charges.

**104.** During the latter half of the 1960's, the Japanese government required an import deposit in the amount of 5%. The rate dropped

the "Japanese Standard Method of Settlement," [105] and strict limitations on foreign investment in Japan,[106] which, in Nehmer's submission, act together to impose an onerous financial burden on foreign competitors seeking to sell in Japan.[107]

In addition to these financial barriers, the reports detail a number of "subtle, non-financial means that can be highly effective in severely restricting foreign competition." Nehmer Report at IV–7. First, and probably most important, is the Japanese government's practice of providing "administrative guidance" over business activities. While such informal guidance does not have the force of law, it does tend to have an important influence on private business behavior. Other non-financial barriers include an elaborate system of quantitative restrictions, which in earlier years operated together with a foreign exchange licensing program; safety and design standards which implicate cumbersome inspection and testing procedures; barriers to the importation of samples; and the Japanese government's procurement practice, which has been to solicit bids only from domestic firms. In addition to these governmental regulatory practices, the structure of the Japanese market adds another layer of difficulty to U.S. firms attempting to enter the Japanese market.

As described in detail in the Yamamura Report, the Japanese economy is dominated by company groups, called *keiretsu*, which are groups of companies in various industries, perhaps best described as "cliques" of associated companies. The historical roots of *keiretsu* are to be found in the prewar *zaibatsu*, which were family organizations that controlled particular industries, with strong central control through a holding company. These conglomerates were called upon during World War II to assist in the war effort. As a result, after the defeat of Japan, the leaders of the Allied occupation blamed much of Japan's militarism on these industrial conglomerates, and were determined to eradicate them from the Japanese business system to prevent future combinations of economic or military strength. Accordingly, during the period of occupation under General MacArthur, and in full consultation with the United States Department of Justice, the Mitsui Holding Company, the Sumitomo Holding Company, the Yasuda Holding Company, the Mitsubishi Holding Company, and 28 other holding companies were sold to the general public and the linkages were dissolved. In their place, the lesser groups emerged, with links

to 1% for the final months of its imposition. No interest was paid on the deposit unless the deposit was made in cash. Thus potential importers were required to commit capital for the privilege of doing business in Japan.

**105.** This policy requires that imports be paid for within four months, while domestic competitors are permitted to sell on a deferred-payment basis. While exceptions may be made, such exceptions are entirely within MITI's discretion.

**106.** Until 1967, foreign investment was virtually prohibited. Thereafter, until 1976, foreign ownership could not exceed 25% of the total equity issued by an existing Japanese corporation, and no single foreign investor could acquire more than 10% of total equity. While 100% foreign ownership of both existing and new Japanese companies is now permitted in theory, the red tape and paperwork are frequently insurmountable obstacles, and approval is discretionary. Moreover, no foreign manufacturer may establish more than ten wholly-controlled retail outlets.

**107.** The combined result of these measures is that a U.S. exporter of color television receivers must bear charges in the amount of approximately 30% of the f. o. b. U.S. price; the corresponding figure for a Japanese manufacturer exporting to the U.S. is only approximately 10%. After analyzing the history of Japanese tariff and commodity tax rates for other CEP's, Nehmer concludes that for most years the result is a "compounded rate of financial burden which is substantially in excess of 20 percent." He notes in addition that "a tariff of over 20 percent ad valorem is a serious obstacle to trade when added to the natural protection created by distance, difficulties of communications and marketing and foreign languages and customs," *quoting* G. Patterson, Deputy Director General of the G.A.T.T., *Current GATT Work on Trade Barriers*, in Vol. I, *Compendium of Papers Submitted to the Commission on International Trade and Investment Policy* 27 (1971).

dependent upon mutual interest and convenience, though based in part upon the traditional family linkages.[108] Unlike the *zaibatsu*, the *keiretsu* has no central control; holding companies remain illegal.

There are two main species of *keiretsu* : horizontal [109] and vertical (or distribution network) [110] *keiretsu*. Professor Yamamura goes on to describe the international significance of *keiretsu*. He suggests that to the extent that the *keiretsu's* market power can limit domestic competition, the situation is similar to a cartelized market. The firms act together to prevent foreign entry into the Japanese market, constituting, in Yamamura's terms, an "invisible trade barrier." [111]

The first priority following World War II was rapid industrial growth. Accordingly, the government's monetary policy was designed to promote rapid growth of the largest firms. The antitrust laws, enacted by the occupation forces, were weakened and were only weakly enforced. Moreover, certain cartel activities were exempted, and a large number of "authorized cartels" arose. In the submission of the experts, these policies, linked with the close governmental cooperation described above, fostered the growth of *keiretsu* and created a "climate" which encourages "cartel capitalism" in the Japanese market.

We have been brief in our discussion of the Japanese market because defendants virtually concede that much of the information presented by plaintiffs' experts is true. They argue, however, that the facts we have set forth are totally irrelevant to the existence of a conspiracy to export to the U.S. at predatorily low prices. They argue further that Professor Yamamura's description of the Japanese market is an attempt to describe the Japanese "propensity to conspire," and as such that it is impermissible character evidence under F.R.E. 404(a). Plaintiffs, on the other hand, argue that they are showing a climate in which collusive behavior is commonly accepted, and that this evidence therefore bears upon opportunity, motive, and intent.

■ While conceding that plaintiffs have adduced evidence of a "climate," we accept defendants' position. No amount of evidence about *keiretsu* activities of Japanese companies—or even about these specific defendants, who were for the most part not aligned in the same *keiretsu*—can suffice to create an inference that these partic-

---

**108.** Some of the companies continued to use the pre-dissolution names, such as "Mitsui," "Sumitomo," "Mitsubishi," and others.

**109.** Within the category of horizontal *keiretsu* there are two primary types, characterized by the institution at the center. A *kinyu keiretsu*, or financially linked group, is a fairly weakly joined group which revolves around a bank and which includes a trading company. Member companies generally obtain their financing through the member bank and sell their products through the member trading company. While members need not deal solely with one another, they tend at least to refuse to deal with competitors of member companies.

The second, more strongly-linked type of horizontal *keiretsu* is a *sangyo keiretsu*, or industrially-linked group, with a major manufacturing company at its core. In this type of group the central company is usually the main or only buyer of the products of the others, thus exerting considerable control. In many cases, the central company of a *sangyo keiretsu* is itself a member of a *kinyu keiretsu*, and reaps the benefits of that association on behalf of all its satellite companies.

Cohesiveness of these groups is maintained through a variety of mechanisms. One of the most visible such mechanisms is, in Yamamura's submission, the formation of presidents' clubs, which meet on a regular basis to discuss matters of mutual interest. According to Yamamura, solidarity is also reinforced through mutual shareholding among the members and through interlocking directorships.

**110.** Vertical *keiretsus* are essentially domestic marketing systems, in which a product manufacturer totally controls its distribution network. Retail outlets are generally associated with a single manufacturer. Territorial restrictions, by which retailers may purchase only from designated wholesalers, are common. *See generally* Haley Report.

**111.** For example, a *keiretsu* bank would not finance an entry into the market by a competitor of one of its associated companies; a trading company will not help import products of competitors; and a foreign company will be unable to develop a distribution network. In short, *keiretsu* constitute a substantial barrier to foreign entry into the Japanese market.

ular defendants combined to take over the U.S. market in consumer electronic products. The only inference a jury could draw from the experts' dissertations on trade barriers is that the Japanese domestic market is tightly closed to foreign trade and investment. But a climate which might nurture or even condone collusive behavior is simply not probative of any actual conspiracy.

### D. *Plaintiffs' Expert Reports*

We described plaintiffs' expert reports in detail in our Expert Testimony Opinion, and in capsule form in Part IV, *supra;* we need not repeat that description herein. The critical opinions regarding the existence of a conspiracy were held inadmissible in evidence in that opinion, leaving in only explanatory materials as to the closed nature of the Japanese market, the technological development of the consumer electronic products industry, and economic principles and methodology. These matters we held to be admissible, when purged of their occasional lapses into inflammatory rhetoric, under the "or otherwise" clause of Federal Rule of Evidence 702, which permits an expert to "give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts." Advisory Committee Note to F.R.E. 702. In addition, we reserved ruling on one comparison of prices in the domestic and export markets, presented in the DePodwin Report at V–32 to 36. *See* Expert Testimony Opinion, 505 F.Supp. 1313 at 1347–1348.

We have already discussed in Part VII.B, *supra,* the technological development of the CEP industry and the organization of Japanese firms on the foundation of borrowed technology, and in Part VII.C, *supra* the nature of the Japanese market. In light of our discussion of plaintiffs' evidence of international price discrimination, Part VII.K, *infra,* we need not further consider the admissibility of the reserved calculation. The only admissible materials in the expert reports which we have not discussed are those sections outlining economic principles

and methodology. Such matters plainly do not raise a factual issue sufficient to defeat defendants' summary judgment motions.

### E. *Plaintiffs' Allegations About the Combined Economic Power of the Defendants and their Cartel*

Plaintiffs devote a segment of their FPS to detailing the "combined economic power of the defendants and their cartel." Attaching data taken from the annual reports of MEI, Melco, Hitachi, Sanyo, Sharp, Sony, and Toshiba, plaintiffs first allege that:

"The seven Japanese defendants are among the world's largest corporations. During fiscal year 1973–1974, for example, the seven defendants had aggregate sales of $20.8 billion and aggregate net income of $.7 billion. In the fiscal year 1966–1967, the seven Japanese defendants had sales of $4.9 billion and net income of $.2 billion. Over the seven year period, therefore, the defendants enjoyed an increase in sales of 324 percent and an increase in net income of 250 percent."

FPS at 3139.

Citing MC's annual report, plaintiffs state that MC is the world's largest trading company, with sales ranging from $17.3 billion in 1971 to $44.0 billion in 1978, and net income growing from $17.3 million in 1971 to $100 million in 1978. They also state that MC employs more than 19,000 people, has a worldwide network of 260 offices, handles some 10,000 commodities, and so forth. *Id.* at 3147–50.

Then, without supporting documentation, the plaintiffs allege that the financial strength of the Japanese "cartel" arises from the close affiliations of the defendants with companies and banks in their "respective groups" and from the participation in the cartel of "several other financially strong companies," including Japan Victor, General Corporation, Nippon Columbia, Ltd., and Nippon Electric Company, Ltd. They explain:

"In 1978, for example, eight selected companies in the Mitsubishi Group which consists of over 40 companies, had aggre-

gate sales of $21.9 billion and net income of $199.7 million. . . . Moreover, the Mitsubishi Group owned two banks . . . whose combined assets of $96.7 billion in 1978 placed them as the world's largest banking group."

FPS at 3157. Apparently intoxicated with these figures, the plaintiffs point out that "the groups which control the defendant companies" had sales of at least $58.9 billion in 1977–1978, and at least $38 billion in 1974–1975; that these groups employed at least 654,668 workers in 1977–1978, etc. They then contrast Zenith and NUE as being considerably smaller in terms of sales, net income and employment than the "groups which controlled" the defendants. *Id.* at 3157–58.

While this approach is symptomatic—or perhaps symbolic—of plaintiffs' approach in this litigation, we will not labor the point. It is clear beyond peradventure that plaintiffs' allegations about the combined economic power of the defendants and their cartel is "bootstrapped" and is in any event utterly of no probative value in drawing an inference of the conspiracy alleged by plaintiffs.

F. *The Manufacturers' Agreements and the JMEA Rules; Operation of the Minimum Price Agreements and the "Five Company Rule"*

1. *General Background; Operation of the Minimum Price Provisions*

From 1963 until 1973, the seven principal Japanese manufacturers of television receivers that are defendants in this litigation, along with a large number of non-party Japanese manufacturing companies, were signatories to formal written agreements which established minimum prices for television receivers sold for export to the United States.[112] In addition, many defendants were members of the Japan Machinery Exporters' Association (JMEA), an exporters' trade association which, during the same period, required its members to register the names of all customers who purchased television receivers for the U.S. market and, after 1967, limited the number of customers so registered to five.[113] The plaintiffs characterize these arrangements as "formal written cartel agreements," involving both price-fixing and customer allocation.

As we have noted in Part II, *supra*, at various times plaintiffs have asserted that these agreements formed the "heart" of the alleged conspiracy.[114] The defendants, on the other hand, contend that these arrangements were mandated by the Japanese government Ministry of International Trade and Industry (MITI) in response to actual or anticipated pressure from U.S. industry and government to limit the effects of Japanese television exports on the U.S. television industry, and that the defendants are immunized from antitrust scrutiny by the act of state and sovereign compulsion doctrines and principles of international comity.

The written agreements in question bear the title "Agreements on Manufacturers' Domestic Transactions Relating to Exportation of Television Sets," and we refer to them herein as the "Manufacturers' Agreements." There were seventeen different agreements, covering consecutive time periods which varied in length from one month to two years. Each of the agreements was accompanied by a written "Rationale" set-

---

112. These manufacturers are Hitachi, Matsushita, Melco, Sanyo, Sharp (formerly Hayakawa), Sony, and Toshiba. Similar arrangements existed during various periods with respect to radio receivers and tape equipment. These arrangements are discussed in Part VIII, *infra*, relating to non-TV products.

113. We will discuss in Part VII.G.4, *infra*, the record with respect to the meetings and activities of the JMEA and its committees, and also

its role in the alleged conspiracy. Our discussion here is limited to the JMEA export control rules.

114. And, as we have also noted in Part II, at other times plaintiffs have contended that the "heart" of the conspiracy was an alleged agreement to *violate* the minimum-price agreements by granting secret rebates. *See* Part VII.L, *infra*.

ting forth reasons for the agreement.[115] Although there were minor variations in the provisions of the agreements, none of those variations is significant for the issues before us. A copy of the full text of the first Manufacturers' Agreement, covering the period from October 1963 to March 1964, and the accompanying Rationale, is attached to this opinion as Appendix A. While the first agreement applied only to black-and-white television receivers, all subsequent agreements applied to color television receivers as well, and the attached agreement is fairly representative of the others.

The Agreements applied on their face only to television receivers sold by the manufacturers for export to the United States. Article III of the Agreements created an entity called the "Television Export Council," consisting of all the parties to the Agreements. The Agreements contained other administrative provisions relating to the eligibility of parties to enter into the agreements, the procedure for joining the Television Export Council, and the procedure for withdrawing from the agreements.

The Manufacturers' Agreements set minimum prices below which the signatories were not permitted to sell. The operative provision, in Article 8 of the Agreements, states:

> The parties to this agreement shall not offer for sale, make a contract for sale or deliver to export businessmen goods at prices *lower than* the prices specified in attached Schedule 2.

(emphasis added).[116] Thus, the agreements left the signatories free to sell *at or above*

the minimum prices set therein. In addition to minimum sales prices, the agreements also imposed other controls on exports. Manufacturers were: (1) required to register in advance with the Television Export Council the names of all customers to whom they wished to sell goods and prohibited from trading with unregistered customers; (2) required to register with the Television Export Council the brand names which were to be affixed to goods sought to be exported; (3) prohibited from selling or delivering television receivers which did not conform to specified quality standards; (4) required to submit to the Television Export Council an "Application for Confirmation of Shipment" with respect to each sale; and (5) subjected to fines for violations of any provision of the agreements.

During the same years that the Manufacturers' Agreements were in force, 1963 to 1973, the JMEA adopted rules which, in the plaintiffs' submission, "parallel and dovetail with the Manufacturers' Agreements." FPS at 5191. While the Manufacturers' Agreements operated through the governance of sales by manufacturers to exporters, the JMEA rules applied directly to sales of television receivers by exporters in Japan to United States customers and importers. A copy of the JMEA rules for the period corresponding to the first Manufacturers' Agreement, along with the accompanying Rationale, is attached to this opinion as Appendix B.[117]

Like the Manufacturers' Agreements, the JMEA Rules created an entity to administer its provisions. The administrative organ set up by the JMEA Rules was called

---

**115.** We will consider the Rationales to the Manufacturers' Agreements and JMEA Rules in our discussion of plaintiffs' "intent" evidence, Part VII.I, *infra.* Our discussion here is concerned only with the operative provisions of the Agreements and Rules.

**116.** The first agreement, a copy of which is attached as Appendix A, contained a slightly different Article 8, which merely empowered the Television Export Council to set minimum export prices with the approval of MITI, for goods specified in the attached Schedule 2. Subsequent agreements listed, in the attached Schedule 2, the minimum prices thus set.

**117.** As with the Manufacturers' Agreements, there are slight variations in the JMEA Rules from year to year. For example, the first version of the Rules, attached hereto as Appendix B, applies only to black-and-white television receivers, while all subsequent versions apply to color television receivers as well. The Rules adopted December 18, 1966, and all subsequent versions, apply to exports to Canada as well as to the U.S. Except as indicated in the text, we find these variations insignificant for the issues before us.

the "Television Export Examination Committee" and consisted of ten members appointed by the chairman of the JMEA Board of Trustees. With respect to prices, the JMEA Rules did not set forth specific minimum export prices, but required that export prices for televisions of the categories subject to the minimum price provisions of the Manufacturers' Agreements be higher than the prices established under those Agreements. Thus, the JMEA Rules echoed the minimum-price provisions of the Manufacturers' Agreements. In addition, the Rules required that export prices on *all* television sets, not just the categories subject to those minimum provisions, be reported to the JMEA.

■ We need not labor the impact of these minimum price provisions on the case at this juncture, for we have explained in detail in Part VI.B, *supra* that plaintiffs cannot have been injured by the minimum price agreements, and that they therefore lack standing to attack them. We incorporate that discussion by reference here and conclude on the basis thereof that the agreements and accompanying rules are of no significance in the case and cannot create a genuine issue of material fact.

### 2. *Operation and Significance of the "Five Company Rule"*

In terms of distribution, the JMEA Rules contain customer and brand name registration provisions similar to those contained in the Manufacturers' Agreements.[118] In addition, from 1967 on, the Rules limited the number of export customers that could, as a rule, be registered each year by individual JMEA members. This restriction was accomplished by means of the "Gosha Waku" or "Five-Company Rule," which limited the total number of export customers to five companies in the United States for each exporter:

Article 6

The members of the Association, when they are going to export applicable goods to an applicable area, shall register in advance the export customer with the Association in conformity to attached Form (1), and shall also notify the Association of the trademark (expressed by means of letters, symbols or a combination of both, and hereinafter referred to as 'trademark') to be used for the applicable goods in conformity to attached Form (1).

2. Application for registration pursuant to the provisions of the above paragraph must be such that the export transaction referred to in the application satisfies each of the following conditions:

(1) An export contract has been concluded or a long-term, continuous trading relationship has been maintained; and, as a principle, the number of such customers shall not be more than 5 companies for the First Zone....

The terms of the so-called Five Company Rule embodied in the Manufacturers' Agreements and the JMEA regulations do not limit any defendant to selling only to a particular customer or customers. Nor do they allocate particular customers to particular manufacturers, or prevent a particular manufacturer from changing the registration of a particular customer if the need should arise. Thus, the agreements themselves do not provide *direct* evidence or any basis for inferring a customer allocation agreement. Indeed, plaintiffs have in effect admitted that a number of defendants competed for the business of the same U.S. customer and themselves demonstrated that individual registered customers changed from time to time during the time period applicable to this litigation.

According to plaintiffs' FPS and the report of their expert, Horace J. DePodwin,

---

**118.** The plaintiffs contend that JMEA prohibited two members from selling to the same U.S. customer, citing one of the "Guidelines for Registration" attached to the 1973 Rules. *See* FPS at 5221. However, plaintiffs have identified no evidence in the record to indicate that this guideline existed *prior* to January 1, 1973, or

that it was *ever* enforced. In fact, even according to plaintiffs' expert Dr. DePodwin's analysis of the record, several of the defendants *did* share the same customers, and registered those customers with the JMEA, during a number of years including 1973. DePodwin Report at V–54.

at different points in time, certain American customers were dealing with several Japanese suppliers. Thus, for example, J. C. Penney Corp. purchased CEP merchandise from Hitachi, Toshiba, and Matsushita; W. T. Grant purchased from Matsushita and Melco; Montgomery Ward purchased from Sharp and Matsushita; General Electric purchased from Hitachi and Sanyo; Midland (Western Auto) purchased from Melco, Sharp, and Sanyo; and Sears purchased from Toshiba and Sanyo. *See* Exhibit F to Plaintiffs' FPS and the DePodwin Report, Tables V–10 and V–11 at pp. V–50 through V–53.[119]

Plaintiffs have compiled a list of each of defendants' customers who were registered pursuant to the Five Company Rule in Exhibit F to plaintiffs' FPS. While this list is not a complete list of all companies with which defendants did business in the United States—it does not include customers who purchased goods manufactured by defendants in countries other than Japan, nor does it include customers who purchased merchandise from defendants' United States sales subsidiaries—the exhibit demonstrates the fact that no defendant limited its sales to any five customers and that the Five Company Rule was not a "customer allocation." In fact, at one time, Sanyo had thirteen customers.

Of equal significance is the fact that nothing in the Five Company Rule prohibited the members of the JMEA from registering their United States subsidiaries as export customers, and nothing in the Rule prohibited those subsidiaries from reselling products in the United States, free from the restriction of the Five Company Rule. In fact, most of the Japanese manufacturing defendants followed this pattern by listing their U.S. subsidiaries as export customers with the JMEA. PTO 289 at 231–36 (August 21, 1980); plaintiffs' FPS at 7631–7759 and 10741–47. Dr. DePodwin's own summary of the export validation forms filed by the defendants to comply with the JMEA Rules shows that each of them listed its U.S. subsidiary as an export customer during all or nearly all of the years for which information is available. DePodwin Report, Table V–10 at V–52. *See also* FPS at 5234–35. In plaintiffs' own submission, each of these American sales subsidiaries sold products to hundreds of customers in the U.S. FPS at 7631–7759 and 10741–47.[120] In view of the foregoing, the impact of the Five Company Rule was entirely illusory.

■ However, even if the Five Company Rule were not illusory in character, it would be unavailing to the plaintiffs, suffering the same fate as the minimum price agreements. That is because, as we have explained in Part VI.B, *supra,* an agreement to allocate customers runs precisely contrary to a "low price export conspiracy," for such an agreement would limit competition and have the tendency to keep prices up, not push prices down. That result could not possibly cause injury to plaintiffs.[120A] Plaintiffs thus have failed to show how a customer allocation could have injured them and, therefore, how they have standing to press this claim.

### 3. *The Agreements as Evidence of Conspiracy*

■ Notwithstanding plaintiffs' lack of standing to attack the Manufacturers' Agreements, they can still proffer those agreements as evidence of climate and opportunity for collusive activity by the defendants. Indeed, plaintiffs depict the ne-

---

**119.** Customers were registered by defendants pursuant to the Five Company Rule by filing a "Form 2" with the TV Export Council. In the words of William H. Roberts, Esq., one of the lead counsel for the plaintiffs, defendants produced literally "barrels of them" (PTO 291 at 134) to plaintiffs during discovery.

**120.** Additionally, a number of the signatories to the Manufacturers' Agreements (Sony Corp. was the only exception) listed a trading company, such as C. Itoh and Co., Ltd., as one of their customers. As plaintiffs' FPS clearly establishes, each of these trading companies in turn sold to hundreds of customers in the United States market.

**120A.** *See also* discussion at 1213 *infra.*

gotiations surrounding the Manufacturers' Agreements as quintessential evidence of defendants' opportunity and intention to conspire, in the shadow of which all of defendants' activities take on a conspiratorial hue.

We explained in Part VI.A.4, *supra* why opportunity to conspire does not give rise to an inference of actual conspiratorial behavior on the part of particular defendants. To the extent that plaintiffs argue that one can infer an agreement to fix prices at less than the check price level via concerted rebate activity or an agreement to take over the U.S. CEP market by charging depressed prices from the fact that another agreement—the export control arrangements—existed among some of these defendants, that effort must also fail. That is because evidence of one alleged conspiracy is not a basis for drawing an inference of the existence of some other conspiracy.

In *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426 (5th Cir. 1977), the plaintiff obtained a verdict under Section 1 of the Sherman Act by proving the uniform practice of restricting the sale of pro-line equipment to pro shops. In addition, the plaintiff proved that officials of the Professional Golfers Association had joined with representatives of the manufacturers in an effort to prevent "leakage," which refers to the practice of some professional golfers of buying pro-line equipment for their own shops and then reselling it to retailers such as the plaintiff. On appeal, defendants attacked the trial court's findings of fact on the grounds that they did not make clear the basis for the court's finding of liability and apparently confused the question of the conspiracy to prevent leakage with the question of a possible conspiracy to restrict direct sales. The Fifth Circuit reversed and remanded for the entry of more precise findings of fact, rejecting any "intuitive link" between the anti-leakage conspiracy and a conspiracy to restrict direct sales, stating:

> Clearly there is a link between the *fact* of antileakage and the *fact* of pro only sales policies. The two share the object of restricting to pro shops the sale of pro-line golf equipment. We do not understand, however, the nature of the link between antileakage and the question of whether the pro only sales policies were born or maintained in *conspiracy. If the inference is based only on the notion that persons who engage in one conspiracy probably engaged in another, then the inference is improper....* We have trouble understanding why antileakage efforts would not be just as compatible with the scenario urged by appellants that the pro only sales policies were formulated unilaterally and were prompted by the utility of the policies as a form of non-price competition.

We find *Golf City* to be well-reasoned, and adopt it in this context. Plaintiffs' use of the export control arrangements as evidence of a low-price export conspiracy is unavailing.

### 4. The Role of MITI

It is not disputed that the Manufacturers' Agreements and the JMEA Rules were formulated with significant participation by the Ministry of International Trade and Industry ("MITI"), a cabinet-level ministry of the Japanese government. The defendants urge that the MITI involvement in the arrangements was so substantial as to render them immune from attack in United States courts by reason of the doctrines of act of state and sovereign compulsion, and principles of international comity. The plaintiffs, while conceding a MITI presence and an active MITI role, as they must under the facts, dispute the substantiality of MITI's role and vigorously assert that these defenses are inapplicable as a matter of law.

It is plain that application of the doctrines of act of state and sovereign compulsion, as well as principles of international comity, would require a detailed analysis of the factual patterns of the various cases which have implicated those doctrines, cited in note 123, *infra*. It is equally plain that a decision on these issues would have enormous implications for U.S. trade policy. Therefore, since our injury and standing

analysis makes it unnecessary to reach these issues, we prefer not to do so. Our approach does not eradicate the enormous amount of time and briefing devoted to the issue, nor can we gainsay that if defendants are correct in their contentions many of the points that we have in fact reached are mooted. In order that the Court of Appeals might have an adequate record should they decide to address these issues on appeal, it is appropriate that we summarize the record with respect to MITI's role. In fact, an understanding of the defendants' contentions in this area is essential to an understanding of the case.

██ The keystone of the defendants' position in this area is a written statement which was transmitted to this court by MITI through diplomatic channels ("the MITI statement").[121] The statement sets forth the role and responsibilities of MITI

121. The MITI statement was transmitted to the court with a cover letter dated June 9, 1975, from Phillip R. Trimble of the U.S. Department of State. The statement had earlier been transferred to the Department of State by the Embassy of Japan along with a diplomatic note dated April 25, 1975, requesting that the Department of State transfer the statement to this court. Although the original MITI statement was unsigned and unsealed, a formal seal for the statement and verifying affidavits were subsequently supplied.

For several years, it was unclear whether the MITI statement represented the views of the Japanese government as a foreign sovereign, or only the views of the Ministry of International Trade and Industry—a distinction which may be of some significance for the act of state, sovereign compulsion, and comity defenses. The dispute between the parties on this point was resolved by a letter to us dated July 11, 1980 from Yoshio Okawara, the Ambassador Extraordinary and Plenipotentiary of Japan, which stated that "MITI was and is empowered and authorized to act for the Government of Japan in making the statement as attached to the Note Verbale dated April 25, 1975 which was delivered to the Department of State of the United States by the Embassy of Japan."

Plaintiffs moved to strike Ambassador Okawara's letter on the grounds that it was sent directly to us through the U.S. mail, instead of being forwarded through diplomatic channels. They argued that the court may not give any weight to a communication from a foreign government unless it is transmitted by the U.S. Department of State, *citing, e. g., The Navemar*, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667 (1938); *Civil Aeronautics Board v. Alitalia-Linee Aeree Italiane*, 328 F.Supp. 759 (E.D.N.Y. 1971); *United States v. Anchor Line, Ltd.*, 232 F.Supp. 379 (S.D.N.Y.1964). Plaintiffs also suggested that the letter should be excluded under F.R.E. 403.

We denied plaintiffs' motion to strike Ambassador Okawara's letter, PTO 298 (Oct. 20, 1980), because it is no longer the policy or practice of the U.S. government that statements or positions of foreign governments regarding pending litigation be submitted through the Department of State. Rather, the current policy is for foreign governments to submit their views directly to the court where the litigation is pending. This practice was changed in 1978 in response to a suggestion of the Clerk of the United States Supreme Court. At the present time, statements of foreign governments regarding litigation pending in the United States Supreme Court or the United States Courts of Appeals are to be made by means of a brief *amicus curiae*. *See* 73 Am.J. Int'l L. 124 (1979). With respect to federal trial courts, the Department of State has announced that it does not, in general, expect to transmit diplomatic notes to such courts either, but may do so on a case-by-case basis. 73 Am.J. Int'l L. 678 (1979). We can discern no reasons for requiring diplomatic transmittal of Ambassador Okawara's letter in this case. In order to promote consistent practice as between courts on the appellate and trial levels, we think that, in general, the views of foreign governments should be communicated directly to the district court where the litigation is pending. Since there is no equivalent of an amicus brief in the Federal Rules of Civil Procedure, and since the Japanese government's statement is only two double-spaced pages in length, we think it entirely appropriate for that statement to be communicated in a letter to the court. To require the government of Japan to intervene in the litigation under F.R.Civ.P. 24, as plaintiffs suggest, would be pointless and wasteful of the court's and the litigant's resources when, as here, the statement which the Japanese government wishes to communicate is simple and short. To the extent that the decisions cited by the plaintiffs contain statements which can be interpreted to support their position on the admissibility of Ambassador Okawara's letter, we view those statements as merely descriptive of then contemporary practice, which has since been changed.

Furthermore, it should be noted that even prior to 1978, the federal courts apparently did occasionally consider the statements of foreign governments when presented directly to the courts by letter. *See Puente v. Spanish National State*, 116 F.2d 43 (2d Cir. 1940); *United States v. Melekh*, 190 F.Supp. 67 (S.D.N.Y. 1960). Finally, we find plaintiffs' Rule 403 argument to be patently without merit.

under Japanese law, explaining its authority under Japanese law to direct Japanese manufacturers and exporters to enter into agreements and adopt trade association regulations like those we have described above, in order to implement the foreign trade policy of the Japanese government.

The MITI statement then turns to the genesis of the particular agreements and rules involved in this litigation:

> With respect to the export of television sets to the United States, in 1962 MITI accurately recognized, in view of the importance of televisions as one of Japan's export products, the need for assuring their orderly exportation to avoid the possibility of trade conflicts.

> Thus, MITI directed Japanese television manufacturers including the present Japanese defendants to enter into an agreement under Article 5–3 of the Export and Import Trading Law with respect to minimum prices and other matters concerning domestic transactions relating to exports to the United States, and further, directed the exporters to establish a new regulation to be observed by the members of the export association with respect to filing of export prices and other related matters, pursuant to the association's functions under Article 11, Subparagraph 2 of the same law regarding the same exports. MITI supervised the preparation of such agreements and regulation so that MITI's intention was correctly reflected. Such direction and supervision concerning minimum prices at which televisions could be sold for exportation to the United States and other matters were exercised continuously from 1963 until February 28, 1973 when such exporting arrangements were terminated.

> Had the Japanese television manufacturers and exporters failed to comply with MITI's direction to establish such an agreement or regulation, MITI would have invoked its powers provided for in the Export Trade Control Order under the Foreign Exchange and Foreign Trade Control Law in order to unilaterally control television sales for export to the United States and carry out its established trade policy.

> Therefore, when MITI decided the above-mentioned policy with respect to such sales and directed the television manufacturers and exporters to conclude, under the Export and Import Trade Law, such agreement and regulation relating to the minimum prices at which televisions could be sold for the United States market and other matters, the Japanese television manufacturers and exporters had no alternative but to establish the agreement and regulation in compliance with the said direction.

The evidence in this record is uncontroverted that the MITI role included the attendance of a MITI representative at meetings of the JMEA; participation by MITI in the drafting of the Manufacturers' Agreements, including the establishment of the check-price level; MITI supervision of the agreements, in the form of various reporting requirements; and MITI approval power, in the form of licensing, over manufacturers' exports. MITI's overriding purpose was to promote "orderly marketing" through these means.

 The defendants contend that the MITI statement should be afforded conclusive effect as the statement of a foreign sovereign, and submit that the statement conclusively establishes the defenses of act of state, sovereign compulsion, and comity. The plaintiffs challenge the conclusivity of the statement,[122] and argue further that

---

122. On the conclusivity point, defendants cite, *inter alia, United States v. Pink*, 315 U.S. 203, 218–21, 62 S.Ct. 552, 559–561, 86 L.Ed. 796 (1942); *Banco de Espana v. Federal Reserve Bank of New York*, 114 F.2d 438, 443–44 (2d Cir. 1940); *The Claveresk*, 264 F. 276 (2d Cir. 1920); *Agency of Canadian Car & Foundry Co. v. American Can Co.*, 258 F. 363 (2d Cir. 1919);

*D'Angelo v. Petroleos Mexicanos*, 422 F.Supp. 1280, 1283–85 (D.Del.1976), aff'd, 564 F.2d 89 (3d Cir. 1977); *United States v. Melekh*, 190 F.Supp. 67, 87 (S.D.N.Y.1960). Plaintiffs dispute defendants' reading of these cases, contending that the cases set forth certain minimum standards which a statement must meet in order to be efficacious, such as that it be

even if it were afforded conclusive effect, it would not be sufficient to establish these defenses.[123]

In addition to contending that the MITI statement is insufficient to establish any of the defenses for which it is offered, the plaintiffs also challenge the accuracy of the statement. Their factual position is based primarily on the testimony of their expert witness, Prof. John O. Haley, PTO 264 (June 24, 1980), and his earlier affidavit. According to Professor Haley and the plaintiffs, MITI lacks the authority under Japanese law to compel Japanese companies to enter into the kind of arrangements described *supra,* and instead can only make non-binding recommendations. Plaintiffs point, in particular, to Article 7 of the Man-

ufacturers' Agreements, which permits any party to the agreement to withdraw from it upon notice to the Television Export Council (a provision that has been dubbed in this litigation the "opt-out clause") and to pertinent provisions of Japanese law which, in their view, are to the same effect. They also note that the Japanese statute which authorizes agreements among manufacturers and exporters speaks in terms of MITI approval of agreements entered into by the companies themselves, rather than in terms of MITI ordering the companies to enter into agreements, and that the language of the Agreements themselves is consistent with this statutory scheme.

In sum, plaintiffs contend that MITI's role in the formulation of the export control

---

made by a person or agency with the power to interpret the foreign law involved, that there be an affidavit by an Ambassador, or that the statement be by the highest and sole authority empowered to issue official legal opinions. None of these are met, in plaintiffs' submission, in the case of the MITI note. *See also In Re Muir,* 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383 (1921); *Sullivan v. State of Sao Paulo,* 122 F.2d 355 (2d Cir. 1941); *The Rogdai,* 278 F. 294 (N.D.Cal.1920); *Lamont v. Travelers Insurance Co.,* 281 N.Y. 362, 24 N.E.2d 81 (1939).

**123.** The act of state doctrine provides that "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). Thus, a U.S. court cannot entertain any action that calls into question the validity of conduct or policies of a foreign government acting within its sovereignty. The degree of foreign government entanglement which must be present to invoke the act of state doctrine varies with the circumstances of individual cases. *See, e. g., Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *Ricaud v. American Metal Co.,* 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918); *Underhill v. Hernandez, supra; Hunt v. Mobil Oil Corp.,* 550 F.2d 68 (2d Cir. 1977), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977); *Bokkelen & Rohr S.A. v. Grumman Aerospace Corp.,* 432 F.Supp. 329 (E.D.N.Y.1977); *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331

F.Supp. 92 (C.D.Cal.1971), *aff'd,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). Plaintiffs cite a number of cases in which courts have determined that the doctrine should not be applied. *See, e. g., Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287 (3d Cir. 1979); *Industrial Investment Development Corp. v. Mitsui & Co.,* 594 F.2d 48 (5th Cir. 1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980); *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir. 1976); *United States v. The Watchmakers of Switzerland Information Center, Inc.,* 1963 Trade Cases ¶ 70,600 (S.D.N.Y.1963). It is the application of these cases to the factual pattern before us that the parties dispute.

The sovereign compulsion defense rests upon similar reasoning. Although the actions of a private party are at issue rather than actions of the sovereign itself, as in the act of state doctrine, the defense is applicable when those private actions were compelled by the sovereign. *See Interamerican Refining Corp. v. Texaco Maracaibo, Inc.,* 307 F.Supp. 1291 (D.Del.1970). Again, the parties' dispute centers upon application of the relevant cases to the facts before us, with plaintiffs citing, *inter alia, Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *United States v. Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927); and *Watchmakers of Switzerland, supra.*

Finally, defendants assert that even if they fail to persuade the court that plaintiffs' claims are precluded by the act of state or sovereign compulsion doctrines, principles of international comity nonetheless require dismissal. *See, e. g., Mannington Mills, supra,* 595 F.2d at 1297–98; *Timberlane, supra,* 549 F.2d at 613.

arrangements amounted, at most, to informal encouragement and subsequent approval of activities initiated by the defendants themselves. They submit that none of the defendants were under any compulsion to engage in the export trade at all, and that they could have avoided any governmental compulsion simply by declining to export their products to the United States. Defendants, relying *inter alia* on the cases cited in n.123, *supra*, rejoin that plaintiffs' arguments are not sufficient to overcome these defenses.

Since we do not reach the act of state, sovereign compulsion, or comity defenses, we have no occasion to make findings on these disputed points, nor to determine whether or not a genuine issue of material fact exists as to them so as to preclude summary judgment on the defenses.[124] We trust, however, that the foregoing discussion has served to introduce the points, without which the mosaic of this case would be incomplete, and thus to inform the deliberations of the Court of Appeals.

G. *Activities of Certain Groups and Associations in Japan*

1. *Introduction; General Background*

Plaintiffs' case as it relates to activities in Japan has its primary roots in the membership of the Japanese manufacturing defendants in a large number of conventional trade associations (and in sub-committees thereof) and in a number of additional trade groups operating sub rosa. Plaintiffs have identified these groups in the 500-page Appendix A to their FPS, entitled "Plaintiffs' Compilation of Japanese Trade Associations and Other Groups." In this appendix, plaintiffs also identify the individuals who attended the meetings of the various groups, the company employing that individual, and the source of information as to membership. Appendix B, consisting of four volumes entitled "Calendar of Conspiratorial Meetings," sets forth the dates of these meetings.[125] As the title of the Appendix suggests, it is a fair statement that, in plaintiffs' submission, no meeting ever occurred among the executives of the defendants which was not "conspiratorial."

We will address four basic groups or congeries of groups. The most important to plaintiffs' case is a host of informal sub rosa groups (the Okura, Palace, and Tenth Day Groups, *et alia*), whose existence was revealed by the JFTC investigation in the "Six Company Case" and whose membership was composed of executives of the Japanese manufacturing defendants. The purpose of these groups, in plaintiffs' submission, was darkly conspiratorial. The second and largest category consists of the Electronic Industries' Association of Japan (EIAJ), a trade association, and its multitudinous committees and sub-committees. The third category contains the JMEA and its various committees, which were involved in the export control scheme implemented in conjunction with MITI. Finally, we will address the Home Electric Appliance Market Stabilization Council and a supposedly related group, the Four Associations Conference. These groups are alleged to have been involved in a Japanese home market price fixing conspiracy in the late 1950's.

---

**124.** We also do not reach defendants' contention that the MITI-related export control arrangements do not, given their setting, violate the U.S. antitrust laws. Price-fixing and customer-allocation agreements are, in general, per se violations of § 1 of the Sherman Act. Defendants submit, however, that the specific context of the arrangements involved in this case, i. e., the international trade background and the Japanese government involvement, creates significant differences from the factual patterns of the cases which announced the per se rules. Defendants thus contend that even if the Manufacturers' Agreements and JMEA Rules are not immunized from antitrust attack by reason of the doctrines and principles discussed in the text, those arrangements should not be assessed against a per se standard, but considered under the rule of reason, under which, defendants argue, the arrangements should be found reasonable and therefore lawful because of their concomitant political and economic benefits to the U.S.

**125.** The four volumes represent the following time periods:

April 21, 1961 to August 7, 1968;
Aug. 9, 1969 to Aug. 30, 1971;
Sept. 1, 1971 to March 26, 1974; and
March 27, 1974 to Feb. 10, 1979.

We have organized this segment of the opinion according to these four categories of groups, further dividing the sub rosa groups according to whether the activities under discussion relate to the home market or export aspects of the "unitary" conspiracy. We are not entirely happy with this mode of organization because there is considerable overlap in the activities of the various groups, especially with respect to certain kinds of data dissemination. Nonetheless, we believe that the record before us can be described more fully and with greater clarity by organizing our discussion around the four categories of groups and associations than by utilizing an issue or subject matter approach with annotations to the relevant groups sprinkled amidst a cross-sectional discussion. However, to avoid redundancy in the information exchange area, we make an exception to this format with respect to data dissemination concerning price, production, shipment, and inventory, and joint forecasts of demand. We shall discuss all of plaintiffs' evidence in this area at the time that we discuss this type of data exchange by the sub rosa groups.

The Japanese manufacturing defendants do not dispute either the existence of or their membership in any of these groups, and assert that the fact of membership alone is not evidence of the conspiracy which plaintiffs have pleaded. That proposition is, as we have seen in Part VI.A.4, *supra*, quite correct, and to the extent that plaintiffs have offered evidence of no more than mere membership, their case in this area must fall. Recognizing this fact, plaintiffs have attempted to supply evidence about the activities of the various groups through documents seized by the JFTC in the "Six Company Case" and by other documents produced in discovery. As we have observed, plaintiffs have been unable to procure direct evidence of conspiracy, and have therefore been relegated to establishing it by circumstantial means. Hence, the documents are of critical importance.[126]

It is the documents that have been the principal object of our attention over the past months. As will be seen, however, they are not necessarily pellucid or self-explanatory. As will also be seen, because plaintiffs have adhered to a litigation strategy of refusing to take depositions of persons who might clarify these often cryptic or opaque documents, *see* discussion at pp. 1200–1202 *infra*, we have generally been left to interpret the documents in a vacuum. Although we shall, as we must, give the plaintiffs the benefit of all favorable inferences in analyzing the documents, they may have to suffer the consequences of their litigation strategy.

## 2. The Sub Rosa "Conspiratorial" Meetings of Executives Revealed by The Six Company Case

### (a) Introduction; General Background

The groups and associations most important to plaintiffs' case are those whose existence was revealed by the seizure of certain documents from the offices of the Japanese manufacturing defendants during the course of the investigation in the Six Company Case brought by the JFTC in 1966.[127]

---

**126.** We repeat that we have not considered those documents that have already been excluded from evidence (except where specially noted as being assumed admissible on an arguendo basis), those that are not translated or missing from the depository, or those that are not remotely germane. *See* n. 46, *supra*.

**127.** *See generally* Public Records Opinion 505 F.Supp. 1125 at 1173–1176 (describing Japanese Antimonopoly Law and JFTC procedures). The "Six Company Case," Case No. 6 of 1966, was brought against six respondents, all of which are defendants in this case: Sanyo Electric Co., Ltd., Tokyo Shibaura Electric Co., Ltd. (now known outside Japan as Toshiba Corporation); Hayakawa Electric Co., Ltd. (now known as Sharp Corporation); Hitachi, Ltd.; Matsushita Electric Industrial Co., Ltd. ("MEI"); and Mitsubishi Electric Corporation ("MELCO" or "Melco"). The seizure mentioned in the text occurred in November 1966, during the course of "raids" carried out in conjunction with the JFTC investigation which are conceded by the parties to have been legal under Japanese law. On December 14, 1966, the JFTC charged the six respondents with violations of the Japanese Antimonopoly Law by issuing a document

The documents included diaries or notebooks of officials of the Japanese companies and also certain internal company memoranda, all of which revealed the existence of regular sub rosa meetings of executives of the various companies. It is plaintiffs' submission that during the course of these meetings the defendants jointly discussed and entered into agreements upon price levels for television receivers to be sold in Japan, as well as to be exported to the United States, and that the executives agreed upon production and allocation of production as well as other matters, all in furtherance of a conspiracy to fix high prices in Japan to finance or "war-chest" a predatory export raid designed to destroy the United States CEP industry. The catalogue of allegedly conspiratorial groups is as follows.

Plaintiffs describe the *Okura* Group as a regular monthly meeting of the highest executives of the Japanese CEP manufacturing defendants at the Okura Hotel in Tokyo. They are said to have met from as early as 1964 through at least September 1974. The *Palace Group* is said to have met at the Palace Hotel in Tokyo from 1964 until at least September 1974. The *Palace Group* was composed of senior managing directors, who are high-level executives just below the chief executive level. The *Palace Preparatory Group* is said to have been an assemblage of persons whose job it was to digest the matters discussed at meetings of the Tenth Day Group, *see infra*, and to segregate those matters relating to the price-fixing activities of the Tenth Day Group and those issues not decided by the Tenth Day Group and to prepare an agenda of the more important unresolved matters to be taken up by the *Palace Group.*

The *Tenth Day Group,* said to have been so named because its first meeting occurred on September 10, 1964, was attended by mid-level corporate managers involved in the day-to-day operation of the various divisions of the Japanese CEP manufacturers. In plaintiffs' submission, the Tenth Day Group was the real hub of the price-fixing conspiracy. More specifically, plaintiffs assert that at Tenth Day Group meetings, defendants' representatives secretly discussed and agreed upon: (1) the minimum price level for monochrome and color television receivers manufactured and sold by them in Japan; (2) the profit margins (in percentages) to be realized by retail dealers on sales of defendants' television receivers; (3) the profit margins to be realized by wholesalers on the sale of defendants' television receivers; (4) (indirectly) the manufacturers' shipment prices on television receivers manufactured and sold in Japan; (5) the relationship between the prices of television receivers manufactured by them and sold in Japan and the prices of television

---

called a "Recommendation," which bears the legend "No. 17 of 1966." The six companies were charged with holding meetings known as the Tenth-Day Group and the Palace Group, at which they agreed on retail list prices, retail and wholesale profit margins, and rebates in connection with the sale of television receivers in the domestic Japanese market. The JFTC held a total of 39 hearings in the case between January 31, 1967 and June 7, 1969. On June 9, 1970, the hearing examiners issued a "Draft of Decision" in which they found that the respondents had engaged in the violations charged, but that the violations ceased in 1967. The JFTC did not adopt this Draft of Decision, however. On July 27, 1978, the JFTC entered an Order to Terminate, dismissing the case, which stated:

> Whereas, examining the draft of decision on the basis of the case records as well as the statements of objection, etc., although it may be noted that the respondents had discussed together the retail cash list prices and wholesalers' and retailers' margin rates of color television sets and black-and-white television sets, this Commission has not been able to reach a conclusion up to the present because of the factual and legal problems involved in this case.
>
> Moreover, as the acts which are the subject matter of the hearing proceedings ended in January of 1967, thus already showing a lapse of more than ten years, the factual background cannot be expected to be further clarified even if the hearing proceedings were reopened at this time while, in addition, from the point of view of maintaining order in competition, the practical benefit of continuing the hearing proceedings has now been lost. Moreover, any further prolonging of the disposition of this case is also considered to be undesirable from the point of view of legal stability.

receivers manufactured by them and sold in the United States; and (6) prospective shipment and production figures. With respect to this last point, plaintiffs submit that defendants exchanged a variety of internal corporate information regarding immediate past records of production and shipment, exchanged corporate estimations of future demand for television receivers to be sold in Japan and to be exported, and also "voted" on projected production. Although the defendants have asserted that the Tenth Day Group was dissolved in 1966, plaintiffs contend that it continued until at least 1973.

The *TS Group* is said to have been a conspiratorial group which was attended by several smaller Japanese CEP manufacturers as well as by the larger manufacturers. It is said to have engaged in discussion of and agreement on the prices of television receivers to be sold in Japan, including installation fees and service charges, the nature of warranties to be furnished, the common advertising approach to be taken to certain products, etc. Although the TS Group was originally related to TV service, the character of the meetings is said ultimately to have changed so that the group talked about the same issues as the Tenth Day Group and used essentially the same procedures.

The *Twentieth Day* (or Hibiya) *Group* is said to have been formed at least as early as 1960 as a "secret forum for discussion of, and agreement upon, the export prices of television receivers." Plaintiffs allege that among the matters considered by the defendants at the Twentieth Day Group meetings were the prices of TV receivers exported to the United States. The plaintiffs also submit that through the Tenth Day and the Twentieth Day Groups, the "cartel" coordinated the relationship between TV export prices and domestic TV prices. The Twentieth Day Group is said to have met at least through November 1972.

The last group claimed by the plaintiffs to have been involved in secret conspiratorial activity is the *MD Group*, which plaintiffs say was a forum for secretly exchanging the most sensitive intra-corporate material, such as actual and projected production, shipment, and inventory figures. The MD Group members are also said to have voted on each company's projected production, providing a vehicle, in plaintiffs' submission, for adjusting production in conjunction with one another.[128]

In the appendices to the FPS which we have described, the plaintiffs have elaborately set forth the membership and the dates of meetings of each of these groups. In the FPS, plaintiffs have stressed the overlapping membership of the groups and have pointed to the commonality of membership of these groups and the various EIAJ committees, and also of the JMEA and its committees, whose members were signatories to what plaintiffs contend were export cartel agreements.

Beyond such background matters as membership and dates of meetings, the plaintiffs have devoted hundreds upon hundreds of pages of their FPS to a putative description of the activities of these sub rosa groups. As is so often the case, plaintiffs' FPS contains conclusory statements about what the evidence shows without support in the evidence itself. In the case of evidence of the activities of the various "conspiratorial groups," the evidence is derived almost entirely from the JFTC record in the Six Company Case and various answers by the defendants to "Interrogatories Relating to Japanese Trade Associations and Other Groups."

The answers to interrogatories concede that the various groups existed as alleged and that representatives of the various defendants attended meetings of the groups. The defendants also concede multiple group membership and that the same individual often attended meetings of a number of

128. A large number of other groups, some with colorful names such as The Big Dipper Group, are also alleged by plaintiffs to have existed sub rosa in furtherance of defendants' unitary conspiracy. Because plaintiffs have neither seriously advanced nor documented their role, we shall not discuss them in any detail.

different groups. However, that is where the agreement between the parties ends. The defendants submit that the plaintiffs' conclusions as to what went on in the various group meetings is totally at odds with the facts. They also submit that plaintiffs have taken great liberties with the documents which they have referenced in the FPS by asserting that they support plaintiffs' conclusory allegations of conspiratorial activity. That this latter contention is correct is clear beyond cavil.

Many of the documents here at issue are those dealt with at length in the Japanese Materials Evidentiary Opinion, which we have summarized in Part IV, *supra*, and which we have incorporated by reference herein. In that opinion, we excluded virtually all of the materials which can be claimed to constitute direct evidence of plaintiffs' broad conspiratorial allegations, including their "smoking guns," on the grounds that they were unauthenticated or were hearsay and not within any of the exceptions to the hearsay rules. It is important to note that the documents upon which the plaintiffs have most heavily relied—those that are the most critical to their case—were excluded not on some technical ground, but because they were found to be untrustworthy.

The most significant of those documents, the diaries and internal memoranda, all appear to have been written solely for the author, with the notations written in a kind of shorthand code which the writer presumably could understand but which, except for occasional excerpts, is unintelligible to others. We explained in the Japanese Materials Evidentiary Opinion:

As defendants correctly note, they [the diaries] are a "hodge podge" of notes in which the author has not explained with any degree of clarity what he meant, to what he was referring, or even where he was when he wrote it. While plaintiffs have clarified a few of the references in the diaries by cross reference to JFTC testimony or protocols, only an infinitesimal part has been thus explained. One would have to engage in the rankest of speculation to make sense out of the vast bulk of the diaries.

One cannot tell with any certainty where entries begin and end. There are many time gaps in the notebooks or diaries, and only a portion of the "conspiratorial meetings" otherwise demonstrated to have taken place are recorded in them. There are all kinds of arrows and innumerable symbols and notations and references which are unintelligible to the translators, who report those references as "illegible." Many of them are written in a code which only a cryptographer could solve.

There is both intrinsic and extrinsic evidence that many of the diary entries reflect occurrences at meetings which the diarists did not attend, but rather about which they were informed by others. The diaries plainly contain numerous instances of second and third level hearsay. Because of the manner in which the diaries are kept, however, it is not possible to sort out which entries are based upon the diarist's personal knowledge and which are based upon hearsay. There is no evidence of regular or continuous habit on the part of any of the diarists in making their notebook entries or checking them systematically.

505 F.Supp. 1190 at 1212. These observations are documented at length in that opinion.

Our exclusion of these documents was in large part a function of the failure of the plaintiffs to lay any foundation for them by the testimony of someone who could explain what they meant. Notwithstanding that fact, what the plaintiffs have done (or at least have attempted to do) in the FPS is to interpret the documents according to their own view of the case, that interpretation being the nexus between the raw excerpts from the document, or what we call the "bits and pieces," and the conclusory statement in the FPS. Plaintiffs cannot, of course, advance their interpretations on the basis of documents we have excluded as the result of pretrial evidentiary hearings (except to the extent that they succeed in

challenging our rulings on appeal). However, a number of documents similar in character to those excluded in the Japanese Materials Evidentiary Opinion but not submitted for consideration during the evidentiary hearings must be taken up herein because they appear at important points in the FPS.[129] Since these documents too are unexplained by any witness, it is necessary that we rescribe what we said in the Japanese Materials Evidentiary Opinion on the subject of plaintiffs' litigation strategy.

Taking the diaries as an example of that litigation strategy, it is obvious that there are indeed persons who could eliminate the difficulty we have described and decipher any code-like references: the diarists themselves. In their absence, someone present at the meetings whose proceedings are supposedly recorded, or someone contemporaneously familiar with the contents of the diary or memo and the diarist's recording practices could serve. However, the plaintiffs, despite their role as proponents of the documents, hence bearers of the burden to qualify them, have not proffered the testimony in any form of any such person. Moreover, they have made it clear that they have no intention of doing so, before or at trial.[130] Rather, they have attempted to qualify the documents circumstantially and to offer selected (though extensive) excerpts therefrom.

129. We refer, *inter alia*, to the MD Group documents and to a number of the "rebate scheme" documents.

130. This intention is confirmed by their failure to list any such witness in the preclusive FPS.

131. We note that plaintiffs' strategy does not reflect sloth or any lack of experience on the part of plaintiffs' counsel. Mr. Rome is one of the ablest antitrust lawyers in the United States. A brilliant and eloquent advocate, he tried some of the pioneering antitrust cases in the movie industry and has assembled a stellar litigation team, led by William H. Roberts, whose efforts have been prodigious, as well as of the highest quality.

132. This warning came not only during the course of our numerous pretrial conferences, but as early as Melco's motion for summary judgment, filed in March 1978, well before the close of discovery. In that motion, Melco spent many pages detailing the kinds of evidentiary

The litigation strategy we have described is not merely our supposition. Edwin P. Rome, Esquire, plaintiffs' lead counsel, has confirmed the strategy time and again. For example, he noted during the course of the evidentiary hearings:

I assume personally, Your Honor, whatever onus there may be about the fact that we chose quite deliberately, and I state it of record, we chose quite deliberately not to undertake to depose persons in a foreign language when we had documents that in our view documented and explicated a conspiracy to violate American law.

PTO 268 at 143–44 (June 27, 1980). There are numerous similar statements by Mr. Rome in the voluminous record.[131] This litigation strategy was maintained in the face of repeated warning from the defendants that they intended to challenge the admissibility of the diaries, memoranda, protocols, and testimony.[132]

Indeed, we challenged plaintiffs on several occasions, questioning why, having proceeded with this case for close to a decade and having inspected literally millions of documents, they had failed to take depositions to lay foundation for the admissibility of the seriously challenged JFTC materials. We also sharply questioned plaintiffs as to foundational deficiencies we dealt with in the first two opinions in the pretrial evidentiary "trilogy." Yet the plaintiffs, all the while insisting they were ready for trial, declined to take depositions of those who might shed light upon the documents. For example, at the pretrial conference of June 14, 1978, six months before the close of plaintiffs' discovery period, plaintiffs' counsel stated to the court:

MR. McELROY: We said a long time ago, and Ed Rome has repeated throughout, that the plaintiffs in this case are ready to go to trial upon reasonable advance notice. We believe that discovery in the case to date is sufficient for us to get to a jury and to get a verdict. Likewise, we believe that, and it follows, that we believe we have had enough discovery, we have enough evidence to defeat a motion for summary judgment. We don't need further discovery in order to respond to [Melco's counsel] Mr. Reath's motion.
PTO 107 at 21.

why, given the magnitude of their claims and the existence of so much fodder for examination, they had failed to take depositions, for substantive purposes, of a single Japanese executive who attended any of the allegedly conspiratorial meetings at the core of plaintiffs' case. We noted that we found it difficult to conceive of counsel pursuing that strategy in a case with purely U.S. roots, and that it was ordinary fare in complex cases for counsel to take depositions to qualify documents,[133] as well as for substantive purposes. Mr. Rome consistently responded that it was his considered decision not to do so.

That foundational and substantive depositions of Japanese executives were feasible is demonstrated by the repeated and uncontroverted representations of Japanese manufacturing defendants' counsel that, with the exception of Mr. Yajima who died in 1968, all of the diarists and all persons whose names were focused upon during the evidentiary hearings are alive and well in Japan, still employed by their companies,[134] and that they have been available for depositions throughout this litigation.[135]

Defendants' explanation for plaintiffs' litigation strategy is not gentle. It is stated in the "Memorandum of Certain Defendants in Support of their Position that Materials from the JFTC Proceeding Are Not Admissible in Evidence" (pp. 3–4) as follows:

> Indeed, it seems clear that it was precisely because the Japanese materials do not constitute records of the only two matters that could make them properly probative in this case, that plaintiffs

chose not to follow the normal route of taking depositions to lay a proper foundation for their introduction. Plaintiffs knew that such depositions would not be helpful to their case and that, at the end of such discovery, while they might have come up with admissible evidence regarding discussions of "bottom prices" by six companies for two years (1965–1966), they would not come up with any admissible evidence of the creation of a U.S. export invasion fund or of a United States predatory price agreement. They, therefore, seized upon the ploy of attempting to introduce the materials without proper foundations—and without any opportunity by the other side to cross examine—and arguing to the jury that all kinds of wild inferences can be drawn from a handful of cryptic and basically incomprehensible "export references" found in materials which were obviously not written to record export activities. Since plaintiffs' direct case will last for some months, the jury will be hopelessly prejudiced by such tactics before the first of the defendants could even be heard.

In furtherance of this approach, plaintiffs adopted the tactic of piling into the FPS hundreds of thousands of materials and spuriously arguing that they are all evidence of conspiracy, so that they could create the argument that it would be extremely burdensome for them to lay foundations in the normal way, even though their PPTM and summary judgment briefs show that they are, in fact, relying on a relatively small number of such Japanese materials.

---

**133.** Defendants have taken them in this very case. For another example, see the pretrial order governing non-party discovery in the Uranium Antitrust Litigation, which makes specific reference to "depositions ... taken solely for the limited purpose of ... authenticating documents produced by such non-party." Joint Pretrial Order No. 8 at 2–3, In Re: *Uranium Antitrust Litigation*, M.D.L. 342 (N.D. Ill. Nov. 13, 1979) (Marshall, J.).

**134.** These representations have been made in response to our request that counsel attempt to verify continued employment *vel non.*

**135.** That depositions were feasible is further illustrated by the fact that plaintiffs did take depositions of some Japanese executives in connection with the motions relative to personal jurisdiction and venue. Although plaintiffs have occasionally complained about the cost and cumbersomeness (due to translation problems) of taking depositions in Japan in the Japanese language, they have abandoned any reliance upon such problems as their rationale for their failure to take depositions. They concede, as they must, that given the magnitude of the litigation they have instituted and maintained, cost factors provide no excuse.

While we do not endorse defendants' rhetoric, we do note that we find more than a kernel of truth in defendants' evaluation of plaintiffs' litigation strategy. As we have suggested, their observations apply not just to the materials from the Six Company Case, but to many other materials in the case as well.

Notwithstanding our exclusion of the diaries and memoranda, there was certain evidence from the JFTC proceedings which we did admit and which must be considered in connection with our evaluation of the activities of the Tenth Day Group and the other "conspiratorial" groups. We refer specifically to the JFTC testimony, which we held admissible, with the exception of export references, against the defendants in the Six Company Case,[136] and to the protocols given to the JFTC investigators which we found admissible against the employer of the executive giving the protocol. Moreover, as we have noted above, plaintiffs have now placed reliance upon a number of other documents which they did not find important enough to proffer during the pretrial evidentiary hearings, but with which we shall have to reckon. Against this background, we turn to a discussion of plaintiffs' evidence as to the "secret conspiratorial meetings."

Any such discussion must take into consideration the two facets of plaintiffs' claims: the home market and the export market aspects of the "unitary" conspiracy.[137] Although the vast bulk of the JFTC materials relates to the home market, there are smatterings of export references which the plaintiffs contend are evidence of an export conspiracy. Because the references are all mixed in together, we do not find it useful to analyze the evidence separately as to each "conspiratorial" group. Rather, we shall look at what the record as a whole shows, first about the home market aspect of the "unitary" conspiracy and then about the export aspect thereof. The bulk of the relevant references is from the Six Company Case record, although we include within the compass of our discussion any other documents that plaintiffs have relied upon in this area of the case.

(b) *Evidence of the Home Market Aspect of the "Unitary" Conspiracy; the Plaintiffs' "War-Chesting" Claims*

We have canvassed the evidence and sought to extract therefrom the version most favorable to plaintiffs of what occurred at the meetings of the numerous groups and associations identified by the defendants in their answers to interrogatories and of the relationship of those meetings to the Japanese domestic CEP market. What we have gleaned, largely from the JFTC protocols and testimony but also from other admissible evidence of record, may be summarized as follows.[138]

The Tenth Day Group and the other groups metamorphosed from social gatherings to hard core business gatherings involving exchange of information some time near the end of 1964 or in early 1965. The domestic TV market was then oversaturated, and there was tremendous retail price-cutting competition. The period from 1960 to 1965 had seen a steady decline in the price of monochrome TV, so that there was already a relatively low price threshold, and the manufacturers were concerned about the possibility that the retail market might collapse. Accordingly, they entered into serious discussions at the Tenth Day Group about a variety of business matters. It is apparent that their primary concern was

**136.** We did admit export references with respect to the testimony of two witnesses, *see* pp. 1209–1210 *infra*.

**137.** Our separate analysis of the home market and export aspects is not an attempt to fragment the conspiracy, but rather a matter of convenience and a vehicle for clarity.

**138.** In accordance with our rulings in the Japanese Materials Evidentiary Opinion, the testimony is admissible only against the defendants in the Six Company Case and the protocols are admissible only against the employer of the maker of the protocol. Although, given the large number of other defendants in the case, this markedly constricts the impact of plaintiffs' evidence, in view of the ultimate result, we need not parse out the "cut" of this evidence against the various defendants.

prediction of demand so as to avoid over-production, oversaturation, and further price decline.[139] However, there was also discussion at the Tenth Day Group meetings of so-called "bottom prices" and of wholesale, retail, and rebate margins.

The evidence all points to the conclusion that the "bottom price" was the lowest price that any manufacturer would charge. It is indisputable, however, that under the practice as it existed, any manufacturer could quote as a bottom price as low a price as it wished, but that once that bottom was determined, it was the general understanding of the manufacturers that no one would sell below that bottom for some (undetermined) period of time. Mr. Yajima of Toshiba defined bottom price as the "target" price, or the price where the price level ought to be within a foreseeable period, such as six months. The evidence is strong that there was no agreement on bottom price and that ultimately everyone was free to proceed with whatever bottom price he wished;[140] however, for purposes of the motion for summary judgment, we assume that there was such an agreement.

It is important to note that the "bottom" price was not the actual retail selling price, but rather the suggested retail (or so-called "cash normal") price. Yajima, for example, testified that the conferees were not overly concerned about the bottom price. He noted that a higher bottom price did not necessarily end up being a higher actual selling price, and that there was no relationship between the bottom price and the actual selling price. He said that "they each represent a separate element." Yajima also identified various countermeasure funds, as well as a variety of rebates paid by Toshiba, directly or indirectly to the retailers. He added that fixing only the bottom price and the profit margin rates did not automatically determine the price of TV sets marketed by Toshiba Shoji (Toshiba's marketing subsidiary).[141]

Yajima testified before the JFTC that he would report to his superior, Mr. Kamakura, the bottom price and demand forecast figures disclosed at the Tenth Day Group meeting. Having discussed these matters at the meeting, Yajima said that he could "more or less guess each company's moves." He testified that he could "speculate on the basis of his hunches" what the companies were up to. There was no disagreement, however, on one point—that cost of production, company manufacturing and marketing policies, and product line details were *never* disclosed by one company to another. Yajima, for instance, testified that up-to-date plans of the companies were *not* discussed at the Tenth Day Group meetings, and that topics so specific in nature were not discussed at all because that might reveal proprietary secrets of each company. Adachi also made clear that the companies did not discuss their profit margins. This uncontradicted testimony in and of itself seriously rends the garment of plaintiffs' conspiracy-cartel theory.[142]

139. During this initial period, color TV was not as big a factor as monochrome. However, color TV was becoming popular and the demand was increasing, though prices were still very high.

140. Mr. Yajima, for example, testified that there was no approval or disapproval solicited as to the bottom price.

141. Yajima's testimony and protocols were corroborated by Hitachi's Mr. Adachi, who was emphatic as to the extreme swings in the rebates and as to the existence of sales, expansion, and other funds of a similar nature. In his submission, the price the Japanese retailer sold at was up to him and was also affected by the so-called rebate. There is a dispute among the protocol-givers and JFTC hearing witnesses as to whether rebates were ever disclosed, some saying that they were and others that they were kept like state secrets. For purposes of the summary judgment motions, we must assume they were disclosed.

142. Perhaps the most interesting JFTC testimony about the various meetings was that from several witnesses who stated that when the defendant companies made disclosure of economic data at the meetings, they lied to one another. For instance, Adachi claimed that "when it comes to price, profit margin, and rebate," the manufacturers would not tell the truth and disclose exact figures. One attendee described attendance at the meetings as a "reconnaissance mission." We do not, however, consider the testimony about mendacity because it is disputed.

The best that plaintiffs can draw from the Tenth Day Group meetings then is that each company would disclose its projected "bottom" price as well as its projected wholesale and retail margin, and perhaps its rebate figure. Theoretically it was necessary to have agreement on the margins, since otherwise the suggested "bottom" or "cash normal" price would be inefficacious. However, insofar as margins are concerned, the only evidence is that there was considerable pressure to *increase* the margins, and that the companies during the relevant period agreed to increase the margins, particularly the retail margins, so as to protect the retailers from collapse. This, of course, would have the effect of *decreasing* the manufacturer's profit, the opposite of what plaintiffs posit in support of their theory of high profits in Japan to war-chest a predatory export raid on the United States market. Concomitantly, any agreement to limit production would also impede that supposed predatory export raid.

Moreover, and this may be a subtle distinction, but it is an *important one*, undisputed on the record, it is plain that the thrust of whatever price discussions there were was not to keep prices high, but rather to keep them from going all the way down. Thus, the minimum price which was being set was not a high price, but was rather as low a price as the manufacturers could bear without letting their retail market collapse, i. e., a price consistent with protecting retail margins. As one witness stated, they were talking about targets for the maximum price *cut*.

Yajima's testimony is important in this regard. He relates a Tenth Day Group meeting at which Kamakura, Yajima's Toshiba superior, proposed the "daring" figure of 175,000 yen as the bottom price of certain table-top models. Yajima testified that it was simply impossible to market the new line at a price below 180,000 yen, indeed 182,000 yen was the absolute limit. Had they introduced the product at 175,000 yen, they would have undoubtedly gone into the "red." However, it appeared ultimately that Kamakura had merely been trying to "smoke everybody else out," and Toshiba finally withdrew the 175,000 yen price and settled at 180,000 yen. The point is that the bottom price, according to plaintiffs' "star" witness, was in no sense a high price calculated to war-chest a predatory export raid.

At another point Yajima noted that circumstances did not allow Toshiba to market monochrome TV sets at prices as low as the bottom price. Moreover, according to plaintiffs' evidence, some manufacturers would complain at the meetings that they could not break even at a particular bottom price. The point—again—is that the so-called bottom prices were not high prices, but rather were relatively low prices, inconsistent with the plaintiffs' war-chesting theory. Indeed, according to the record, throughout the relevant period, bottom prices went down, not up!

There is also strong evidence, which we accept for F.R.E. § 104(a), though not for summary judgment, purposes, that there was considerable pressure for price *cuts*, not only to popularize color TV, but also to compete for business, so long as the cuts did not become ruinous. One figure which plaintiffs say was often mentioned in the sub rosa meetings and which is frequently referred to in the protocols and JFTC testimony—10,000 yen per inch—was incontrovertibly a function of the common desire to lower, not increase, prices toward the end of popularizing color TV.[143]

At all events, it is plain that there is not the slightest evidence in this record of "war-chesting" activity, i. e., of extracting high profits from the Japanese consumer to fund a predatory export raid on the U. S. CEP market.[144] Rather, the evidence is

---

143. Adachi testified, for example, that the 10,000 yen per inch cost was not a profit figure, but rather an effort to popularize color TV, with the expectation that the cost of manufacturing color TV would drop substantially in the future.

144. The plaintiffs have at no time even suggested that there is any direct or specific evidence of an agreement to this effect.

only of efforts to stabilize prices so as to keep them from going too low. The evidence also is only that the wholesale and retail margins which were discussed at the meetings increased. To repeat, all of this would have the effect of reducing the returns of the manufacturers, contrary to the war-chesting theory. Moreover, in terms of company profits, there is nothing in the JFTC record—or elsewhere in the record—which would establish that defendants made excessive profits in the sale of CEP's in the Japanese market which could constitute a "war-chest" to fund an export low price conspiracy.

In terms of profits, we note the following colloquy which we had with Mr. Rome, lead counsel for the plaintiffs, during the final summary judgment argument:

> The Court: Do you have any evidence of excessive or exorbitant profits that constituted the war chest, Mr. Rome, on the part of Matsushita, Sanyo, Sharp, or any of them?
>
> Mr. Rome: Your Honor, to the extent you inquire about excessive or exorbitant profits, that in my respectful submission isn't required to be shown if there is a difference, if it can be shown that there is a profit being made, a higher price being charged than that which is being charged in the export market.
>
> That provides a financial curb on—
>
> The Court: Maybe they paid it all out in dividends. I mean, I don't know what they did.

Mr. Rome: Maybe they did, your Honor. PTO 292 at 129–30.[145]

We also note in this regard the substance of two documents offered by plaintiffs. The first is DSS 61, the JFTC testimony of Mr. Tsu Fujio of MEI, in which it is stated that profits in the Japanese CEP industry were very low. The second is a lecture entitled "Commemorative Lecture at the Appreciation Sale for the Attainment of 6 Million National [MEI's Japanese brand name] TV Sets: The Road to Co-Existence and Co-Prosperity," by K. Matsushita, delivered January 1, 1966. The document makes the following comments:

> . . . profit has become very small indeed. It has dropped to half of former levels. . . . . Although business had been increasing year after year, more or less, profit is decreasing because competition has gradually become severe. In addition, because of general adversity in business there is a stronger impression that profit is decreasing . . . [T]otal quantity of production exceeds actual demand by far. This is one of the major reasons why profit plummets in these already unfavorable conditions. Another reason for decrease in profits seems to be coupled with [sic] excessive competition among manufacturers, agents, and sales stores, respectively . . . .

This picture, of recession, plummeting profits, and cutthroat competition contradicts plaintiffs' argument that the Japanese market was characterized by high, monopolistic profits and the absence of competition.[146]

---

**145.** Plaintiffs' post-argument summary judgment brief fails to supply any of the missing evidence about which we were inquiring, and, indeed, the brief actually disavows any ability, or need, to establish the existence of a "war chest." Moreover, it admits that the alleged "subsidy" might have come from any of the defendants' "very profitable enterprises" (p. 249). In the same segment of the brief, however, plaintiffs still maintain that:

> "It is logical to assume that the monopoly profits the Japanese manufacturers earn from their price-fixed closed home market provide the source for the subsidization.
>
> * * *
>
> In plaintiffs' submission, the most logical and reasonable source for such subsidization is

the margins defendants enjoy for the consumer electronic products they manufacture and sell in the closed Japanese market." (247, 249).

We cannot help but observe that what is "logical and reasonable to assume" is, in the absence of evidence, but speculation by counsel. Speculation, however, cannot serve as a substitute for evidence.

**146.** This statement was made at a time when, according to plaintiffs' own submission, the home market aspect of the conspiracy was at the very least in midstream. The JFTC raids took place in November 1966. Accordingly, it cannot be said that subsequent joint conduct significantly altered the profit picture.

In plaintiffs' submission, the architect of the conspiratorial activity in Japan about which they complain was K. Matsushita, the founder and chairman of MEI. Plaintiffs assert that Mr. Matsushita had prevailed upon the other Japanese manufacturing defendants to avoid competition and to cooperate in order to avoid over-production and destructive price cutting which might lead to the collapse of the retail market. Plaintiffs rely on a number of public statements of Mr. Matsushita in addition to the lecture which we have just quoted. One of the documents they cite is an "essay" entitled "Toward the Year of Restored Business by Overcoming the Slump," also delivered in January 1966. The "slump" refers to the then current condition in the Japanese market, not to exports. This document is cited at p. 7812 of the FPS as evidence that K. Matsushita "explained to the consumer electronics products industry in Japan that competition among rival companies must not be permitted." The essay states:

> one of the causes for sluggish business during the past two years was our (mutual) excessive competition. We competed with each other in terms of expanding equipment caused the business slump. Therefore, we must not have excessive competition for plants and facilities even if we do enter a period of prosperity. But, in the future, expansion that produces the effect of competition among rival companies must not be permitted. In a Japanese wrestling match, victory or defeat is important. But we do not compete for victory in business.

Plaintiffs have repeated Mr. Matsushita's statements again and again as evidence of the home market aspect of the conspiracy. It would be astounding if such public statements could be the foundation of a conspiracy claim. However, even assuming that these statements were acted upon by the Japanese manufacturing defendants, their very formulation does not suggest a conspiracy to gouge the Japanese consumer by charging high prices either to "war-chest" a predatory export raid in the U. S. CEP market, or for any other purpose. Rather, the formulation of the statements is more redolent of efforts to avoid domestic market collapse.

This first portion of our summary of the evidence concerning meetings of the sub rosa groups makes plain that we have found no evidence of a *high price high profit* conspiracy to war-chest a predatory export raid on the U. S. CEP market. We turn to the evidence of data dissemination to see if that can alter the picture. Before reviewing that evidence in detail, we are constrained to comment upon a problem we confront in dealing with plaintiffs' data dissemination claims that is far more vexing than one of mere organization—the manner in which the data dissemination claims are advanced. Plaintiffs' representations in the FPS tend to be broad and conclusory, to the effect that certain types of data were exchanged among the conferees at certain meetings. However, when the source for the representation is consulted, it generally does not support the conclusory statement. While in some instances that is because the source, while appearing to be a statistical compilation of production, shipment, and inventory figures, is entirely in Japanese, usually it is for a more pervasive reason.

More often than not, the source for a conclusory statement is a "minute" of a committee meeting (often that of the MD Group or an EIAJ Committee) which contains only a one line agenda item suggesting that some aspect of data dissemination was on the agenda or was discussed, but supplying no detail of the conversations or of the dramatis personae involved.[147] For example, a typical EIAJ meeting minute (MIH 012781) says: "Data: ... (4) The 1973 Production/Export Statistics." What can we make of this? To what country were the exports discussed shipped? Obviously, there are many unanswered ques-

---

**147.** This, by the way, is a supreme irony. Although plaintiffs, in their FPS, ground much of their case upon such "minutes," they complain in their Supplemental Post-Argument Memo-

randum in Opposition to Defendants' Motions for Summary Judgment, filed September 22, 1980, that the MD Group had not produced adequate documentation. *See* n. 262, *infra.*

tions. We cannot draw an inference of conspiratorial activity from a bald statement that some subject may have been discussed without knowing the details of the discussion, the persons who discussed it, or what, if anything, was done as a result. Even where the documents are statistical in nature, a conspiracy cannot be inferred in a vacuum, without knowing how and by whom the statistics were prepared, what the figures represent, to whom they were distributed, and how, if at all, they were used.

The data dissemination area provides the most graphic example of the folly of plaintiffs' litigation strategy. It may well be that substantive depositions might not, Perry Mason-like, have ferreted out evidence of conspiratorial agreements on price. But they surely would have produced explanations of thousands of documents upon which plaintiffs rely but as to whose significance we can only guess.[148] So often, in dealing with the FPS, we feel like we are trying to nail jelly to the wall, as it were.

Notwithstanding these observations, we shall posit, in connection with our consideration of the summary judgment motions, that a broad range of information was exchanged among representatives of the Japanese companies. The nature of the exchange is what is critical, and we shall flesh out what can best be said for plaintiffs' position in the discussion to follow. As will be seen, there is far more "evidence" of home market data exchange than of exchange of export information. The majority of the cognizable data exchange took place under the aegis of the several subcommittees of the EIAJ and of the MD Group. MITI (and therefore also the JMEA) was

also heavily involved, because it sought and obtained a great volume of statistical data from its Japanese manufacturers. We will here summarize the evidence of domestic data exchange as it appears from the EIAJ and sub rosa group documents. In the next segment, we shall do likewise with respect to the dissemination of export-related data.

It appears that domestic data dissemination occurred on two levels: dissemination by the EIAJ of aggregate statistics based upon information supplied by its members, and dissemination of individual company statistics. There is evidence that the EIAJ disseminated aggregate statistics about past production, sales, shipment, and inventories by region,[149] and also that individual company statistics of this variety found their way into the files of other companies.[150] There is evidence that demand forecasts were aggregated and distributed. Finally, although it is sketchy and elusive, there is some evidence of "voting" on production. It is important to note that in none of the charts and statistics disseminated through the EIAJ committees or the MD Group is there any evidence of exchange of identifiable price data.

The foregoing information is gleaned primarily from documents not submitted as DSS's during the pretrial evidentiary hearings. The documents at issue are similar in character to many of the documents excluded in the Japanese Materials Evidentiary Opinion. They have neither been qualified under the exceptions to the hearsay rule, despite omnibus challenge by defendants, nor explained. We note again that: (1) we have no idea from these documents who said what to whom or which company rep-

---

**148.** Although we are at the pretrial stage, plaintiffs have made it clear that they will call no witnesses from Japan to explain the documents. They have said so in colloquy and have failed to list any such witnesses in their preclusive FPS.

**149.** We note that many of the documents whose general nature we have adumbrated emanate from the EIAJ's several statistics committees, which distribute lists of aggregate statistics. A number of documents from those committees relate to statistical methodology,

including such matters as the type of data to be submitted, deadlines for submitting information, ultimate computerization of statistics, and non-disclosure to outsiders.

**150.** We glean this from documents which we have traced from our reading of the FPS. Most of the statistical documents are in Japanese, but there are some master translations of statistical documents which are at least suggestive of the point made in the text; hence, we posit it for purposes of summary judgment.

resentatives were present and/or voted on any of the proposals; (2) there has been no deposition taken of anyone present at such meetings, so we do not know the extent of detail exchanged or the extent of dissemination; and (3) we do not know whether any of the proposals were implemented. Although the documents are therefore merely suggestive of the kind of information exchange we have described, without providing any specific information, plaintiffs attempt to interpret these documents to suit themselves. Notwithstanding these factors, we assume admissibility.

Although the foregoing discussion strongly suggests that some kind of data dissemination program existed, the plaintiffs' information exchange claims are not cohesively presented; rather, they are a blunderbuss, amounting to random documentation, referenced helter skelter in the FPS. Moreover, these claims are not supported by evidence which creates a genuine issue of material fact.

As we have explained in Part VI.A.5, *supra*, the exchange of aggregate production and inventory statistics is insufficient alone to give rise to an inference of an agreement violative of Sherman § 1 under *Maple Flooring*. As we explained in Part VI.A.6, *supra*, to the extent that there is also evidence of the exchange of technical data and of product standardization, that kind of information exchange will not, except under unusual circumstances not present here, give rise to an inference of conspiracy. On the other hand, it may be that the data dissemination in Japan was ancillary to some kind of an agreement to adjust domestic production and avoid oversaturation of the market, although—and this is another major flaw in plaintiffs' case—the dates of the activity are most unclear. However, even assuming that the defendants were disclosing or signaling their individual production plans, and further assuming that the "vote" was tantamount to some kind of production limitation, there still is insufficient evidence to support an inference of the home market aspect of the "unitary" conspiracy.

First, there is no evidence of who did what at various meetings or whether any of the supposed plans were implemented. Second, data exchange does not constitute a per se violation, and even exchange of individual production, sales, shipment, and inventory data cannot sustain a conspiratorial inference in the absence of some evidence that the information was used in aid of collusive pricing activity, or of some purpose or effect to stifle competition in the manner charged by plaintiffs, *see* Part VI. A.5, *supra*. There is no such evidence. Finally, even assuming that plaintiffs had adduced evidence of some kind of production limitation, that would not be evidence of a "unitary" conspiracy claim for the reasons that follow.

Although a limitation on production would be consistent with a scheme to keep Japanese domestic prices high, and would further be consistent with plaintiffs' claim that K. Matsushita had persuaded his confreres to "stabilize" the Japanese market against ruinous competition which was driving prices down and threatening the retail distribution system, it is inconsistent with plaintiffs' theory of conspiracy. In analytical terms, the conspiracy could fund a predatory export raid only if accompanied by high prices and high profits in the domestic market. However, as we have seen, *see* pages 1204–1206, *supra*, and 1213–1214, *infra*, the plaintiffs have offered no evidence of high prices and seem no longer even to contend that there was high profitability on domestic CEPs. At all events, the claim is inconsistent with the record, which contains no evidence of a high price conspiracy or of high profits, but which does reflect a policy of increasing the margins of the wholesalers and retailers to protect the distribution system at the expense of high profitability. Accordingly, plaintiffs' domestic information exchange claim is unavailing.[151]

---

151. Our discussion in this segment takes into account all of the documents which plaintiffs cited on pp. 28–30 of their Supplemental Post-Argument Memorandum in Opposition to De-

Plaintiffs have thus adduced no significant probative evidence from activities of the sub rosa industry groups or from the data dissemination activities of any of the allegedly "conspiratorial" organizations to support the domestic high price "war-chesting" aspect of their "unitary" conspiracy theory.[151A]

(c) *Evidence of the Export Aspect of the "Unitary" Conspiracy*

■ We have canvassed the evidence and sought to determine therefrom whether there is any evidence that an export conspiracy was conceived or implemented at the meetings of the numerous groups and associations identified by the defendants in their answers to interrogatories.[152] For the reasons that follow, we find no admissible evidence in the JFTC materials or in any other materials which refers or relates to the setting or coordination of export prices, the exchange of export price information relative to the claimed conspiracy, the im-

permissible dissemination of other export-related economic data, or any other aspect of the "export" component of the "unitary" conspiracy claimed by plaintiffs. This result follows inevitably from the fact that virtually all of the documents in the JFTC materials that are of major significance to plaintiffs' "export" case were excluded in the Japanese Materials Evidentiary Opinion. Because this aspect of their case is so critical to plaintiffs, however, we have elected to canvass the entire record, analyzing the significant portions of the excluded materials to determine whether the result would change our evidentiary rulings. We also consider some additional documents referenced in the FPS. As will be seen, the result would be no different.

We begin with the JFTC protocols and testimony. None of the protocols contain any export references. We ruled inadmissible all of the export references in the JFTC testimony with the exception of those in the

fendants' Motions for Summary Judgment. In that document, filed September 22, 1980, plaintiffs made submissions of documents they had not thought important enough to include as DSSs during the pretrial evidentiary hearings. More precisely, what plaintiffs did was to give us a list of additional document numbers with the representation that those documents reflected additional conspiratorial meetings of the defendants and their coconspirators at the TS Group, Tenth Day Group, Twentieth Day Group, Palace Group, Palace Preparatory Group, MD Group, and Okura Group. Upon visiting the document depository to retrieve these documents, we found that a number of them were not in the depository, and that all those that were there were untranslated into English, with the exception of a number of pages from one of the Yajima diaries which had already been excluded in our Japanese Materials Evidentiary Opinion. One other document was translated into English but said nothing intelligible, much less probative.

**151A.** We have not dwelt upon the TS Group in the foregoing discussion. For the most part, that group is an analogue of the Tenth Day Group, and most of the references to its activities are in diaries excluded in the Japanese Materials Evidentiary Opinion. There are some TS Group data dissemination references cited in the FPS which are similar to MD Group references, but they suffer from the same flaws. The activities of the TS Group were confined to the Japanese domestic market, and those activities do not support plaintiffs' high

price war-chesting theory for the same reasons explained above.

**152.** The canvass covered the following materials: the parties' briefs; their oral argument in connection with the motions for summary judgment; the portions of the FPS dealing with plaintiffs' allegations about the groups and associations in Japan alleged to be involved with export activity or about export activity in any context; the supporting documents cited in the FPS; and plaintiffs' Feb. 12, 1980 submission, with its five-page cover letter, of a list of "export references" contained in the JFTC materials. The Feb. 12, 1980 submission, signed by Arnold Kalman, one of plaintiffs' counsel, was in response to our directive at the January 16, 1980 pretrial conference (PTO 222 at 230–32) that plaintiffs identify the portions of the JFTC record which tended to show that defendants agreed to coordinate their pricing of television receivers for export to the U.S. We understand the submission to include *all* export references, for that was our order. We note that plaintiffs time and again throughout this litigation, when asked to submit a complete list of something, have submitted it with a disclaimer that the list is "representative," implying that there are other documents in the requested category somewhere in the voluminous record. Indeed, they did so in their February 12, 1980 cover letter, but, in view of our previous directive to them, we deem this attempted disclaimer unacceptable and unavailing.

testimony of Mr. Nishi, Senior Managing Director of Hitachi. *See* Japanese Materials Evidentiary Opinion at 1293–1294. However, these references are of no help to plaintiffs' case.[153] We turn then to the mainstay of plaintiffs' case—the documents.

The plaintiffs' February 12, 1980 submission, *see* note 152, *supra*, purports to be a compendium of export-related documents. This compendium lists 310 separate page references from the 6,317 pages in the JFTC record. However, a review of these 310 pages reveals that only a small number of them, amounting to approximately 30 separate references, actually contain language which could be argued to be an "export reference." The remaining pages do not refer to export even peripherally. Moreover, virtually all of the arguable export references relate to exports in general and not specifically to exports to the United States, and thus they are of no probative value.

In their final summary judgment briefs, defendants analyzed all of the export references. Upon review, we find their analysis (appropriately referenced to the documents themselves) to be accurate, and we draw upon it here. Fourteen of the cited references contain nothing more than estimates of future domestic and export demand or shipments, with no separate breakdown for the U.S.[154] We note again that such information exchange, common in trade association activity, is at best for plaintiffs of the *Maple Flooring* genre and cannot give rise to liability. One reference is a statement by Mr. Yajima that he was neither responsible for nor knowledgeable about Toshiba's export operations;[155] and three are statements by Mr. Kamakura of Toshiba, upon whose testimony plaintiffs also rely, that he too had no knowledge concerning Toshiba's export operations.[156] A number are passing and innocuous references to exports in general: MJ 2653, 2655, 2656 (excerpt from testimony of Mr. Nishi of Hitachi that the TV industry is an "export industry" and "specialty item of Japanese industry"); TJ 4610 (excerpt from Yajima Diary concerning an internal Toshiba meeting: "export . . . more export . . . there is a limit domestically. . . ." "Strengthening of export"); TJ 4656 (excerpt from Yajima Diary concerning Tenth Day Group meeting: Hitachi "will domestically distribute TV's for export"—a mysterious statement indeed); HJ 50033 (excerpt from diary of Mr. Yamada of Hitachi: "19" CTV: will exhibit at U.S.A. show, but the prospect of actual sales unsure"); HJ 50085 (excerpt from diary of Mr. Yamamoto of Hitachi concerning discussion at the Color TV Committee: "EIA re U.S. market analysis presented by RCA"); TJ 4439–4442 (excerpt from testimony of Mr. Fujio of MEI concerning technical capabilities and capital structure of Japanese companies as compared with U.S. CEP companies); MJ 2927 (statement of respondents' counsel that Mr. Fujio of Matsushita had testified regarding the growth of exports in the home appliance industry).

Numerous pages of the JFTC record contain the word "export" followed by certain small quantity figures (usually in the range of a few hundred, occasionally in the thousands). These statements are usually from the Yajima diaries and contain no explanation as to what the figures represent. We do not know whether the entries are internal company notes of a meeting with co-workers or quantities passed on to Yajima by someone else within or without Toshiba, nor do we know to what they refer.

We have paid special attention to the allegations in the FPS and elsewhere about the Okura Group, the Twentieth Day Group, and the MD Group, all of which

---

**153.** Mr. Nishi's export references are so amorphous that they are not even worth mentioning. Mr. Fujio's testimony supports defendants' position.

**154.** Some of these citations are excerpts from the Yajima Diary; others are excerpts from the diary of Mr. Yamada of Hitachi. As we noted in the Japanese Materials Evidentiary Opinion, Mr. Yamada's is the most cryptic and unintelligible of the diaries.

**155.** MJ 2100.

**156.** MJ 2081, 2083, 2090–91.

supposedly dealt with export matters. We have, however, found nothing probative. Despite their centrality to plaintiffs' case, the FPS entries relating to the Okura Group are limited to membership and attendance data, which are not disputed, and to other material which has either been excluded (e. g., materials from Yajima's or some other diary), or which has been demonstrated to be of no value (*see* discussion of "intent" documents, Part VII.I, *infra*). Most of the references to the Twentieth Day Group were contained in materials excluded in the Japanese Materials Evidentiary Opinion. No substantive reference of any significance survives.

We have carefully reviewed a host of documents submitted by plaintiffs with respect to the MD Group, even though they did not submit these documents for consideration at our *in limine* hearing.[157] The tenor of the MD Group documents was discussed in the preceding segment of this opinion. Those documents mostly refer to intended or expected *domestic* shipments, and not to export shipments as represented by the plaintiffs. Even if some of them list export statistics, these statistics represent only aggregates; no individual breakdown by company is included. As was the case with the domestic materials discussed *supra,* these purportedly export-related documents give us no idea what was said or done at any of these meetings or whether the plans or policies discussed in the "minutes" were ever implemented, much less who was responsible for doing so. To the extent that there may have been some kind of "voting" on export shipments of stereos and TVs, we can only speculate as to the nature and results of such voting.[158]

The only portion of the 6,317 pages of the JFTC record which could arguably be called an export *price reference* is a five line note from the Yajima Diary which reads as follows: "Hayakawa—export price—olympic —16 inch—$160—contract 20,000 sets—41% of those for domestic." We can only speculate on the meaning of this cryptic statement. There is no indication of its source or of where Mr. Yajima heard it, and it possesses no indicia of reliability. We explained at length in our Japanese Materials Evidentiary Opinion that the Yajima diaries are inadmissible on multiple grounds. *See* Part IV, *supra.* As we have noted, plaintiffs have made no effort to adduce testimony, by deposition or otherwise, to explain any of the cryptic references in the diaries and memoranda.

What the foregoing description represents is the plaintiffs' litigation strategy, discussed at pages 1200–1202, *supra,* in action. The principal manner in which plaintiffs have constructed their export conspiracy theory is to draw upon bits and pieces and fragments of sentences and paragraphs in the various diaries and memoranda and, proceeding from the premise that there had to be a conspiracy, fit in the "bits and pieces" to suit their purposes. What plaintiffs have in actuality been en-

---

**157.** We cannot assume admissibility of these MD Group documents, for they suffer from the same flaws as many of the documents excluded in the Japanese Materials Evidentiary Opinion. Whether the MD Group "minutes" are in chart form or otherwise, they are just as unexplained as those already excluded, and are not shown to meet the requirements of F.R.E. 803(6) or any other hearsay exceptions; nor are they the admissions of any party.

**158.** We have also looked at all the documents not excluded by the Japanese Materials Evidentiary Opinion relating to the other "conspiratorial groups"—the Tenth Day Group, the Palace Group, the Palace Preparatory Group, the TS Group, etc.—and can find no translated export references probative of plaintiffs' case. None of these documents support plaintiffs' conclu-

sory allegations of conspiracy, even if they were admissible. *See, e. g.,* the recently asserted document MA 033669 relative to the "Shachokai" (Presidents' Meeting); that document, like so many others, is cryptic and meaningless on its face, and plaintiffs have proffered no explanatory testimony. F.R.E. 403 analysis is an alternate approach to the materials considered in the Japanese Materials Evidentiary Opinion. Were we to have erred in our Article VIII and IX rulings, Rule 403 would be an independent basis to exclude most of the excluded documents on the ground that any (minimal) probative value the documents had would be grossly outweighed by the unfair prejudice of admitting them, the waste of time in explaining them, and the danger of misleading the jury.

gaged in is not logical inference but speculation for, upon scrutiny, the "export references" are illusory.

The data dissemination record with respect to exports is qualitatively different from that with respect to the domestic market. Other than certain average past price information promulgated by the EIAJ, there is no evidence of price information exchange. There is evidence of demand forecasts for exports, but there is no evidence of any substance of "voting" on expected exports. Neither is there any evidence of exchange of production, shipment, and inventory data except for aggregates. Moreover, the aggregate figures do not even provide discrete data as to the U.S.[159] But assuming that they were otherwise probative, plaintiffs still could not establish the "unitary" conspiracy to destroy the U.S. CEP industry via such worldwide figures.[159A]

We concluded in Part VI.A.5 that cases which have found Sherman Act § 1 violations as a result of data dissemination have either involved an exchange of detailed, individually identifiable, actual price data, a concentrated industry, and a purpose or effect to restrain competition, or some other evidence of an actual agreement to restrain

competition. Exchange of aggregate data and most non-price data, such as market conditions, trends, and forecasts, has generally been permitted, at least in the absence of some evidence of an agreement to use the information to fix prices, adjust production, or allocate market shares. Under these standards, plaintiffs' export-related data dissemination case fails the summary judgment test.

Even were we to assume that the record contains cognizable evidence of exchange of individual past production, sales, shipment, and present inventory statistics in the export context, such evidence would not help plaintiffs' case either. We explained in Part VI.A.5, *supra*, why this kind of data exchange does not tend to show a Sherman Act violation, at least, as here, in the absence of evidence of an anticompetitive purpose or effect. At all events, the kind of information exchanged in the export context is more in the *Maple Flooring* than the *Container Corp.* mode.

Another problem with the data dissemination point is of equal significance: plaintiffs have shown no evidence of a logical nexus between the information exchange and the alleged conspiracy. First, even though there is no admissible evidence of

---

**159.** For example, plaintiffs offer the documents of the Consumer Overseas Survey Committee (EIAJ). These "minutes" are afflicted with the same admissibility problems as are exposed in the Japanese Materials Evidentiary Opinion. However, assuming admissibility, they suggest only that the EIAJ was attempting to forecast total exports of CEPs, without any breakdown by country or by individual company. It is interesting to note in this regard that the Electronic Industries Association of the U.S. publishes annual sales forecasts for the forthcoming years which are derived from surveys of the major U.S. manufacturers, including Zenith. These are published in *Consumer Electronics*, a weekly trade publication.

Another facet of the EIAJ documents which bears special mention is the fact that the export-related topic alleged to have been most frequently discussed at the EIAJ meetings was that of the various MITI-related export control arrangements affecting exports to the United States and elsewhere. These discussions apparently involved the establishment of the arrangements, compliance with them, their termination, their revision, and the manner in which

they operated. Although plaintiffs in some instances suggest by broad conclusory references in their FPS that "agreements" were entered into at EIAJ meetings, examination of documents reveals that the alleged agreements were in fact the MITI-related export control arrangements, which we have explained are of no value to plaintiffs' case. There are also references to statistics to be supplied to MITI which collected and disseminated them in pursuance of its duties. MITI was thus like government organizations in virtually all other nations, publishing details on (export) statistics.

**159A.** Our discussion to this point has dealt with data dissemination via the sub rosa groups and the EIAJ. The plaintiffs have also offered JMEA meeting agendas which imply that "export statistics and trends" were discussed at JMEA meetings. However, insofar as it can be gleaned from the record, the JMEA discussions related to aggregate non-price statistics only. There is no evidence of disclosure via the JMEA of individual companies' production, sales, shipment, or inventory data.

"voting" on export shipments, it would not help plaintiffs' case if there were. While an agreement to adjust production levels might, under some circumstances, be helpful in keeping prices high, such an agreement is not consistent with the main thrust of plaintiffs' export conspiracy theory, for it is illogical to assume that a group of companies that sought to flood the American market with CEPs at artificially low prices would agree to limit production.

Moreover, as explained in Part VI.A.5, *supra*, information exchange is not per se illegal, and is only found to be unreasonable when it is conducted as part of or in furtherance of some anti-competitive scheme. While the anti-competitive agreement can be inferred from the data dissemination in some circumstances, in the circumstances of this case the conspiracy posited by plaintiffs cannot, as a matter of logic, be inferred from the types of data exchange activities purportedly described in these documents. The U.S. CEP market is an open, competitive market; the defendant companies, as new entrants into that market, had no power to affect either output or prices in that market. Thus information as to past shipments, present inventory, or forecasted demand would not be useful to alleged participants in a conspiracy to export at low prices to the U.S. market.

Plaintiffs, of course, proceed from the premise that the defendants had allocated the U.S. market via the Five Company Rule and that they were acting in concert in the U.S. market as a "monolith," competing only against the U.S. CEP manufacturers. In plaintiffs' submission, those activities would protect manufacturers pursuing a low price policy from ruination, or at least from substantial losses. However, there is no evidence to support these premises. There is no evidence of market allocation, *see* Part VII.F.2, *supra,* and no evidence that the defendants acted in concert with respect to exports (or that they administered or policed their supposed arrange-

ment, see p. 1240, *infra*).[160] Moreover, there is no evidence that the defendants were able accurately to predict U.S. demand. Even if there were such evidence, the notion that this information would so strengthen the coconspirators as to enable them to effect their low price conspiracy is illogical given the uncontradicted information in the record about U.S. market conditions: Zenith and RCA had close to 50% of the market, there was competition among a large number of manufacturers, etc. To put it charitably, the analytical possibilities of a nexus between plaintiffs' evidence and the concerted predatory pricing conspiracy theorized by plaintiffs range from non-existent to gossamer, especially given the onus of a rule of reason test.

In sum, the scenario portrayed by plaintiffs, even assuming that there were evidence to support it, cannot be a viable part of their "unitary" conspiracy theory in the absence of evidence, direct or circumstantial, of concerted pricing activity, and there is no such evidence. But even assuming that plaintiffs had admissible evidence which might permit an inference that there was an export production limitation, that would not be sufficient under the facts of this case to permit an inference of concerted pricing activity, since for the reasons stated above, such an inference would be illogical here. The short of it is that our canvass of the record of documents generated in Japan shows no evidence, direct or circumstantial, on which plaintiffs' claim of a predatory export conspiracy can be founded.

#### (d) *The Six Company Case—Conclusion*

Our conclusions about the significance of the Six Company Case materials are not a function of the JFTC's July 27, 1978 termination order, which stated that the commission had not been able to reach a conclusion. Neither are they a function of the fact that in the Six Company Case the JFTC did not itself allege a "high price" conspiracy. Instead, they are a function of our indepen-

---

160. Although not a basis for our decision on the summary judgment motions, the evidence explained in Part VII.L, *infra*, demonstrates

that there was in fact competition among the Japanese manufacturing defendants and that they did not act monolithically.

dent review of the documents produced as a result of the Six Company Case and proffered here by plaintiffs. These documents do not show a massive worldwide thirty-year conspiracy to fix prices of Japanese CEPs at home and abroad. Actual prices and actual rebates and discounts were not discussed at the meetings relied upon by plaintiffs. During the period of the alleged conspiracy, the "bottom" or suggested list prices allegedly discussed dropped, while the wholesale and retail margins which were discussed rose, all of which would have had the effect of reducing the returns to the manufacturers, contrary to the "war-chest" theory. Moreover, the data dissemination evidence is essentially non-probative.

There is simply nothing in the JFTC proceedings which supports the claim of a high price "war-chesting" conspiracy in Japan. The following colloquy is instructive in this regard:

> "THE COURT: .... Do they [the protocols] demonstrate in terms of specifics, that the level at which they fixed the prices was artificially high?
>
> MS. LARKIN: [Counsel for plaintiff] They demonstrate that they were setting a price without specifically addressing whether it was a high price or low price, but that it was an artificially created price decided among them, and the level of it being a high price conspiracy is something which we would prove by other documentation.
>
> THE COURT: What other documentation?
>
> MS. LARKIN: Well, the model price comparisons for one." [161]

Whether or not Ms. Larkin's statement represents an abandonment of the "high price"

conspiracy claim, it is clear that there is no evidence of such a conspiracy in the JFTC record.[162]

Finally, the JFTC record does not show an export conspiracy. Indeed, export prices and export terms of sale were not discussed at the meetings relied upon by plaintiffs, and according to the only viable evidence on the point, in the JFTC protocols and testimony, most of the attendees were not involved in export business and had no knowledge of export matters.

Notwithstanding plaintiffs' broad conclusory allegations about the role of the Okura Group, the Twentieth Day Group, and the MD Group as vehicles for the export aspect of the alleged conspiracy, our careful canvass of the record has revealed no admissible evidence which refers to or relates to setting export prices, improperly exchanging export price information, or any other evidence of a low price export conspiracy. And evidence about the data dissemination of non-price matters is non-probative. The record of the Six Company Case taken all together thus does not supply any evidence which will help plaintiffs create a genuine issue of material fact on plaintiffs' television receiver conspiracy claims.[163]

For reasons of convenience, we have subsumed within the foregoing discussion of the materials from the Six Company Case certain matters dehors the record of that case, especially the EIAJ documents relating to certain types of data dissemination. That fact has not altered our focus or changed the result. We turn now to plaintiffs' case as it is built upon the other EIAJ documents.

---

**161.** As will be seen *infra*, the model price comparisons do not supply the missing link.

**162.** We need not address plaintiffs' contention that the mere fixing of *any* price in Japan is enough to create a genuine issue of material fact on plaintiffs' conspiracy claims. Such an argument would fall of its own weight.

**163.** In evidentiary terms, it might even be said that the Six Company Case record is irrelevant. That analysis would proceed on two levels.

First, in terms of F.R.E. 401, the Six Company Case documents do not make the existence of any fact which is of consequence to determination of the action more probable than it would be without the evidence. Secondly, in F.R.E. 403 terms, assuming initial relevancy, the (minimal) probative value of such evidence would be substantially outweighed by the danger of unfair prejudice from the jury hearing about the meetings in Japan, confusion of the issues, etc.

### 3. *The EIAJ*

The Electronic Industries Association of Japan ("EIAJ") is a trade association to which a number of defendants have belonged since at least 1952.[164] The EIAJ operates through a large number of committees which deal with virtually every aspect of the manufacture, distribution, and exportation of CEP's (and certain other electronic products). The plaintiffs, in Appendix A to their FPS, identify some 86 committees of the EIAJ. As we have noted, in that Appendix they also identify the individual members of the various committees, naming the company employing that individual as well as the source of the information as to membership. This description alone consumes some 294 pages. The vast majority of the "conspiratorial meetings" listed in the Calendar of Conspiratorial Meetings which constitutes Appendix B to the FPS are EIAJ committee meetings. Plaintiffs' description of the activities or alleged activities of the EIAJ and its various committees is spread over some 550 pages of the FPS.

In both their PPTM and their FPS plaintiffs have set forth a list of the names of "some of the principal, pertinent committees of the EIAJ," which "convey a sense of the variety of the matters which received joint attention by defendants during their EIAJ committee meetings." PPTM at 105. They lay the heaviest stress on the so-called export committees: the TV Export Committee, the Radio Export Committee, the Tape Recorder Export Committee, the Transistor Radio Export Stabilization Committee, the Electron Tube Export Committee, and the Parts and Components Export Committee. The entire list, as presented in plaintiffs' PPTM, is set out in the margin.[165]

**164.** The following defendants are members of the EIAJ: Hitachi, MEI, MEC, Melco, Sanyo, Sharp, Sony, and Toshiba.

**165.** Plaintiffs' list consists of the following committees:
Advertising Committee of EIAJ
Audio Technical Committee of EIAJ
Color TV Fair Trade Council of EIAJ
Committee of PR to USA of EIAJ
Committee of TV Export to US of EIAJ
Commodity Tax Considering Committee of EIAJ
Consumer Domestic Investigation or Research Committee
Consumer Electronic Products Joint Technical Committee
Consumer Equipment Section Meeting
Consumer Overseas Research Committee
Consumer Products Patent Committee of EIAJ
Domestic Safety Committee
Electric Products Design Committee
Electron Tube Export Council
Electronics Compilatory Committee
Four Channel Stereo Research Committee
Electronic Industries Association of Japan—General Meetings
International Safety Committee
Standing Board of Directors
Operation Committee of Research & Statistics Committee
Patent Committee (Steering Committee)
Radio Business Committee
Radio Export Committee
Radio Technical Committee
Safety Investigation Committee of EIAJ
Safety Research Committee
Safety Special Committee
Solid Lighting Device Technical Committee
Statistics Committee
Steering Committee of Statistics & Investigation Committee
Stereo Business Committee
Stereo Technical Committee
Stereo Technology Committee
Stereo Advertising Committee
Tape Recorder Business Committee
Tape Recorder Export Committee
Tape Recorder Technical Committee
TV Business Committee
TV Export Committee
TV Technical Committee
Technical Promoting Committee
Transistor Radio Export Stabilization Committee
Electron Tube Business Committee
Hybrid I.C. Business Committee
Semiconductor Business Committee
Electrolytic Condenser Committee
Electron Tube Inspection Method Subdivision
Electron Tube Semiconductor Patent Committee
Electronic Devices Technical Joint Committee
IC Test Method Subdivision
Magnetic Head Committee
Picture Tube Technical Committee
Picture Tube Technology Committee
Semiconductor External Shape Committee
Semiconductor Technical Committee
Semiconductor IC Technical Committee
Semiconductor Reliability Sub-Division
Plaintiffs allege *every* group to be a part of the conspiracy; nary a one escapes their condemnation.

Plaintiffs thus have gone to enormous length to document the existence of the various committees of the EIAJ and the membership of those committees, despite the fact that defendants concede those points. What is really at issue is the nature of the activities of the EIAJ; we turn to plaintiffs' evidence in that area.[165A]

The plaintiffs contend that the EIAJ committees served as fora for discussion of and agreement upon export and domestic prices of CEP's and for consultation and agreement upon "virtually every other phase of the manufacture, sale and exportation of consumer electronic products." PPTM at 105. The plaintiffs further allege that the formation of the JMEA and the EIAJ facilitated the achievement of the objectives of the defendants' conspiracy by providing two important vehicles for communication among the Japanese manufacturers and their affiliates. Moreover, according to plaintiffs, one of the first steps taken by the EIAJ was the elimination of competition among defendants by the creation of the so-called Market Stabilization Council, which we will discuss in Part VII. G.5.

Plaintiffs first seek to draw an inference of conspiracy by the mere demonstration of the names of the various committees, their membership lists, and the dates of their meetings. As we have seen in Part VI.A.4, *supra*, such an inference is improper, for mere opportunity to conspire is not probative of actual conspiratorial activity. Moreover, no inference can be drawn from plaintiffs' surmise, based apparently on the name, as to any given committee's purpose. The enormous amount of effort which plaintiffs have spent in listing the names of the various committees, identifying particular committees as part of the EIAJ, and explaining who attended the meetings of each committee, and when it met, all of which creates no inference of conspiracy, itself suggests the weakness of plaintiffs' claims.

Plaintiffs next seek sustenance in the General Rules of the EIAJ, which set forth a series of general purposes, subsidiary objectives, and authorized programs. According to the General Rules, the EIAJ's purpose is to bring about the prosperity of the manufacturers through the mutual cooperation of the members, and one of its subsidiary objectives is to expedite the overall growth of the electronics industry. Among the programs expressly established in the General Rules is one for the collection of statistics and data and "affiliation and cooperation with other industrial associations related to the electronics industry and other related organizations." (Article IV). However, these objectives and activities (and those set out in the margin)[166] are insufficient to create an inference of conspiratorial activity. First, they are too general; conspiracies are made of more specific stuff. Second, and more important, all of these matters come within the purview of what we have explained in Part VI.A.5, *supra*, as the kind of trade association, data dissemination, and product standardization activities which do not offend the Sherman Act.

The crowning touch to plaintiffs' presentation concerning the EIAJ is their discussion of agenda items allegedly discussed at EIAJ meetings.[167] The Matsushita defend-

---

**165A.** We have discussed the bulk of the EIAJ-related data dissemination materials in the preceding subpart of this opinion.

**166.** Plaintiffs also argue from the fact that the expressly authorized activities of the EIAJ include: (1) "conducting research on production of, trade in, and consumption of electronic equipment and components, collecting, preparing and providing information and data thereon"; (2) "conducting research on business and technological know-how for the electronic industries, collecting, preparing and providing information and data thereon"; (3) "helping to prepare and standardize specifications on elec-

tronic equipment and components"; and (4) "conducting research for balanced expansion of external trade in electronic equipment and components and disseminating the results thereof." (Article IV of Revised Articles of Association, EIAJ Translation).

**167.** We are herein assuming admissibility of the EIAJ-related documents, although we are constrained to note that the only EIAj-related documents which plaintiffs thought to be of sufficient importance to present during the *in limine* hearings, DSS's 1027, 1028 and 1029, were held to be inadmissible. *See* Japanese Materials Evidentiary Opinion at 1301–1309.

ants, in one of their final summary judgment memoranda, offered the following sample of agenda items which we find to be fairly representative of what appears in the FPS and the documents:

(1) Market conditions and trends in the United States and other countries;

(2) Public relations and lobbying efforts within the United States;

(3) Compliance with various U.S. regulations concerning such matters as the designation of country of origin on imported products and product safety;

(4) Various investigations and proceedings instituted in the United States and Canada against Japanese CEP manufacturers calling for the imposition of import restrictions, including anti-dumping proceedings, the countervailing duty investigation, the "escape clause" investigation, and the U.S. International Trade Commission § 337 proceeding initiated by Sylvania;

(5) The effect of United States import surcharges;

(6) Concern about protectionist sentiment in the United States and the threat of import restrictions in the U.S. market;

(7) Export statistics;

(8) After-sales service in the United States;

(9) Standards for testing the performance of televisions for export to the United States;

(10) Televisions donated to India;

(11) Requests for pricing information from MITI;

(12) Restraints on exports to Western Europe;

(13) The effect on television exports to the United States of the Japanese government's decision to float the yen.

In order to give a complete picture of the agenda items reflected in the FPS, we comment specially on four categories. First, the agendas place a heavy emphasis on technical matters, particularly those relative to product standardization and product safety. Secondly, we note a significant number of agenda items reflecting joint efforts to deal with the Japanese government with respect to Japanese commodity tax law. Third, we note repeated agenda consideration of simplification of export procedures. Fourth, there is frequent reference to exportation problems with countries around the world, such as West Germany, the Benelux countries, and Canada.

Our discussion in Part VI.A.5 (Data Dissemination), (and in the preceding segments of this Part VII) and Parts VI.A.6 (Product Standardization and Technical Research Exchange) and VI.A.8 (Joint Activities in Promoting Public Relations and Joint Legal Action in Response to Common Problems), *supra*, makes clear that these agenda matters, without additional evidence of the kind plaintiffs failed to adduce, e. g., evidence of price fixing or exchange of identifiable actual price data, or of an actual agreement (or a purpose or effect) to restrain competition, are not, alone or together, or coupled with all the other evidence in the case, a basis for inferring an antitrust conspiracy in violation of the Sherman Act.

We have reviewed all of the plaintiffs' translated material relating to the EIAJ and its various committees in an effort to determine the existence of support for the broad conclusory statements in the FPS alleging that the EIAJ engaged in conspiratorial activities. Consistent with our earlier declarations, we shall not burden the record by recounting all such matters, limiting ourselves to the more important groups of documents. However, it is essential that we state our conclusion from this review: we can find nothing in any of these materials (primarily documents) to implicate defendants (or any one of them) in the unitary conspiracy asserted by the plaintiffs, or in any aspect thereof.

One of the EIAJ Committees which must be accorded special mention is the so-called

Television Business Committee. Although plaintiffs apparently did not feel the Television Business Committee sufficiently important to submit any of its documents during the course of our *in limine* hearing, plaintiffs' apparent heavy reliance thereupon as reflected by their post-summary judgment argument submission of a large volume of TV Business Committee "minutes" prompts this special comment.[168]

None of the "minutes" reflect the involvement of the Committee with export matters. Indeed, in the 61 meetings, there are only six passing references to exports which are of no significance whatever and do not point in any way to an export conspiracy.[169] Of primary concern to this Committee, as reflected by the "minutes," were commodity taxes, safety, consumer protection problems, government regulations,[170] transmission interference, stimulation of demand for television in Japan, and educational television. This is amply illustrated by the frequency with which certain topics were discussed. For example, commodity tax matters were discussed at 26 meetings, and safety matters were discussed at 22 meetings. The short of it is that the Television Business Committee was solely a domestic committee and that no export con-

spiracy was created at its meetings. Moreover, as we have seen, the product safety and government relations concerns plainly do not create an inference of Sherman Act violation, *see* Parts VI.A.6 and 8, *supra.*

The minutes also show an intense involvement by MITI in the activities of the Committee. MITI representatives were in attendance at numerous Committee meetings. Moreover, a review of the minutes reveals that even when MITI officials were not physically present, much of the Committee's time and energy was spent discussing requests made by MITI or preparing materials to submit to MITI. For example, at the October 15, 1973 meeting (D 15109–11), the following items were apparently discussed:

Pre-heat presentation to MITI

Issues concerning advertising and labelling of home electric appliances

Report on MITI's proposed guidelines and the attitude of Tokyo's sanitation department on the question of large-size waste disposal

MITI's request for materials relating to model changes

Report on a meeting with consumers sponsored by MITI

MITI's expected announcement of new administrative guidance regarding retail-

---

**168.** We will assume admissibility of the Television Business Committee documents notwithstanding that the plaintiffs have not, even in the face of defendants' non-frivolous challenge to the admissibility of their documents: (1) sought to authenticate them; (2) sought to establish foundation for them which might qualify them as exceptions to the hearsay rule, *see* Japanese Materials Evidentiary Opinion, or (3) introduced any evidence which will explain the naked documents. Additionally, we note, the documents are laden with internal hearsay.

**169.** The references are as follows:

(1) In what appears to be a draft of an appeal to the Ministry of Finance to lower taxes on stereo products, the argument is made that taxes should be lowered because stereos are the export product of the future.

(2) The Committee lists export promotion and enhancement of international cooperation as a project to emphasize in 1969;

(3) In response to a request by MITI, the Committee prepared and submitted certain unknown materials concerning export and domestic color television prices to MITI;

(4) In discussing the standardization of terms used to describe screen size it was agreed that export as well as domestic models would be taken into account;

(5) A presentation was made based on materials prepared by MITI and the EIAJ concerning an issue involving domestic and export prices that was raised in the Japanese Diet;

(6) Discussion of a pamphlet which argues that taxes on television, radio and stereos should be *lower* because it would promote exports by making them more competitive.

**170.** These discussions included the so-called "double pricing" problem. Although plaintiffs intimate that this double price is related to their claims of rebate/double pricing schemes, *see* Part VII.L, *infra*, it is clear that the two have no connection. The "double pricing" that concerned the Television Business Committee was a consumer protection problem in the domestic market resulting from a disparity between list price and actual sales price of merchandise on a retail level. The Committee apparently was concerned with this matter because it was being investigated by the Japanese government.

ers pressing for new purchases rather than procuring replacement parts.

We fail to see how such evidence helps plaintiffs' claims.[171]

Three additional groups, related to the EIAJ, must also bear special mention: the Japan Light Machinery Information Center (because the plaintiffs made so much of it in the final round of briefs), the Color TV Manufacturers' Fair Trade Council, and Konshin Kai (because these latter two are the subject of a post-summary judgment argument sally and apparently thought by plaintiffs somehow to resurrect their case).

Although it might be considered an activity in the U.S. rather than in Japan, because the Japan Light Machinery Information Center allegedly is an arm of the EIAJ, we shall deal with it here. Plaintiffs state in their FPS:

> "The defendants created and funded, through the EIAJ, the Japan Light Machinery Information Center in New York....
> The JLMIC acted as liaison between the United States' subsidiaries of the defendants. The JLMIC also facilitated the communications between the EIAJ and JMEA in Japan and the U.S. subsidiaries. In fact, the JLMIC has been referred to as the "EIAJ–N.Y.""

FPS at 4851.[172]

Plaintiffs allege in their FPS that the JLMIC received information concerning JMEA Agreements (FPS at 4862); forwarded information to the JMEA regarding market penetration, current events and marketing (FPS at 4856–4858); relayed information concerning import statistics and estimates of future demand (FPS at 4855); discussed the possibility of import restrictions (FPS at 4867); and promoted Japanese products in the United States (FPS at 4854).

The bulk of the documents cited in support of these claims are copies of the JMEA *Association News* which cover a multitude of topics, dealing with a multitude of products (e. g., cameras, clinical thermometers, optical equipment) and with dealings of Japanese firms in the four corners of the globe. Accounts of activities of the New York Light Machinery Center generally concern that Center's reports on proceedings in the United States which were being transmitted back to Japan. For example, document MA296, on JLMIC stationery, simply tells EIAJ members about testimony given at hearings of the Tariff Commission. Other typical entries, set out in the margin, taken from documents relied upon in the FPS, demonstrate that plaintiffs' conclusory statements ascribing a role in the "unitary" conspiracy to JMLIC activities are not borne out by the documents.[173] At best, these matters reflect harmless (and ostensibly pro-competitive) data dissemination. *See* Part VI.A.5, *supra*.

---

**171.** It may also be contended that accommodation to MITI might be one ingredient militating against liability under a rule of reason test. *See* n. 124, *supra*.

**172.** The plaintiffs have neglected to point out in their arguments and briefs what appears from our reading of the actual documents (i. e., the JMEA Newsletters)—that there are Light Machinery Information Centers in London and Bangkok, as well as in New York. We assume the plaintiffs believe that these offices support conspiratorial activity in England and Thailand as well.

**173.** Sample entries relate to:
(1) dry cell battery and TV problems in regard to the Fair Package Labelling Law of the U.S.A.;
(2) the distribution of "Machinery Japan 1967";
(3) distribution of catalogues, etc. for the International Automobile Show;
(4) the FCC's proposal concerning walkie-talkies;
(5) the influence of the increase in marine freight;
(6) preparations for the reception for the group which is investigating telescopes in North American markets;
(7) information from 13 newspaper articles;
(8) trends of the Olivetti Corp.;
(9) the receipt of surveyors for consumer electronic machinery and appliances;
(10) the declining number of orders received by U.S. factories;
(11) order acceptance of the U.S. machine tool manufacturers in December;
(12) the decline in profits of the Ford Corporation;
(13) the number of lines for advertisements in U.S. general newspapers;

The documents cited were not proffered as DSS's during the pretrial evidentiary hearings and are, as of this writing, unauthenticated hearsay documents. However, we assume admissibility and note that defendants do not deny that: (1) the JLMIC was created by the EIAJ for the purpose of promoting the export of products manufactured in Japan into the United States; (2) the JLMIC would furnish to the EIAJ statistical data for consumer electronics imports and estimates for future demand of CEP imports; (3) that the JLMIC forwarded other information as to the progress of the dumping proceedings back to Japan. But, to repeat, these actions do not give rise to an inference of Sherman § 1 liability.

■■■ The conclusory statements in the FPS that the innocuous documents which we have mentioned are evidence that the JLMIC coordinated a "cover-up" of activities among the Japanese manufacturers for the record are also not supported.[174] Because of their litigation strategy, *see* pp. 1200–1202, *supra*, plaintiffs have not taken the deposition of anyone connected with the JLMIC to shed light on the documents related to the JLMIC's activities, nor will they, since the FPS lists no such witnesses. Thus, we are relegated to the documents, which do not advance plaintiffs' case at all.

The Color TV Manufacturers' Fair Trade Council is referenced in plaintiffs' post-summary judgment argument memorandum of September 22, 1980, which lists a large number of documents which supposedly reflect conspiratorial meetings. However, all of these documents are in Japanese. In the same memorandum, plaintiffs referenced a group known as "Konshin Kai."[175] They cite some 32 pages of documents referable to that group, but again, all of these documents are lodged in the document depository in Japanese. To repeat, we will not consider documents which are not in compliance with valid case management orders.

As we stated earlier, our discussion does not purport to summarize everything that the plaintiffs have said about the EIAJ and its committees and subcommittees and affiliated groups, but it sets forth everything of any significance.[176] However, nothing in any of these materials constitutes any basis, alone or in conjunction with other evidence, for creating a genuine issue of material fact as to the existence of a "unitary" conspiracy among the defendants.

We cannot conclude the EIAJ segment of this opinion without referring to the fact that, during the final summary judgment argument, defense counsel addressed plaintiffs' allegations as to the EIAJ's committees for several hours, demonstrating that the documents referenced in the FPS showed nothing, or at least did not add up to probative evidence raising any material

(14) outlook for RCA's pocket-size TVs;
(15) the sales decrease of the Chrysler Corp. Similar entries are found regarding the other Light Machinery Information Centers in London and Bangkok.

**174.** Plaintiffs have asserted that the "cover-up" was engineered by EIAJ's U.S. counsel, H. William Tanaka, Esq. In addition to our observation in the text, we recall our discussion in Part VI.A.8, *supra*, to the effect that no inference of conspiracy can be drawn from joint legal action in response to a joint legal problem. Where, as in this case, the defendants for the most part merely defended themselves in a legal action, defendants' activities cannot even colorably be held to fall under the "sham" exception to the *Noerr-Pennington* doctrine. Without some showing of bad faith or an egregious attempt to clog judicial channels by instituting claims, defendants cannot be held to have violated Section 1 of the Sherman Act in their concerted

activities involving governmental action. There has been no evidence offered to support such a showing.

**175.** As far as we can recall, this is the first mention of this group. Although it is not clear that it is an EIAJ related group, its placement in plaintiffs' brief in the same paragraph with the Color TV Manufacturers' Fair Trade Council, which is listed in the FPS as being EIAJ-related, leads us to assume that "Konshin Kai" was also so related.

**176.** We repeat that we have not separately treated all of the numerous groups, committees, and subcommittees mentioned in the FPS. However, we have not been cited to any documents of these miscellaneous groups in plaintiffs' 1000-plus pages of final briefs, nor at the pretrial evidentiary hearings, that are of any significance. Nor has the FPS revealed any.

factual issue. Yet plaintiffs have provided no citations to any documents to counter defendants' arguments, and have advanced no specific answer since the argument. They have, however, devised an approach to the problem—an attempt to shift the burden to the defendants to prove that they were *not* engaged in conspiratorial activities.

 Referring during the course of his final summary judgment argument to the numerous meetings of the defendant groups, plaintiffs' lead counsel, Mr. Rome, observed that defendants "weren't just whistling Dixie" at these meetings (PTO 291 at 36–37). Mr. Rome argued that an adverse inference could be drawn as the result of defendants' failure to rebut plaintiffs' contentions about the conspiratorial nature of the meetings. In other words, defendants, to avoid an "adverse inference," have to prove a negative: that never during any of the hundreds of meetings of dozens of trade associations and other groups, over a period of more than two decades, did defendants do whatever it is plaintiffs are complaining about. Such an argument falls of its own weight.[177]

Continuing in this vein, plaintiffs, in their Supplemental Post-Argument Memorandum in Opposition to Defendants' Motions for Summary Judgment, have listed the names of a number of individuals who attended meetings of the export committees of the EIAJ (TV, radio, stereo, and electron tube) and have complained that "defendants have failed to provide affidavits" from any of these individuals. To repeat, under the law governing summary judgment discussed in Part V, *supra*, that is not their burden. Notwithstanding plaintiffs' innuendos, their evidence of activities of the EIAJ amounts to nothing.

### 4. The JMEA and the Television Export Council

The Japan Machinery Exporters' Association ("JMEA"), a trade association of companies engaged in machinery export, was formed in 1952. The JMEA's membership is comprised of more than 500 Japanese companies engaged in the export or manufacture for export of aircraft, ships, motor vehicles, bicycles, many kinds of industrial, agricultural, and business machinery, roller bearings, sewing machines, and home appliances, in addition to CEP's. Defendants MEI, Toshiba, Hitachi, MC, Sanyo, Sharp, and Sony, as well as various of their subsidiaries, were, at all times relevant to this case, members of the JMEA. The JMEA is divided into sections and committees that deal separately with various aspects, including exportation, of the wide range of products, including CEP's, exported by the member companies.[178] The JMEA was first established under Article XI of the Japanese Export and Import Trading Law (Law No. 299, August 5, 1952, as amended) (EIT law). Its purpose, as set forth in Article I of the Articles of Association, echoes the central language of the EIT law:

> "The purpose of this association shall be to promote the development of a sound export trade in machinery through the prevention of unfair export transactions, the establishment of an orderly system of export, and engaging in undertakings designed to advance the common benefits of its members."

JMEA's Articles of Association, Article I (1977). Despite plaintiffs' contention, this language does not point to the existence of a conspiracy.

---

**177.** We note that a number of affidavits have been filed denying plaintiffs' allegations. One affidavit directly addressing the role of the EIAJ is that filed in support of Sony's summary judgment motion by Akio Morita, Sony's co-founder and chief executive officer. In Morita's affidavit, he states that

> the EIAJ is a trade association composed of companies in the electronics industry. I have served as a director and vice chairman of the EIAJ. Among other things, the EIAJ pro-

> motes research concerning safety and engages in the dissemination of statistics which are of interest to the industry. To my knowledge, it was never used as a forum for fixing prices or sales in Japan or the United States. (Morita Aff. ¶ 58).

As our discussion in the text shows, this affidavit is unrebutted by any *facts*.

**178.** Appendix A lists 23 JMEA committees and subcommittees.

Plaintiffs claim that the JMEA "was formed . . . to effectuate various agreements among its members regarding export of consumer electronic products from Japan," FPS at 4585, and that it provided "a forum for joint discussion and coordination of price levels of television receivers" exported to the United States, FPS at 4590. However, plaintiffs' evidence—consisting of defendants' interrogatory answers and materials from the JMEA's *Association News* and other documents of doubtful admissibility—does not bear out their claims.

 According to plaintiffs' evidence about JMEA meetings (and assuming arguendo its admissibility),[179] various JMEA committees purportedly met to discuss such subjects as (1) market conditions in the United States and other countries; (2) possible, potential, or actual import restrictions, impositions of dumping duties, surcharges, or other restrictions with respect to consumer electronic products to be imported into the United States; (3) simplification of export procedures; and (4) export regulations affecting countries other than the United States.[180] None of these can give rise to liability.

Dissemination of generalized information about (U.S.) market conditions is not improper for, as we explained in Part VI.A.5, *supra*, exchange of such information is usually considered pro-competitive. Since concerted action to confront government regulation which affects an industry cannot be the subject of antitrust liability under the principles explained in Part VI.A.8, *supra*, mere discussion of that governmental regulation cannot be probative of the conspiracy alleged by plaintiffs.

The JMEA was concededly the vehicle through which the Manufacturers' Agreements which we have discussed in the preceding section were drafted and implemented. As the foregoing discussion makes clear, both the JMEA charter and its actual operation demonstrate its close relationship to MITI. Notwithstanding all of their pejorative and conclusory statements, and 270 pages of the FPS, our review of all the (translated) JMEA documents, including those related to the various JMEA committees, makes clear that what plaintiffs have documented about the price-related activities of the JMEA, assuming admissibility of the underlying evidence, is essentially that the Manufacturers' Agreements were developed by close cooperation between the JMEA and MITI; that the setting of check prices was effected at JMEA meetings attended by MITI representatives; and that the JMEA regularly assisted MITI in performing various ministerial duties and acted as the vehicle for implementation of the export control arrangements.

As the scope of the JMEA's activities would suggest, *see* p. 1221, *supra*, there are countless entries in the JMEA newsletters reflecting the worldwide scope of the JMEA's activities in export-related matters. For example, the JMEA Association News for the period 2/11/69 to 3/10/69 (Sony document # 0527–0531) contains such entries as: the Export Insurance Committee; Countermeasure Council on Australian Tariff; Industrial Machine Section (discussion of plan to send a group to investigate the African markets and to plan and compile a guidebook; study of intensified PR for the commodities shipped to Central and South America; and decision to survey (the Indonesian market); explanatory meeting on yen credit to the Philippines; preview of the 8mm promotional movie on pesticide disbursing equipment; and explanatory meeting on trade situation with Iraq.

The short of it is that the only evidence that plaintiffs have adduced as to the JMEA either relates to traditional trade association activities or else to the involvement of the member companies with the export control arrangements which we have

---

**179.** That is a very large assumption, wholly unsupported by our experience in this case. *See* Japanese Materials Evidentiary Opinion, where similar documents, offered for similar purposes, were excluded.

**180.** We have taken up the plaintiffs' evidence with respect to JMEA-related dissemination of export related production data in Part VII.G. 2(c), *supra*.

described in the preceding segment of this opinion. However, we have already explained that plaintiffs, as competitors, cannot suffer antitrust injury from the Manufacturers' Agreements and JMEA Rules, Part VI.B. *supra.* Since these arrangements cannot give rise to antitrust liability, plaintiffs have added nothing to their case against summary judgment by their dissertation upon the JMEA.[181]

We separately discuss the JMEA-sponsored Television Export Council, albeit briefly, because plaintiffs have, at least in earlier submissions in the case, asserted that it was one of the prime vehicles for implementation of defendants' export conspiracy to destroy the U.S. CEP market, and because plaintiffs offered six Television Export Council documents as putative "smoking guns" at the pretrial evidentiary hearings. The Television Export Council was created under the Manufacturers' Agreements to serve as a liaison between the manufacturers and MITI, and functioned as a vehicle for registration of customers and brand names. Television Export Council meetings were attended by MITI representatives; at these meetings, the level of check prices was often discussed.

The documents to which we have referred, DSS 1030 to 1036, are discussed at pages 1310 to 1313, of the Japanese Materials Evidentiary Opinion. For the reasons there set forth, they are inadmissible. There has been no admissible evidence called to our attention (and our independent document review reveals none) tending to show that the Television Export Council was a vehicle for conspiratorial activity as alleged by plaintiffs. Rather, at most it was the vehicle for determining the minimum or "check" price. We thus conclude our discussion of the Television Export Council with the same comment that we

made in connection with our discussion of the activities of the JMEA—since the check price agreements create no liability, neither does anything that happened at the Television Export Council.

5. *The Market Stabilization Council, The Nine Essential Points of Implementation, and The Four Associations Conference*

■ Plaintiffs' earliest "evidence" of the alleged home market price fixing conspiracy emanates from JFTC Case No. 5 of 1957 (the Market Stabilization Council Case), which was brought against the Home Electric Appliance Market Stabilization Council, five of whose members are defendants in this action,[182] and the National Federation of the Associations of Radio and Electric Appliance dealers. In plaintiffs' submission, the Council was an industrywide group formed to "stabilize" the domestic market in electric appliances (the so-called, "white goods": refrigerators, washing machines, etc.), as well as in CEP's, by setting and maintaining artificially high prices and by policing the agreements reached by its members.[183]

We dealt in our public records opinion with the plaintiffs' efforts to introduce into evidence the Recommendation Decision of the JFTC in the Market Stabilization Council case. For reasons set forth at length in that opinion, at 88–111, the Recommendation Decision is inadmissible. Apparently recognizing the finality of that evidentiary decision, at least before us, plaintiffs now place heavy stress upon the alleged conspiratorial impact of a document which was an exhibit to the Recommendation Decision, but which plaintiffs never proffered or even referred to at the evidentiary hearings. That document is entitled "Nine Essential Points of Implementation."

---

181. If, of course, plaintiffs can produce evidence that the minimum prices were artificially low prices (set by concerted action) then they might have a case, but as will be seen, they have offered no such evidence here.

182. MEI, Hitachi, Melco, Sanyo, and Sony were members of the Council. Toshiba Shoji Com-

pany, Ltd., a non-party subsidiary of defendant Toshiba, was also a member.

183. Plaintiffs do not advance any export references from the Market Stabilization Council case. Defendants were not exporting television receivers to the U.S. during the relevant period.

The Nine Essential Points of Implementation provide as follows:

I. Manufacturers and the National Radio Federation will, in cooperation with each other, make arrangements to complete the attachment of price cards to the three kinds of goods within a certain period of time;

II. Posters concerning selling at the list price will be printed and distributed.

III. A monitoring organ will be established for each Chapter.

IV. Vigorous implementation of the items of understanding on the prohibition of wholesale-and-retail paralleling by wholesalers. (A material indicating to this effect will be shown in the stores of the wholesalers.)

V. Badges will be made for sellers, and every member of the Association will be required to wear one.

VI. Manufacturers will jointly stage a campaign directed to sellers for the maintenance of the list price.

VII. A Price Maintenance Committee will be established.

VIII. A presidents' meeting will be held in the future for the purpose of adjustment of production and the maintenance of price.

IX. Manufacturers will cooperate in the advertising by department stores.

By way of laying foundation, plaintiffs have asserted that the Nine Essential Points were identified in Answers to Interrogatories of various defendants, that "defendants admitted drafting" the Points, and that defendants have also "admitted implementing" them by virtue of establishing the Market Stabilization Council. In plaintiffs' submission, the Japanese Manufacturing defendants have made these admissions by specific joint interrogatory answers by which they are bound. Defendants stoutly deny plaintiffs' contentions.

The record regarding the Nine Essential Points is not extensive. It consists of the Nine Essential Points themselves, which are set forth on a one-page, unsigned, undated document, and also that portion of the "Response of Certain Defendants to Plaintiffs' Interrogatories to Defendants Concerning Japanese Trade Associations and Other Groups" [184] that deals with the Market Stabilization Council (that portion makes reference to the Nine Essential Points). The problem with plaintiffs' position is the text of the interrogatory answer itself. The answer states that the Market Stabilization Council was formed in 1956 with sixteen Japanese Companies, including some, but not all, of the defendants in this action, as original members. It also states that in 1956, "certain of the manufacturers drafted a statement entitled 'Nine Essential Points of Implementation' setting forth a *proposed* course of action. Immediately thereafter the Council was established" (emphasis added). The record does not identify who those "certain manufacturers" were. Nor is there anything in the record to support plaintiffs' contention that "the defendants" or any of them admitted implementing the Nine Essential Points, or, indeed, that *anyone* ever implemented the Nine Essential Points. There is not even any evidence that the Market Stabilization Council ever adopted the Nine Essential Points after its formation.

It may be that plaintiffs will derive no benefit from the Nine Essential Points solely because of their failure to lay a foundation for the evidence, and that in reality, as plaintiffs surmise, the Nine Essential Points were drafted, agreed to, and implemented by these defendants. However, we cannot engage in surmise. The fact is that the absence of any record concerning the "Nine Essential Points" is a result of plaintiffs' conscious litigation strategy not to seek explanatory discovery on this subject or any other relating to material generated in Japan. *See* pages 1212–1213 *supra*.

---

184. Interrogatory Answers were filed by MEI, MECA, MET, Toshiba, Hitachi, Ltd., Hitachi Kaden, Sharp, Sanyo, and Sanyo Electric Trading, Ltd. The Sony defendants filed separate answers to these interrogatories in which they stated that they do "not have any knowledge" concerning this document.

Plaintiffs have taken no depositions of anyone who is familiar with this document, anyone who was connected with the Market Stabilization Council, or anyone who attended meetings of that group. Because the plaintiffs have preferred to argue from unilluminated "bits and pieces," what we have is a mere piece of paper instead of a meaningful document. In terms of the principles enunciated in the Japanese Materials Evidentiary Opinion, plaintiffs have offered nothing which would establish the Nine Essential Points as an admission or as a business record, or which would justify its receipt under the residual hearsay exception. This includes Melco document 20404 submitted to the court after the summary judgment argument by letter of October 20, 1980.

However, even assuming that the document containing the Nine Essential Points could be admitted into evidence against certain of the defendants, it would be of no probative weight, for it has nothing whatever to do with export matters. It also could not be used to show "war-chesting," for two reasons: (1) there is nothing in the record to show that any of its provisions were ever agreed to or, if so, were carried out,[185] and (2) it appears on its face to concern, at most, resale price maintenance at the retail level and that does not implicate any increase in the profits of the manufacturers. We add that, as appears from documents reflecting activities of the groups involved in the Six Company Case, see discussion infra, resale price maintenance was a vehicle to protect the economic viability of the retail outlets of the manufacturers. A price maintenance policy which would protect retailers from cutthroat competition, thus keeping their own profit margins up, would not aid the manu-

facturers of the goods. Indeed, the protection of the retailer and increase in the retailer's profit margins would be at the expense of the manufacturer, and that would be inconsistent with the war-chesting theory. While, to be sure, the retailer is an important part of the distribution chain, the mere existence of the Nine Essential Points of Implementation does not suggest that the manufacturers were charging high prices as a part of a high price/war-chesting conspiracy.

In addition to the foregoing deficiencies, plaintiffs have made no effort whatever to show that prices of CEP's in Japan went up or failed to go down or were stabilized or were in any other way affected by the activities of the Market Stabilization Council or the provisions of the Nine Essential Points. Even more important, plaintiffs have made no effort whatever to show that the profits of any Japanese company regarding consumer electronic products were greater following announcement of the Nine Essential Points than prior thereto. Were plaintiffs to put the Nine Essential Points before the jury, they would not establish any facts helpful to plaintiffs' case.[186]

Plaintiffs allege that during the period between the 1957 JFTC proceedings and the origination of the groups discussed at such length in connection with the Six Company Case, infra, a group known as the Four Associations Conference engaged in conspiratorial activity; hence we consider this group before turning to the Six Company Case. Several of the defendants belonged to the Four Associations Conference; in plaintiffs' submission, it arose in response to the JFTC's surveillance of the CEP industry. However, we have canvassed the docu-

---

**185.** We also note that the interrogatory answer upon which plaintiffs rely and the (inadmissible) "Recommendation Decision" of the JFTC state that the Market Stabilization Council abandoned the challenged activities when the JFTC commenced its proceeding. Notwithstanding these statements, the plaintiffs submit that the Market Stabilization Council continued in existence throughout the relevant damage periods in this case. That point is not impor-

tant in view of the lack of evidence that any activities of the Market Stabilization Council were germane to plaintiffs' alleged conspiracy.

**186.** The FPS description of the Market Stabilization Council also refers to another document known as the "Eight Essential Points of Implementation." However, that document, which we have reviewed, adds nothing to plaintiffs' case either.

mentary references in the FPS to see if we could find any support for plaintiffs' allegations. We find none.[187]

We could have ignored the Four Associations Conference.[187A] We mention it only because of the approach which the plaintiffs have taken in connection with that group, and because that approach is endemic, i. e., plaintiffs spend an enormous amount of time in their FPS demonstrating how individuals who attended meetings of one group also attended meetings of other groups. If, of course, one starts with the presumption of an overall conspiracy, such facts will plainly extend the conspiratorial skein. Otherwise we fail to see how that proves anything in the absence of evidence as to the activities of the groups.

We have now concluded our review of the many facets of the activities of certain groups and associations in Japan. However, the voluminous "evidence" adduced by plaintiffs amounts to nothing. On the arguendo assumption that there is some evidence of conspiratorial activity in Japan, we turn to an analysis of plaintiffs' "connection" documents.

### H. The "Connection" Documents

In a variation on the export reference theme, plaintiffs have alleged that the existence of an export conspiracy is demonstrated by a showing that Japanese executives engaged in discussions of the relationship between the home and export markets. They have advanced this theme through a

series of what they dub "connection documents," which we take up at this juncture.[188] The notion of "connection" documents was coined by plaintiffs but has also been used by defendants. The parties have used the term "connection" variously to refer to: (1) a relationship between home market and export prices; (2) a relationship between home market and export sales and profits; (3) a relationship between "domestic" and "export" groups; and (4) efforts to conceal from MITI and/or U.S. Customs either the extent of the disparity between home market and U.S. prices or the fact that sales in the U.S., by virtue of rebates, were below the check price reported to MITI and to U.S. Customs. The proffered entries give the plaintiffs no comfort.

We start with Yajima's diary, which includes a 1966 entry which suggests that the JFTC asked Toshiba to explain the price difference between its domestic and export TV prices. A subsequent entry in the diary, which does not purport to be the record of any meeting, would appear to be Yajima's analysis of the cost bases for the differences, including a list of various costs not incurred in export sales. A September 6th entry purports to indicate that the issue was raised at the Tenth Day Group meeting. However, the apparent conclusion of the conferees at the meeting was that there was no reason to worry about the *lack* of any connection between domestic and export prices.[189]

187. What may be the key documents referenced, Melco 20572–73, are not even in the document depository. Moreover, we have looked at the surrounding Melco documents which are in the depository, and they remain untranslated.

187A. Plaintiffs have never mentioned it during any of the hearings. They devote eleven FPS pages thereto.

188. Most, if not all, of the documents discussed in this segment are essentially similar in character to those discussed in the preceding sections, and we could have included the discussion of these documents therein. Moreover, many of the "connection" references have already been held inadmissible. However, because of plaintiffs' emphasis on the "connection" theme and because many of the docu-

ments supposedly relate to the critical matter of price, we consider them in a separate segment of the opinion so as to explore whether there is anything to plaintiffs' "connection" theory even assuming the documents were admissible.

189. Consistent with their litigation strategy, plaintiffs have not deposed the people who attended this meeting even though it supposedly involved discussions linking domestic and export prices; nor have they, in their preclusive FPS, listed as a witness anyone present at the meeting or with knowledge of what transpired. The only other potential "connection" entry in Yajima's diary is in the Hayakawa-Olympic entry which we have explained at page 1211, *supra* and which does not advance plaintiffs' case either.

Plaintiffs also cite two "connection" entries during the same time period from the diary of Hitachi's Mr. Yamada.[190] The first entry is:

9/19 Department Heads Meeting (10)

 \* \* \*

(2) Palace Meeting . . .

 \* \* \*

x related Hibiya-kai
(Twentieth Day Meeting)
Trading Division of Sanyo would like to lower, will stay with what is presently in effect for this year.
For the next year's check price—middle of December.

(footnote omitted). One would need a crystal ball to divine what this entry means. The Twentieth Day or Hibiya Group is reputed to have dealt with export matters, and perhaps it could be inferred from this entry that someone (perhaps a Sanyo employee, but that is by no means clear) may have expressed some thoughts concerning check prices at a meeting of the Palace Group, which allegedly was a "domestic" group. That is only speculative, but even if it were true, such a fact would hardly be probative of the existence of an agreement to coordinate domestic and export prices or of any other conduct contrary to the Sherman Act.

The second entry, also referencing the Twentieth Day Group, states:

10/25 Department Heads Meeting (10:00 to 2:00)

1. Managing Directors Meetings
 1. Utilization of automatic [illegible].
 2. Okura meeting.
 3. PX–X.
 4. Hibiya Meeting.

Sanyo 4800Y Check prices (5100. 5300).

(footnote omitted). This entry is even more cryptic than the one cited above, and we cannot permit the inference to be drawn

therefrom of the existence of any conspiracy involving domestic and export prices.

Turning to JFTC testimony, which we have held admissible against the defendants in the Six Company Case, we find plaintiffs' position no better served. Thus, Mr. Fujio of Matsushita was asked to explain the difference between Matsushita's domestic and export prices:

> Said trial examiner: From what you have said, I understand that you are exporting a large quantity to America. How about the prices (in America) as compared with domestic prices?

> Said Witness: The nominal price changes. (The price of televisions which we export to America) is the price at which we deliver the TV at the port of Kobe, that is, the CIF price, + the price at which we deliver (the commodity) at the Port Kobe is the so-called export price. Then, the importers pay the transportation expenses of shipping (the commodity) and importing (it) by paying import taxes and after making some profit they deliver (it) to the dealers. *The selling price is generally balanced with the normal price in Japan.* The reason being that they pay all expenses. The manufacturer's export price (expenses) end at the time when the commodity is delivered to the Port of Kobe. However, in Japan, we must advertise the commodity, and do other things as well. That is how we end up with the price I have mentioned. Various things are added to the price at which (the commodity) is delivered at Kobe, and these are paid by them. *This is why the price on the American markets is balanced with the price in Japan.*

(emphasis added) (footnote omitted). This testimony does not support the conclusion that there was an export conspiracy; rather it accounts for or harmonizes differences between domestic and export prices.[191]

---

**190.** As we explained in our Japanese Materials Evidentiary Opinion, Mr. Yamada's diary is generally incomprehensible and was never clarified either before the JFTC or in these proceedings.

**191.** We held inadmissible in the Japanese Materials Evidentiary Opinion at 1294, the testimony of Mr. Yoshioka of Sanyo and Mr. Kamakura of Toshiba. Mr. Yoshioka's testimony was similar to that of Mr. Fujio. If admissible, it would have supported defendants' position because he concluded, after making certain ba-

There being no direct evidence of an export conspiracy or of any connection between import and export prices anywhere in this voluminous record, plaintiffs have turned to other devices to attempt to establish that connection. They have contended that an inference of an export conspiracy can be drawn from documents which establish that some of the individuals who attended meetings at which domestic sales were discussed also allegedly attended meetings at which exports were discussed. Accordingly, they proffer a chart listing a number of persons whom they contend attended both domestic and export meetings. As we have explained, the existence of meetings alone without some direct evidence of what occurred at those meetings does not lead to an inference of antitrust violation, and we fail to see how nothing becomes something because a person attended several meetings.

■ Plaintiffs also contend that concealment of the (alleged) price disparity between the home and export markets gives rise to an inference of concerted action. This claim is advanced principally by means of the oft-cited Japan Victor document, which we held inadmissible in the Japanese Materials Evidentiary Opinion at 1303–1309. Of course, even if there had been such concealment, and if the Japan Victor document in fact tended to establish that concealment, it would not be evidence of the conspiracy pleaded by plaintiffs, because concealment of the price disparity would be at least as consistent with the concealer's self-interest (in seeking to avoid detection for MITI or U.S. Customs' violations) as with conspiracy.

Plaintiffs introduced a number of additional "connection" documents at the pretrial evidentiary hearings, and we take these up in the order of submission. DSS 101, dated December 11, 1965, is a one-page chart entitled "itemized minutes of the October 10 meeting of the presidents of sales companies from all over Japan." It purports to relate to a meeting at which MEI's "new sales system" was discussed with MEI's distributors. The pertinent part reads as follows:

| Speaker | Nature of Speech | Subjects | Summaries |
|---|---|---|---|
| Vice President | Greetings | 1. Expression of gratitude for a favorable export situation. 2. "Would like to establish Rules" | 1. Export has reached 90-million dollar mark. This was an achievement which was supported by a foundation of domestic sales. 2. ...not legible... |

Despite evidentiary challenge, plaintiffs have laid no foundation for admissibility of this document over hearsay objection,[192] nor have they laid foundation to establish it as an admission of MEI. The inferences to be drawn from the document are totally speculative. We can only guess that it means to say that domestic sales were the "foundation" for export sales. The words, moreover, are not those of MEI's Vice President, but rather of an unknown recorder who

sic calculations, that "our customers here and the people in the U.S. will be able to buy our products at the same price." Mr. Kamakura apparently denied any connection between import and export prices.

192. There has been no testimony or other evidence to authenticate this document or to establish it as a business record. We do not know who prepared it, whether the person who did had first-hand knowledge, where the record was kept, and who, if anyone, received a copy. Moreover, the date of the document, December 11, 1965, indicates that it was prepared about two months after the meeting it supposedly records, which leads to the conclusion that it was not made "at or near the time" of the event recorded, as is also required by Rule 803(6).

may or may not have had first-hand knowledge of what was said.

Plaintiffs speculate that this is an admission that profits earned in the domestic market were used to underwrite sales to the U.S. However, given the fact that the document purportedly reflects a speech of "greetings" to a meeting of domestic sales managers, the equally if not more logical inference would be that the speaker was praising these managers by telling them that Matsushita's competitive ability stems from its domestic market share. Plaintiffs' inference that the Vice President was in actuality describing a secret conspiracy to the assembled managers is a surmise typical of plaintiffs' approach to this case.[193]

DSS 102, another alleged "connection document," is an excerpt from the testimony of Mr. Saeki of MEI in the JFTC Matsushita Resale Price Maintenance case. This testimony did not address exports at all. Rather, it discussed MEI's domestic "new sales system," which was at issue in that case. DSS 103 purports to be a "notice of regular meetings for September, 1966." It lists for September 1, 1966 a Market Stabilization Council meeting for 10:00–11:30 and a Twentieth Day Group meeting for 11:30–12:00. Since the Market Stabilization Council was a "domestic" group and the Twentieth Day Group an "export group," DSS 103 is proffered as evidence of coordination between domestic and export activities. However, the document does not tend to prove such coordination. Moreover, its admissibility has been challenged and it is inadmissible under the standards set forth in the Japanese Materials Evidentiary Opinion. We do not know who prepared this document or anything about the circumstances of its preparation and, in the absence of depositions, we do not know whether the meetings noted therein actually took place, or, if they did take place, what transpired.

DSS 104 is a page from the diary of Mr. Kozukue of Sanyo, which says only that a meeting of some "20th Day Group" took place on May 20, 1965. It appears in the FPS only in Appendix B, the "calendar" of "conspiratorial meetings." It is as inadmissible as the other diaries in this case, because there is no evidence to establish it as a business record or as an admission or otherwise to justify its admissibility. Furthermore, plaintiffs do not claim that Mr. Kozukue was a member of the 20th Day Group relating to CEP's (*see* FPS Exhibit A at 473–74); therefore, if this document had reflected a meeting of this group, it could not be based on personal knowledge. Moreover, the entry is irrelevant because it does not establish any "connection" between the domestic and export markets: it does not even say what happened at this alleged meeting.

The plaintiffs also offer as "connection documents" several of the oft-cited "Ex. Hall" documents, which were marked as exhibits at the deposition of a Sears, Roebuck executive. The most celebrated among these documents is the so-called "Parson's Meeting Anti-Dumping" memo which describes the manner in which the Japanese manufacturers, or at least Sears' suppliers Toshiba and Sanyo, evaded the Japanese check price system through the rebate scheme. These documents do not show any "connection" between a home

---

**193.** There is a second DSS 101, also labeled by plaintiffs as a "connection document," the lecture entitled "Commemorative Lecture at the Appreciation Sale for the Attainment of 6 Million National [MEI's Japanese brand name] TV Sets: The Road to Co-Existence and Co-Prosperity," by K. Matsushita, which we discussed at p. 1205, *supra*. It mentions neither exports nor CEPs.

The document then describes the "summit meetings" which had been taking place monthly during the previous year, during which future domestic demand was estimated, for fans and refrigerators for the purpose of avoiding over-production:

"The first thing we discussed last year concerned refrigerators and fans. We determined the production volume of refrigerators for this year, 1965. But having summed up the total quantity produced by each company, it exceeded demand by 2 million units. The tendency is also true for fans. This should not be."

This document has nothing to do with any "connection" between domestic and export sales of CEPs.

market and export conspiracy, in pricing or otherwise, and they do not aid plaintiffs' case for reasons which will be clear in our discussion of the "rebate scheme" in Part VII.L, *infra*.

■■■ Although plaintiffs have relied heavily on their ability to draw an inference from one conspiracy to another, the existence of a home market conspiracy, assuming arguendo that there was one, is no ground for inferring the existence of an export conspiracy. As we explained in Part VII.F.3, *supra*, evidence of one alleged conspiracy is not a basis for drawing an inference of the existence of some other conspiracy. *See Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426 (5th Cir. 1977). Thus, in sum, the "connection" documents, separately or together, amount to nothing, and supply no evidence to support plaintiffs' case.

### I. The "Intent" Documents

We turn next to a group of documents which the plaintiffs have denominated "intent" documents.[194] These documents fall into two basic categories. First, plaintiffs proffer the Rationales to the various Manufacturers' Agreements and the JMEA Rules to which the Japanese manufacturing defendants were signatories. Second, they rely upon statements, mostly public statements, of certain executives of the Japanese manufacturing defendants. The Rationales and the statements are interpreted by plaintiffs as clearly evincing a predatory intent to destroy the American CEP industry. Both are said to constitute evidence *aliunde* from which the existence of a low price export conspiracy among the defendants can be inferred, constituting a basis for the admission of coconspirator declarations.[195]

We address first the Rationales to the various Manufacturers' Agreements and the

JMEA Rules. The operative provisions of those documents have been discussed *supra*, and copies of the initial Manufacturers' Agreement and the initial JMEA Rules, with their Rationales, constitute Appendices A and B, respectively, and are not published. Although the text of the Rationales varied from year to year, the initial Rationales which are included in Appendices A and B are fairly representative of the tone and overall substance of the later versions.

In plaintiffs' submission, the Rationales demonstrate the defendants' predatory and conspiratorial intent. Plaintiffs place particular emphasis on a relatively small number of excerpts from the Rationales. For instance, they point to an excerpt from the Rationale to the initial Manufacturers' Agreement which states that "attention is now focused upon the exportation of television sets as the new star of the nation's export electronics equipment." This Rationale continues:

> We, manufacturers of television sets, on the basis of our confidence in the international growth of the electronics industry and realizing that horizontal division of labor is a growing trend among advanced nations, hereby undertake to consolidate and establish the export system, particularly concerning television sets for the United States on the basic principle of commercial ethics among businessmen, to nurture our market in the United States which is already on its way to growth and to respond to the desires and the industry of that country.

Plaintiffs contend that the quoted statements are evidence of defendants' intention to acquire a monopoly in the U.S. television market. In plaintiffs' view, any reference to an international "division of labor" is a "euphemism" for the defendants' intention jointly to "capture and share a monopoly of the United States markets." Plaintiffs' PPTM at 95–97.

---

194. We shall deal here only with "intent" documents related to export matters. Domestic "intent" statements have been dealt with in Part VII.G.2.(b), *supra*.

195. We note preliminarily that although the FPS devotes 396 pages to the subject of "in-

tent" (claiming all the while that "intent" is demonstrated and established by all the facts and circumstances set forth in the *entire* FPS), the only specific evidence of intent relied upon is that contained in the Rationales and the executives' statements.

Several of the Rationales to subsequent Manufacturers' Agreements also contain the following language:

> [W]e must restrain ourselves from being enmeshed in so-called excessive competition and must further strive to establish export order so that we may avoid unnecessary friction with the U.S. industry.

Plaintiffs contend that the statement is evidence of the defendants' intention to eliminate competition among themselves.

The plaintiffs also cite several passages from the Rationales to the JMEA Rules. The Rationale to the initial version of the JMEA Rules states:

> For the current year, a conservative figure of 530,000 units has been set as the target for exportation to all regions.

In plaintiffs' submission, this comment demonstrates that the defendants jointly set a target for the volume of their exportation. The same Rationale also includes the following statement:

> Thus, the businessmen involved have decided that, acting as one body, they will strive to maintain export order and, furthermore, to aim for steady expansion of exportation. With respect to regions other than the U.S., separate measures shall be devised as needs arise.

Similar language is contained in the Rationales to subsequent versions of the Rules. In plaintiffs' submission, this language is evidence of the defendants' conspiratorial intent. For the reasons which follow, we disagree.

The statements which plaintiffs have selectively excerpted from the Rationales must be read in the appropriate context—that is, in the context both of the entirety of the Rationales from which they were taken, and of the Agreements and Rules which the Rationales accompany and purport to explain. The overall tenor of the various Rationales is that the Agreements and Rules were intended to provide the means to reduce friction between Japan and its trading partners, principally the

United States. For example, the Rationales to the Manufacturers' Agreements for the years 1968 to 1971 all contain the following statements:

> [I]n recent years, the protectionist trade movement has been gaining momentum in the United States, the area to which the Agreement applies.

> Henceforth, even more than heretofore, we must restrain ourselves from being enmeshed in so-called excessive competition and must strive to establish sound export order and promote proper growth of exportation.

The phrase "excessive competition" appears to refer to competition between the Japanese and the U.S. manufacturers, and not to competition among the Japanese themselves. The Rationales are thus consistent with the Manufacturers' Agreements which, as we have noted *supra*, establish minimum prices for products sold for export, while permitting the signatories to sell at any price at or above the minimum level. The establishment of a minimum price is obviously the converse of concerted predatory pricing. While we are aware that on the present motions for summary judgment the plaintiffs are to be given the benefit of all favorable inferences which the law allows, the Rationales and statements therein must be considered in their proper context.

■ We summarize our conclusions about the Rationales as follows. First, leaving aside the extent to which the draftsmanship represents the efforts of MITI or of the Japanese manufacturing defendants,[196] as well as the question whether the agreements were mandated by MITI, we cannot draw the inference of a low price conspiracy. For even if, as plaintiffs contend in their post-summary judgment argument briefs, the MITI check price was, in fact, a low price, the language of the check price agreements cannot be contorted by plaintiffs' contentions as to the

---

196. The record is undisputed that MITI was heavily involved in the drafting of the Agreements.

signatories' real intent; it is a minimum price which cannot injure the plaintiffs. Second, the language of the Rationales, even aside from their context, is too general, and susceptible of too many other inferences, to support plaintiffs' proposed interpretation. We turn now to the statements of the executives.

The first document of this type on which plaintiffs rely is the transcript of the JFTC testimony of Mr. Nishi of Hitachi in which he described the home electric appliance industry as "Japan's heritage" and further stated that now that the export on TV's is firmly established, the Japanese intended to "work at it until TV's become a specialty of Japanese industry." Plaintiffs assert that "specialty" is a euphemism for "monopoly," but we fail to see how this statement can be evidence of a violation of the Sherman Act.

DSS 111, which plaintiffs proffer as a group of "intent" documents, collects several articles which appeared in the "My Thoughts" column of the JMEA Association News, a trade publication put out periodically by the JMEA.[197] The articles are all filled with generalized rhetoric, and are not probative of anything. Assuming their admissibility, we take them up in no particular order.[198]

*Sony 605*, which is undated, purports to be an essay entitled "Theme for 1970's," by Mr. Furuyabu, identified as Managing Director and Director of Main Trade Department, Sharp Corp. In this article, Mr. Furuyabu is quoted as saying that:

> For our industry, there is no other market in the world that can replace the U.S. market. The development of other markets is, of course, to be continued in order to correct the uneven state of distribution; however, further efforts should be required to retain the U.S. market.

There is no mention of what those "further efforts" to "retain the U.S. market" are to be, or even specific mention of exports of CEP's rather than exports in general.[199] There is no indication that Mr. Furuyabu "intended" anything other than to continue to export successfully to the United States, through vigorous competition. That would, of course, be a lawful intent. Indeed, it would run contrary to the spirit of the antitrust laws if we were to hold that it was unlawful for a firm to have as its object the penetration of a market or the increase of its market share. At least it would run contrary to the corporate objectives of Zenith, the lead plaintiff in the case.

When Walter C. Fisher, Zenith's Executive Vice President and Senior Marketing Executive for close to a quarter century, was asked in his deposition to explain Zenith's market objectives, he replied:

A. *I am going to answer this in a way that you are not going to like at all.* Because you don't understand marketing men at all.

Q. I accept that.

A. I will tell you what *my job objective* would be and will be always: *it is to get all of the market* and then expand it also. [192 A].

(emphasis added). Mr. Fisher's immediate subordinate, Robert Bowen, Zenith's Vice President of Marketing, expressed an identical sentiment immediately prior to the

---

**197.** We again note our concurrence with defendants' view that public statements, whether in speeches, newspaper articles, or public testimony, are hardly a likely place to find evidence of a conspiracy. Putting that matter aside, however, we note that the plaintiffs have not laid any foundation for the admissibility of these statements. We will nonetheless assume admissibility.

**198.** These articles, of course, have serious admissibility problems. Newspaper articles are routinely held inadmissible as hearsay. *Pallota v. United States*, 404 F.2d 1035 (1st Cir. 1968);

*Poretto v. United States*, 196 F.2d 392 (5th Cir. 1952); *United States v. Nacrelli*, 468 F.Supp. 241 (E.D.Pa.1979), aff'd mem., 614 F.2d 771 (3d Cir. 1980); *Robert Stigwood Group v. O'Reilly*, 346 F.Supp. 376 (D.Conn.1972), rev'd on other grounds, 530 F.2d 1096 (2d Cir.), cert. denied, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976). We know nothing about the preparation of these articles—the author, his sources, his knowledge, etc.

**199.** Mr. Furuyabu's duties included world-wide exports of all Sharp products, not just CEPs.

sale of Motorola's color television business. In a presentation to Zenith's senior management in January, 1974, Bowen stated:

> In short, despite the fact that *we already dominate* console color TV sales, *we want even more.* [182–84, 188, 392 A.]

(emphasis added).

Zenith's desire for "all of the market" was not amorphous. Under oath Mr. Fisher admitted to specifically targeting Motorola and others for elimination from the market and even claimed success in that regard:

> Q. On the next paragraph, ... you make the statement, and I quote, in part, "I cannot, in good conscience, at this time project Zenith penetration any higher than the 23½ percent [of the U.S. color television market] shown *unless we shake out some of our competitors now in the business.*" Now, your reference to competitors, are those the competitors that are set forth on Page 64949–75?
>
> A. Yes, sir.
>
> Q. Magnavox, *Motorola*, Admiral, Sears, G.E., Westinghouse, Philco and others?
>
> A. Yes, sir. Some of those I felt were at the levels of penetration they could attain, and there would be some question of their ability to stay in the market, and *there was a shake-out.* We didn't shake them out; *we shook them* into *multinational corporations*, tremendous. *You know what happened*: Admiral with Rockwell, *Motorola with Matsushita*, Magnavox with Phillips (*sic*). [193–96, 520–23 A.]

(emphasis added). Plaintiffs have also invoked a statement from the deposition of Joseph J. Sullivan, a former employee both of Sony and of NUE. Mr. Sullivan testified in 1971 that, in a 1964 conversation, Akio Morita, President of Sony, said: "Sullivan San, militarily we could never defeat the United States ... [b]ut economically we can overcome the United States and become number one in the world."

█ These statements of competitive desire to succeed in penetrating a market, even to become "number one," are not redolent of violation of the Sherman Act. Unless one begins with the conclusion that the utterers of such statements are monopolists, the inference of conspiratorial predatory monopolistic intent is the sheerest speculation. It not only is not a violation of the Sherman Act to want to be "number one," but it is quite consistent with the competitive ethic which underlies the act; hence the statements to that effect by executives of the Japanese defendants do not help plaintiffs' case.

*Sony 909* is attributed to Mr. Motoda of Hitachi. This article, entitled "Strategy for Export," states in pertinent part:

> The most important thing for us in the future would probably be a wide-range strategy for export.
>
> \* \* \* \* \* \*
>
> Further, with respect to 'route sales' products, it is, needless to say, most important to establish sales routes; however, it is not enough to think clearly because problems such as what cooperative system should be established among manufacturers, Japanese trading firms and overseas trading firms, whether we should aim for export of finished products or principally for export of parts under technological cooperation, or taking a step further, whether we should go into overseas production by advancing our enterprises, etc., have formed into a disorderly whole. *Therefore, we can no longer deal with problems of export and business expansion on an individual basis.* Moreover, we cannot expect a widening of the market with a leap unless we create a market by making new products which presently do not exist in the world.

(emphasis added). Plaintiffs seek to infer from this paragraph and especially from the underscored sentence that the author had an "intent" to conspire about export prices. In our view, the passage does not support such a construction, for the cooperation it suggests has nothing to do with price. Moreover, it is couched in the utmost generality, does not mention any specific product,

and purports to be only the "thoughts" of the author, not necessarily the policy of Hitachi. This article does not advance plaintiffs' case one whit.

*Sony 689* was apparently written in 1966, purportedly by a Mr. Tanaka, who is described as Assistant Director of the Foreign Research Section of Melco. The article, entitled "Excessive Competition and Correct Competition," first states that

> Domestically, discount sales that have become even a common sales tactic have led to a state of sales competition which is connected to a cumulative increase in losses....

It further states that the same had been true for exports:

> the fact that these (check prices) are even considered to be prices for deductions or rebates is ... the most extreme reality of excessive competition.

The article continues with the statement that, 10 years previously (*i. e.*, 1956), the Chairman of the EIAJ had stated that export transactions should be made at prices which insured "proper (just) profits" but that "the majority of persons who attended this meeting" (who were not identified)

> felt that ... the first priority is to develop the market in some way, even with the expectation of loss.... I think that this was a common idea in those days .... Since then, ten years have passed.

■ The article characterizes and speculates about the views and feelings of unidentified third parties, from a period at least a decade prior to the relevant time period in this case, on the basis of second or third level hearsay. The article does not refer to any specific product category, and, since Mr. Tanaka was only the Assistant Director of the Foreign Research Section, is not shown to be a statement made on behalf of Melco. Thus, the article is inadmissible hearsay. But even assuming admissibility, it is simply too amorphous to be probative of predatory intent.

*Sony 705* was purportedly written by Mr. Miyazaki, who is described as a director of the trading department of Fuji Electric, a non-party. The "intent" of a non-party is,

of course, irrelevant and the article cannot be an "admission" against any party in this case. Moreover, the content of the statement does not help the plaintiffs.

We have referred above to plaintiffs' reliance upon an "essay" by K. Matsushita entitled "Toward the Year of Restored Business By Overcoming the Slump" as evidence that K. Matsushita "explained to the consumer electronics products industry in Japan that competition among rival companies must not be permitted." While plaintiffs have tried to generalize from this document, it is plain that it says nothing about any intent to restrain competition in *exports*. Indeed, agreements to restrict capacity would drive prices up and would therefore be inconsistent with any claim that defendants were engaged in a conspiracy to flood the U.S. market with low-price goods.

Plaintiffs also cite (at p. 7923 of the FPS) to a portion of the document which states:

> Therefore, some say that we would be more successful if we would narrow down the scope of our business and concentrate on one product line on an international scale.

This statement is apparently argued to be evidence that defendants intended to concentrate on CEP's and create a worldwide monopoly. However, that is not what the document says. Nor is there identification of which companies are implicated by the "some say." This document thus does not help plaintiffs' case.

*SC 555–56* is entitled "My Opinions at this Beginning of the Year," from the January 1969 issue of the EIAJ publication "*Denshi*," purportedly written by Masaharu Matsushita, President of MEI. This document contains the following statement:

> In any event, in order to deal with the waves of a floating international economy and to concentrate our efforts on export, which can be called the driving force of economic development for our country, it is necessary first of all to set up as a basic premise the establishment of order in the industry by means of

*voluntary cooperation and solidarity*, and then implement it.

This document does not support plaintiffs' conspiracy theory for the same reasons, explained at pp. 1231–1232 *supra*, that the Rationales do not support it.

Plaintiffs also cite a number of internal corporate (unauthenticated hearsay) documents which reflect an interest on the part of *individual* defendants in doing business, or increasing their business, in the United States. Some of these documents purport to set goals of increasing market shares, others describe surveys taken or events occurring in the United States, and still others purport to be documents in which investments in, or the establishment of, facilities in the United States are discussed. Obviously, these indications of an individual defendant's intent to compete in the United States do not support any inference of conspiracy; hence, we shall not detail them herein.

The plaintiffs' supply of meaningless "intent" documents is virtually limitless. At one point, they even cite an article in the *Atlantic Monthly*. We have spent as much time as we have in discussing these meaningless documents because we believe that fairness requires thoroughness in reviewing plaintiffs' proffers and because we have tried to be respectful of all the plaintiffs' submission. In this instance (as well as in some others) such an attitude has been difficult to maintain because the "intent" documents are so far afield.

### J. Plaintiffs' Allegations of Below Cost Sales

Plaintiffs have offered Dr. DePodwin's expert testimony that four of the defendants sold their products in the U.S. at prices below their costs. In our Expert Testimony Opinion at 1352–1363, we ruled this evidence inadmissible because, *inter alia*, it was a mathematical construction based upon explicit assumptions which were contradicted by the record, and because the construction was based upon unreliable average prices by screen size.[200]

Under these circumstances, plaintiffs' argument that the predatory nature of defendants' low price export conspiracy is demonstrated by below cost sales falls of its own weight.

### K. Evidence of International Price Discrimination Between the United States and Japanese Markets

As an element of their purported proof of conspiracy, the plaintiffs have offered voluminous comparisons of the prices which defendants charged in the United States and in the Japanese markets for allegedly comparable products. We ruled most of these materials inadmissible in our Expert Testimony Opinion.[201] However, because of

---

**200.** We also noted that far more reliable evidence of defendants' costs was available to the plaintiffs in discovery, but that they had not availed themselves of it.

**201.** The defendants' challenge to the admissibility of plaintiffs' evidence of price differentials between the U.S. and Japanese markets was bottomed on both Article IV (relevancy) and Article VII (opinions and expert testimony) of the Federal Rules of Evidence. Principally, they argued that the products compared were not comparable under the principles adduced in our opinion on the 1916 Antidumping Act claims, that the U.S. and Japanese prices which plaintiffs used were based on sales at different levels of distribution in the two markets, and that the plaintiffs had failed to make necessary adjustments for a variety of selling, distribution, and warranty costs borne by defendants in the Japanese market but not in the U.S. market. The Expert Testimony Opinion addressed defendants' objections to the admissibility of portions of the proffered testimony of plaintiffs' economic expert, Horace J. DePodwin Associates, Inc., which were based on the price comparisons. We ruled that portions of the DePodwin report which were based only on comparisons of average prices by screen size and monochrome or color category of television receivers were inadmissible because the averaging of prices by screen size ignored highly significant differences among receivers within each screen size. Expert Testimony Opinion at 1353–1354. We also ruled that Dr. DePodwin's statistical analysis of price comparisons based on technical model comparisons prepared by Zenith personnel was inadmissible. Those portions of that analysis which were based on the defendants' answers to interrogatories 45 and 46(c) we ruled inadmissible because the interrogatory answers provided only list, as opposed to actual, prices in the domes-

their pivotal role in plaintiffs' case, we shall assume arguendo their admissibility and thereupon consider them.

Plaintiffs' price comparisons are based on technical comparisons and model-by-model "matchups" constructed by their technical experts Walter Lukas, Karl Horn, and Vito Brugliera. The matchups and price comparisons are described more fully in our opinion granting summary judgment on the plaintiffs' claims under the 1916 Antidumping Act, 494 F.Supp. 1190, 1203–04 (E.D.Pa. 1980), *appeal pending*, No. 80–2080 (3d Cir.). In that opinion, we held that the technical differences between television receivers and most other consumer electronic products which defendants marketed in the United States and those which they marketed in Japan precluded comparison of those products under the Antidumping Act of 1916, 15 U.S.C. § 72. In the Expert Testimony Opinion at 1354, however, we held that the issue of comparability under the Sherman Act differs from that under the Antidumping Act, and that the products need not be of "like grade and quality," but need only be "sufficiently similar to make the comparison of their prices logically probative of parallel pricing." *Id.*

■ In plaintiffs' submission, all of their price comparisons, from whatever methodology derived, show that all of the Japanese manufacturing defendants sold comparable products at lower prices in the U.S. than in Japan. The price differential, in plaintiffs' submission, sometimes exceeded 100% of the U.S. price. The plaintiffs do not contend that the defendants each maintained the same price differential between the two national markets, either in absolute terms or as a percentage of the sales price.

Indeed, such a contention plainly would not be supported by their calculations. However, plaintiffs contend that their evidence that each defendant maintained *some* price differential between the U.S. and Japan, and sold at a lower price in the U.S., is evidence of parallel business conduct which supports an inference of conspiracy under § 1 of the Sherman Act. We disagree.

Under the principles governing the inference of conspiracy from evidence of parallel business conduct, explained in Part VI.D.4, *supra*, plaintiffs' evidence of price differentials between the U.S. and Japanese markets is not probative of the conspiracy alleged in their complaint. Those principles provide that an inference of conspiracy from parallel business conduct is not permissible as a matter of law unless the plaintiffs can show that the defendants' behavior made the inference of rational independent choice less attractive than that of concerted action, *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Such a showing generally requires that plaintiffs show the defendants had motivation to enter an anticompetitive agreement and that the behavior was truly interdependent, *i. e.*, that it was inconsistent with the defendants' own independent economic interests. *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309 (3d Cir. 1975). We will assume for present purposes that plaintiffs have come forward with sufficient evidence of consciously parallel business behavior to raise a genuine issue of material fact precluding the grant of summary judgment on the parallel nature of defendants' conduct and on the defendants' consciousness of one another's be-

tic market. Comparing these prices with actual transactional prices in the United States fails to take into consideration the pervasive use of rebates in the Japanese market. *Id.* at 1355. Those portions of the analysis which were based on the defendants' commodity tax returns were also excluded, for the commodity tax formula results in a hypothetical construct rather than an actual price, again rendering the Japanese price incomparable to an actual price in the U.S. market. *Id.* at 1356.

A far less detailed calculation of price differentials between markets was presented in the DePodwin Report at V–32 to 36. We reserved our ruling on this calculation, *id.* at 1347–1348 because the record was unclear as to the basis for the prices in the Japanese market. Because of our conclusions herein, it is unnecessary that we reach it now.

havior.[202] Nevertheless, plaintiffs have failed to raise a genuine issue of material fact as to the interdependence of the defendants' alleged price differentials between the U.S. and Japanese markets.

The fact of the matter is that the plaintiffs have never articulated a credible explanation of their theory of the interdependence of the defendants' allegedly parallel pricing. Their purported discussions of that interdependence are best characterized as misdirected, diffused, lacking in coherence, and even focusing on irrelevant matters, such as the defendants' establishment of production facilities in third countries like Korea and Taiwan and alleged violations of U.S. Customs laws by means of the double-invoicing system described *infra. See, e. g.,* Plaintiffs' Supplemental Post-Argument Memorandum in Opposition to Defendants' Motions for Summary Judgment, at 210–27 (Sept. 22, 1980).[203]

The essence of the plaintiffs' charges with respect to pricing is, as we have noted above, that defendants entered a conspiracy to sell television receivers and other consumer electronic products in the United States market at low prices necessary "to get the available business." [204] The fatal

202. The defendants argue forcefully that the plaintiffs have made no showing that they conducted their business in a parallel manner, pointing principally to the undisputed facts that they sold at different prices ranging from the lowest to the highest, and that the alleged price differentials between their U.S. and Japanese prices vary widely among different products and different defendants. Defendants also point out that plaintiffs have failed to produce evidence of the competitive price levels and of where defendants' actual prices fit in relation to the competitive level. The only prices plaintiffs set forth in their FPS are charts purporting to show that defendants' prices were lower in the U.S. than their prices in Japan. However, these charts do not show any American competitors' prices, and hence do not demonstrate that defendants' prices were lower than American competitive levels. Indeed, certain defendants plaintively comment:

> Thus, as incredible as it is in a price-fixing case, the plaintiffs' evidence is totally devoid of any specific pricing data to establish low prices, parallel prices, or interdependent prices. In short, there is no basis from which a conspiracy could be logically, or in any other way, inferred from the record before this Court.

The plaintiffs submit that the alleged fact that each defendant sold at lower prices in the U.S. than in Japan is sufficient to establish parallel behavior. As to consciousness, the plaintiffs contend and the defendants deny that there is sufficient evidence of mutual awareness among the defendants of each other's business conduct in the United States. Notwithstanding the feebleness of plaintiffs' rejoinder to these points, we will accept it for purposes of the summary judgment motion, as the plaintiffs have failed utterly to come forward with any evidence of the interdependence of defendants' conduct, a fundamental precondition for inferring conspiracy even from consciously parallel business conduct.

203. Plaintiffs' lack of a coherent theory of consciously parallel interdependent conduct is also demonstrated by the following statements by plaintiffs' counsel during the first summary judgment argument in April, 1979:

> MR. E. ROME: The parallelism is found in the fact that these companies participated in the meetings of the various groups, participated and joined in the decisions reached, participated and joined in the interchange of information about the myriad details of their business, participated in a planned program fraudulently to conceal what they did, participated and joined in the decision to take over the U.S. market.... Consciously parallel, that doesn't mean everybody has to do the same things. It only means that they participated and knowingly agreed to that which is to be done.

PTO 167 at 591–92. And a few moments later:

> THE COURT: Before you close. Interdependence, what is the evidence of interdependence?
> MR. E. ROME: I thought I just stated it your Honor.
> THE COURT: Do you have more? Just what you stated?
> MR. E. ROME: A to Z, everything they ever did.
> MR. M. ROME: Your Honor, may I add one more thing. I would refer Your Honor to Section 876 of the Restatement of Torts which to my mind defines in tort terms persons acting in concert which is really interdependence. Interdependence is simply an antitrust word that has been adopted from the law of aiding and abetting. From the law of acting in concert.

PTO 167 at 597–98.

204. Plaintiffs have adduced no evidence that there was any formal *agreement* to price at whatever price "was necessary to get the business" but contend that this pricing policy is evident from the record and that such a policy constitutes parallel conduct from which one can infer conspiracy.

flaw in plaintiffs' approach to this indispensible and elemental ingredient of an alleged conspiracy is that it describes normal business conduct. No defendant, or any other businessman for that matter, would have any motivation for entering a conspiracy to sell at low prices because one does not need a conspiracy to sell at low prices. One can do that by oneself and would not in any way be aided by a conspiracy; to do so is more consistent with competition than with conspiracy. Thus, plaintiffs' theory fails for want of a logical predicate. Indeed, plaintiffs' entire theory is inherently implausible. Unlike parallel raising of prices, parallel lowering of prices without more (and plaintiffs have adduced no evidence of either parallel reduction of prices or anything more) does not point to conspiracy. Lowering of prices is what a reasonable seller is likely to do to avoid a loss in sales. A parallel price reduction ordinarily reflects a series of market-compelled individual responses, not agreement. However, in plaintiffs' universe, circumstantial evidence of competition becomes evidence of conspiracy.[204A]

Plaintiffs' notion of "artificially low prices" makes no sense, especially since it includes prices which are at the highest price level of the U.S. market, *see* discussion *infra* respecting defendant Sony. To say that what makes the price artificially low is the mere fact that it will get the sale *would* mean that every price at which a sale into the United States was ever made of any Japanese CEP was "artificially low" and "predatory," because if it were not, it would not have secured a sale.

To extend the analysis a bit further, we observe that companies do not need to conspire to sell at prices "necessary to get the sale." Indeed, when competitors make their investment, marketing, and pricing decisions, they necessarily assume that the competition "will price to get the business." While the result of such practices may be a depression of prices in the market, it is the

kind of price depressing effect which flows from normal competitive pricing behavior and is precisely that which the Sherman Act is intended to secure, not condemn. Indeed, if there had been such an express agreement, the mere fact that the word "price" was mentioned would not render any such agreement in violation of the Sherman Act in the absence of an agreement upon particular prices or price levels. *See* discussion at Part VI.A.(2), *supra*.

Plaintiffs' apparent inability to come up with a theory of the interdependence of the price differentials is not surprising for still other reasons. It is undisputed that the Japanese defendants are well-established in Japan; plaintiffs themselves have repeatedly pointed out that the Japanese manufacturing defendants collectively control more than 90% of the domestic market for television receivers in Japan. In contrast, during the pertinent times, the defendants were new entrants in the U.S. market, with unknown brand names and with no goodwill or business reputations in the United States. Thus, the defendants individually faced similar circumstances as new entrants in the U.S. market and, therefore, could be expected *unilaterally* to adopt similar pricing strategies to attract customers and gain consumer acceptance in this country. Such a reasonable response to the common business problems presented by the United States market for consumer electronic products to foreign entrants does not support an inference of conspiracy. As noted by the Ninth Circuit in *Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 661 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963):

> Like businesses are generally conducted alike and, as the trial judge correctly stated, similarity in operations lacks probative significance unless present "under circumstances which logically suggest joint agreement as distinguished from individual action."

---

**204A.** Defendants make a forceful argument in this regard that the only logical way to infer collusion from evidence of parallel low pricing is if the defendants sell below marginal cost, as in the Areeda-Turner formulation, or at least below *some* measure of cost.

Another factor ignored by plaintiffs, though equally destructive of their theory of interdependence, is the difference in the market conditions (or, in terms of economic theory, the level and elasticity of the demand curve) between the U.S. and Japanese markets. Charging lower prices in the United States than they charged for similar CEPs in Japan would in no way undermine the unilateral character of defendants' conduct. Price differences between two markets where competitive conditions, income and spending patterns, and products differ are to be expected and, therefore, do not support an inference that the lower price is the result of an agreement.[205] Indeed, in the one case which the parties were able to locate in which evidence of geographic price discrimination was offered as proof of conspiratorial behavior, *Vanco Beverage, Inc. v. Falls City Industries, Inc.*, 1980–2 Trade Cas. ¶ 63,357 (S.D.Ind.1980), the court rejected the evidence as insufficient to support allegations of a conspiracy in restraint of trade. *Id.* at p. 75,820.[206]

■ It is, of course, irrelevant to our present inquiry that price differentials between the U.S. and Japanese markets may have: (1) rendered the defendants liable for antidumping duties under the Antidumping Act of 1921, a nonantitrust, protectionist statute; (2) may have violated the Manufacturers' Agreements and JMEA Rules in contravention of Japanese law; (3) may have been accompanied by violations of U.S. Customs law as a result of the double invoicing system; or (4) may have violated the Antidumping Act of 1916 which forms the basis of distinct counts of the plaintiffs'

complaints. The question we are considering is only whether or not the price differentials give rise to an inference of conspiracy in violation of the Sherman Act, and not whether the price differentials violate some other law, American or Japanese, which does not require proof of collusion.

The plaintiffs claim that the violation of other laws demonstrates the interdependence of defendants' pricing behavior, but we find no logical basis for this claim. Although we, of course, do not condone violations of any law, it is obvious that under certain circumstances, a firm might find violating a price-control law to be in its own independent economic interests. In an analogous context, the Third Circuit rejected a claim that a conspiracy may be inferred from violations of a price control law by means of allegedly illegal rebates. *Knuth v. Erie-Crawford Dairy Cooperative Ass'n*, 463 F.2d 470, 476 (3d Cir. 1972) (Gibbons, J.), *cert. denied*, 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973). *See* discussion at Part VI.A.(7), *supra* and VII.L., *infra*. Thus, in the absence of any elucidation by the plaintiffs of a link between the alleged violations of other laws and the interdependence of the defendants' pricing, those alleged violations are not evidence of conspiracy.

■ Finally, plaintiffs contend that the interdependence of the defendants' price differentials is supported by evidence that the Japanese defendants' U.S. subsidiaries sustained losses on their operations in the U.S.[207] Such evidence does not provide log-

---

**205.** To establish a precedent of drawing an inference of conspiracy in restraint of trade from "low" prices alone, or from a difference between ("high") domestic and ("low") export prices, would have serious international trade consequences, as well as consequences for antitrust policy. The possibility that such an inference could be drawn, with the potential for treble damages in its wake, might result in the type of price rigidity and barriers to competition that the antitrust laws were intended to prevent. We underscore "antitrust laws" to denote that there are legitimate policy goals which can be achieved through protectionist trade policy, in contrast to the antitrust policy.

**206.** *Vanco* involved the sale of beer in a single metropolitan area which covered portions of northern Kentucky and southern Indiana, with higher prices charged in Indiana. While the evidence of parallel discriminatory pricing was, as stated in the text, insufficient to support a finding of collusion among beer distributors, it did support a finding of violation of the Robinson-Patman Act.

**207.** To show that the defendants incurred losses on their U.S. operations, the plaintiffs have relied primarily on a mathematical construction in the DePodwin Report, which we have ruled inadmissible, and which we therefore do not

ical support for an inference of conspiracy. Although *Venzie* requires a showing that the defendants' conduct was "in contradiction of their own economic interests," 521 F.2d at 1314, the mere fact that some of the defendants lost money in the initial years of their entry into the U.S. market, or that they lost money on particular transactions, does not meet that test. A company's long-range independent economic interests may require it to operate at a loss for several years in order to become established in a new market. Certainly, this might have been true of the defendants as new entrants in the U.S. consumer electronics market. The particular documents cited by the plaintiffs to show that the defendants sustained losses are entirely consistent with the conclusion that the losses were incurred by the defendants in the course of gaining a foothold in the U.S. market and in no way indicate anything other than legitimate independent competitive activity. Thus, we conclude that plaintiffs' putative evidence of losses sustained by the defendants in attempting to enter the U.S. market is insufficient, as a matter of law, to support an inference of conspiracy.

■ This discussion presages the final point which must be made with respect to plaintiffs' efforts to infer a conspiracy from alleged international price discrimination. Even if there were evidence that defendants had incurred losses in a concerted effort to take over the U.S. CEP market,

plaintiffs' export conspiracy claim makes no sense in the absence of evidence of: (1) an increase in prices to reap "monopoly" profits after penetration of the U.S. market had been achieved; and (2) an administrative mechanism capable of effectively managing or policing the alleged joint strategy or of a means to share profits or recoup losses. Turning to the latter point first, we note that even plaintiffs' own "experts" have stated that an effective conspiracy of this type would have included as one of its key elements "some administrative mechanism capable of effectively managing and enforcing the joint strategy, such that the rewards of monopoly and U.S. market share could be equitably shared among the co-conspirators."[208] Yet, no such profit and loss sharing mechanism by defendants is even alleged by plaintiffs in their FPS, and no evidence thereof is offered.[209] This lacuna is magnified upon recollection that the Japanese manufacturing defendants are supposedly joined in the conspiracy by many if not most of the other CEP manufacturers in Japan, as well as by dozens of alleged coconspirators of other nationalities as well.

More importantly, plaintiffs' allegation that defendants deliberately sustained losses in the United States in the hopes of taking over the U.S. CEP market and charging "monopoly" prices at a later date simply makes no sense in light of the evidence. There is no evidence that the de-

consider on these motions. F.R.Civ.P. 56(e). In addition, plaintiffs rely on three other types of evidence: (1) U.S. tax returns and financial statements of the U.S. subsidiaries of the Japanese defendants, which in plaintiffs' submission show losses during some of the years in the period 1962–75; (2) documents which tend to show losses on particular transactions between the U.S. subsidiaries and their customers; and (3) other documents which contain or report general statements that the Japanese companies, or a particular company, sell products at a loss in the United States. *See* FPS at 7970–99 & 8001–28; Plaintiffs' Memorandum in Reply to Motions for Summary Judgment of Certain Defendants, Matsushita Defendants and Sears, Roebuck & Co. at 105–09 (April 2, 1979). We have not ruled on the admissibility of the latter three categories of documents; many of them are plainly hearsay and may be inadmissible. We assume in this opinion that the plaintiffs do

have sufficient evidence to create a genuine issue of fact that the Japanese defendants' U.S. subsidiaries made some sales at a loss and incurred losses on their operations as a whole during some of the early years of their entry into the U.S. market, but find that such evidence fails to satisfy the *Bogosian/Venzie* test for an inference of conspiracy, for reasons stated in the text.

We have already seen that there is no admissible evidence that the defendants sold below cost in the U.S.

**208.** Nehmer Report at II–8.

**209.** *Cf.* DePodwin Report at I–4, where it is acknowledged that profit and loss sharing is generally listed as one of the critical elements in an effective antitrust conspiracy.

fendants, after having achieved a foothold in the United States market, ever raised their prices to recoup their losses, or earned monopoly profits. But, even the notion that this might happen makes no sense, for the defendants, as new entrants with relatively small market shares, could not rationally have hoped to recoup sustained losses in the United States in view of both the dominant market positions already held by RCA and Zenith (maintained, according to the record, to this day) and the ability of European manufacturers, other Far East companies, and major American firms swiftly to increase their United States CEP sales if higher "monopoly" prices were ever charged. We also note in this regard that there is no evidence of high entry costs or barriers in the U.S. CEP manufacturing and distribution industry.

In sum, plaintiffs' purported evidence of international price discrimination amounts to nothing. We turn to another of the major components of plaintiffs' case, the alleged collusive predatory export rebate scheme.

L. *Plaintiff's Evidence of the Operation of the "Predatory Export Rebate System for Collusive Concealment of Dumping"*

1. *Elements of the Rebate Scheme*

Plaintiffs' description of the operation of what they describe as a "predatory export rebate system for the collusive concealment of dumping" proceeds in contrapuntal style. Referencing the Manufacturers' Agreements, plaintiffs first claim to have demonstrated that the Japanese manufacturing defendants and their coconspirators, as a means of coordinating their concerted export drive, applied for and attained an exemption from the Japanese Antimonopoly Law to meet together to discuss and establish minimum or "check" price levels for television receivers to be exported to the United States, for the purpose of protecting and preventing the destruction and disruption of the United States TV manufacturing industry (although in reality they sought to destroy that industry). Then, in plaintiffs' submission, defendants and their

coconspirators proceeded "commonly and systematically" to sell and export TV receivers to customers in the United States and to market TV receivers in the United States through subsidiaries created for that purpose at prices far *below* the "check prices" (also referred to by plaintiffs as "reference" or "benchmark" price levels), as well as below U.S. domestic price levels.

Plaintiffs contend that defendants' representatives met and negotiated with their registered U.S. private label and original equipment manufacturer (OEM) customers and that, "with the knowledge and adherence of their confederates to the scheme, agreed upon export prices far below the so-called check prices sufficiently low to obtain the business and to depress prices in the United States to unremunerative levels." Plaintiffs allege that in order to conceal the actual export prices in these transactions, the invoices, purchase orders, letters of credit, export validation forms, shipping documents, United States Customs' invoices, and other formal documents reflecting the price at which the goods were being exported from Japan and imported into the United States were "systematically falsified" by the entry and declaration of erroneous prices, in most instances higher than the prices actually agreed upon between the Japanese suppliers and their customers in the United States. The difference between the fictitious invoice prices and the concealed actual prices is said to have been secretly rebated or otherwise returned to the United States importers and customers.

Plaintiffs further allege that the Japanese manufacturers, trading companies, subsidiaries, and certain customers: (1) deliberately established and maintained double sets of books for their television transactions involving the United States; (2) purged purchase orders and invoices reflecting actual pricing; and (3) substituted purchase orders and invoices setting forth false information for the true documents for the purpose of frustrating and evading investigations, litigation, or inquiries from the U.S. Bureau of Customs, the United States

Treasury Department, and other United States law enforcement agencies. Alternatively, plaintiffs allege that certain manufacturers, trading companies, and importers of Japanese television receivers adopted the deliberate policy of refraining from keeping records reflecting the difference between the fictitious prices and the actual prices or records reflecting the receipt of the clandestine payments, allowances, and adjustments therefor.

Plaintiffs particularize their allegations as follows:

> Under the scheme of fraudulent concealment employed by defendants and their confederates to avoid detection, United States purchasers of Japanese television receivers lodged letters of credit in Japan for the value of the television receivers calculated at the higher, fictitious prices, instead of the actual, negotiated prices. The export transactions, therefore, created an overpayment or balance in the hands of the Japanese manufacturer or vendor which was reimbursed to the purchaser. This balance, equal to the difference between the "invoice price" or "camouflaged price" and the *"actual price,"* was referred to by a variety of terms. Since the "actual" or negotiated price per unit was often several dollars below the "invoice price" or the "check price," the aggregate difference between the *"check price"* and *"actual price"* for an entire transaction was usually substantial. Because of the size of the sums of money to be rebated to the customer, a variety of devious and illegal means were employed to rebate the overpayments to the United States customers.

Plaintiffs enumerate the following labels, euphemisms, or devices for rebates of the difference between the check price and the actual negotiated contract price:

1. "difference money"
2. "behind-the-scenes money"
3. "check price balance" or "c. p. balance"
4. "loyalty discount"
5. "excess inspection," "100% inspection," "inspection fees" or other "inspection" costs
6. credits or payments for "rework" or "service" charges
7. credits offset against tooling costs
8. travel expenses
9. entertainment
10. "free goods"
11. "replacement" allowances for allegedly "defective" products or "excessive warranty cost"
12. free spare parts
13. "warehousing"
14. "commissions" or "sales commissions"
15. deposits in customers' yen accounts in Japan
16. "compensation" for purchase by the Japanese vendor of valueless "market research" from the customer
17. credits toward the purchase price of other products, including a system known as "over-and-under" or "over-and-under billing," under which the difference between the higher "invoice" price and the "actual" price is credited toward and deducted from the actual purchase price of another product and, in this manner, refunded to the purchaser
18. "advertising allowance"
19. "usance" or "usance interest"
20. "refunds"
21. "rebate" or "rebate check"
22. "Sharp money" or "Sharp Fund"
23. "adjustments to invoice prices"
24. travelers checks
25. telegraphic transfers through Swiss, German, Hong Kong, and other foreign banks.

The plaintiffs then proceed to describe in some 2,000 pages of their FPS the details of the operation of the "rebate scheme." This segment of the FPS is bottomed largely upon depositions taken by plaintiffs of American importers and documents produced in discovery, mostly by American importers that supported the transactions between the importers and the various Japanese

manufacturing defendants. Many of the documents submitted by plaintiffs during the *in limine* hearings were of this genre.

Notwithstanding the length of the FPS narration, we shall not attempt to describe in replete detail plaintiffs' specific allegations as to the alleged scheme.[210] That is because, assuming admissibility of the various documents,[211] the defendants, or at least most of them, concede with respect to U.S. import transactions that: (1) the price listed on the invoice for the various CEP's at issue was the check price reported to MITI; (2) the actual or negotiated price per unit was often several dollars below the invoice price; and (3) the aggregate difference between the check price and the actual price was rebated by a variety of means, *i. e.*, one of these listed by the plaintiffs at p. 1242, *supra*.[212] Moreover, it is not in dispute that the United States purchasers would lodge letters of credit in Japan for the value of the television receivers calculated at the higher prices, instead of at the actual negotiated prices.[213] There is thus no genuine issue of fact on these matters, rendering extended discussion wasteful. Whether the facts are material is quite another question, one which will be addressed *infra*. In the

**210.** Plaintiffs' FPS first describes the "dumping and predatory export rebating scheme of defendants Sears, Sanyo, and Toshiba." It is undisputed that Sanyo and Toshiba's largest U.S. customer was defendant Sears, and that after the demise as an independent entity of Sears' erstwhile private label supplier, Warwick Manufacturing Company, Sears bought all its television receivers from Sanyo and Toshiba. The dollar sums involved were substantial. Between 1963 and 1975, Toshiba shipped to Sears over 3 million TV receivers, almost two-thirds of them color sets, with a value of some 285 million dollars. Sears is alleged to have been a co-conspirator in a plan to sell CEP's to it at prices far below the fair market value of the products, far below the levels at which Zenith and other manufacturers could compete, and far below the level which Sanyo and Toshiba sold the same or similar products on the Japanese home market.

After some 494 pages of initial description of the Sears-Sanyo/Toshiba relationship, the plaintiffs then move on to the relationships between various defendants and U.S. private label and OEM customers, including such firms as Magnavox, J.C. Penney, W.T. Grant, Montgomery Ward, Midland International, and defendant Motorola.

**211.** We note that during the *in limine* hearings the defendants challenged the admissibility of most of these documents and, in general, the plaintiffs failed to lay a foundation for them as business records. Although many of the documents are internal company memoranda, generated in a business context, we reject plaintiffs' contention that, merely because a lawyer or executive writes a memorandum describing what took place at a meeting, the memorandum qualifies as a business record within the meaning of F.R.E. 803(6). Rather, it must meet the requisites set out in the Japanese Materials Evidentiary Opinion. Notwithstanding the extensiveness of their program of substantive depositions of officials of American purchasers of Japanese CEP's with respect to the alleged

rebate scheme, for some reason laying a foundation for admissibility of documents did not make plaintiffs' priority list.

The requisites of F.R.E. 803(6) are described in great detail in our Japanese Materials Evidentiary Opinion. Our sense of the matter in the wake of considering many of these documents at the *in limine* hearings is that a document-by-document analysis would result in the holding that the vast bulk of these documents do not pass 803(6) muster. Neither have plaintiffs laid a foundation to establish the documents as statements against interest or under the residual exception of the hearsay rule. Most of the documents are probably admissible as non-hearsay admissions of the company whose employee authored the document, but under such circumstances the document is admissible only against that company, most of which are not parties.

Notwithstanding these comments, although a considerable amount of time was expended at the *in limine* hearings in considering DSS's that related to U.S. import transactions, we shall not make formal admissibility determinations because it is not necessary. As we have stated in the text, even assuming admissibility, these documents do not create a genuine issue of material fact.

**212.** The plaintiffs themselves were not strangers to this scene. There is uncontradicted evidence that NUE negotiated and received a rebate from Hitachi.

**213.** There are, of course, matters with respect to the rebate scheme which are in dispute, mainly those related to the questions of concealment and customs fraud, and the question whether the customer knew that the prices at which it purchased were "substantially below the actual market values and wholesalers' prices of television receivers manufactured and sold by the supplier in Japan." Defendants stoutly deny plaintiffs' contentions on such matters.

meantime, a few additional words about the rebate scheme as it is fleshed out in the record will be helpful to the discussion which ultimately follows.

Plaintiffs themselves admit that there was no consistent pattern to the "predatory export rebate conspiracy." They allege that well over a dozen techniques were employed and that still more were considered.[213A] For example, Sanyo employed a "loyalty discount" scheme in sales to Sears, which rewarded Sears with a periodic refund check for purchasing a certain number of television receivers during the contract period. Toshiba and Sears are said to have engaged in "overbilling and underbilling between television receiver models." According to plaintiff, Toshiba over-billed Sears on models initially priced below the check price and underbilled Sears on models initially priced above the check price so that the differences would "wash." Plaintiffs claim that Hitachi paid GE rebates in the guise of payments for "worthless" technical information. A proposed rebate scheme between Sharp and Motorola allegedly involved consideration of the payment of "engineering fees," "inspection charges," "refunds in other products," and selling through three different possible intermediaries.[214]

Our emphasis heretofore has been on documents. Rebating, however, is the one area of the case in which plaintiffs have proceeded extensively by way of depositions. Another reason (in addition to defendants' concessions about the payment of rebates) why we need not engage in an extensive description of the rebate documents is that the plaintiffs have, by depositions (e. g., the deposition of Mr. Brennan of Sears), come forward with sufficient evidence of the existence of the rebate scheme to create a factual issue as to its existence. If the mere existence of the scheme would defeat summary judgment, we would be obliged to deny defendants' motion.

Plaintiffs' principal emphases in their description of the rebate scheme are upon its clandestine nature and the facts that it was pervaded by attempts of the exporter and

**213A.** Plaintiffs do not have evidence that all of the techniques listed above were actually used.

**214.** The number of customers granted the alleged rebates also varies greatly. For television receivers, Sanyo is charged with rebating to over ten different customers, Toshiba is charged with rebating to two customers, and Matsushita is charged with rebating to six different customers. The "Mitsubishi Defendants," which according to plaintiffs include both Melco and MC, are charged with rebating to five different customers. Hitachi is charged with rebating to three different customers, and Sharp is charged with rebating to three customers. The bulk of plaintiffs' evidence on alleged rebating, however, concerns Sanyo's transactions with Sears, Toshiba's transactions with Sears, and Matsushita's dealings with J.C. Penney.

Plaintiffs do not contend that defendants gave rebates to all of their customers. Each defendant sold to many customers, yet plaintiffs only identify one or two customers of each defendant who received rebates. For example, Toshiba sold television receivers to J.C. Penney, Sears Roebuck, Singer, and R.H. Macy & Co. and to its American sales subsidiaries Toshiba America, Inc. and Toshiba Hawaii, Inc. Yet only Sears Roebuck and J.C. Penney & Co. are cited as allegedly receiving rebates, Sears by the so-called "over and under billing" method for the period 1972–1975 and J.C. Penney by the payment of interest, on two occasions, on monies deposited with Toshiba for the later purchase of television sets. Finally, plaintiffs have not alleged that Sony gave any rebates. (Sony did not sell to any private label or OEM customers.)

Plaintiffs' assertions of alleged rebates are also confined to a particular time frame. The first television check price agreement and regulations went into effect in September 1963, but the earliest alleged television rebate identified by plaintiffs occurred in 1967 (FPS at 5582), with the vast majority of alleged rebates occurring after 1970 (after NUE commenced this litigation). Thus, the television check price agreements were in effect for almost four years before the alleged rebating occurred. Similarly, with radios, although the check price agreements went into effect in 1958, the earliest of the two alleged radio rebates cited by plaintiffs in their FPS, a purported rebate from Toshiba to J.C. Penney, occurred in June of 1965. FPS at 10156. Thus, radio check prices were in effect over seven years before any rebate is alleged by plaintiffs to have been granted. The only other alleged radio rebate was from Hitachi to RCA in 1973. Yet, the Radio Export Regulation had terminated in 1972 and the last radio check price agreement terminated at the end of 1965. See Part VIII.A, infra.

the importer to conceal: (1) from MITI the fact that there were sales below check price and (2) from U.S. Customs authorities the fact that the price reported to Customs was not the true sales price. Of course, the higher price reported to Customs would result in a higher normal duty. However, in plaintiffs' submission, the defendants and their coconspirators feared that discovery of the true price for the goods would lead to the assessment of dumping duties under the 1921 Antidumping Act, which would be even higher than the elevated normal duty; hence, the "cover-up." Plaintiffs thus expend many pages of their FPS relating excerpts from depositions and from documents which support their contention that various defendants attempted to conceal from MITI and from U.S. Customs the actual prices at which CEP's were being bought. Again, although we could write at length on these points, we shall refrain from doing so, because we agree that there is evidence of the concealment of the rebate scheme from MITI or from U.S. Customs by at least some of the defendants. We will therefore assume for purposes of summary judgment that many of the defendants concealed the rebating practices.

The existence of the "rebate scheme" is not in and of itself sufficient to create a genuine issue of material fact, however. For it to create a *genuine* issue what the plaintiffs must show is some evidence, direct or circumstantial, that the rebating was done in concert, in pursuance of collusive activity, and in such a manner as to support plaintiffs' claim of a predatory export conspiracy. Plaintiffs have sought to establish this essential portion of their case in two ways. First, they contend in their

FPS that "through continuous meetings among themselves, including meetings at the highest levels, the defendants and their affiliates coordinated their export pricing." Second, plaintiffs approach the matter indirectly or circumstantially by contending that:

> the Japanese defendants and their subsidiaries and certain favored large importers had full knowledge of the rebating system and accompanying "double-pricing" devices and patterns of customs fraud, and that with full knowledge that other defendants and co-conspirators were giving their adherence to and accepting the benefits of this unlawful system of export trade, each defendant and each co-conspirator gave its adherence to and participated in the combination and conspiracy.

We turn now to plaintiffs' evidence of collusive rebate activity.[215]

### 2. *Alleged Collusion in the Export Rebate System*

The plaintiffs have made conclusory allegations in their FPS that through meetings of their executives at every level of management, defendants and their subsidiaries and affiliates coordinated their export pricing. More specifically, the plaintiffs have alleged that the "dumping price levels" at which export sales were made were established in concert by the Japanese manufacturing defendants, their trading companies, and coconspirators as part of a "joint export system devised and implemented by them and related to certain common reference price levels, known as check prices or 'MITI prices.'"[216] However, we have re-

---

**215.** In addition to alleging that the private label or OEM customers of the Japanese manufacturing defendants participated in the rebate scheme, plaintiffs allege that those customers purchased television receivers at prices which both they and the Japanese manufacturing defendant knew were substantially below the actual market values and wholesale prices of television receivers manufactured and sold by the supplier in Japan. We have examined the documents which plaintiffs proffer in support of this point, but find that they do not support it. The plaintiffs do offer evidence which supports

a related point, *i. e.*, that the defendants were concerned about proceedings by United States Customs and Treasury authorities under the 1921 Antidumping Act, and that individually (as well as collectively) they sought to combat the charges. Defendants concede that point, though arguing it to be of no help to plaintiffs' case. We discuss that matter *infra*.

**216.** This allegation is addressed to defendants' pricing practices in general, not just to the rebate scheme, but we consider it here because plaintiffs' ultimate theory (the intertwining of

viewed every document which has been cited by the plaintiffs in support of such allegations and find no evidence to support them.

As we have noted, in addition to claiming that there was overt agreement, plaintiffs rely upon the assertion that defendants' rebates were "parallel," "interdependent," and that defendants had "knowledge" of each other's rebates.[217] All of this, they claim, adds up to "interdependent conscious parallelism," which allegedly supports an inference of conspiracy. In a variation on this theme, plaintiffs assert that liability may be predicated on the fact that each of the defendants and importers, with knowledge that the price levels at which products were sold from Japan into the United States were dumping levels, and with knowledge that it was necessary in order to avoid the imposition of dumping duties by the United States Customs Bureau and Treasury Department to conceal the actual prices, and even with knowledge that they were participating in a criminal offense, nonetheless participated in this scheme.

■■■ Plaintiffs' evidence in support of their claims of interdependent and conscious parallelism and of defendants' "knowledge" of each other's rebates was reviewed in detail in the in limine hearings and during the summary judgment arguments. Defendants' counsel have represented that in preparation for the summary judgment arguments they reviewed every document cited by the plaintiffs in support of their claim that the rebate scheme was common knowledge among the defendants and that concerted rebate activity could be

inferred, including all of plaintiffs' "starred" DSS's,[218] all the documents cited for this point in the FPS, all the documents cited in plaintiffs' various briefs and exhibits, and all the documents contained in plaintiffs' supplementary list submitted to the court for in limine consideration. Defendants' counsel summarized the results of their review during the summary judgment argument (PTO 289 at 97–137 and PTO 291 at 260–71), representing that while these documents show that there was general awareness of the existence of rebate practices, they provide no evidence of collusion among the defendants in connection with rebate activity. Our own review confirms that defendants were correct in this conclusion.

Some of plaintiffs' documents show that U.S. purchasers were aware of rebates being given by more than one manufacturer, that practically every exporter in some manner attempted to bypass the check price system, and that the importers generally were aware of the fact that it was difficult for the Japanese firms to compete by selling at the check price. However, plaintiffs have not developed any facts which demonstrate that information about the amount of rebates was gleaned by Japanese manufacturers from each other. Rather, the evidence shows that the individual defendants learned about their competitors' rebates through their own U.S. purchasers. Moreover, there is significant evidence that the U.S. purchasers who provided the Japanese manufacturers with this information did so in an effort to put pressure on them to lower their prices to meet competition.[219]

the rebates and the check prices) makes the two notions coalesce.

**217.** We add here that many of the statements in the segment of the FPS which deals with "the conspirators' knowledge of and acquiescence in defendants' unlawful, collusive export system" (p. 7542 et seq.) actually deal with the domestic market.

**218.** The "starred" or "asterisked" DSSs were those DSSs which plaintiffs represented during the in limine hearings had especial importance in proving the existence of a conspiracy.

**219.** For example, plaintiffs have proffered a document which shows a communication from Midland, an importer, to Sharp, one of the Japanese manufacturing defendant-exporters. The letter states that other manufacturers have proposed rebating and asks the same arrangement of Sharp. The letter, however, does not disclose who had been granting rebates or in what amount. See DSS 1164. Other of plaintiffs' documents show specific price quotations by a customer to induce an even lower price from the supplier's competitor. For example, a 1967 internal Sanyo memo (which is probably not admissible) describes a Matsushita offer to Magnavox which had apparently been commu-

There is also evidence that efforts were made by Japanese manufacturing defendants to prevent the other Japanese manufacturing defendants from learning about their rebate structure.[220] Thus, if these documents advanced by plaintiffs are admissible,[221] they show that: (1) rebates were paid; (2) they were necessary to enable individual Japanese manufacturers to meet competition; (3) the American importers played the Japanese manufacturing defendants off against one another in order to get the best price; and (4) the defendants sought to keep information about their rebates from one another. This pattern of conduct sounds more in competition than in antitrust conspiracy.

Plaintiffs rely heavily on allegations of clandestine customs fraud, but it is uncontroverted that there was widespread knowledge at all relevant times of the existence of the practice of reporting the MITI price to U.S. Customs and of consummating the transaction (via a rebate) at a negotiated or actual price less than the reported price.[222] Indeed, it was even a matter of public record, as is evident from a reading of the *Continental Forwarding* cases, *see United States v. Continental Forwarding Co.*, 297 F.Supp. 1396 (Cust.Ct.1969), *aff'd*, 311 F.Supp. 956 (Cust.Ct., App.Term 1970), *aff'd*, 463 F.2d 1129 (2d Cir. 1972). That litigation, which began in the early 1960's, raised the question whether certain binocu-

lars imported from Japan should be dutied at the MITI price at which they were entered and appraised, or at the actual contract price, which was below the MITI price by virtue of a rebate paid to the importer. The facts set forth in all of the reported opinions in that litigation, one as early as 1961, make it clear that the whole industry, as well as United States Customs officials, knew of the rebate practice.[223] The ultimate holding of the *Continental Forwarding* cases was that the lower contract price (after the rebate), rather than the higher MITI price, prevailed for Customs purposes. The *Continental Forwarding* litigation thus demonstrates that the practices which plaintiffs proclaim to have been clandestine were, in fact, widely known.

In the wake of these observations, it should be plain that knowledge of the existence of the rebating practice does not suggest collusion as to those practices. Moreover, the very divergence of approaches to rebating described above is sufficient in and of itself to suggest conduct consistent with competition, or at least with the exporters' self interest. Additionally, and still more important, the evidence shows that prices at which the various CEPs were sold under the different rebate schemes were very different, that the amounts of the rebates given by individual defendants were different, and hence that the net prices were signifi-

nicated to Sanyo, which presumably impelled Sanyo to attempt to meet it. Other documents proffered by the plaintiffs suggest that plaintiff NUE itself (through its predecessor, Emerson Radio Corporation) pressured Melco for a better deal on the basis of its knowledge of a Sanyo price.

**220.** There are documents in the record which, if admissible, would reflect that Sharp requested Motorola, at a time when the Matsushita acquisition of Motorola's Quasar division was imminent, not to tell Matsushita of Sharp's past rebates to Motorola.

**221.** In discussing the evidence in this segment of the opinion, we assume admissibility.

**222.** Plaintiffs have made much of the alleged secrecy of the rebating practices and have sought to relate that secrecy to the alleged conspiratorial scheme. To counter plaintiffs' contentions, a number of defendants, during

the course of the summary judgment argument, called our attention to documents which demonstrated that they had in fact informed U.S. Customs of rebate transactions in which they, themselves, had been involved. Plaintiffs make a forceful argument *contra*, and for summary judgment purposes we decline to posit that any defendant made full disclosure.

**223.** For example, in an opinion filed and published in 1964, *Continental Forwarding, Inc. v. United States*, 52 Cust.Ct. 629 (1964), an appeal from a reappraisement decision, the head note reads: "Binoculars, imported from Japan— MITI or check price not export value." That decision reversed *Continental Forwarding, Inc. v. United States*, 46 Cust.Ct. 579, Reap.Dec. 9910 (1961), which also set forth the background of the case. The Court noted that "this controversy is familiarly referred to as the 'MITI' case," 52 Cust.Ct. at 630.

cantly different. More precisely, plaintiffs' evidence demonstrates that, even during the same year, identical screen size televisions were sold by different sellers to different buyers at different prices involving alleged secret rebates which were also different.[224] As we will underscore below in our further discussion of the inferences which are drawable from the rebating practices, these differing prices and rebate amounts are inconsistent with collusion, or at least, they are as consistent with competitive, rational, independent behavior by each individual defendant.[225]

Another approach taken by plaintiffs in an attempt to adduce some evidence of collusiveness in rebate-related export practices lies in their contention about certain meetings which took place in the wake of the U.S. Treasury antidumping investigation. These meetings were attended by execu-

---

**224.** For example, in 1972, according to plaintiffs, Sharp allegedly sold 17″ color television receivers to Gambles, Midland, and Montgomery Ward at alleged "actual" prices of $181.80, $167.70, and $160.00, with alleged rebates associated with these sales of $1.60, $15.70, and $23.00, respectively. FPS at 7190 (Gambles), 7193 (Midland), and 7208 (Montgomery Ward). Plaintiffs also allege that, in 1970, 15″ color television receivers were sold by Nippon Electric Corp. to Midland at $139.03, from Sharp to Midland at $140.44, and from Sanyo to Sears at $135—transactions in which rebates were alleged to have been $8.97, $11.56, and $13.00, respectively. FPS at 7133 (Nippon-Midland), 7185 (Sharp-Midland), and 7238 (Sanyo-Sears). Plaintiffs also allege Matsushita's participation in differing rebate schemes as well. *See* FPS at 10590–650. By way of additional example, at page 7140 of the FPS plaintiffs state that in 1969–70 Nippon Electric Co. (a non-defendant) allegedly sold 9″ Black and White TVs to Midland for $38.023/unit, while allegedly falsely representing that the price was $41.00/unit, thus giving Midland a rebate of $2.97/unit. However, during the same time period, MEI and MET allegedly sold Magnavox 9″ black and white TVs for a much higher $56.40/unit price, while allegedly falsely representing that the price was $59.70/unit, and giving a higher rebate of $3.30/unit. FPS at 6875. Similarly, in the 12″ black and white TV market, in 1971, Nippon allegedly received $39.98/unit from Midland, while falsely claiming that the price was $41.00/unit, for a rebate of $2.20/unit, FPS at 7143, whereas, in 1972, MEI and MET allegedly received a higher $47.35/unit from W.T. Grant, while allegedly falsely claiming $48.90/unit for a rebate of only $1.55/unit. FPS at 7076.

Toshiba's pricing arrangement with Sears and J.C. Penney was apparently different from that of either Nippon, MEI, or MET. Toshiba in 1973 allegedly sold Sears 12″ black and white TVs for $55.49/unit. FPS at 7018. More specifically, it is alleged that in their negotiations concerning Model 50721A, Sears and Toshiba agreed on an actual unit purchase price of $57.29 fob Japan, but that in order to conceal the actual price, Toshiba and Sears agreed to falsify Sears' purchase price of each to make the unit price appear to be $55.49 fob Japan, or $1.80 *lower* than the actual price. Toshiba is alleged ultimately to have declared the unit price to be the fictitious lower unit price of $55.48, thus understating the unit price by $1.81. This unusual variation on the theme is unexplained by plaintiffs.

**225.** On November 24, 1980, we received a letter from plaintiffs' counsel, Mr. Rome, in the nature of a response to:

the unsupported assertion found in the latest filing of the defendants to the effect that plaintiffs have failed to '*cite any evidentiary support*' for the fact that defendants engaged in a joint and concerted system of double invoicing and Customs fraud in pursuance of their combination and conspiracy and in concealment thereof and that this system was common knowledge among the defendants and many of their principal customers...

Plaintiffs maintain in the letter that the documents and deposition testimony "unquestionably" establish the concerted nature of the defendants' double pricing invoice system. Plaintiffs thereupon set forth a half-page list of documents and deposition transcripts in support of their thesis (many of which were not lodged in the document depository, and many of which that were lodged therein were not translated). Having examined all of this material (or more properly, reexamined, for most of it was invoked earlier) we are reinforced in our earlier conclusion. To be sure, this material demonstrates the existence of rebate schemes with various importers (that "everybody was doing it"—or almost everybody). The documents also suggest knowledge on the part of the various parties that others were engaged in rebating, although we must note in this regard that the various declarations as to what others were in fact doing are all excludable under F.R.E. 805. The materials also reflect the joint response of various companies to the joint legal problem posed by the Treasury Department 1921 *Antidumping Act* investigation. However, none of these materials in any way demonstrate what plaintiffs maintained in their November 24, 1980 letter that they had established, i. e., concerted activity in connection with the alleged rebate scheme.

tives of and counsel for a number of defendants and their private label customers to whom they had paid rebates and with whom they had apparently engaged in "double invoicing." The conferees apparently discussed the Treasury Department dumping investigation from a number of points of view. *Inter alia,* they sought information about the investigation and discussed its anatomy, scope, and potential consequences, and appropriate strategies for defending against it. J.C. Penney and Matsushita actually brought lawsuits challenging the Treasury Department's conduct at the dumping investigation involving television receivers from Japan.[226] Plaintiffs seek to draw an inference of conspiracy from these discussions and suits. However, as we have seen in our legal discussion, Part VI.A.8, *supra,* it is impermissible to draw an inference of conspiracy from that fact.

As the foregoing review demonstrates, there was no consistent pattern to the so-called rebate conspiracy. There were at least 25 different rebating techniques which were considered or employed. Plaintiffs have been unable to adduce any direct evidence as to collusive activity by the defendants with respect to rebates, nor have they cited any facts to support their claim that defendants adopted a common rebating strategy, or that there was any agreement among defendants concerning rebates. Rather, by listing a series of alleged rebating transactions involving individual Japanese defendants for some 2,000 plus pages of the FPS, plaintiffs assert, *ipse dixit,* that this by itself leads to an inference of conspi-

ratorial behavior. The fact, however, is that plaintiffs' rebating evidence in actuality is at least as consistent with, and actually supports, just the opposite inference— that defendants engaged in unilateral conduct which was neither "parallel" nor "interdependent," but rational, independent, and pro-competitive. We take this opportunity to summarize our analysis of what inferences are drawable from the evidence adduced by plaintiffs about the "rebate scheme."

We start with the proposition that it is illogical to infer joint conduct from disparate behavior. Most of the alleged rebating, according to plaintiffs' submissions, was random and was done by one or two defendants with one or two customers.[227] As we have noted above, *see* n. 214, the number of customers granted the rebates varied greatly, and plaintiffs do not contend that defendants gave rebates to all their customers. Moreover, it is plain that rebating "to get the business" does not meet the *Bogosian/Venzie* test. It is not against, but rather in one's own self-interest to rebate if doing so obtains the sale.

We have already rejected, in Part VI.A.7, *supra,* the notion that secret rebates to get business violate the antitrust laws, *see Knuth v. Erie-Crawford Dairy Cooperative Ass'n, supra,* and the related notion that concealing such rebates from a governmental organ, such as MITI or U.S. Customs, in an effort to circumvent barriers to competition, can form the basis for an antitrust violation, *see Citizens & Southern National*

---

**226.** The case of *J. C. Penney Co., Inc. v. U. S. Treasury Dept.,* 319 F.Supp. 1023 (S.D.N.Y. 1970), *aff'd,* 439 F.2d 63 (2d Cir. 1971), *cert. denied,* 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971), was dismissed for lack of jurisdiction in the District Court. The case of *Matsushita Electric Ind. Co. v. U. S. Treasury Department,* 67 Cust.Ct. 328 (1971), *aff'd,* 485 F.2d 1402 (C.C.P.A.1973), was dismissed essentially as premature.

**227.** Defendants note that there were twenty-seven, not fifteen, signatories to the Manufacturers' Agreements. (Actually, the 1963, 1964, 1965, and 1966 Television Manufacturers' Agreement had 21 signatories, the 1967 Television Agreement had 20 signatories, the 1969

Television Agreement had 19 signatories, and the 1970 and 1971 Television Agreement had 18 signatories.) Of these 27 signatories, plaintiffs in their FPS only identify eight companies as having granted rebates: Sanyo, Toshiba, Melco, MEI, Hitachi, Sharp, Nippon Electric Co., and The General Corp. Thus, defendants say, plaintiffs' charge of "pervasive rebating" among the alleged coconspirators, is predicated on the fact that only eight of the twenty-seven signatories to the MITI-mandated check price agreements allegedly granted rebates. As defendants have also pointed out (see n. 214, *supra* ), the challenged rebating was limited in time sequence.

*Bank, supra.*[228] Instead, we have noted that such activities are in reality pro-competitive. Accordingly, the probative value of plaintiffs' evidence of secrecy in the rebating practices, without more, is nil.

Evidence that a customer of one of the defendants informed that defendant of a rebate being offered or granted by another defendant, or even evidence showing that manufacturers and their customers had general knowledge that rebates were available, or that these rebates might cause problems under the 1921 Antidumping Act, is also not a basis for drawing an inference of concerted action. It is commonplace for competitors to learn from customers or potential customers about "deals" being offered by other manufacturers. This is precisely how customers induce price competition between one manufacturer and another. As we have pointed out, there is widespread evidence in the record of this case that this was being done by the American purchasers of Japanese CEP's in an effort to "whipsaw" or induce the Japanese manufacturing defendants, competing among themselves, to give better discounts, rebates, allowances, etc. in order to get the business.

What plaintiffs must adduce evidence of, but have failed to, is that this "knowledge" was gained through communications between or among the defendants or that it relates to a rebate conspiracy. Moreover, the extremely diverse rebating practices followed by the defendants and the independent self-interest which they had to engage in rebating themselves preclude any inference that there was an agreement concerning the amounts or types of rebates being offered by the defendants. At the very least, the evidence is as consistent with competition as with conspiracy.[229]

The foregoing discussion concentrates on the inferences to be drawn as to the Japanese manufacturing defendants. To complete our discussion, however, it is necessary to consider what inference can be drawn as to MC and MIC, Motorola, and Sears, who were not manufacturers but rather purchasers of Japanese CEP's. Flipping the coin, however, does not alter the result. First, there is no evidence that the rebates paid to Sears follow a pattern similar to that paid to any other importer of Japanese CEP's or, in fact, that Sears' two principal suppliers, Toshiba and Sanyo, acted in parallel fashion in their rebating practices vis-a-vis Sears. Indeed the evidence is to the contrary. There is evidence of only one

**228.** Defendants have argued that any attempt to prove customs fraud during the course of the trial would create a lengthy and complicated peripheral issue. In defendants' submission, in addition to all the other complicated pricing and economic data the jury would have to analyze, they would have to consider data depicting prices communicated by importers of merchandise from defendants to United States Customs. This material, defendants contend, would have no probative value, but would cause significant and unfair prejudice to defendants if plaintiffs could portray them as "inveterate lawbreakers" because of their alleged customs fraud. Defendants thus argue that the customs data is inadmissible under F.R.E. 403. Their argument is buttressed by problems which underlie the plaintiffs' efforts to support their customs fraud claims. The supporting documents were not offered at the pretrial evidentiary hearings; hence, we would not be considering them before trial. These are various internal Customs memoranda which are evaluative in nature, but which probably do not qualify for admissibility under 803(8)(C) as that rule has been explicated in our Public

Records Opinion. Extensive trial time would thus be consumed in hearings and rulings upon the admissibility of such documents. Accordingly, defendants' argument that the (minimal) probative value of the evidence would be outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, and by considerations of undue delay and waste of time is forceful indeed. However, in view of the result we reach herein, we need not decide the Rule 403 question.

**229.** Plaintiffs seem no longer to press seriously what has been described as their "blowing the whistle" argument, but to the extent that they have not abandoned it, we give it passing mention. Plaintiffs have suggested that evidence of the rebate conspiracy is to be found in the failure of the defendants to notify U.S. Customs about their supposed competitors' customs violations, or to notify MITI about sales below check price. It is, however, obviously in each defendants' own self-interest not to "blow the whistle," since doing so might focus attention on their own Customs violations.

rebate paid to Motorola, that by Sharp, and there is only questionable evidence of a rebate paid to MC; but there is no evidence of parallel activity in those instances.

More significantly, it is plainly in the interest of a purchaser to obtain a rebate so as to get the lowest possible price. Although plaintiffs decry the activities of Sears in securing rebates from Sanyo and Toshiba, noting that they made it possible for these companies to compete vigorously with Zenith, it appears to us to be pro-competitive and in Sears' interest for Sears, or any buyer, to attempt to get the best price it can.[230]

### M. Plaintiffs' Evidence Concerning the Depletion and Destruction of the United States CEP Industry

Plaintiffs devote some 131 pages of their FPS to what they describe as "the debilitation and destruction of the United States consumer electronic products industry." They offer this evidence in an attempt to draw an inference therefrom of conspiratorial behavior—i. e., an inference of intent and anticompetitive acts from "effects." Plaintiffs' presentation falls into three discrete areas. First, plaintiffs offer a plethora of statistics relative to increases in Japanese imports into the United States, the decline in production of U.S. television receivers, and related matters. Second, plaintiffs proffer certain findings about injury to U.S. industry emanating from administrative proceedings before the United States Treasury Department, the United States Tariff Commission, and the United States International Trade Commission. Third, plaintiffs advance an analysis based upon the notion of "retail price points" in

the U.S. market which are alleged to have deteriorated as the result of defendants' activities.

In the first of these categories, the statistics, plaintiffs have submitted data demonstrating a considerable increase in imports of monochrome and color television receivers from Japan into the United States during times relevant to this case. For instance, U.S. imports of color television receivers from Japan increased from less than 0.7 million units in 1968 to 3.7 million units in 1976. In terms of private label sales, U.S. imports of color television receivers from Japan increased from 192,000 in 1966 to 376,000 in 1970, and total U.S. imports of private label television receivers (monochrome and color) from Japan increased from 758,000 units in 1966 to 1,309,000 units in 1970. In terms of percentages, in 1965 Japan supplied about 10% of the United States consumption of television receivers, compared to 28% in 1970.[231]

Plaintiffs also set forth figures showing a significant decline in the number of United States produced complete television receivers and United States assembled receivers. Additionally, they advance statistics as to the number of U.S. producers of television receivers between 1960 and 1976 which show that the number of companies producing television receivers in the United States declined from 18 in 1968 to 12 in 1976.[232] Moreover, during the same period, the number of U.S. establishments in which television receivers were assembled declined from 30 to 15. Finally, plaintiffs adduce figures showing: (1) underutilization of U.S. television receiver assembly plants; (2) decline in operating profit of U.S. producers of television receivers; (3) decline in the average

**230.** We shall discuss plaintiffs' rebating claims vis-a-vis MC and MIC, Motorola, and Sears in greater detail *infra* when we reach the evidence as to their alleged participation in the conspiracy.

**231.** The figures cited in the text are broken down further into various screen sizes. For example, imports from Japan of monochrome sets having 10 to 13 inch screens increased from 25% of the U.S. market in 1965 to 50% in 1970. Imports from Japan of monochrome sets having 17 to 19 inch screens increased from

1% of the domestic market in 1965 to more than 15% in 1970. None of the statistical data cited is challenged by defendants.

**232.** Plaintiffs neglect, however, to point out that between 1960 and 1968, during most of which period the Japanese manufacturing defendants were not even exporting color television sets to the United States, the number of U.S. television receiver producers declined from 27 to 18.

number of persons employed in U.S. establishments in which television receivers were assembled; and (4) decline in man hours worked on television receivers, all during periods relevant to the case.[233]

As to agency findings, plaintiffs have set forth a number of "injury" findings of the U.S. Tariff Commission and the U.S. International Trade Commission. They quote at length from portions of those Commissions' findings giving conclusory opinions as to the source of the decline in the U.S. television industry. They also offer the Less Than Fair Value findings of the Secretary of the Treasury in connection with the 1921 Antidumping Act Proceedings.[234] All of these findings are discussed at length in our Public Records Opinion, in which they were all excluded from evidence on grounds of trustworthiness and lack of relevancy.

Finally, plaintiffs devote some 67 pages of the FPS to a discussion of the "deterioration of television retail price points" in the U.S. caused by the alleged activities of the Japanese defendants. The term "price points" refers to retail price levels to which consumers have become accustomed and which are the maximum levels they expect to pay. In the television receiver market from the mid-1960's to the early 1970's, in the case of the middle and lower price range sets, plaintiffs assert that the price points were set by the mass merchandisers. Plaintiffs contend that the Japanese "cartel" concentrated on brands in the low price niche in the market, which included Emerson (predecessor of plaintiff NUE) and Dumont (an Emerson label). Defendants are said to have done so by their sales to mass merchandisers such as Sears, J. C. Penney, W. T. Grant, and R. H. Macy. Although prior to the Japanese "invasion" Emerson/NUE was capable of manufacturing and selling sets in the middle to lower price range by meeting price points with sufficient margin for the dealer to warrant continued purchases from Emerson/NUE, plaintiffs submit that after the Japanese saturation of the market at the lower end of the price range, the deterioration in the price points enabled the Japanese to dominate that segment of the market, leaving Emerson/NUE unable to compete.

Plaintiffs have thus engaged in an extensive presentation of the manner in which Japanese pricing and marketing policies caused a lowering of prices in the domestic television receiver market, though they fail to mention that what they portray looks very much like the competitive model. The purpose of the presentation is to support plaintiffs' theory that: (1) failure of NUE and other U.S. television manufacturers and (2) the deterioration of the profit margin of Zenith and others which also resulted, in plaintiff's submission, from the vast increase in Japanese imports and the destruction of television retail price points in the U.S. market lead to an inference of defendants' conspiracy. Plaintiffs, however, cite no authority which supports this proposition.[235]

---

**233.** Plaintiffs offer still further charts showing such matters as the ratio of net operating profit or loss to net sales for domestic producers; charts showing aggregate profit and loss experience on TV operations of U.S. producers; wholesale price indices for TV receivers; and a host of other financial data reflecting that the times in question were not good ones for the U.S. television receiver manufacturing industry.

**234.** Plaintiffs also attach charts from the Tariff Commission Report as to the extent by which wholesale net selling prices of imported television receivers sold to distributors were lower than those for U.S.-made sets.

**235.** There was some suggestion at oral argument that *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) could be read to support an inference of conspiracy from effects alone. Plaintiffs rely for this theory upon *Gypsum's* footnote 13, which points out that *Gypsum*, which analyzed the type of intent needed to sustain a criminal conviction under the Sherman Act, left "unchanged the general rule that a civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect," *citing Container Corp., supra*. But plaintiffs have ignored the fact that the anticompetitive effect which can sustain an inference of a civil Sherman Act violation must have been the result of some anticompetitive *conduct*, such as the exchange of specific current prices in *Container Corp.* or the exchange of detailed price verification data in *Gypsum*. We fail to see how conduct can be inferred

■ It is plain that the depletion of the U.S. CEP industry is as consistent with a number of other inferences, such as efficient foreign competition or inefficient U.S. management,[236] as it is with the inference that the industry was harmed by a conspiracy among these particular defendants. But even beyond this observation, in the total absence of any evidence of collusion or, indeed, of any evidence of anticompetitive activities on the part of the defendants from which collusion could be inferred, it is impossible as a matter of law to infer the conspiracy plaintiffs allege from deterioration of the U.S. CEP industry. Such an "inference" would in reality be mere speculation.[237]

## N. Plaintiffs' Claims Concerning Defendants' Acquisitions of United States Manufacturers and Their Establishment of Manufacturing Facilities in the United States

### 1. Introduction

■ Plaintiffs devote over 70 pages of the FPS to their claims of "take over and elimination by the defendants and their co-conspirators of United States manufacturers through a pattern of unlawful acquisitions, mergers, joint ventures, and the establishment of manufacturing facilities in

the United States." Plaintiffs complain of four acquisitions:

(1) the acquisition by Matsushita of the consumer electronics products ("Quasar") division of Motorola;

(2) the acquisition of Magnavox by N. V. Philips;

(3) the acquisition of Warwick Electronics, Inc., (Warwick) by Sanyo;

(4) the acquisition of Fisher Corporation (Fisher) by Sanyo.

Plaintiffs contend that each of these acquisitions is an overt act in furtherance of the conspiracy among the defendants. Additionally, the Quasar and Warwick acquisitions are the subject of Zenith's claims under Section 7 of the Clayton Act, which are discussed separately *infra*.

We recite in this segment the facts of record relevant to plaintiffs' "acquisition" claims. As a matter of convenience, we shall also set forth the facts relative to Sanyo's defense that Warwick was a "failing company" when acquired by Sanyo. While those facts are principally relevant to Sanyo's defense to plaintiffs' claims under § 7 of the Clayton Act, to the extent that they could be used at trial to deflect the claim that the Warwick acquisition was an anticompetitive act in furtherance of the

merely from proof of alleged consequences of that conduct, and *Gypsum* does not so hold. We note in addition that the Supreme Court in *Gypsum* expressly stated that it was not discussing what evidence might support an inference of an "intent to agree, but only intent 'to effectuate the object of the conspiracy.'" 438 U.S. at 443 n.20, 98 S.Ct. at 2877 n.20.

**236.** One subject extensively explored during discovery was the question whether NUE's demise was a function of poor management and inefficiency. Defendants have offered significant evidence to support their claim that NUE was operating from an antiquated facility, that its production and marketing operations were inefficient, and that its management was mediocre. According to the defendants, most of NUE's distributors were operating "in the red" long before the defendants had achieved a significant U.S. market share. NUE denies these contentions.

**237.** To the extent that plaintiffs rely upon evidence of destruction to particular companies—NUE for example—as opposed to evidence of

injury to the entire industry, we note that such an approach would be unavailing. Because the antitrust laws are designed to protect competition, not competitors, evidence which shows only injury to individual firms cannot be used to infer injury to the competitive process. *See, e. g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Thus, without specific evidence of anticompetitive conduct and effects, the most that could ever be inferred from the demise of NUE or the decrease in Zenith's profit margin would be an "intent" to obtain business to the detriment of a particular competitor—an intent which is not a violation of the antitrust laws. We note too that under the principles of *Brunswick, supra,* as further enunciated in *Murphy Tugboat Co. v. Crowley,* 454 F.Supp. 847, 852 (N.D.Cal.1978), injuries suffered by a firm from the competitive process are not compensible, even if the defendants are engaged in unlawful conduct.

conspiracy they have some bearing on plaintiffs' Sherman Act § 1 claim, even if only in a peripheral way.

The FPS presentations about the acquisitions are extremely lengthy, in part because they describe in replete detail the negotiations for the various acquisitions and the terms of the acquisition papers. We need not summarize those matters here; rather, we will set forth only those matters essential to our disposition of the pending motions.[238]

### 2. The Quasar Acquisition

On May 28, 1974, an agreement was reached between Matsushita and Motorola under which Matsushita ultimately acquired, for a consideration of $100,000,000 and "reciprocal arrangements" in the solid state and related fields, the entire consumer electronic products division of Motorola, including Motorola's "Quasar" trade name, its manufacturing facilities throughout the United States, and its complete United States consumer electronic products distribution system. Matsushita (MEI) kept open and has continued to operate a number of former Motorola television production facilities.[239]

Plaintiffs' primary allegations concerning the Quasar acquisition relate to what plaintiffs see as collusion in its background. In 1972, desiring to market television receivers in Japan, Motorola officials discussed with Mr. Morita, the President of Sony, Motorola's desire to establish a long-range cooperative association with the Japanese manufacturer.[240] From this discussion came a suggestion that Quasar sets be marketed in Japan in cooperation with AIWA, an audio equipment company controlled by Sony. As of June 6, 1973, Motorola and AIWA agreed

upon the terms for AIWA to become the exclusive sales agent for Quasar brand color television receivers in Japan. A short time later, in mid-August, 1973, they announced an agreement under which AIWA would import four television receiver models manufactured by Motorola to be sold in Japan under the Quasar label. However, shortly thereafter, MEI entered into negotiations with Motorola, ultimately completing the Quasar acquisition. MEI insisted from early in the negotiations that the sales contract between Motorola and AIWA be dissolved. Accordingly, the AIWA arrangement was formally terminated by Motorola after the acquisition by Matsushita. Motorola paid $250,000 to AIWA in consideration for termination of their arrangement.

Plaintiffs contend that the termination of the Motorola-AIWA agreement was evidence that the Japanese manufacturers, in this instance specifically MEI and Sony, were determined to keep the Japanese market closed to U.S. competition, thereby safeguarding their own ability to continue their high-price domestic conspiracy. In addition, plaintiffs contend that Motorola was "pressured" concerning the ongoing Quasar negotiations by virtue of "startling [price] increases from its Japanese suppliers of component parts" in January, 1974. This allegation is apparently intended to give rise to the inference that Motorola's Japanese suppliers participated in a conspiracy either to make it financially unattractive for Motorola to enter the Japanese market or to weaken Motorola in order to ease MEI's takeover. This allegation is not supported by the three documents listed to support it at page 8424 of the FPS, however. Moreover, it is strongly controverted by a variety of Motorola sources, including the testimony of Motorola's president, Mr.

---

**238.** Plaintiffs ask us to look at each acquisition as an overt act in furtherance of the "unitary" conspiracy. The discussion in the following sections examines whether, as to each individual acquisition, an inference of conspiratorial activity can be drawn.

**239.** Plaintiffs complain that although Matsushita represented to the Department of Justice that it would keep all of the plants open and retain all of the Motorola employees, it did not

do so, instead closing several plants and laying off numerous employees. We fail to see what relevance that fact, if true, has to this case.

**240.** According to its president, Mr. Galvin, Motorola believed that it could sell its television receivers in Japan at lower prices than those at which comparable sets were being sold by Japanese manufacturers.

Galvin, and a letter from Motorola's counsel, Mr. Nygren, to the Justice Department.

We have carefully considered all of plaintiffs' allegations about the background of the Quasar acquisition, but we fail to discern in them any hint of a link to the "unitary" conspiracy. Rather, we see evidence of rational pursuit of economic self-interest, antithetical to notions of conspiracy.[241] Motorola's plans to compete in the Japanese market were certainly in its own self-interest and totally contrary to plaintiffs' claims that Motorola was a participant in the conspiracy. Motorola's sale of a division which was losing money, see Part VII. Q.11, infra, was obviously in its own self-interest as well. There is no evidence or indication that MEI's acquisition of an American CEP manufacturing division was anything other than unilateral and in its own interest pursuant to a desire to establish a production facility in the U.S., a significant market for its goods.

Motorola's participation in the conspiracy is asserted to stem in part from its accession to the demands of MEI and Sony with respect to cancellation of the AIWA contract. However, we see no evidence of a conspiratorial role. If Motorola wished to conclude a favorable agreement with MEI, it apparently had no choice but to cancel the AIWA contract, and it was plainly therefore in Motorola's self-interest to do so. Although plaintiffs suggest that Mr. Morita's acquiescence in the termination of the AIWA deal was against Sony's interest and in furtherance of the conspiracy, the fact is that Sony was compensated for the termination of the AIWA venture. Moreover, it would appear that Sony had little choice, faced with MEI's plans, unless it wished to sue. There is no evidence that the settlement was inadequate, and we cannot speculate that it was, elevating the fact of settlement into evidence of a conspiracy.[242]

Finally, MEI had an interest in not having its own subsidiary manufacture TV sets which would compete with it in Japan. Merely because its own interest in this one regard is parallel to that of other Japanese manufacturing defendants does not constitute evidence of conspiracy. In fact, all of plaintiffs' conclusions in this area are speculation.

Turning to plaintiffs' remaining factual development about the Quasar acquisition, plaintiffs set forth in their FPS the U.S. television receiver market shares of Motorola and MEI at the time of the acquisition (1974). These figures include reported sales of MEI's "Panasonic" brand and those of the "Penncrest" brand marketed by MEI's private label customer, J. C. Penney. According to these figures,[243] the joint Motorola-MEI market share was 15.6% of the monochrome market, 11.4% of the portable market, and 9.9% of the console market. The 1973 Trendex statistics for the U.S. color television market are as follows: Zenith, 23.8%; RCA, 20.1%; Magnavox, 7.8%; Sears, 7.3%; Motorola, 7.3%; G.E., 5.7%; Sony, 4.5%; Sylvania, 4.5%; Philco, 3.2%; Admiral, 3.1%; Panasonic, 2.1%; Montgomery Ward, 1.6%; Penncrest, 1.1%; Grants, 0.9%; Hitachi, 0.7%; Sharp, 0.7%; Sanyo, 0.6%; Packard Bell, 0.6%; Western Auto, 0.5%; Emerson, 0.3%; all others, 3.6%.

Aside from potential impact on plaintiffs' Clayton Act § 7 case, we fail to see how these figures in any way support plaintiffs' conspiracy claims, and plaintiffs do not explain how they do. Indeed, armed with these and other uncontested figures, the defendants suggest that the fact of overriding significance concerning the U.S. color TV market is that every year for the last eight years Zenith has sold more color television sets in the U.S. than any other company, American or Japanese.

**241.** Since the acquisitions are said to be a function of consciously parallel interdependent action, hence (circumstantially) conspiratorial, we apply Bogosian/Venzie analysis.

**242.** Plaintiffs also seek to draw an inference from the fact that Mr. Morita was a guest in the private airplane of Mr. Galvin, the President of Motorola, when certain conversations took place. That fact does not make up for missing evidence.

**243.** Plaintiffs' figures are drawn from "Trendex" statistics relative to the television market. The "Trendex" figures are generally accepted by the parties as reliable.

### 3. The Warwick Acquisition

Warwick was a Delaware corporation which manufactured consumer electronic products, musical instruments, and dining room furniture, with its principal manufacturing facilities located in Arkansas.[244] During the 1960's, Warwick was Sears Roebuck's principal television supplier. Jerome Brennan, Sears' senior buyer of televisions from mid-1967 through mid-1974, testified at a deposition that throughout his tenure it was Sears' policy to purchase from Warwick all of its requirements for television sets which Warwick was able to supply on a competitive and profitable basis. Plaintiffs themselves assert in the FPS that on June 30, 1969, Sears affirmed its determination to develop Warwick as a home entertainment electronic products source "second to none in the industry in every facet of its business," to purchase most, if not all, of its requirements from Warwick, and to concentrate in Warwick the maximum volume of Sears' purchases which competitive conditions would permit.

Prior to September, 1966, Sears was Warwick's majority shareholder, and, at all times since September 1, 1966, Sears has owned at least 25% of Warwick's outstanding shares. Consistent with its policy of developing and purchasing from Warwick, Sears heavily financed Warwick's operations. Warwick's audited consolidated financial statement for its fiscal year ending March 30, 1968 reflects long-term (ten years at the prime rate) loans from Sears of $15,000,000. Moreover, in 1970, Sears increased its financial assistance to Warwick, agreeing to purchase finished products from Warwick "as manufactured" rather than "when shipped" as in the past. By this device Sears, in effect, assumed the burden of financing Warwick's finished goods inventory, assistance which Warwick valued at $2,500,000 in that one year. In 1975, approximately 66% of Warwick's net sales consisted of sales of color television receivers and related service parts, virtually all of which were sold to Sears. In that year, Warwick was the sole domestic, and on a dollar volume basis, the largest single supplier to Sears of color television receivers.

All of the foregoing facts are undisputed. Also undisputed is the fact that Warwick had been losing money "hand over fist." After 1973, Warwick was unable to generate a sufficient volume of business to remain viable, and continued to operate at a loss and to lose business. Warwick lost 3.8 million dollars in 1974, ending the year with negative retained earnings.[245] In 1975, Warwick lost 8.9 million dollars, ending the year with a stockholder's equity deficit in excess of $5 million dollars and a retained earnings deficit of nearly $10 million dollars. After being advised that Sears would purchase no table-top color TV's from it after June of 1976, Warwick terminated all of its engineering personnel, leaving itself with no future in the television business.

While the parties have differing contentions as to the reason for Warwick's demise, two important facts are undisputed. First, Sanyo and Toshiba offered to sell and, in fact, did sell color TVs to Sears for lower prices than Warwick could profitably meet. Second, the quality of the imported color TVs available to Sears was vastly superior to those which Sears was buying from Warwick, resulting in enormous dollar savings on warranty expense.[246]

---

**244.** Warwick also had manufacturing facilities in Mexico.

**245.** Mr. Nevin, the board chairman of Zenith, testified at his deposition that Warwick was, for practical purposes, out of business by 1974.

**246.** Mr. Brennan testified that, in terms of quality, serviceability, and number of service calls in the field, the imported television receivers purchased by Sears from Sanyo and Toshiba were clearly superior to those which it purchased from Warwick. He further testified

that this superiority was a significant factor in Sears' decisions to buy from Sanyo and Toshiba. Even Mr. Nevin, Zenith's board chairman and chief executive officer, testified that the quality and performance of the product Sears was getting from Warwick was "second rate." Field failures of Warwick TVs had sent the service call rate on Sears' color TV sets soaring and, by the first quarter of 1974, Sears had the highest service call rate in the industry for color sets within the quarter in which the set was purchased. Moreover, Sears' cost of honoring the warranties it gave to customers on

As a result of the better quality and lower prices available from Sanyo and Toshiba, Sears gradually reduced its color TV purchases from Warwick.[247] Because of the 1974 recession, Sears further reduced its purchases from Warwick. At one point, because Warwick had indicated disinterest in producing those TV receivers that would not make a significant contribution towards its fixed costs, Sears had to make plans to import 19,015 sets which Warwick had the ability to produce. The only set which Sears was planning to buy abroad in 1975, and which Warwick both could make and wished to make,[248] was offered by Warwick at a higher price than the comparable imported model, even before considering the higher service costs.

As of September 15, 1975, Sears found that it had paid to Warwick price premiums over import prices exceeding $1.2 million; that Warwick was over 11,000 sets behind its contracted production schedule for Sears; that Warwick had an inventory of over 18,000 finished sets which it was unable to ship pending repairs of manufacturing defects; and that the defect rate of Warwick products sold to Sears was over four times higher than that of the imported products Sears bought. By October 31, 1975, Sears finalized its decision to discontinue purchasing table-top color television sets from Warwick in favor of sets offered to it by Sanyo and Toshiba which had better specifications, brighter pictures, lower power consumption, better serviceability, and lower costs.

In 1976, Sanyo acquired the controlling interest in Warwick's television business through a complicated tripartite transaction among Sanyo, Sears, and Whirlpool (Warwick's largest stockholder). The essentials of this transaction were that: (1) defendant Sanyo Manufacturing Company (SMC), a new corporation, was organized; (2) Sears retained its 25% interest in the reorganized corporation; (3) Sanyo acquired virtually all of the outstanding stock of SMC other than that held by Sears; and (4) Sears and SMC entered into a contract by which Sears agreed to purchase at least 70% of its console color television requirements from SMC, provided SMC's prices and features were competitive.[249]

Zenith has alleged that Warwick was debilitated by the "whip-saw price tactics" that Sanyo and Toshiba aimed at Warwick, to the point where it was vulnerable to the demands of the cartel. Zenith has, however, offered no facts, admissible or otherwise, to support this contention.

We will comment *infra* on the significance of the foregoing facts to plaintiffs' Clayton Act § 7 claims, including Sanyo's "failing company" defense. In terms of the conspiracy claims, however, we fail to see how the acquisition by Sanyo of a controlling interest in Warwick constitutes evidence of conspiratorial activity. What Sanyo acquired was not a viable company (the facts make clear that Warwick's demise was inevitable, if not already a fact), but rather a manufacturing facility. The desire of an individual defendant to improve its competitive position in the United States market by establishing manufacturing facilities here is not only consistent with unilateral behavior and self-interest, but indeed with notions of competition rather than restraint of trade.

There is certainly no evidence that Sanyo acted in concert with any of the other Japa-

---

sets which it had purchased from Warwick had doubled from 1973 to 1974 and was three times as great as its cost of honoring the warranties which it gave customers purchasing imported sets. In October, 1974, Sears' home entertainment buying department estimated that Sears would save over $9,000,000 in service costs if it could achieve on the 340,000 color TV sets Sears planned to buy from Warwick in 1975 the same low incidence of service calls it was enjoying on the imported color sets it had purchased.

**247.** Warwick had earlier discontinued its monochrome (black and white) TV operations.

**248.** Warwick was unable to make a number of television sets in which Sears was interested.

**249.** The agreement was for a three year period with automatic renewal on an annual basis subject to notice of termination by either party.

nese defendants in connection with the Warwick acquisition. As for Sears, its self-interest was served by continuing Warwick as a viable entity for two reasons. First, Sears' financial interest (stock ownership and notes payable) was thereby protected. Secondly, a domestic facility remained as a potential source of supply. There is simply no evidence to support plaintiffs' claim that the Warwick acquisition was yet another link in the chain of defendants' "unitary" conspiracy; all plaintiffs have adduced is speculation.

### 4. *The Sanyo-Fisher Acquisition*

Fisher Corporation (Fisher) is engaged in the production and sale of stereo and audio equipment in the United States. It was acquired in 1969 by Emerson Electric Company of St. Louis, Missouri,[250] and was subsequently acquired from Emerson by the Sanyo interests.[251] The FPS contains a list of Sanyo, Emerson, and Fisher personnel who discussed the acquisition, as well as various financial and organizational data with respect to Fisher, whose gross sales in 1974–1975 were estimated by it to be in the $28 to $35 million range. But other than basic background data, the plaintiffs, in their FPS, tell us nothing about the impact of the transaction except to allege that the acquisition immediately eliminated a competitor of Sanyo, increased Sanyo's share of the United States consumer electronics market, integrated the former Fisher facilities with "highly vertically integrated production facilities" in the Far East, and increased concentration in the United States CEP market. More precisely, plaintiffs have told us nothing specific about the impact of the transaction on Zenith or the U.S. stereo market.

We will explain in Part VIII.B., *infra*, that plaintiffs have offered virtually no evidence in support of their stereo claims. We extend this discussion only to note that the acquisition of Fisher by the Sanyo interests is in no wise demonstrated to have even the vaguest connection with the overall "unitary" conspiracy. There is no evidence of concerted activity; there is no indication that the acquisition was other than in Sanyo's self-interest, stemming from its desire to improve its competitive position in the stereo market. There is only speculation.

### 5. *The Philips-Magnavox Acquisition*

N.V. Philips Gloelampenfabrieken, incorporated in the Netherlands, is one of the world's largest industrial corporations. Though highly diversified, Philips is heavily involved in the manufacture and sale of consumer electronic products, including television receivers. Philips' American subsidiary, North American Philips Corporation, is a large corporation which manufactures and sells a large variety of products, including certain products imported from Philips in the Netherlands. The plaintiffs take some 75 pages of their FPS to tell us that (1) the Philips interests were seeking to acquire a U.S. television manufacturer; (2) at one time they considered the acquisition of Zenith; (3) Magnavox's market situation and corporate well-being were deteriorating; and (4) Magnavox was ultimately acquired by North American Philips Development Corporation, a subsidiary of North American Philips Corporation created for the purpose of acquisition of the Magnavox stock, in a transaction that was financed by Philips itself.

That is all plaintiffs tell us about the acquisition except to suggest that it somehow corroborates the worldwide scope of the alleged conspiracy because of certain "cooperation agreements" between Philips and Matsushita, discussed in Part VIII.C., *infra*. Plaintiffs intimate that although Philips had been interested in acquiring Motorola, and although Matsushita had been interested in acquiring Magnavox, they had adopted a "hands off" policy towards each

---

**250.** Emerson Electric Company of St. Louis is unrelated to the Emerson Radio Co., NUE's predecessor.

**251.** The acquisition was divided among Sanyo Denki (the parent manufacturing corporation), Sanyo Trading (the Japanese sales corporation), and Sanyo Electric Trading Company, Ltd. (the American sales subsidiary).

other's "turf" after the other's intention became known. There is, however, no admissible evidence offered to support this contention.

Plaintiffs have made a number of allegations, against the background of the Philips-Matsushita "cooperation agreements," *see* Part VIII.C., *infra*, which they apparently have injected into the Philips-Magnavox acquisition section of the FPS to elevate the significance of the transaction. First, plaintiffs allege that Philips and Matsushita "consulted on their respective plans with respect to consumer electronic product manufacture and sales in the United States." However, the documents which plaintiffs reference in support of this allegation (MIH 029201–210) are in the document depository only in Japanese. Plaintiffs have alleged that Philips and MEI conferred from time to time concerning the marketing strategy to be employed with respect to the sale of products manufactured by Matsushita Electronics Corp. (MEC). But that would not be improper, for MEC was a joint Philips-Matsushita venture, not shown to be itself unlawful. Finally, plaintiffs cite a document (MIH 029415–17) which is not in the document depository, but which, according to the copy furnished in one of plaintiffs' submissions to the court, does nothing more than evince the friendship between Philips and Matsushita and speak amorphously about having a positive long-term relationship. This adds nothing to plaintiffs' case, nor to the significance of the Philips-Magnavox acquisition.

We shall not extend this discussion by a lengthy summation. Suffice it to say that, just as in the case of the acquisitions discussed in the preceding sections, there is no evidence of concerted action; the transaction appears to have been unequivocally in Philips' own best interest; and there is nothing here from which an inference (as opposed to speculation) of conspiratorial activity can be drawn. Indeed, there is nothing here which links Philips in any way to the alleged conspiracy.

6. *Plaintiffs' Claims About Establishment of United States Manufacturing Facilities by the Japanese Defendants*

Plaintiffs contend that the Japanese manufacturing defendants furthered their conspiracy to take over the American CEP market by establishing manufacturing facilities in the United States. Although they devote approximately thirty pages of their FPS to this aspect of the matter, what emerges is the following. In 1972, Sony established a manufacturing facility in San Diego, California. By virtue of the Quasar acquisition, Matsushita obtained manufacturing facilities in Franklin Park, Illinois and Caguas, Puerto Rico. By virtue of the Warwick acquisition, Sanyo obtained a manufacturing facility in Forrest City, Arkansas. In 1978, Melco constructed a manufacturing facility in Irvine, California, and one in Los Angeles, California. In 1978, Toshiba constructed a manufacturing facility in Lebanon, Tennessee, and, in 1979, Sharp constructed a manufacturing facility in Memphis, Tennessee.

This very review reflects the random nature of the complained of acquisitions, negating any claims of parallel, much less concerted, activity. These acquisitions are incontrovertably in furtherance of the interest of the company establishing the facility, giving it a better position in the American market, thus enhancing competition.

In sum, we fail to see how plaintiffs' claims concerning defendants' establishment of manufacturing facilities can in any respect be used as a basis for drawing an inference of conspiratorial activity.

O. *Plaintiffs' Evidence Concerning "Defendants' Systematic Price Discrimination in the U.S."*

Plaintiffs devote over 100 pages of their FPS to what they describe as "Defendants' Systematic Price Discrimination in the U.S." This segment consists of page after page of schedules purporting to reflect prices of U.S. sales subsidiaries of the Japanese manufacturing defendants to their various customers and comparisons of sales analysis reports to price lists. The latter

documents purport to analyze invoices produced in discovery and demonstrate that similar goods were sold to different customers for different unit prices. The ultimate thrust of plaintiffs' claims as to each of the sales subsidiaries, as exemplified by the following passage concerning MECA, is that the:

> price lists, price schedules, sales bulletins, promotional bulletins, sales analysis reports, sales invoices and sales allowances establish that MECA regularly sold its models of consumer electronic products at prices substantially lower than the prices for such models set forth or disclosed in MECA's answers to plaintiffs' interrogatory Nos. 45 and 46 and supplemental interrogatory Nos. 10 and 11.... Further, MECA's price lists, price schedules, sales bulletins, promotional bulletins, sales analysis reports, sales invoices and sales allowances prove that MECA regularly charged substantially lower prices to its large, preferred customers and chain stores than defendant charged to its regular dealers for identical models of its consumer electronic products.

Plaintiffs contend that this material is evidence of the "unitary" conspiracy.

The material contained in these FPS pages constitutes the basis for Zeniths' Robinson-Patman Act claims discussed in Part X, *infra*.[252] We point out there, *see* n.394, *infra*, that there are serious problems with plaintiffs' proof. We highlight in that discussion defendants' contention that Zenith has failed to provide proof of certain jurisdictional elements required by the words of the Robinson-Patman Act. Various defendants claim, for example, that Zenith has not come forth with sufficient evidence of at least two contemporaneous sales of comparable merchandise to at least two different purchasers. They argue that Zenith does not have evidence of actual sales prices, as opposed, for example, to list prices, and that only actual sales prices will support a Robinson-Patman claim. They also contend that the instances of price discrimination in plaintiff's FPS are in any event *de minimis*.

The Matsushita defendants claim that Zenith has failed to show that the commodities were sold for use or resale within the United States. We have examined these contentions and have found that in most, though not in all, instances, they were well-founded.

██ It is plain that there is no evidence of any logical connection between the supposed price discrimination and the "unitary" conspiracy, even if there is some cognizable evidence of price discrimination. First we note that there is no evidence of any collusion in connection with alleged price discrimination. Plaintiffs have adduced no direct evidence of collusion in pricing, and the documents described in plaintiffs' FPS show widely disparate patterns. We have been cited to no authority supporting the proposition that disparate conduct gives rise to evidence of conspiracy. Second even assuming parallel conduct, there is no suggestion that such price discrimination as may have existed was contrary to the interest of the seller. It does not militate against the self-interest of a seller to regularly charge substantially lower prices to its large preferred customers and chain stores than to other regular customers for identical models of CEP's. Such conduct reflects rational independent choice, not conspiracy. The plaintiffs thus "fail" the *Bogosian/Venzie* test. Finally, there is an absence of focused evidence of sales to other types of customers below the prices set forth in defendants' answers to plaintiffs' interrogatories 45 and 46(c). The random nature of the evidence and the lack of any focus totally precludes any contention that the defendants' price discrimination in the U.S. is evidence of the "unitary" conspiracy.

P. *Plaintiffs' Contentions Based Upon the "Undisputed Facts and Legal Propositions" Identified by Plaintiffs' Counsel in the Course of Summary Judgment Argument on August 28, 1980*

As we have earlier observed, we invited counsel to take as much time as they wished

---

**252.** NUE has filed no Robinson-Patman Act claims.

during the final summary judgment arguments in August, 1980 to pull out of the massive piles of documents which constitute the sinews of plaintiffs' case those documents which demonstrate the presence or absence of a genuine issue of material fact. Defendants' counsel accepted our invitation, notwithstanding the added challenge of proving a negative. As we have said, they spent four days reviewing and analyzing plaintiffs' critical documents. Plaintiffs' counsel, Mr. Rome, however, declined the invitation, instead devoting the bulk of his argument to what he described as "undisputed facts and legal propositions." Indeed, with what we might call a touch of bravado, Mr. Rome stated that he was content to rest his case in opposition to defendants' motions on those undisputed facts and legal propositions which he proceeded to elucidate.[253]

Despite Mr. Rome's offer, we plainly do not rest our decision of these summary judgment motions upon analysis of the success or failure of his argument from "undisputed facts and legal propositions." However, in view of the fact that Mr. Rome devoted most of his final summary judgment argument to this approach, and also because it is useful as a kind of "retrospective," we shall take up plaintiffs' argument from these alleged undisputed facts and legal propositions.

Preliminarily, we note that it is not correct that all of the listed facts are undisputed. Many of the facts asserted by Mr. Rome to be undisputed are not even supported by the record, and many of the alleged facts are gleaned from inadmissible evidence. However, except as otherwise noted, we will assume lack of dispute and admissibility for purposes of this analysis. Plaintiffs' list of undisputed facts and legal propositions is as follows:[254]

1. The defendants have colossal wealth and combined financial power, are engaged in extensive lines of business, and have a huge sales volume.

2. There are interlocking officers and directors among the defendant groups, including mutual stock ownership, financial guarantees and loan arrangements, control and dictation of decisions by the parents, and absorption by the parents of losses of U.S. subsidiaries.[255]

3. Mr. Yamaguchi was selected by the President of Melco in 1974 to become the head of MSI.

4. Personnel are exchanged among parent and subsidiary companies.

5. The Japanese defendants are members of the EIAJ, JMEA, and many other groups and committees, and designated representatives at all levels within each company attended meetings of numerous groups and committees.

6. Various defendants attended meetings of these intercorporate groups and committees consistently over extended periods of time.

7. Defendants themselves have admitted in answers to interrogatories and in documents that they discussed and exchanged information on production, shipment, inventory, and other business data.[256]

---

**253.** Mr. Rome's argument was amplified in Plaintiffs' Supplemental Post-Argument Memorandum in Opposition to Defendants' Motions for Summary Judgment, filed September 22, 1980, from which we draw the list of undisputed facts and propositions which follows.

**254.** We ignore several "legal propositions" contained in the list because they are germane only to the Act of State and Sovereign Compulsion defenses which we do not reach.

**255.** Defendants do not concede control and dictation of decisions. Nor do they concede absorption of losses. (The record is clear that many of the subsidiaries were profitable.)

**256.** These facts are not admitted in the expansive sense in which they are stated, *see* discussion at Part VII.G, *supra*. This statement is followed in plaintiffs' "undisputed facts" presentation by some four pages of citations to documents, a number of which have already been held to be inadmissible in the Japanese Materials Evidentiary Opinion. These documents supposedly reflect conspiratorial meetings, but add nothing to our discussion at Part VII.G, *supra*, about the activities of groups and associations in Japan.

8. "The Japanese defendants met and discussed their acting together concerning the penetration of the U.S. market and they put it all down in written documents, actually signed by the head of companies each year over many years." [257]

9. Copies of the "cartel agreements" went to the Japan Light Machinery Information Center in New York, of which the defendants' U.S. subsidiaries and related companies were members.

10. The defendants' coordinated pricing was intended to be applicable to the United States market. [258]

11. The Japanese defendants agreed to allocate customers among themselves by means of the Five Company Rule and the customer registration provisions. [259]

12. No Japanese manufacturers other than Toshiba and Sanyo were the historical suppliers of Sears.

13. The Manufacturers' Agreements were recognized as cartels by the OECD, an internationally recognized entity.

14. The "cartel agreements year-by-year report, with satisfaction and pride on the part of the signatories, the enormous increase in their sales of televisions in the United States."

15. The number of United States companies involved in this industry has dwindled significantly during the same period of time covered by these "cartel agreements." At least 20 companies, including NUE, left the field, throwing out of their jobs literally tens of thousands of employees. Moreover, RCA and General Electric have sustained substantial losses in their television business.

16. The "cartel agreements" were being discussed by the participants at the same time the JFTC was pursuing the Six Company Case.

17. Mr. Nishi, a senior official of Hitachi, stated that the success of the Japanese industry in the U.S. had been achieved entirely on their own without government assistance.

18. Defendants agreed upon a check price for items destined for sale in the United States, and this price was knowingly used by defendants to conceal the actual price. [260]

19. Defendants systematically sold at prices "substantially below the dumping levels of the check prices." [260A]

20. The statements in the "cartel agreements" are admissions by each of the heads of the Japanese defendant companies who signed them.

21. "Fourteen of the great men of the Japanese consumer electronics industry who signed the cartel agreements year after year" did not file any affidavits in this proceeding.

22. "There are literally at least 200 other individuals, who attended the various meetings of the conspiratorial groups, who have not signed or filed any affidavits in this case." [261]

23. "There is a strange, suspicious and unexplained absence of notes, minutes, memoranda, and other documentation relating to most of the defendants' meetings at the conspiratorial groups." [262]

257. This refers to the Manufacturers' Agreements and their "Rationales" discussed at Parts VII.F.1 and VII.I, *supra.*

258. This "fact" is disputed and unsupported. *See* Parts VII.K. and L, *supra.*

259. This "fact" is disputed and not supported. See Part VII.F.2, *supra.*

260. Knowing concealment is denied.

260A. This "fact" is disputed.

261. Plaintiffs thereupon go on for some 13 pages listing individuals who attended meet-

ings of the various groups and associations in Japan who have not signed or filed any affidavits. Plaintiffs fail to mention that they at no time sought to depose any of these individuals.

262. Plaintiffs thereupon provide the following partially annotated list of groups that met regularly and for which no minutes or documents were produced by the defendants:

Four Associations Conference—2 meeting minutes produced

—met once every 2 months

Twentieth Day Group

24. The JFTC investigated both horizontal and vertical price fixing agreements covering certain CEPs in Japan, growing out of the pricing activities of certain of the Japanese defendants.[263]

25. The National Women's Consumer Organization in Japan organized a boycott of the Japanese television manufacturers in Japan.

26. Meetings of the leading Japanese defendant manufacturers were held to discuss a concerted reaction to the consumer boycott, and as a result of these meetings, prices were lowered in the home market.[264]

27. Incident to Motorola's deal with AIWA it was publicized in Japan that Motorola's TVs were to be marketed through AIWA and were going to be sold for as much as 150,000 yen under the prices then prevailing in Japan.

28. A condition of Matsushita's deal to buy Motorola's color TV assets was the requirement that Motorola withdraw from the deal with AIWA and not sell its sets in Japan.

29. An internal memo of Motorola's states that the announced reasons for ending the AIWA deal were false.[265]

MD Group—some agenda—no minutes
Palace Group
TS Group
Palace Preparatory Group
Okura Group
Japan Light Machinery Information Center
TV Export Council (several)

Defendants, needless to say, reject the plaintiffs' innuendo.

263. The defendants deny price fixing in Japan. *See* Part VII.G, *supra.*

264. Plaintiffs asserted in the final summary judgment argument that the 1970 consumer boycott in Japan demonstrates that CEP prices were high and that the boycott caused a reduction in those prices. The record contains no competent evidence of the consumer boycott. At all events, the supposed opinions of anonymous Japanese consumers could not be admissible on both hearsay and other grounds to prove the alleged high price conspiracy.

At the argument we asked the plaintiffs to support their claim that domestic prices were actually lowered as the result of the consumer boycott and, if so, to demonstrate whether it

30. Manufacturers had television plants in Korea and Taiwan, and the output of those factories was exported to United States and not to Japan.[266]

31. The Japanese manufacturers admitted and agreed in the cartel agreements that if they were to sell in the United States below the so-called "check-price" or "minimum price" it would disrupt the United States market and "there is also no dispute that defendants' counsel in last week's argument acknowledged the fact."[267]

32. There is no affidavit from any defendant manufacturer to the effect that they sold in the United States only at the check price.

33. The failure to report the actual prices of a transaction on a United States Customs Form No. 5515 is a violation of the United States laws.

34. The United States Customs Form No. 5515 were falsified by at least some of the defendants; some of the United States subsidiary defendants acted at the direction of their parent companies as conduits for the payments of rebates; some of the Japa-

was the defendants or retailers who did the lowering. In their responsive brief, plaintiffs claimed that both retailers and manufacturers lowered their prices, but there are no translated documents in the depository to support this claim. This argument is at best a make-weight.

265. This statement is misleading, and is not supported, as stated, by the record.

266. According to plaintiffs' theory, advanced in their supplemental briefs, defendants took advantage of the lower offshore labor costs in order to increase their production capacity sufficiently to flood the U.S. market with cheap CEPs. Such moves, however, are as consistent with a theory of intense competition as with anti-competitive activity, and do not logically point to conspiracy. We did not deem this point worthy of a special section of this opinion and simply note it here.

267. This "undisputed fact" is based upon an alleged statement of Matsushita's counsel, Mr. Millstein, during the summary judgment argument, but it mischaracterizes Mr. Millstein's statement.

nese parent companies at the request of their subsidiaries transmitted funds or otherwise aided and abetted the payment of rebates; the non-disclosure of the rebates and the falsification of the 5515 document resulted in the payment of a higher Customs duty on the imported goods; and the higher Customs duties were less than the dumping duties which might otherwise have been imposed.

35. There is no affidavit from any cartel signatory of any Japanese company, other than Mr. Morita (of Sony), attesting that he has personal knowledge that his company did not rebate and that he had no knowledge that other defendant companies were rebating.

36. "One would not normally pay a higher Customs duty unless there was some secret purpose to be served, a purpose which by its secrecy we suggest is necessarily a fraudulent one."

37. Mr. K. Matsushita gave an interview concerning a meeting in which he said, "It is important that top leaders of enterprises hold talks and get the whole industry to act in concert"; and further

> To overcome, this difficulty, today, it is important, first of all, that top leaders of enterprises hold talks and get the whole industry to act in concert ... top level conferences—the first of the kind in the appliance industry—were started last year at my suggestion for the purpose of achieving cooperation and stabilization in the industry through the good sense of all those concerned. In this way, we are striving to seek a way out of the present difficulties.

38. In 1964, Akio Morita, Chairman of the Board of Sonam and President of Sony, said to Joseph Sullivan (then a sales manager for Sonam):

> "Sullivan-san, militarily we could never defeat the United States. *But economically we can overcome the United States and become No. 1 in the world.*" (emphasis supplied).

39. No defendant filed an affidavit contending that the Japanese manufacturers sold at the same price in the United States at which they sold in Japan.

40. Additional costs are involved for a Japanese company seeking to sell its product in the United States. It would normally be concluded, therefore, that the export price would be higher because of packaging, shipping, ocean freight, insurance, and Customs duty.[268]

41. A company would not normally pay any higher taxes than it is obligated to pay. The Japanese Commodity Tax is based upon the selling price disclosed by the defendants. Therefore, defendants would not normally overstate their selling price. To do so would be to overstate the basis for calculation of their tax obligations. Therefore, the commodity tax information is a permissible and acceptable source for price information.[269]

Because we have covered virtually all of these points in our previous discussion, and because the ones that we have not covered are of no significance, we shall not extend this opinion with seriatim comment on the "undisputed facts and legal propositions." We do, however, make several points. First, the foregoing litany is remarkable for the number of instances in which plaintiffs argue from the *failure* of defendants to come forth with affidavits, even though, in the present posture of this case, that is not their burden. Secondly, it is clear beyond cavil that this presentation adds nothing to what we have already analyzed and that the "undisputed facts and legal propositions" are not sufficient to get the plaintiffs

---

**268.** Plaintiffs spend a number of pages of their FPS documenting secret rebates paid to defendants by ocean carriers enabling defendants to ship their CEPs at rates below those provided by law, thus obtaining, in plaintiffs' submission, an unfair competitive advantage. But the "extraction" of rebates from shippers does not point to the existence of a conspiracy; at the

least it is equally consistent with intense competition. We fail to see how this theory in any way contributes to plaintiffs' case. We did not deem this point worthy of a special section of this opinion, and simply note it here.

**269.** *See* discussion in Expert Testimony Opinion at 1356.

beyond the motions for summary judgment. Indeed, it would be incredible if claims of the magnitude asserted by the plaintiffs could rest on such a flimsy foundation. The fact that plaintiffs relinquished the opportunity afforded them during final summary judgment argument to spend unlimited time detailing how the documents or other evidence they have proffered could create a genuine issue of material fact and instead devoted their time to a discussion of these "undisputed facts and legal propositions" reflects the bankruptcy of their case.

### Q. Evidence of the Participation of Individual Defendants in the Conspiracy

#### 1. Introduction

In order for plaintiffs to survive the motion for summary judgment as to any given defendant with respect to the conspiracy aspects of their claims, they must come forward with evidence not only of the existence of a conspiracy to restrain trade, but also of the membership of that defendant in the conspiracy. Accordingly, in the final major facet of our evidentiary review of plaintiffs' Sherman Act § 1 and Wilson Tariff Act conspiracy claims as to television receivers we consider and assess the evidence against each individual defendant advanced to show that defendants' complicity in the alleged scheme.

Prior to commencement of the pretrial evidentiary hearings, we were confronted time and again with the defendants' contention that plaintiffs had consistently lumped all of the defendants together, and had not identified evidence discrete as to each defendant which linked that defendant to the "unitary" conspiracy.[270] The plaintiffs rejoined that their evidence applied to

all of the defendants because they were all involved in the same conspiracy, and that plaintiffs' proffered items of evidence would, if admissible, apply to more than one defendant. That is certainly so in many instances, as in the case of the JFTC testimony. Many other items of evidence are common to many defendants, such as participation in the export control arrangements. Having in mind that we have already discussed all of plaintiffs' primary evidence, we will focus here on matters specially relevant to each defendant. In view of the length of the opinion, we will make the summary as brief as possible.

Before commencing this task, a word is in order about the use of coconspirator declarations, for it is plain that the success of plaintiffs' trial strategy depends at least in part upon the admission under F.R.E. 801(d)(2)(E) of numerous pieces of evidence against all of the defendants on the theory that they are declarations of coconspirators. We explained in section VI.D.6, *supra*, the requisites for admissibility of coconspirator declarations. If we find by a preponderance of the evidence independent of the coconspirator statements that a conspiracy exists among the declarant and the defendant against whom the statement is offered, the coconspirator statements will be admissible, and must be considered as part of the record in determining whether a genuine issue of material fact exists as to any given defendant. This preliminary determination will be made *infra*; our consideration in this section of the evidence of the participation of the individual defendants in the conspiracy will help lay the foundation for that determination.

---

**270.** There is no doubt that this was the theme most frequently voiced by defendants' counsel throughout the issue development and pretrial management phases of the case. Our acceptance of the legitimacy of that plaint is embodied in a provision of Pretrial Order 154 which provides in ¶ III.C:

> In view of the primacy of the conspiracy claims in plaintiffs' case and defendants' counterclaims, the FPS shall itemize all overt acts to be proved at trial. In particular, the FPS shall enumerate with specificity the

facts (i. e., the evidence *aliunde*) upon which they rely to prove that each defendant (including counterclaim defendant) or other entity knowingly joined in the alleged conspiracy and all facts, separately as to each defendant, upon which they rely as to each defendant's participation in the alleged conspiracy. Where any facts will be offered against fewer than all parties, the FPS shall identify the parties against which the facts are or are not offered.

Our review of the evidence of participation of individual defendants in the conspiracy will commence with the evidence concerning the six companies (MEI, Toshiba, Hitachi, Sanyo, Sharp, and Melco, in that order) who were defendants in the Six Company Case. In conjunction with this summary, we will also describe the plaintiffs' evidence (or lack of it) against those subsidiaries of the six companies that have also been named as defendants. Since the vast bulk of the evidentiary review already conducted relates to the six companies, our task will be simplified, for that material can be incorporated by reference here. We will discuss the Matsushita defendants in the greatest detail. The length of that discussion will make it possible to abbreviate the others.

We shall then take up the evidence as to Sony, which contends that it sold in the United States market at the highest prices, and therefore could not logically be charged with membership in a predatory low price export conspiracy. Next, we shall take up the evidence against MC and MIC, which did not manufacture CEP's, but rather purchased Japanese CEP's for resale, *inter alia*, in the United States market.

Turning to U.S. companies, we shall take up the evidence as to Sears, which imported Japanese CEP's, and that with respect to Motorola, which on at least one occasion also imported Japanese CEP's. In these respective subparts we shall also discuss plaintiffs' claims against Sears and Motorola arising out of their respective roles in the acquisitions by Sanyo and Matsushita, respectively, of U.S. companies. We shall conclude our review of the evidence of participation by individual defendants in the conspiracy with some comments about

plaintiffs' claims against subsidiaries of the Japanese manufacturing defendants. In the case of each defendant, our evidentiary review will be followed by comment as to the legal sufficiency of plaintiffs' evidence measured against the legal principles that have already been outlined.

### 2. *The Matsushita Defendants*

■■■ We begin the discussion of the plaintiffs' evidence as to the various entities constituting the Matsushita interests by taking up the parent company, Matsushita Electric Industrial Co., Ltd. (MEI).[271] We will then turn to Matsushita Electric Trading Company, Ltd. (MET), MEI's Japanese sales subsidiary; Matsushita Electronics Corporation of America (MECA), MEI's U.S. sales subsidiary; and Matsushita Electric Corporation (MEC), the MEI-Philips joint venture.[272]

### (a) *MEI*

The evidence of any potential significance proffered with respect to MEI consists essentially of the following: (1) documents reflecting its participation in the check price agreements and in the activities of the various groups and associations in Japan; (2) the JFTC materials; (3) the "connection" documents which allegedly show some relationship between MEI's domestic and export prices and activities; (4) the "intent" documents; (5) documents reflecting attendance at meetings concerning possible responses to the 1921 Antidumping Act proceedings; and (6) miscellaneous matters, including the Motorola acquisition and the arrangement with Philips concerning MEC. We take these up in the order mentioned.

MEI admits to having been a party to the MITI-related export control arrangements,

---

**271.** We shall not attempt here to rescribe the conclusions set forth at length in earlier segments of this opinion as to plaintiffs' lack of evidence of conspiracy, even though some of that discussion pertains to the Matsushita defendants. We incorporate our earlier discussion by reference and address here only those evidentiary matters specially relevant to the Matsushita defendants.

**272.** Quasar Electronics Corp., a fifth Matsushita defendant, is involved only in the transactions surrounding its acquisition by MEI, which we have discussed in Part VII.N.2, *supra*, and is at most a passive figure in this case. We incorporate that discussion here by reference, and note that there is no evidence anywhere in the record to link Quasar to the alleged conspiracy. Plaintiffs' meritless Clayton Act § 7 claims against Quasar are addressed in Part XI, *infra*.

and to membership in the JMEA, the T.V. Export Council, and the EIAJ. However, as we have seen, the plaintiffs were not injured by, hence have no standing to assert, a claim based upon minimum price agreements or the Five Company Rule. In any event, plaintiffs have adduced no direct or circumstantial evidence that the export control arrangements or group activities were part of any low price export conspiracy.

Turning to the materials from the Six Company Case, we ruled in the Japanese Materials Evidentiary Opinion that, except for certain export references, the JFTC testimony of witnesses employed by the six companies was admissible under F.R.E. 804(b)(1) against the six companies who jointly defended the Six Company Case. With respect to "export references" we held that the testimony would be admissible only against the witness's employer. Four MEI employees testified: Mitsuo Tsuruta, Hiroyuki Oshima, Takuma ("Ta") Fujio, and Tsuyoji ("Tsu") Fujio. The only export references were in the testimony of the two Fujio's, but those references contain no suggestion of a low price export conspiracy or of any other conspiracy. Rather, they state that "the price on the American market is balanced with the price in Japan."

In terms of the home market aspect of the "unitary" conspiracy, and for the reasons explained in our discussion thereof, see Part VII.G.2.(b), supra, the testimony of the various witnesses in the Six Company Case, including those employed by MEI, was not probative of the alleged high price conspiracy in Japan. Nor is there anything in the testimony of any of the witnesses upon which an inference of "war-chesting" could be built. Indeed, the only reference to profitability at all was a comment by Mr. Tsu Fujio that profits in the Japanese CEP industry were very low (DSS 61).

We held in the Japanese Materials Evidentiary Opinion that protocols are admissible only against the employer of the person who gave the protocol. No MEI employee gave a protocol; hence no protocols are admissible against MEI. Similarly, we held that diaries seized by the JFTC would be admissible only against the employer of the diarist. The only diary entries by an MEI employee are short excerpts from the Tokizane diary, DSS's 56 and 57. However, the Tokizane diary was held to be inadmissible. See Japanese Materials Evidentiary Opinion at 1285–1286.[273]

Plaintiffs' proffers from two other cases before the JFTC—the recommendation decision in the Market Stabilization Council case and the consent decision and other materials from the Matsushita Retail Price Maintenance case—were held to be inadmissible in our Public Records Opinion; hence they cannot add to plaintiffs' case.

We described in Section VII.H, supra the so-called "connection" documents which allegedly demonstrate a connection between the so-called domestic and export aspects of the "unitary" conspiracy. In our description we explained that the bulk of the "connection" documents are either inadmissible or are not probative of any relationship between the domestic and export markets. Several of the "connection" documents were directed at MEI. The most notable among them, the Japan Victor document, was dealt with at length (at 1303–1310) in the Japanese Materials Evidentiary Opinion, where we held it to be unauthenticated and inadmissible on a number of grounds. The additional export references set forth by plaintiffs' counsel in the February 12, 1980 letter, see n. 152, supra, are no more availing. That letter set forth countless references from the Six Company Case, the vast bulk of which were ruled inadmissible in the Japanese Materials Evidentiary Opinion. None of those materials link MEI to an export conspiracy.

Plaintiffs rely heavily upon the meetings of counsel concerning the Treasury Department's 1921 Antidumping Act proceedings. The only evidence concerning MEI's activi-

---

**273.** We note that, in any event, the portion of the Tokizane diary relied upon by plaintiffs

does not advance their conspiracy claims.

ties in this area are third-party memoranda relating to discussions among counsel concerning tactics for dealing with the antidumping proceeding and other third-party internal documents relaying hearsay information about the antidumping proceedings which make passing reference to a Matsushita strategy. DSS 1266 contains documents concerning an alleged agreement between J. C. Penney and MEI to split costs and legal fees arising out of the defense of the dumping proceedings. There are, as we suggested earlier in our discussion of the so-called rebate scheme, *see* n. 211, *supra,* serious problems of admissibility with many of these documents. They are tainted by primary hearsay and laden with internal hearsay. However, the short of it is that, admissible or not, these documents do not offer evidence probative of collusive behavior. As we explained in Part VI.A.8, *supra,* an attempt to work out a common response to a common legal problem does not establish the existence of a conspiracy, and is protected activity. In sum, none of the "connection" documents or those relative to the defense of the 1921 Act proceedings serve to link MEI to the alleged "unitary" conspiracy.

We discussed the "intent" documents at Part VII.I, *supra.* As that discussion demonstrates, those documents, insofar as they are admissible, are meaningless, or at least totally non-probative in establishing the "unitary" conspiracy alleged by plaintiffs. The documents offered to show the intent of MEI are statements purportedly made by K. Matsushita and M. Matsushita appearing in "Denshi" (DSS 112) and an excerpt from the diary of an unknown person that purports to relate the remarks of an unidentified chairman of MEI's board (presumably K. Matsushita) (DSS 116). These documents are not probative of conspiracy, or at least no more so than the statements of Zenith's officials, *see* pp. 1232–1233, *supra,* relative to their desire to improve their business and increase their market share.

Plaintiffs' supplementary *in limine* list contains a potpourri of documents referring to MEI, mostly relating to the Quasar acquisition and to MEI's meetings with Phil-

ips concerning the business of the MEI/Philips joint venture, MEC, which we will address in our discussion of plaintiffs' evidence as to non-TV products in Part VIII, *infra.* None of these documents support plaintiffs' conspiracy claims. ZSX–0021, a 1971 Sanyo memorandum, reports that the president of "Matsushita Electric" complained to Sanyo about prices which he believed were too low. MOT 2507, a 1964 Motorola "trip report," suggests that Motorola attempted, apparently without success, to induce MEI to lower its TV tube price in order to meet the competition. Ex. Westinghouse 12 is a series of memoranda and charts depicting widely varying price quotations that Westinghouse had obtained from many different Japanese manufacturers, including MEI. We need not go so far as to say that these documents establish the existence of competition, although we might; at least they do not tend to establish the existence of a conspiracy between MEI and the other defendants.

Other than the foregoing, there is no evidence in the record of any potential significance as respects MEI. We find that fact revealing, for MEI is the largest consumer electronic products manufacturer in the world, and Konosuke Matsushita, its founder and chairman, is alleged by the plaintiffs, *see* p. 1232 *supra,* to be the prime architect of the domestic strategy which led, in plaintiffs' submission, to the "unitary" conspiracy complained of herein. And yet, when we turn from allegations to hard evidence, we find that plaintiffs' evidence against MEI amounts to nothing; certainly there is no significant probative evidence of MEI's participation in the "unitary" conspiracy.

#### (b) *MET*

MET is MEI's domestic trading subsidiary. Plaintiffs point first to MET's participation in the export control arrangements and in trade association activity. MET's involvement, however, is minor compared to that of MEI. Since, as we have seen, there is no probative evidence arising out of these arrangements or participation in the vari-

ous groups and associations which implicates MEI (or any other defendant) in the alleged conspiracy, *a fortiori* there is none as to MET.

Secondly, plaintiffs point to individual rebate transactions between MET and its private label customers, J.C. Penney and W.T. Grant. Many of the documents offered by plaintiffs to show MET's rebating practices are transactional documents which relate to private label sales.[274] All plaintiffs have thus advanced, however, is a group of documents which show, at most, the existence of individual rebate transactions. MET has conceded that it paid rebates.[275] As we have explained above, that does not create a genuine issue of material fact in this case. What would be significant is concerted rebate activity, but plaintiffs have produced no evidence that MET (or any other Matsushita defendant) engaged in any actionable collusive rebate activity.

Plaintiffs also ground their case against MET on the fact that it is a subsidiary of MEI, with interlocking directorships. Indeed, this theory is advanced by plaintiffs with respect to each subsidiary of all the principal Japanese defendants named in the complaint. Most defendants concede the subsidiary and interlocking directorship status, but vigorously argue that far more is needed to establish participation in a conspiracy by a separately incorporated subsidiary. We shall describe our approach to plaintiffs' agency and "functional alter-ego" theories in Part VII.Q.12, *infra,* and shall not, until then, separately mention this aspect of plaintiffs' claim against each subsidiary. At all events, there is plainly no evidence, direct or circumstantial, of MET's individual participation in the conspiracy.

### (c) *MECA*

MECA is MEI's U. S. sales subsidiary. The case against MECA consists principally of (1) its alleged rebates and knowledge of MET's rebates; and (2) miscellaneous matters.

Once again, all that plaintiffs allege with respect to rebates is individual rebate transactions. For example, in its answers to interrogatories[276] MECA stated that in 1969 and 1970 Magnavox demanded that MECA retroactively cut its TV prices if it wanted to obtain any future business from Magnavox. As a result, MECA refunded to Magnavox $46,000, some of which is reflected in document MA 33722–6 on plaintiffs' supplementary list. Similarly, plaintiffs invoke MA 031001–12, transactional documents and correspondence relating to MECA sales to Philco; these are also offered to show rebates. MECA argues that, as a U. S. company, it is not bound by the check price, and that therefore these transactions cannot even be characterized as rebates designed to circumvent the export control arrangements. Although MECA

---

274. For example, DSS's 1267, 1268, 1269, and 1271 are MET documents identified in MET's interrogatory answers pursuant to Fed.R.Civ.P. 33(c). Also on plaintiffs' DSS list are Penney transactional documents which relate to these transactions, including a series of documents pertaining to a single purchase contract between Penney and MEI, which plaintiffs claim show a rebate (DSS 1240–47), along with other shipping documents (DSS 1249–1260), invoices (DSS 1249–1260; DSS 1267), credit forms (DSS 1268; DSS 1269–70), 90 day letters of credit (DSS 1271), shipment schedules (DSS 1272; DSS 1401); and tooling charges and debits to private label customers (DSS 1267). There are certain additional documents contained in DSS's 1267, 1271, 1272, 1318, 1398–1400, and 1401 (MET 25724, 25726, and 25729) which plaintiffs allege indicate that items of value were given to these same private label customers. In addition, MET is alleged to have

agreed to reimburse Magnavox for dumping duties which might be imposed. *See* DSS 1316.

275. In the Supplemental and Amended Answers of MEI and MET to Interrogatory 51 of Plaintiffs' Interrogatories to Defendants, Set No. 1, MET stated that it gave the following "things of value" to private label customers: payments totalling $9,000 to the J.C. Penney Purchasing Corporation during a portion of 1967–68; acceptance of payment from Penney by 90 day letters of credit from April 1969 to September 1971; and reduction or elimination of tooling charges respecting certain television purchases by Penney (1971–73) and Grant (1971–72).

276. Supplemental Answers of MECA to Plaintiffs' Interrogatories, Set No. 1.

thus denies that it gave "rebates," whether it did is not a material fact on this motion, for, as has already been explained, even if we assume *arguendo* that rebates were given, that fact could not defeat summary judgment in the absence of evidence of collusive rebating activity.

Plaintiffs have also proffered documents, such as handwritten price sheets (DSS's 1273 and 1275) and general handwritten references to rebates (DSS 1274)[277] which they allege show that MECA had knowledge of and was involved with rebates given by MET. Assuming *arguendo* the admissibility of these matters,[278] and further assuming *arguendo* that plaintiffs interpret the documents correctly, there is still no evidence suggesting the existence of the agreement posited by the plaintiffs among the Matsushita defendants and the other defendant groups and their importer-coconspirators to grant rebates as part of a predatory low price export conspiracy.[279]

Plaintiffs have also proffered several documents for the purpose of demonstrating communication between MECA and MEI or MET concerning the check prices. However, since the prices at which MECA purchases from MET are affected by the check prices, such communication is to be expected, and is no basis for an inference of unlawful conspiracy.

Finally, plaintiffs have cited a number of miscellaneous documents: telexes concerning a customs check on MET invoices relating to J.C. Penney (DSS 1277); the text of a price assurance given to Treasury by MEI and MECA (DSS 1279); handwritten notes speculating as to what Penney is doing or should do about the dumping proceedings

---

**277.** Other documents plaintiffs cite for this proposition are: DSS 1275; MA 31001–13; ZH–48; ZB–54; ZB–54A–G, J, L; MA 033722, 23, 26; MA 019953–60; MA 029447, 29453, 29465, 29496, 33634, 33707; TPB 689–90.

**278.** DSS's 1273 and 1274 were produced by MECA in response to plaintiffs' interrogatories to MECA, *see* interrogatory No. 51, which requested MECA to indicate whether it gave credit to its customers. In answer, MECA stated that "Documents MECA has in its possession which are responsive to this Interrogatory have been made available for plaintiffs' inspection at MECA's headquarters. . . ." Plaintiffs argue that the format of the documents indicates that they are business records. The customer order numbers, model numbers, and prices in the documents were compared by Arnold Kalman, Esq., one of plaintiffs' attorneys, with other documents produced by defendants, *see* PTO 277 at 270–78. Defendants, on the other hand, state that there is no evidence as to who prepared any of the documents, no evidence that they were prepared in the regular course of business, no authentication of the documents, and that plaintiffs never took a deposition of a single MECA witness to explain the documents or lay foundation for their admissibility, and that they are therefore inadmissible on multiple grounds. We shall not, however, rule on admissibility at this time. We shall, however, note that, working with what he had, Mr. Kalman's general presentation on rebates was very impressive.

**279.** The evidence cited in the text could be read to create an inference of agreement between MEI and/or its trading company subsidiaries (MET and MECA) with respect to the granting of rebates. In fact, Mr. Brown, attorney for the Sanyo defendants, conceded during argument that, to the extent the Sanyo parent company knew of rebating practices, its trading subsidiaries shared that knowledge. This comment would apply to many of the Japanese defendants. We ignore here the pro-competitive aspect of the "rebate scheme" which we discuss at Parts VI.A(7) and VII.L., *supra*, which renders plaintiffs' rebate claims, insofar as they have evidence to support them, inoperative as a basis of liability. Rather, given the apparent knowledge of the various Matsushita defendants about rebates paid by various Matsushita subsidiaries, we consider the logical question whether plaintiffs can evade summary judgment by allegations of an intra-enterprise conspiracy within the Matsushita family. *See Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

The answer to this question is essentially twofold. First, plaintiffs have never framed their Sherman Act § 1 or Wilson Tariff Act conspiracy claims in this fashion. To so frame them now would be antithetical to plaintiffs' posture during a decade of this litigation. The integrity of our case management orders prevents plaintiffs from changing their approach to their case at this late date. Secondly, any attempt to construct the case like the spokes of a wheel, asserting that each group of defendants is engaged in a separate intra-enterprise conspiracy, would be improper. *See* discussion of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) and its progeny at note 30, *supra*.

(DSS 1278); handwritten notes concerning a meeting of counsel concerning the 1921 Act proceedings (MA 48332–379); a telex from Isomura (MEI) to Yamato (MECA) referring to an EIAJ meeting at which Penney's suit against Treasury was discussed (DSS 1276); a letter from Kamihira (MEI) to Glenn (J.C. Penney) regarding contract prices being changed from dollars to yen (DSS 1246); various Magnavox documents discussing the pros and cons of purchasing on the basis of fob Japan prices vs. fob U. S. prices, which refer to purchases from MECA (DSS's 1290, 1299, 1319, ZR 54, ZM 328, ZH 206); and telexes from an unidentified source, presumably from one of the Matsushita companies, discussing radio quotas (MA 29466), prices to be charged to MECA's customers (MA 33690, 29453, 2511), and customer information (MA 29447, 33669). We could mention others. The point is that this potpourri of documents, however, shows nothing unusual or suspicious, and goes nowhere toward establishing the existence of the conspiracy alleged in this case. There is no significant probative evidence against MECA in this record.

### (d) MEC

MEC, which was involved solely in the manufacture and sale of components, is not implicated in plaintiffs' case as to television receivers. Plaintiffs' entire case against MEC is based upon: (1) the MEI-Philips agreements discussed in Part VIII.C, *infra*; (2) documents purporting to record meetings between MEI and Philips relative to those agreements; and (3) the fact that from January to August, 1973, MEC was a party to the Electron Tube Export Control Arrangement. When we examine plaintiffs' evidence as to non-TV products in Part VIII, *infra*, we will explain that the MEI-Philips documents do not contain any evidence connecting those companies to the conspiracy alleged by plaintiffs.[280] Moreover, we have already explained, *see* Part VII.F, *supra*, that the various Manufacturers' Agreements, such as the Electron Tube Export Control Agreement, do not help plaintiffs' case.

In sum, there is no evidence against any of the Matsushita defendants which directly or circumstantially involves or gives rise to an inference of involvement of any of the Matsushita defendants in the "unitary" conspiracy charged by the plaintiffs.

### 3. *The Toshiba Defendants*

### (a) *Toshiba*

Any discussion of the evidence against Tokyo Shibaura Electric Co., Ltd. ("Toshiba") must begin with what plaintiffs, for the first nine years of this case, heralded as their "smoking gun": the Yajima diaries.[281] Seiichi Yajima, it will be recalled, was employed by Toshiba and Toshiba Shoji (Toshiba's domestic sales corporation, not named as a party to this litigation) as "Manager of the Second Section of the TV Business Department." [282] However, in the Japanese

---

**280.** For reasons explained in Part VIII.C, plaintiffs' claim that the Matsushita-Philips agreement provides an "improper" 15% discount to MEI on MEC sales of components is contrary to the otherwise monolithic theme of this litigation. The main foci of the MEI-Philips meetings, as reflected in the "minutes" cited by plaintiffs in their supplementary *in limine* list, were general world-wide market trends and a study of the possibility of involving MEC in Philips research at an early stage (MIH 29339). These documents do not give rise to an inference of participation by MEC (or Philips) in the "unitary" conspiracy. Plaintiffs have asserted a Robinson-Patman Act claim against MEC on account of alleged price discrimination in the sale of components. This claim is disposed of in n.395, *infra*.

**281.** We shall not attempt here to rescribe the conclusions set forth at length in earlier segments of this opinion as to plaintiffs' lack of evidence of conspiracy, even though some of that discussion pertains to the Toshiba defendants. We incorporate our earlier discussion by reference and address here only those evidentiary matters specially relevant to the Toshiba defendants.

**282.** That department had no role in export matters. As Mr. T. Kamakura of Toshiba stated in his protocol: The Department of TV Business has a Management Section, the First TV Section, the Second TV Section, and the Business Technique Section. These sections exist in both Tokyo Shibaura and Toshiba Shoji and the Section Managers serve concurrently, but the staff members separate. The work is the same.

Materials Evidentiary Opinion, at 1267–1277, we held the Yajima diaries inadmissible on a host of grounds, but essentially as unintelligible and untrustworthy hearsay. Even assuming admissibility, however, the alleged export references contained in the Yajima diaries are obscure and unintelligible and do not provide any evidence of the low price conspiracy to invade and take over the United States CEP market alleged by plaintiffs.

Plaintiffs have also offered three Toshiba internal memoranda, DSS's 96, 97, and 98, as evidence of Toshiba's involvement in the alleged conspiracy. However, we excluded all of these memoranda in the Japanese Materials Evidentiary Opinion at 1299–1301, on the same grounds that we excluded the diaries.

The other Toshiba-related materials from the Six Company Case are equally unhelpful to plaintiffs' case. Plaintiffs have offered the testimony[283] of three Toshiba employees as evidence of Toshiba's involvement in the alleged conspiracy: Tadashi Kamakura (DSS 69), Mr. Yajima (DSS 70), and Ryozaburo Kawahara (DSS 71). This testimony does not constitute evidence tending to show Toshiba's involvement in either the home market or export facets of the "unitary" conspiracy.[284] Plaintiffs have offered the protocols of Mr. Yajima (DSS's 75, 76, 77, and 78), Mr. Kamakura, (DSS's 81 and 82), Mr. Seigo Narita, (DSS's 79 and 80), Mr. Ryunosuke Kamuro (DSS 83), and Mr. Kawahara, (DSS 84), all Toshiba employees, as evidence of Toshiba's involvement in the alleged conspiracy. We have held protocols admissible against the employer of the giver of the protocol. These protocols are not probative of home market high prices or "war-chesting." Moreover,

there are no references to export matters in any of these protocols (or in fact in any of the other protocols offered by plaintiffs). Indeed, the record does not reveal that any of these Toshiba employees had any responsibilities with respect to export matters.

With regard to matters common to all six defendants, Toshiba was a signatory to the Manufacturers' Agreements and was a member of the JMEA. However, for reasons explained above, the export control arrangements memorialized in these documents are not a possible source of antitrust injury to the plaintiffs. Toshiba, like all of the six companies, has conceded membership in the numerous groups and associations mentioned in the Six Company Case and in the EIAJ. However, as we have seen, these memberships and attendance at meetings do not constitute evidence of conspiracy. Nor, as we explained in Part VII.G, *supra*, have plaintiffs adduced any admissible probative evidence of conspiratorial activity by any of the defendants in conjunction with their membership in these groups.

Turning to Toshiba's alleged role in the "rebate scheme," we note that although Toshiba sold private label merchandise to J.C. Penney and Co., Singer Corp., Philco Electronics Corp., and R.H. Macy, as well as to Sears, plaintiffs have only charged Toshiba with granting rebates to Sears. We have already explained that a genuine issue of fact exists on the question whether the Japanese manufacturing defendants, including Toshiba, paid rebates to their U.S. customers. However, we have also explained that the issue of fact is not *material* in the absence of evidence of concerted activity with respect to the rebate scheme. Plaintiffs have advanced no such evidence.

---

*The TV Business Department is in charge of the domestic business*; the first TV Section is in charge of black & white TV; and the Second TV Section is in charge of color TV. DSS 81, pp. MJ003294–2, MJ003294–2 (emphasis added).

**283.** We repeat that we found the testimony of all witnesses before the JFTC as to domestic matters admissible against the "Six Companies"; "export" or "war-chesting" references,

however, with certain exceptions not relevant to Toshiba, were excluded.

**284.** Moreover, the only reference to export in any of the Toshiba materials is contained in Mr. Kamakura's testimony, where he notes in response to a question concerning export pricing that export matters were "beyond my area of responsibility," DSS 69, pp. MJ002081–1, MJ002082–1.

In a segment of their "Memorandum Concerning Plaintiffs' Conspiracy Evidence Relating to the Toshiba Defendants," Toshiba counsel submitted that the absence of several items of evidence against Toshiba was "telling." That catalogue of evidence that plaintiffs have failed to present is as follows:

1. No evidence, direct or circumstantial, that Toshiba discussed or agreed with anyone to sell television receivers in the United States at unreasonably low prices;

2. No evidence, direct or circumstantial, that Toshiba's pricing of television receivers in the United States or Japan was parallel to any other defendant herein or any other competitor;

3. No evidence, direct or circumstantial, that pricing of Toshiba television receivers sold in the United States market was below the competitive price levels for such products in the United States market (and no showing of what the competitive price level was in the United States market); and

4. No evidence, direct or circumstantial, of sales of television receivers in the United States market below any defined level of costs.

This listing is accurate, and could be augmented to detail other areas of plaintiffs' failure to offer evidence in opposition to the motions for summary judgment.[285] Suffice it instead to say that plaintiffs have simply offered no evidence, direct or circumstantial, which could create a genuine issue of material fact as to Toshiba's involvement in the "unitary" conspiracy.

### (b) *Toshiba America, Inc. (TAI)*

The bulk of plaintiffs' allegations against Toshiba, themselves unavailing, are not even applicable to Toshiba's U.S. sales subsidiary, TAI. There are no references to TAI in the JFTC-related diaries, testimony, or protocols; indeed, TAI never employed any of the witnesses who testified or gave protocols before the JFTC (or whose diaries

were seized). Neither is TAI implicated in any way in the Toshiba internal memoranda (DSS's 96–98). TAI was not a signatory to the Manufacturers' Agreements and was not a member of the JMEA, hence was not involved in any check price rules or regulations. TAI was not involved in the Six Company Case or Market Stabilization Council Case, or in any other case before the JFTC, and was not a member of any Japanese group or trade association. Moreover, during the time periods applicable to this litigation, TAI did not sell private label merchandise, and plaintiffs have made no claim that TAI granted illegal rebates to its customers.

With respect to TAI, there is no evidence, direct or circumstantial, of discussions or agreements to sell television receivers in the United States at unreasonably low prices, or that TAI's prices were parallel to any other defendant or any other competitor, or of sales below competitive levels in the U.S. market. Neither is there any evidence of sales by TAI below cost, or that TAI acquired any U.S. CEP manufacturer.

In fact, the only real allegations as to TAI's involvement in the alleged conspiracy are those set forth in plaintiffs' brief in response to defendants' motion for summary judgment at pages 147–56 (*see also* FPS 1641 *et seq.*), where they assert the following:

1. TAI is a subsidiary of Toshiba;

2. Toshiba made capital contributions to TAI;

3. Toshiba has guaranteed TAI's loans;

4. TAI sold Toshiba television receivers in the United States;

5. Certain TAI employees were previously employed by Toshiba;

6. TAI was a member of the Japan Light Machinery Information Center; and

7. TAI's income tax returns indicated that TAI lost money during the period 1965 through 1977.

---

**285.** This listing also applies to the other defendants. As we explained in Part V, *supra*, while defendants have the burden of showing

the lack of a material factual issue, plaintiffs must come forward with "significant probative evidence" and cannot rest on their allegations.

We consider *infra* the general legal principles applicable to the question whether the subsidiaries of the Japanese manufacturing defendants are sufficiently intertwined with their parents to be considered functional alter-egos or agents, hence chargeable vicariously with their parents' actions. Addressing TAI as an independent entity, however, it is plain that the evidence is insufficient to create a genuine issue of material fact as to its membership in the "unitary" conspiracy.

### 4. The Hitachi Defendants

As with the Toshiba defendants, it is appropriate to begin our discussion of the Hitachi defendants [286] with the JFTC materials, for among the evidence most strongly stressed by the plaintiffs prior to our Japanese Materials Evidentiary Opinion were the Yamamoto and Yamada diaries.[287] At the time of the writing of the diaries, Mr. Yamada was Department Manager, Electrical Appliances Department, Consumer Products Division, of Hitachi, Ltd. and Mr. Yamamoto was Manager of the Television Section of the Television Department of Hitachi Kaden. In the Japanese Materials Evidentiary Opinion, at 1277–1283, we held the Yamamoto and Yamada diaries inadmissible on a host of grounds, but essentially as untrustworthy hearsay. We add, however, that the alleged export references contained in these diaries are unintelligible and do not provide any evidence of the home market war chesting conspiracy or the low price export conspiracy to invade and take over the U.S. CEP market alleged by the plaintiffs. Moreover, at the time the diaries were written, neither Mr. Yamada nor Mr. Yamamoto had responsibility in export matters.

Turning to the JFTC testimony, it will be recalled that we made several exceptions to our ruling in the Japanese Materials Evidentiary Opinion excluding "war-chesting" or export references. One of those exceptions was as to the testimony of Mr. Nishi, which we found admissible against his employer, Hitachi.[288] However, Mr. Nishi's testimony, although it does discuss the success of the Japanese CEP industry in the export field, does not supply any evidence to aid plaintiffs' conspiracy theory. It will be recalled that it was Mr. Nishi who used the "it is our heritage" language which plaintiffs cite frequently as evidence of defendants' predatory intent, but which, as we explained in Part VII.I, *supra*, does not aid plaintiffs' case one iota. Indeed, Mr. Nishi testified that the ability of the Japanese television manufacturers to compete effectively in export markets was significantly the result of intense competition in the Japanese domestic market.

Plaintiffs have offered the protocols of Mr. Adachi (DSS 85) and Mr. Yamamoto (DSS 86) as further evidence of the alleged conspiracy. Although these protocols are admissible against Hitachi, there is nothing in them having any relationship to export-related matters. The protocols concern only domestic Japanese marketing and prices. Neither the protocols nor any other Japan-side evidence supports plaintiffs' claim of a home market high price war-chesting conspiracy.

Plaintiffs have also offered the so-called Shimizu memorandum (DSS 95) as evidence of the Hitachi defendants' participation in the alleged export conspiracy. We discussed the Shimizu memorandum at 1297–1299 of the Japanese Materials Evidentiary

---

**286.** We will treat together Hitachi, Ltd. ("Hitachi"), the parent corporation, and Hitachi Kaden Hanbai Kabushiki Kaisha ("Hitachi Kaden"), the domestic sales corporation. There will be brief separate consideration of Hitachi Sales Corporation of America (HSCA), *infra*.

**287.** We shall not attempt here to rescribe the conclusions set forth at length in earlier segments of this opinion as to plaintiffs' lack of evidence of conspiracy, even though some of that discussion pertains to the Hitachi defend-

ants. We incorporate our earlier discussion by reference and address here only those evidentiary matters specially relevant to the Hitachi defendants.

**288.** The testimony of Messrs. Adachi and Yamamoto of Hitachi contains no export references and in no respect tends to show Hitachi's involvement in the alleged conspiracy. It should be noted that Hitachi does not accept plaintiffs' translation of Mr. Nishi's testimony.

Opinion, where we excluded it from evidence, holding that it is not admissible under any of the exceptions to the hearsay rule and that it does not qualify as an admission of Hitachi.[289]

Hitachi, Ltd., like all of the six companies, was a signatory to the Manufacturers' Agreements. Both Hitachi, Ltd. and Hitachi Kaden were members of the JMEA, hence subscribers to the Rules. However, as we have seen in our extensive discussion above, the export control arrangements do not advance plaintiffs' case. Hitachi has also conceded membership in the numerous groups and associations discussed above. However, as we have also explained, the evidence relating to those groups and associations is equally nonprobative, and does not tend to show any Hitachi involvement in any conspiracy. As for Hitachi's alleged role in the rebate scheme, plaintiffs have offered DSS's 1359 through 1374 as evidence that the Hitachi defendants participated in rebate activity.[290] However, neither these documents nor any others constitute any evidence of involvement in concerted rebate activity. Although a genuine issue of fact exists on the question whether the Japanese manufacturing defendants, including Hitachi, paid rebates to their U.S. customers, we have already explained that that issue of fact is not material in the absence of evidence of concerted activity with respect to the rebate scheme.

The plaintiffs have attempted to show, through the DePodwin report, that Hitachi sold television receivers in the United States below cost. For reasons explained in the Expert Testimony Opinion, DePodwin's opinion is inadmissible. In terms of the other aspects of plaintiffs' claims, we can incorporate by reference the Toshiba defendants' catalogue of evidence that plaintiffs have failed to present, see page 1273, supra, for the same failings exist with respect to Hitachi. In sum, plaintiffs have offered no evidence, direct or circumstantial, which would create a genuine issue of material fact as to the involvement of Hitachi or Hitachi Kaden in the "unitary" conspiracy.

We could also rescribe our discussion about the evidence adduced against Toshiba America, Inc., for what was said about TAI (p. 1273, supra) is transferable to Hitachi's U.S. sales subsidiary, HSCA. Rather, we shall merely incorporate that discussion by reference and note that there is no evidence, direct or circumstantial, of the involvement of HSCA in the alleged conspiracy. Although the plaintiffs set forth in replete detail the intercorporate relationships among Hitachi and its affiliates, this does not supply proof of a conspiracy.

### 5. *The Sanyo Defendants*

The Sanyo defendants [291] are involved with the export control arrangements to

**289.** Hitachi maintains that the Shimizu memorandum, if admissible, would evidence not anticompetitive activity, but independent rational competitive behavior. It relies on the statement in the memorandum that Hitachi should strive for a sizeable market share in Japan and that Hitachi would not export until export prices went up. Moreover, the "Memorandum of Hitachi Defendants Concerning Lack of Evidence Which Would Justify an Inference of Conspiracy," filed September 19, 1980, notes that at the time the Shimizu memorandum was written, Hitachi was not even involved in the export of color television receivers.

**290.** The Hitachi defendants concede the payment of rebates and highlight the evidence of rebates paid by Hitachi Sales Corporation of America to one U.S. buyer—plaintiff NUE/Emerson. In their memorandum cited at n.289, supra, the Hitachi defendants argue that the

plaintiffs have engaged in "unprincipled hypocrisy" in charging that the practice of rebating could be an essential vehicle for carrying out the objective of the conspiracy since one of the plaintiffs was involved in that very practice. Additionally, they point to the rebates as demonstrating that U.S. buyers and Japanese manufacturers were independently acting in their economic self-interests by negotiating competitive prices in a very competitive market. They also point to the fact that the evidence concerning the NUE rebates demonstrates the existence of a competitive motivation to maintain the confidentiality of prices actually paid.

**291.** We take up together the evidence against Sanyo Electric Co., Ltd. ("Sanyo Denki" or "Sanyo"), the parent company; Sanyo Electric Trading Company, Ltd. ("Trading"), Sanyo's Japanese Trading Company; and Sanyo Electric, Inc. ("Inco"), its American sales subsidi-

the same extent as the Matsushita, Toshiba, and Hitachi defendants, with the same lack of consequences insofar as plaintiffs' conspiracy claims are concerned. Looking briefly first at the Six Company Case, we note that unlike the other defendants, there is very little evidence in the record which even purports to be applicable to Sanyo. The JFTC obtained no diaries written by any Sanyo Denki employees; nor did they obtain any other documents from the files of Sanyo Denki which allegedly set forth conspiratorial discussions at any trade association or sub rosa meetings. The plaintiffs have proffered the JFTC testimony of three Sanyo officials, Mr. Hirano (DSS 62), Mr. Yoshioka (DSS 63), and Mr. K. Iue (DSS 74). While this testimony is admissible at least as to domestic matters, neither the testimony nor any other evidence implicates Sanyo in a home market high price "war-chesting" conspiracy. Moreover, the testimony of Mr. Hirano and that of Mr. Iue contains no export reference. While the testimony of Mr. Yoshioka does, we expressly held at page 1294 of the Japanese Materials Evidentiary Opinion that that reference was inadmissible.[292] Mr. Yoshioka's protocol (DSS 104) was also offered. We have held protocols admissible against the employer, but Mr. Yoshioka's protocol contains no export references.

Plaintiffs cite as a "connection" document in their February 12, 1980 letter, *see* n. 152, *supra,* a certain calendar book which was seized by the JFTC in November 1966, but not used by it and not marked as an exhibit in the Six Company case. The calendar was returned to Sanyo Denki by the JFTC following discontinuance of the Six Company case and was produced for plaintiffs' inspection and copying in May, 1979. That document, however, contains only references to the time and place of meetings of some of the sub rosa groups. It is untranslated, but it is represented to us that it does not contain any textual description of the meetings or set forth the purposes of or conversations at the meetings; hence it is equally unavailing, even if admissible. The foregoing are the only "Japan-side" documents which relate specifically to the Sanyo defendants.

Turning to Sanyo's role in the "rebate scheme," the plaintiffs have offered numerous documents purportedly demonstrating Sanyo's involvement in the alleged scheme. There have been heated disputes about the admissibility of many of these documents, but we need not engage in that dialogue, because we have assumed that there is a genuine issue of fact about the payment of rebates.[293] But nowhere in any of the myriad documents offered by plaintiffs is there any evidence or suggestion of *concerted* activity among Sanyo and any other defendants relating to rebates to any of these customers. For the reasons explained above, these rebate documents reflect pursuance of Sanyo's self-interest and are as consistent with the forces of competition as with the forces of conspiracy.[294] There is

---

ary. The only allegations with regard to Sanyo Manufacturing Corp. relate to the Warwick acquisition, discussed in Part VII.N.3, *supra.* That discussion is incorporated here by reference.

We shall not attempt here to rescribe the conclusions set forth at length in earlier segments of this opinion as to plaintiffs' lack of evidence of conspiracy, even though some of that discussion pertains to the Sanyo defendants. We incorporate our earlier discussion by reference and address here only those evidentiary matters specially relevant to the Sanyo defendants.

**292.** Even if that export reference were admissible as an admission against Sanyo, it would not help the plaintiffs. The reference (MJ002250-1 and MJ002251-1) is merely a passing one, serves Sanyo's interest, and in any event does not tend to show the conspiracy alleged by plaintiffs.

**293.** Sanyo is claimed to have paid rebates to the Magnavox Company (DSS 1280 through DSS 1319, DSS 1333A and 1333C); to Sears Roebuck and Company (DSS 1070 to DSS 1135); to General Electric Company (DSS 1375-1378, DSS 1382, and DSS 1074); and to several other private label and OEM customers. Sanyo does not deny the payment of rebates, the principal vehicle for which was the so-called "loyalty discount" program.

**294.** DSS 1239, Trading document No. B-1185(38)-(41), Trading document No. B-1106, Sanyo INCO document No. ZSX-0247, Trading document B-1113(4)-(9), and INCO document No. ZSX-0134 (the latter documents were con-

no evidence that Sanyo had firsthand knowledge of the details of any rebates or discounts being offered or paid by any of its competitors, and vice versa. Even with respect to Sears, whose business Sanyo shared with Toshiba, there is no evidence that Sanyo had knowledge of Toshiba's rebate program with Sears or that the Sanyo and Toshiba rebate programs were coordinated in any way.

Neither have plaintiffs been successful in demonstrating below cost sales by Sanyo. Dr. DePodwin's cost analysis has been excluded.[295] Although the plaintiffs have invoked scattered references in other documents allegedly showing lack of profitability of certain product lines at certain intervals, this evidence does not begin to amount to probative evidence of below cost sales or predatory pricing.[296]

In sum, our review of the evidence as it relates to Sanyo reveals no evidence that Sanyo discussed or agreed with anyone to sell television receivers into the United States at unreasonably low prices or evidence that Sanyo's pricing of television receivers in the United States or Japan was parallel to that of any other defendant or any other competitor. Indeed, Sanyo's series of rebate programs was unique to Sanyo. Neither is there any evidence that

pricing of Sanyo television receivers in the United States market was below competitive price levels. While much heat was generated over the question whether Sanyo disclosed the existence of rebates to U.S. customs (Sanyo contends that it did), we have already explained *supra* that nondisclosure of rebates would be in Sanyo's self interest and more consistent with rational independent action than with conspiratorial activity. There is just no evidence of Sanyo's participation in the "unitary" conspiracy.

Turning to Sanyo's subsidiaries, plaintiffs have offered no discrete evidence as to Trading or INCO which would involve them in the "unitary" conspiracy other than the fact that they are subsidiaries of and therefore allegedly functional alter-egos or agents of Sanyo Denki. More particularly, with respect to the Sanyo subsidiaries, there is no evidence, direct or circumstantial, of discussions or agreements to sell television receivers in the United States market at unreasonably low prices or any other of the kinds of activity which the plaintiffs have described as ingredients in the "unitary" conspiracy of which they complain. We already discussed, in Part VII.N.3, *supra*, why the allegations against Sanyo Manufacturing Corp. with respect to the War-

tained in plaintiffs' postargument submissions, though not given the stature of DSS's) all corroborate Sanyo's contention of competitive conditions, with each of the Japanese defendants responding to market conditions, including price competition from other Japanese companies, in an attempt to get American private label and OEM business. They also reflect a policy of *not* disclosing rebates to competitors.

**295.** Sanyo also points out that DePodwin's analysis examines only factory data, not overall company data, and ignores the data concerning Trading, the company which exported products manufactured by Denki. Sanyo observes that DePodwin's finding that the Gifu plant was not profitable during the six month fiscal term ending in November 1969 fails to highlight that that was the first year of Gifu's operation, and that it turned a profit in 1970, the first full year of its operation, bringing it in line with the rest of Sanyo's profitable operation.

**296.** Plaintiffs rely in this regard on DSS's 1236 and 1237 and a number of other documents. The Sanyo defendants take umbrage at DSS

1237, pointing out that plaintiffs therein misrepresented a monetary exchange-rate loss for an operating loss and overstated the figures at issue by a factor of a thousand by confusing a yen sign for a dollar sign. Although plaintiffs also rely heavily on DSS 1236 as demonstrating the existence of dumping and predatory pricing, we find it susceptible of no such interpretation. Rather, assuming admissibility of the document, it reflects the competitive desire of Sanyo to turn around the loss it was incurring as an entrant in a market as soon as possible. Viewing DSS 1236 as a whole (including the memo from Mr. Tachibana of Sanyo to Mr. Yano of INCO, together with the various attachments in the folder), we find indications only of competition, not of conspiracy. In any event, a fair reading does not support plaintiffs' statement that the document "made clear that the penetration of the ... market was a consequence of Sanyo's and its co-defendants' massive and widespread predatory dumping ... and was achieved only at substantial sales losses."

wick acquisition do not give rise to an inference of conspiracy. Treating the subsidiaries as independent entities, the evidence is not sufficient to create a genuine issue of material fact on the issue of their participation in the alleged conspiracy.

### 6. *The Sharp Defendants*

Sharp [297] stands in the same shoes as the other Japanese manufacturing defendants with respect to the export control arrangements, having been a signatory to the Manufacturers' Agreements and a member of the JMEA, hence a subscriber to its Rules. For the reasons explained above, the export control arrangements cannot help the plaintiffs. Sharp has also conceded membership in the various trade associations and the sub rosa groups mentioned in the Six Company Case and attendance from time to time at their meetings. However, as we have seen, these memberships and attendance at meetings do not constitute evidence of conspiracy. There were no diaries of Sharp officials seized by the JFTC. Mr. Ogawa, of Sharp, gave testimony before the JFTC (DSS 72 and DSS 73), but his testimony contained no export references. Two Sharp employees, Mr. Saeki and Mr. Maekawa, gave protocols to the JFTC. We excluded Mr. Maekawa's protocol in the Japanese Materials Evidentiary Opinion, and Mr. Saeki's protocol contains no export references. There are no miscellaneous Sharp documents, "smoking guns" or otherwise, which come to us from the JFTC proceedings. Plaintiffs have adduced no admissible evidence of Sharp-related conspiratorial ac-

tivity in conjunction with the sub rosa groups (or of the groups themselves), either in terms of home market high price "warchesting" activity or predatory low price export activity.

Sharp sold private label merchandise to a number of American buyers, and a genuine issue of fact exists as to Sharp's participation in the rebate scheme. However, that issue of fact is not material because there is no evidence that Sharp was involved in concerted activity with respect thereto. To the contrary, the documents produced by Midland, one of Sharp's private label customers, showed that Sharp, Hitachi, and JVC, among other Japanese companies, competed with each other for Midland's import business.[298]

In sum, what has been said of the other Japanese manufacturing defendants may also be said of Sharp. Plaintiffs have adduced no evidence, direct or circumstantial, that Sharp discussed or agreed with anyone to sell television receivers into the United States at unreasonably low prices, or that its pricing of television receivers in the United States or Japan was parallel to that of any other defendant or any other competitor, or that Sharp sold television receivers in the United States market below the competitive price levels in that market, or that Sharp sold television receivers in the United States' market below any defined level of cost. For all of these reasons, and for the reasons explained in our more generalized discussion *supra*, plaintiffs have adduced no evidence, direct or circumstantial,

297. We address in this segment plaintiffs' evidence against both Sharp Corporation (formerly Hayakawa Electric Company, Ltd.), one of the Japanese manufacturing defendants, and its American sales subsidiary, Sharp Electronics Corporation (SEC).

We shall not attempt here to rescribe the conclusions set forth at length in earlier segments of this opinion as to plaintiffs' lack of evidence of conspiracy, even though much of that discussion pertains to the Sharp defendants. We incorporate our earlier discussion by reference and address here only those evidentiary matters specially relevant to the Sharp defendants.

298. It is useful to comment on plaintiffs' offer of DSS 1141 as evidence of Sharp's participa-

tion in the conspiracy. That document, produced by Montgomery Ward, reflects a meeting between Mr. A. Saeki and Mr. Y. Fukao of Sharp and Mr. R.A. Noreen of Ward. It is apparently offered by plaintiff as evidence of collusive rebate activity. Leaving aside the serious questions of admissibility (one problem is that the document gives only Mr. Noreen's impression of what Sharp's officials said), at best the document reflects a rebate arrangement between sellers and buyers, each acting in their own best interests. To the extent that the document could be read to give rise to an inference of customs fraud, we note again that that does not help the plaintiffs.

which could create a genuine issue of material fact as to Sharp's involvement in the "unitary" conspiracy. We note, in addition, that Sharp has filed the affidavit of Mr. Y. Fukao, Senior Executive Director of Sharp, controverting in detail plaintiffs' allegations about conspiratorial activity.[299] Mr. Fukao's affidavit stands essentially uncontroverted.

A similar (uncontroverted) affidavit was filed on behalf of SEC by Mr. T. Tani, Executive Vice President, Treasurer and Controller of SEC. Leaving aside the questions of corporate agency or "functional alter-egos," our review of the evidence reveals that plaintiffs have adduced no evidence, direct or circumstantial, of SEC's involvement in the alleged conspiracy.

### 7. *Melco and Melco Sales, Inc. (MSI)* [300]

Plaintiffs' strategy as to the Melco defendants has been essentially threefold. First, as was the case with the other Japanese manufacturing defendants, they have attempted to link Melco to the conspiracy by virtue of its participation in the MITI-related export control arrangements and in the various groups and associations in Japan. Secondly, plaintiffs have made numerous submissions with respect to Melco's alleged involvement in the "rebate scheme." Finally, plaintiffs have devoted considerable efforts to developing the concept of the "Mitsubishi Group," attempting to link the activities of Melco and MSI with those of MC and MIC, discussed *infra*.[301]

Melco, like the other Japanese manufacturing defendants, was a signatory to the Manufacturers' Agreements and, by virtue of membership in the JMEA, a subscriber to the JMEA Rules. We have already explained how participation in these export control arrangements does not aid plaintiffs' conspiracy case. The plaintiffs have offered the JFTC testimony of two Melco witnesses, Mr. Okuma and Mr. Kihara, but the testimony of neither contains any export references. Plaintiffs also offer the protocols of Mr. Okuma as well as Mr. Ito of Melco, but, again, neither protocol contains any export references. Plaintiffs offer no miscellaneous Melco documents seized in the JFTC proceedings.[302] Melco, like the other defendants, has conceded

**299.** Mr. Fukao, who states that he has personal knowledge of the pricing of Sharp's export CEPs, flatly denies that any agreement among competitors ever affected Sharp's export pricing decisions. (¶ 4). He avers that no communications or discussions at any of the meetings alleged by plaintiffs or otherwise ever entered into Sharp's export pricing decisions. (*Id.* ¶¶ 4–8). The Fukao Affidavit states that not only did Sharp set its own export prices and run its own business independently of any of the defendants and alleged coconspirators, but also that export CEP prices at Sharp were determined without regard to domestic profits, were set at a profit-maximizing level, and in fact consistently resulted in a positive contribution to Sharp's profits. (¶ 4). Additionally, the Fukao Affidavit denies that Sharp's export prices or practices were predatory or that they were ever intended to be so. (¶¶ 10–11).

**300.** In July 1980, MSI changed its corporate name to Mitsubishi Electric Sales America, Inc. (MESA). However, we refer to it throughout as MSI.

**301.** We shall not attempt here to rescribe the conclusions set forth at length in earlier segments of this opinion as to plaintiffs' lack of evidence of conspiracy, even though some of that discussion pertains to Melco. We incorporate our earlier discussion by reference and address here only those evidentiary matters specially relevant to the Melco defendants.

**302.** Although none of the diaries seized by the JFTC which plaintiffs have sought to introduce were written by Melco employees, during the discovery period there was much controversy about the diary of Mr. T. Kiuchi, a Melco employee. While the extent to which the plaintiffs advance Mr. Kiuchi's diary as evidence of conspiratorial activity is not clear, having read the diary in translation we are satisfied that it does not aid plaintiffs' case one iota. It is a personal diary which lists Mr. Kiuchi's golf dates and social engagements as well as business meetings, and which does not give any substantive information about any of the entries. The plaintiffs seek to draw inferences from such items as Mr. Kiuchi's dinner appointment with Mr. "Super" Yamaguchi, once a Melco employee who became the president of MSI at its inception in 1974. The dinner apparently occurred at the Yoshida Restaurant on April 10, 1968 in company with several other Melco employees. We do not have the faintest notion what occurred at this dinner, and, as we have seen, mere meetings among individuals, even those affording the opportunity to conspire, cannot create an inference of conspiracy.

membership in numerous groups and associations in Japan, including the various sub rosa groups. However, plaintiffs have not offered any evidence connecting Melco to any conspiratorial activity of either a high price home market war-chesting or a predatory low price export nature.

As we approach plaintiffs' claims about Melco's alleged involvement in the "rebate scheme," and look not just at the "trees" but also at the "forest," it appears that the Melco aspect of the case has taken on a qualitatively different cast than the rest of it. We take a paragraph to explain what that difference is and why, at least in our perception, it is so.

Unlike the other Japanese manufacturing defendants, which essentially conceded that there was a genuine issue of fact on the question of the payment of rebates (though not of *material* fact), Melco has steadfastly denied paying any rebates at all, and has devoted numerous pages of its briefs to demonstrating the correctness of its position.[303] Even though it concedes that MSI sells Melco CEP's in the United States and that MSI is a 100% owned subsidiary of Melco USA, Inc., which is in turn a 100% owned subsidiary of Melco, Melco has attempted assiduously to disassociate itself from MSI. Plaintiffs rejoin that Melco caused Melco USA, Inc. to create MSI and contend that Melco in fact interposed Melco USA, Inc. to conceal Melco's control and to act as a "shield."[304] Melco, however, denies such control. Indeed, Melco and MSI devote an entire section of their response to plaintiffs' supplemental reply memorandum in opposition to motions for summary judgment, filed September 22, 1980, to an attempted demonstration that there is no basis for any of plaintiffs' claims concerning any alleged agency or alter-ego relationship between Melco and MSI.[305]

It appears to us that Melco's "Lone Ranger" position is but another facet of its unceasing effort to resist the personal jurisdiction, venue, and process of this court, which it commenced early in the proceedings. These efforts were rebuffed by our predecessor in the case, Judge A. Leon Higginbotham, Jr., who denied Melco's motion to dismiss the complaint for lack of personal jurisdiction, venue, and adequate service of process. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 262 (E.D.Pa.1975).[306] We, of course, respect Melco's right to press its resistance to personal jurisdiction, venue, and process, and have, throughout our stewardship in this case, treated those points accordingly. We also understand that the vigor with which Melco has pressed these objections is, at least in part, a function of its feeling that, given Melco's small share of the U.S. CEP market (smaller than any of the other Japanese manufacturing defendants and considerably smaller than most of them), it has been an imposition to require it to expend

---

**303.** Melco's briefs in this area have been devoted to both substantive and evidentiary issues, including vigorous attacks upon the admissibility of such questionable submissions as the Gambles Import Corporation "Voluntary Disclosure Statement" (DSS 1166).

**304.** In addition to Melco's total ownership of Melco USA, Inc. and that subsidiary's total ownership of MSI, plaintiffs also counter with loans and loan guarantees from Melco to MSI, and numerous documents reflecting the personal and business relationship between the operating officers of MSI and Melco officials with respect to the operation of MSI's business.

**305.** Yoshito Yamaguchi, President of MSI, has also filed an affidavit on the nature of a general denial of plaintiffs' allegations against MSI.

**306.** Melco unsuccessfully sought mandamus relief from Judge Higginbotham's order. In the absence of appellate review, Melco, of course, preserves the issue. Although we have held Judge Higginbotham's findings on the preliminary issues not binding on the merits, insofar as personal jurisdiction, venue, and service of process are concerned his decision is the "law of the case." Additionally, Melco, alone among the defendants, has attacked the subject matter jurisdiction of the court. *See* Opinion (Introduction to Summary Judgment Motions; Subject Matter Jurisdiction), 494 F.Supp. 1161 (E.D.Pa.1980).

the staggering counsel fees that defense of this litigation has entailed.[307]

Plaintiffs have also asserted that Melco and MC/MIC are linked by the so-called "Mitsubishi Group," a vestige of the zaibatsu, see Part VII.C, supra, and that they are engaged in the coconspiratorial venture as such. Plaintiffs submit in this regard that the purchase by MSI of MIC's MGA Division is evidence of the connection between Melco and MC and MIC as part of the "Mitsubishi Group." Melco has consistently, throughout this litigation, denied the existence of the "Mitsubishi Group" and has denied any connection with MC or MIC beyond a vendor-vendee relationship.[308]

Notwithstanding the foregoing discussion, we elect not to reach the question of the agency of MSI, the question whether there is a genuine issue of material fact as to Melco's involvement in the rebate scheme, or the question of the Melco-MC/MIC relationship and the "Mitsubishi Group," since at all events these issues of fact cannot be material.[309]

The rebate issue is not material for the same reason as for the other defendants: there is simply no evidence that Melco engaged in any concerted activity with respect to rebates. Neither is there any evidence that Melco discussed or agreed with anyone to sell television receivers into the United States at unreasonably low prices, or that Melco's pricing of television receivers in the United States or Japan was parallel to any other defendant or any other competitor. There is also no evidence that the pricing of Melco television receivers sold in the United States market was below the competitive price levels for such products in the United States market, and the plaintiffs have not adduced any evidence of sales of television receivers by Melco in the United States below cost. The short of it is that there is no evidence of participation by Melco in the "unitary" conspiracy.

For the same reasons we have indicated supra and for those explained in connection with the other defendants, we need not consider the MSI agency or corporate veil-piercing questions or the alleged relationship of Melco and MC/MIC via the "Mitsubishi Group." In the absence of any evidence holding Melco (or MC/MIC, see Part VII.Q.9, infra) into the conspiracy, and there is none, it is unnecessary to reach the question of the vicarious liability of their subsidiaries or affiliates. We do note that, insofar as independent evidence against MSI (since its creation in 1974) is concerned, plaintiffs have simply adduced no evidence of its conspiratorial involvement.[310]

### 8. Sony

■■■ Sony is a defendant only in the NUE case, having settled Zenith's claims

---

307. Melco is primarily a manufacturer of heavy electrical equipment, automotive electric equipment, elevators, radar, computers, and aerospace equipment. CEPs which are sold in Japan and then exported for resale to the U.S. constitute an extremely small percentage of Melco's total sales (from 1966 to 1976, this percentage never exceeded 1% of Melco's total sales). Moreover, from 1965 to 1973, Melco's share of Japanese television receiver exports to America never exceeded 3.53% of monochrome television receivers and 5.52% of color television receivers. During that period, Melco's sales never achieved even 1% of the total sales of monochrome or color TV receivers on the American market.

308. Akira Shirado, Manager of Foreign Trade Matters for Melco, has filed an affidavit denying such a relationship between Melco and MIC, as well as making a general denial of conspiratorial activity. Buichi Mochida, Manager, International Contract Administration Department of Melco, has filed a similar affidavit

denying conspiratorial activity and denying the existence of any "Mitsubishi Group."

309. Resolving the questions would require discussion of hundreds of documents which bear on the issues and the treatment of dozens of legal arguments encapsulated in hundreds of pages of briefs. We would have to consider, inter alia, the issues of Melco's relationship with MC/MIC, Melco's alleged involvement with the establishment of the ESD Group within MIC, the issue of the "Mitsubishi Group," and a host of evidentiary questions.

310. Plaintiffs have alleged that the motions of Melco, MSI, MC, and MIC must be dismissed for discovery abuse. While alleged discovery misconduct will be the subject of a separate phase of these proceedings and monetary sanctions will be awarded if deemed appropriate, the abuse alleged here is not a proper basis for denial of the summary judgment motions.

during the course of the litigation. That fact, however, does not alter our analysis, the first portion of which will proceed on the same wave length as our analysis of the evidence against the other Japanese manufacturing defendants.[311] The discussion will then shift to an analysis of the factors which differentiate Sony, namely, its well-known position as the highest price seller in the U.S. market, making it an illogical candidate for membership in a low price conspiracy.

Sony was a signatory to Manufacturers' Agreements and a member of the JMEA. However, Sony's participation in the export control arrangements does not help NUE for the reasons explained above. NUE has attempted to connect Sony with the alleged price fixing activities of certain groups in Japan. Not only is there a categorical denial of such activities by Sony's president, Mr. Morita, who has filed an affidavit accompanying the summary judgment motion, but the evidence is uncontradicted that Sony was not a member of most of the allegedly offending sub rosa groups in Japan,[312] nor was it named in the 1966 JFTC proceedings. No Sony diaries were seized by the JFTC and no Sony witnesses testified before or gave protocols to the JFTC. The only allegedly conspiratorial groups to which Sony belonged were the Market Stabilization Council (which Sony joined in 1959), the MD Group, and the TS Group. Our description of the activities of those groups in Part VII.G, *supra*, makes it clear that even if there were evidence of Sony's participation in their allegedly offending activities, that evidence would not give rise to liability. But there is no evidence offered by NUE to link Sony, through actions or statements of any Sony employees who may have attended such meetings, with any supposed conspiratorial activities.

Moreover, in contrast to its case against the other Japanese manufacturing defendants, NUE does not (and cannot) include Sony in its rebate scheme claims because Sony did not sell to private label or OEM customers, but rather only to its own subsidiary, Sonam, which in turn handled Sony's retail marketing in the United States. Sony thus paid no rebates and, therefore, cannot be implicated in conspiracy claims which posit a predatory low price export conspiracy predicated upon the combination of the check price agreements and the rebate scheme. Moreover, Sonam's prices, the only ones which could affect American television manufacturers, were indisputably much higher than the check prices, and typically higher than the prices of Sonam's American competition, including NUE, mooting plaintiffs' injury claims on still another ground.

The evidence against Sony may fairly be summarized by saying that there is: (1) no evidence that Sony discussed or agreed with anyone to sell television receivers into the United States at unreasonably low prices; (2) no evidence that Sony's pricing of television receivers in the United States or Japan was parallel to that of any other defendant or any other competitor; (3) no evidence that pricing of Sony television receivers sold in the United States market was below the competitive price levels for such products in the United States market, and (4) no evidence of sales of television receivers by Sony in the United States market below any defined level of cost.

At the time we heard Sony's motion for summary judgment, we had not conducted the pretrial evidentiary hearings.[313] In the wake of that argument, believing the membership of Sony in at least some of the "conspiratorial" groups might be sufficient

---

311. We shall not attempt here to rescribe the conclusions set forth at length in earlier segments of this opinion as to plaintiffs' lack of evidence of conspiracy, even though some of that discussion pertains to Sony. We incorporate our earlier discussion by reference and address here only those evidentiary matters specially relevant to the Sony defendants.

312. For example, Sony was not a member of the Tenth Day Group, Palace Group, Okura Group, Palace Preparatory Group, or Twentieth Day Group.

313. We held the initial Sony argument separately from the others because of our perception that there were "distinguishing" factors, *see* discussion *infra*.

to create a genuine issue of material fact, we reserved decision on the motion. We have now seen that the group membership and the other alleged evidence of Sony's involvement in the conspiracy does not create such an issue. We do not, however, rest on that analysis, but extend our discussion to demonstrate why it is illogical, and therefore improper, to infer that Sony was a member of the "unitary" conspiracy.

As Sony correctly observes, at the heart of the conspiracy complained of by NUE is the claim that all of the Japanese manufacturing defendants sold television receivers in the United States at depressed dumping levels. Although plaintiffs' claims have undergone considerable mutation during the course of this litigation, one thing has never changed—the allegation that *all* of the Japanese defendants engaged in a *low price* predatory export conspiracy. Moreover, in terms of impact, NUE has alleged that sales of television receivers by "the defendant Japanese Corporations . . . at unfairly low and discriminatory prices," eroded the "niche" of Emerson (NUE's predecessor) as a seller of "low leader merchandise." Against this background, Sony argues that any inference of participation by Sony in this low price conspiracy is completely illogical because, consistent with its well-recognized image, Sony has always sold its products in the United States at high (and profitable) price levels.

Perhaps the most impressive authority which Sony has cited to this effect is Zenith's Board Chairman, John J. Nevin, who, in deposition testimony, acknowledged that Sony's products were often priced above even the higher priced television receivers available from American companies. Sony also cites a television interview by Mr. Nevin, wherein he specifically excluded Sony from his comments about "Japanese dumping," and asserted that Sony products had typically been sold in the American market at prices equal to or above the prices of the higher priced American products. Additionally, Sony invokes the deposition testimony of Joseph Wright, Zenith's current Board Chairman, to the effect that Sony's prices were higher than any of the United States producers, and statements from other Zenith executives to similar effect, including that of Vito Brugliera, Manager of Value Engineering, who testified that Sony TV's were so expensive that Zenith did not feel them to be a competitive threat. Finally, Sony has relied upon statements of NUE officials who have admitted that Sony, unlike the other Japanese manufacturing defendants, was not identified with low leader merchandise. Sony also points out (and NUE admits) that Sonam, the United States subsidiary of Sony, has made a profit in every year since November 1963.

Along with its summary judgment motion, Sony has submitted summaries of newspaper advertisements by retailers in the New York and Philadelphia areas which demonstrate that the retail prices of Sony's television sets were consistently higher than those of Emerson. For example, in February 1967, Sony nine-inch sets were selling in New York for over $139.00, while Emerson 15-inch sets were selling there for $89.84. It is clear from the record that at no time did Emerson regard Sony television receivers as competing with Emerson; rather, Emerson's competition consisted of other lines which, like Emerson, were attempting to carve a niche for themselves at the low end of the television price spectrum.

Additionally, in the years in question, the Sony brand television receivers on the U.S. market were limited almost entirely to very small screen sizes not manufactured by Emerson. Emerson, during the period that it was owned by NUE, did not, like Sony, manufacture television sets of nine inches and less. Joseph McKee, NUE's then Executive Vice President, testified that, "We considered those as toys."

The foregoing facts (and contentions of Sony) are uncontroverted. NUE's only colorable rejoinder is that what is important for purposes of price comparison would be evidence not of retail prices, but of the prices at which Sony sold to its only customer, Sonam. However, even assuming that could be a valid comparison given the parent-subsidiary relationship, plaintiffs have

adduced no evidence of low price sales to Sonam which changes the result.[314]

The conclusion we draw from the foregoing is that given the standards for conspiracy proof that we have enunciated in Part VI.D.(4), *supra*, it is illogical to infer Sony's membership in a low price conspiracy. First, it is incontrovertible that Sony's high television prices were in furtherance of its own economic self-interest. Given the fact that Sony was able to command higher prices for its television sets than most other manufacturers, including NUE, it cannot be said to have been acting contrary to its economic self-interest in charging them. Second, because Sony consistently occupied the high price niche, it lacked an economic motive to conspire to drive NUE from its low price niche. It is at odds with common sense to believe that Sony would have participated in a conspiracy to drive Emerson out of business when that company posed no real competitive threat to Sony. Put differently, Sony's conduct is totally consistent with rational independent economic behavior, or at least far more so than with conspiratorial behavior. Under these circumstances, we cannot draw an inference of Sony's (or Sonam's) membership in the "unitary" conspiracy. To do so would be to engage in sheer speculation.[315]

### 9. *MC and MIC*

Mitsubishi Corporation (MC), the largest trading company in the world, is engaged in importing, exporting, trading, and other mercantile business, with sales in the billions of dollars. MC engages in no manufacturing, but relies exclusively on outside sources of supply. Taking the fiscal year ending March 31, 1979 as an example, MC had total trading transactions of $44 billion, involving 25,000 different product lines. That year approximately 47 percent of MC's business involved entirely domestic transactions within Japan, 18 percent involved exports from Japan, 25 percent involved imports to Japan, and the remaining 10 percent involved foreign transactions entirely outside Japan. Mitsubishi International Corporation (MIC), MC's wholly owned United States subsidiary, was incorporated in New York in 1954. MIC, like MC, is a general trading company with no manufacturing capabilities.

Prior to World War II, MC's predecessor company was a member of the Mitsubishi zaibatsu, controlled by the Iwasaki family through a holding company.[316] The zaibatsu controlled a broad range of banking, trading, shipping, mining, and industrial manufacturing enterprises. Following the war, under edict from the Occupation Administration, the Mitsubishi holding company was liquidated and its former operating companies, including MC's predecessor, became publicly owned companies operating under separate management.

Trading in consumer electronic products has never been a substantial portion of MC or MIC's business. In 1973, MC and MIC's highest volume year for trading consumer electronic products, they had consolidated sales (predominantly sales by MIC) of consumer electronic products totalling $27 million, about 0.12 percent of MC's total trading volume of $22 billion, and about 0.8

**314.** NUE has contended that Sony's pricing at the retail level is "a small part of the story," because "Sony's wholesale level pricing, together with the retail pricing of its products define the profit margin of the dealers who handle Sony television receivers, and Emerson competed with Sony for sales to such dealers and distributors." (NUE brief in opposition to Sony motion for summary judgment at p. 75). However, this assertion by counsel in a brief is not accompanied by any evidence of "wholesale level pricing" comparing Sony and Emerson television sets, and accordingly, Sony's posture as a high price seller remains uncontradicted. Not only are the allegations about Sony's pricing uncontradicted, but Sony's allegations about Emerson's location in the "low leader" end of the market are likewise uncontradicted.

**315.** We will not dignify by extended comment what we will dub plaintiffs' "smorgasbord" theory of conspiracy. Under that view, the ends of the conspiracy were served by the inclusion of both high and low price sellers.

**316.** For a description of the pre-war Japanese zaibatsu, *see* Part VII.C, *supra*. The Mitsubishi zaibatsu was one of the most prominent zaibatsus.

percent of its total exports of $3.4 billion. That year sales of television receivers alone amounted to only $15 million, or 0.07 percent of MC's trading volume and 0.5 percent of its exports. Neither were MC or MIC a substantial factor in the industry. In 1973, MIC's highest volume year, MIC distributed but 0.9 percent of the monochrome and color television receiver units sold in the United States and accounted for but 0.5 percent of the U.S. dollar sales of television receivers.

MC and MIC have never manufactured television receivers or consumer electronic products of any kind. Neither MC nor MIC has ever sold or distributed consumer electronic products in Japan. Instead, during the years they traded in such products, MC and MIC purchased them from manufacturers of consumer electronic products for resale outside of Japan. MC and MIC purchased television receivers from such Japanese manufacturers as Melco, General Corporation (General), and Osaka Onkyo. In addition, MIC purchased television receivers from Wells Gardner, an American manufacturer. As for other consumer electronic products, MC and MIC purchased from Shodenshosha (also known as Audio World), Fuji Onkyo, General, Maeden Company, Marvel Company, Melco, Nippon Onkyo, Onkyo Nisshin, Osaka Onkyo, and Sankyo Seiki.

MC and MIC traded in consumer electronic products in two ways. First, beginning in 1963, MC sold consumer electronic products to MIC for resale in the United States under private labels to a number of U.S. mass merchandisers and to a number of original equipment manufacturers, including Emerson (plaintiff NUE's predecessor), Muntz, and Westinghouse. Typically, such sales were negotiated between MIC and its customer, often with the direct involvement of technical representatives of the manufacturer, particularly when the private label product was custom-designed to the purchaser's specifications. In 1974, MIC discontinued the private label segment of its consumer electronic products trading.

In 1970, MIC, until then a private label purchaser, undertook to market brand-name consumer electronic products by obtaining the North American rights to Melco's MGA trademark for consumer electronic products. A license agreement between MIC and Melco allowed MIC to market and distribute MGA brand CEP's purchased from a number of firms, including Melco, in the U.S., England, and Japan. The MGA Division of MIC purchased the products at a price negotiated between MIC on the one hand and Melco or other manufacturers on the other hand, and sold them under MIC's schedules of prices and conditions to independent MGA dealers.

MIC separately, and MC on a consolidated basis, incurred consistent losses as a result of trading in MGA brand consumer electronic products. On a consolidated basis, MC and MIC lost a total of $7.7 million between 1970 and 1974. As a result of these sustained and substantial losses during approximately four years of operation, MIC decided in 1974 to cease selling MGA brand consumer electronic products. In October, 1974, MIC sold the assets of its MGA Division to Melco Sales, Inc. for $18.7 million.

Plaintiffs advance three theories of liability as to MC and MIC. First, they contend that MC and MIC were participating members of the alleged manufacturers' conspiracy. However, the only facts plaintiffs have adduced as to MC and MIC are that (1) MC participated in the JMEA meetings and in meetings of two low-level JMEA committees; (2) MIC was a member of the Japan Light Machinery Information Center in the United States; (3) MC and MIC sold consumer electronic products as to which the manufacturers allegedly rebated; (4) MIC's MGA Division offered advertising allowances; and (5) MIC sold at prices below the check prices. We shall analyze these allegations in terms of both direct and circumstantial evidence. Second, plaintiffs argue that even if MC and MIC did not directly participate in the alleged conspiracy, they should be held liable for it as the "intimate affiliates" and "functional subsidiaries," respectively, of Melco. Third, plain-

tiffs seem to argue that MIC should be held vicariously liable for the alleged conspiracy because it was an "agent" of Melco. In addition, plaintiffs raise two procedural grounds for denial of MC and MIC's motions: (1) the alleged insufficiency (under Rule 56) of MC and MIC's affidavits; and (2) a claim of discovery misconduct by MC and MIC (as well as by Melco and Melco Sales).

█ The record plainly affords no support for the direct evidence conspiracy claim. The plaintiffs concede, as they must, that MC was not a member of the Okura Group, the Palace Group, the Palace Preparatory Group, the Tenth Day Group, the MD Group, the TS Group, or any of the other allegedly conspiratorial groups operating sub rosa in Japan. MC was not a member of the Market Stabilization Council. MC was not a signatory to any of the Manufacturers' Agreements. Nor was MC a target of any investigation by the JFTC.

Plaintiffs rely upon MC's membership in the JMEA, in the JMEA Transistor Radio Export Examination Committee, and in the JMEA Television Subdepartment of the Electric Home Appliance Department.

However, beyond mere membership, which cannot create a genuine issue of material fact as to conspiratorial activity, plaintiffs have offered no evidence as to the activities of either committees except for the bare allegation that the television subdepartment discussed "trade activity." [317] Although plaintiffs ask us to, we cannot draw negative inferences against MC because of the *absence* of documentary evidence of the committee's activities. MC was also a member of the EIAJ, but an uncontroverted MC affidavit shows that that membership involved products other than CEPs.[318]

Having failed to adduce any probative evidence of MC's participation in conspiratorial activities in Japan, plaintiffs allege that MC and MIC are implicated in conspiratorial activity by virtue of their participation in the rebate scheme.[319] There are several facets to plaintiffs' claims in this regard. First, while plaintiffs do not allege that MC or MIC received rebates, there is an allegation that on one occasion MC and MIC facilitated a Melco rebating transaction. There is also an allegation that MIC itself engaged in rebating through its cooperative advertising program with its deal-

---

**317.** MC apparently attended the JMEA meetings at which the television and radio export control rules were adopted, and plaintiff asserts that MC "assented" to their adoption. Even if plaintiffs had offered evidence of MC's "assent" (they have not), they could not complain about what are minimum price agreements for the reasons we have explained in Part VI.B, *supra*. With respect to MC's attendance at meetings of the Transistor Radio Export Examination Committee and three departments of the Electric Home Appliance Department of JMEA, we note that plaintiffs have adduced no evidence that MC attended any specific meeting or evidence of what transpired at any meeting. We cannot assume that MC personnel attended specific meetings or that anticompetitive agreements were reached at those meetings, or that MC entered into them, or that MC carried out acts pursuant to them, or that any such acts were directed at and caused antitrust injury to plaintiffs. We note again that plaintiffs might have attempted to establish such matters by discovery, but elected not to do so. Plaintiffs' allegations that MIC is responsible for certain pre- and post-employment conduct of certain employees is patently baseless and requires no further comment. MIC has not admitted membership in the Japan Light Machinery Information Center. Although that would make no difference, see Part VII.G.3, *supra*, the allegation of membership is not borne out by the record.

**318.** We have reviewed plaintiffs' objections to the affidavits of MC and MIC. Those four affidavits, which deny all of plaintiffs' allegations, in actuality are unnecessary because of plaintiffs' failure to meet their burden to advance significant probative evidence to controvert defendants' well-pleaded motion. We rely herein upon the non-controversial aspects of the affidavits, noting that, as to those, plaintiffs' objections are unavailing.

**319.** Plaintiffs also charge that MC and MIC's alleged invoicing at MITI check prices constitutes evidence from which their participation in the alleged manufacturers' conspiracy may be inferred. FPS at 3458–59. This argument is baseless. First, the record is clear that MC and MIC had no role in establishing the check price system. Second, for reasons explained above, neither MC and MIC's adherence to check prices nor to the Five Company Rule (also complained of with respect to MC and MIC) could have injured plaintiffs.

ers. Moreover, plaintiffs seek to draw an inference of conspiratorial activity from their allegation that MIC was aware that certain private label purchases of Melco manufactured television receivers by Gamble Skogmo, Midland, Broadmoor Industries, and AMC were negotiated at prices below check price levels.

Plaintiffs' evidence, even if admissible, is insignificant with respect to either participation or knowledge by either MC or MIC in any kind of "rebate scheme." [320] As we have explained above, knowledge of the rebate system was common, but that does not create an inference that MC or MIC knew that the rebates were the result of concerted activity. At all events, neither the evidence set out in n.320 nor any other information advanced by plaintiffs in this voluminous record reflects or is a basis for drawing an inference of participation by MC or MIC in any agreement with respect to rebates. [321]

In the wake of this uncontradicted factual background, we must determine whether there is any inference that can reasonably be drawn from the evidence which, with any degree of logic, is suggestive of MC or MIC's participation in the "unitary" conspiracy.

Plaintiffs' theory of the alleged conspiracy is that defendants' monopoly profits from the high price-fixed and closed Japanese market subsidized low price-fixed exports in the United States in order to take over the United States CEP market. Plaintiffs' explanation of the alleged economic motivation for this conspiracy is the desire on the part of Japanese manufacturers to maintain full production in the face of excess capacity without putting downward pressure on Japanese home market prices. However, plaintiffs' conspiracy theory as to

---

**320.** Plaintiffs rely in part on DSS 1231, a telex whose author is unknown, which has no addresses, and with respect to which no discovery was taken. It is unauthenticated and inadmissible as hearsay under the standards established in the Japanese Materials Evidentiary Opinion, notwithstanding its mode of production. The plaintiffs also rely on a double hearsay statement that "Gamble saying our basic price be quoted on basis 10 pct. less from check prices" to prove that MIC "was a party to defendants', particularly Melco's, continual sales below check prices." But even assuming admissibility *arguendo*, the document does not establish that sales below check prices were consummated, or that MIC was a "party" to other defendants' sales, or that such sales were continual. For all that appears, if MC and MIC were "parties" to another defendant's sales of private label products, it was in their capacity as buyers. Moreover, plaintiffs' interpretation of the telex is strained, converting a general reference to a "5 pct. price reduction for 1970" into a specific one, referable to MC and Melco without any discernible basis.

Plaintiffs also charge that MC and MIC "facilitated" a rebate transaction and reference a certain agreement to sell Melco TVs to Amcrest Corporation (AMC), a large retail service company. Plaintiffs purport to explain the transaction at pp. 6869–73 of their FPS. The entire account of the transaction is based on documents; no depositions were taken to explain what really occurred. In any event, while the transaction in question might well have involved a Melco rebate had it been consummated (according to the FPS at 6873 it was ulti-

mately cancelled), plaintiffs' account is at best unclear as to MC and MIC's roles, and we can only speculate.

DSS 1164, also relied upon by plaintiff, relating to alleged rebates to Midland International Corp. in 1969, is equally cryptic, and neither the author nor the recipient of the document was ever deposed. Its admissibility has not been established within the strictures of the Japanese Materials Evidentiary Opinion.

Finally, plaintiffs' allegation about the cooperative advertising program fails because the documents on which plaintiffs rely contain no reference to Melco or to communication between MIC and Melco about the program and because the program clearly did not involve a rebate, but rather a genuine cooperative advertising program of a type that is generally considered to be pro-competitive.

**321.** Plaintiffs also claim that losses incurred by MIC's MGA Division for 1970–74 were "due to Melco and MIC's arbitrary pricing with the intent to predatorily take over the U.S. CEP market." The losses are conceded, but plaintiffs' ascription of cause is pure speculation. Plaintiffs have offered no evidence that Melco controlled or even influenced MIC's resale price in the U.S. market, nor may predatory intent be inferred from losses by a new entrant in a highly competitive market. There is no evidence of a later price increase to reap monopoly profits. Finally, MIC sold its MGA division, serving its own self-interest, instead of acting contrary to that interest by continuing to sustain losses.

MC and MIC cannot meet the conspiracy tests enunciated in Part VI.D., *supra* because it is totally illogical.

First, there is no potential benefit to MC and MIC from a successful conspiracy; hence, they had no motive to participate. Neither MC nor MIC manufactured consumer electronic products in Japan or anywhere else. Nor did they distribute consumer electronic products in the Japanese "home" market. Indeed, for MC and MIC there was no "home market." Accordingly, neither MC nor MIC would have, or for that matter could have, fixed prices in Japan. Similarly, no business interest of MC or of MIC could have been furthered by any alleged protection of the Japanese consumer electronic products market.

Second, because MC and MIC had no production capacity, they could not have had the full production motive plaintiffs' experts ascribe to the manufacturing defendants. Third, participation by MC and MIC was not needed by the manufacturers to achieve any end of the alleged conspiracy. That is because MC and MIC would be totally useless to any conspiracy which "allocate[d] among themselves the absolute volume of production and sale" of CEP's, for they had no production to allocate. Moreover, as trading companies, MC and MIC were in economic terms purchasers of consumer electronic products for resale, not sellers with market power.

Fourth, the "elimination of competition" in Japan could in no way enhance MC and MIC's resale of consumer electronic products in the United States. Because MC and MIC did not participate in the Japanese market, they could derive no "monopoly" profits to subsidize their sales in the United States. Fifth, MC and MIC, as non-manufacturing trading companies, were not competitors of the manufacturer plaintiffs, Zenith and NUE, and thus would have little motive to drive them out of business. Finally, even if successful, the conspiracy as alleged could have conferred little if any competitive benefit on MC or MIC. Any benefits they could have derived from the success of the alleged conspiracy in increasing sales in the United States would have been entirely collateral.

■■■■ The sum of the foregoing discussion is that plaintiffs have adduced no direct evidence that MC or MIC participated in the alleged manufacturers' conspiracy, and that there is no reasonable inference that can be drawn from the evidence that they joined it, or even that they knew of its existence and were somehow complicitous with it, intending to further the scheme. Neither does the vertical relationship between MC and MIC and Melco, which involved such matters as plant visits,[322] office sharing,[323] and price negotiations, all of which are invoked by plaintiffs, provide any basis for inferring a conspiracy. Discussions of and agreements as to price and supply relationships among vertically

**322.** Plant visits among even horizontal competitors fail to give rise to any inference of conspiracy. *United States v. National Malleable & Steel Castings Co.*, 6 F.2d 40 (6 Cir. 1957), *aff'd per curiam*, 358 U.S. 38, 79 S.Ct. 39, 3 L.Ed.2d 44 (1958). Therefore, visits by a customer to one of its suppliers' plants *a fortiori* cannot imply that the manufacturer informed the customer about a manufacturers' conspiracy.

**323.** Plaintiffs have relied upon, but have not clarified, the significance of Melco employees' temporary use of MIC office space in the United States. Apparently, those matters are offered to show that MC and MIC had contacts with Melco which, in turn, was allegedly a member of trade association committees to which MC did not belong. These informal office sharing arrangements provide no evidence that MC or MIC knew of the alleged manufac-

turers' conspiracy. At most, office sharing represents only opportunities for disclosure, not positive evidence of it. *Hunt v. Mobil Oil Corp.*, 465 F.Supp. 195 (S.D.N.Y.1978), *aff'd*, 610 F.2d 806 (2d Cir. 1979). Plaintiffs have elected not to depose MC and MIC employees regarding the substantive nature of any contacts between MC and Melco as a result of their office sharing arrangements, and thus have failed to offer any evidence relating to such contacts. Moreover, MIC has denied that it learned of any alleged manufacturers' conspiracy as a result of these office sharing contacts (Tadatoshi Kitayama Affidavit at 7–8 and 11, ¶¶ 21 and 27 [Exhibit B]). Plaintiffs have also failed to connect the timing of the office sharing periods to any event significant to the alleged conspiracy.

positioned firms simply do not raise any inferences of conspiratorial knowledge by the customer of the anticompetitive purposes of its suppliers.[324]

Plaintiffs' only remaining basis for attempting to hold MC and MIC into the case is a function of plaintiffs' allegations about the relationship between these two firms and Melco. These claims, in turn, stem mainly from the alleged present-day remnants of the historic ties between Melco and MC and MIC, and from plaintiffs' claims about the "Mitsubishi Group." We adverted to this matter in Part VII.Q.7, *supra*. Few points in this case have received more heated discussion. MC and MIC have forcefully, indeed persuasively, argued that the zaibatsu is long dead and that MC and MIC are totally independent from Melco. In their submission, the only current viability of the "Mitsubishi Group" notion is for advertising purposes. Plaintiffs, on the other hand, vigorously assert that the notion of the "Mitsubishi Group" is still a meaningful one. They point to interlocking directors and cooperative activity among the companies, and assert that MC was Melco's "functional subsidiary," with the result that MC

and MIC are chargeable for Melco's complicity in the alleged "unitary" conspiracy.[325] However, we need not reach this issue because, since the plaintiffs have no evidence to link Melco to the alleged conspiracy, they cannot hold in MC or MIC on any "functional subsidiary" theory.[326]

### 10. Sears

Sears is the world's largest retailer. The nature of its operations is a matter of common knowledge and does not require elaboration here.

The plaintiffs charge that Sears, as early as 1963, joined in the conspiracy of the Japanese manufacturing defendants and their sales subsidiaries to drive down prices and destroy the U. S. CEP manufacturing industry. Plaintiffs do not charge that Sears joined some different conspiracy, but rather the "unitary" conspiracy which we have described at such length, *supra*. Plaintiffs have made some perfunctory assertions about Sears' involvement in the "Japan-side" of the "unitary" conspiracy, which they have, in essence, abandoned.[327]

---

**324.** *Nifty Foods Corp. v. The Great Atlantic & Pacific Tea Company, Inc.*, 614 F.2d 832 (2d Cir. 1980); *Fuchs Sugar & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979); *Pitchford v. Pepi, Inc.*, 531 F.2d 92 (3d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Klein v. American Luggage Works, Inc.*, 323 F.2d 787 (3d Cir. 1963); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F.Supp. 243 (E.D.Pa.1979), *aff'd*, 637 F.2d 105 (3d Cir. 1980). *A fortiori*, such discussions cannot implicate the customer in a broader horizontal conspiracy among manufacturers.

**325.** We do note, however, that plaintiffs' interlocking directors' claim is incredibly strained. Plaintiffs rely on the presence of one Melco officer on a 43 to 47 person MC board. This approach is not, however, nearly as strained as that contained in DSS 32, initially offered in the *in limine* hearings but then withdrawn. That document was a staff study prepared by the Subcommittee on Reports, Accounting and Management of the U. S. Senate Committee on Governmental Affairs entitled "Interlocking Directorates Among the Major U. S. Corporations." Plaintiffs' proposed use of that study proceeded from its incredibly expansive definition of *indirect* interlocking directorates which is said to occur:

when each of the two companies has a director on the board of a third—or intermediate—company, or conversely where the third company has a director on the boards of each of the two companies. In such situations, there is also the opportunity for direct communication and shared knowledge between the first and second company, even though they are indirectly, rather than directly, interlocked.

The staff report includes many thousands of pages somewhere amidst which it is apparently indicated that a director of Sears, Roebuck or a director of Motorola served on another board on which a director of Montgomery Ward or J. C. Penney or some other U. S. importer apparently served. The point of the matter, in plaintiffs' aborted submission, was that this "indirect interlock" showed that Sears or Motorola were linked with the other coconspirators.

**326.** We incorporate by reference what we said at n. 310, *supra* with respect to plaintiffs' claim that MC and MIC's motions must be denied on the ground of their alleged discovery abuse.

**327.** Plaintiffs have no evidence of Sears' direct involvement in any activities in Japan, such as participation in export control arrangements or presence at meetings of "conspiratorial

Their more seriously conceived allegations about Sears' complicity are twofold. The first relates to Sears' alleged involvement in the "rebate scheme" we have described, and the second is that Sears acted anticompetitively by way of its complicity in the acquisition of Warwick by the Sanyo interests.[328]

With respect to the Warwick transaction, which we take up first because it can be disposed of briefly, there is no evidence other than that: (1) Sears attempted to preserve Warwick, engaging in a variety of financing arrangements for its benefit in addition to long-term loans, and (2) Warwick failed in spite of that support. *See* Part VII.N.3, *supra.* Given that Sears had a 25% interest in Warwick, in addition to its millions of dollars worth of outstanding long-term loans which it would stand to lose

if the alleged conspiratorial objectives were accomplished, it would have been irrational for Sears to conspire to destroy Warwick.

Turning to the rebating "scheme," Zenith's allegation against Sears has three aspects. The first relates to Sears' purchases of Japanese-manufactured television receivers (from Sanyo and Toshiba) at prices which were below the check prices and which, consonant with plaintiffs' generalized conspiracy claims, were "sufficiently low to obtain the business" and to displace U. S. domestic suppliers. We take this up in conjunction with the second aspect, which lies in the allegations that, to conceal the actual export prices in these transactions, Sears systematically falsified the various invoices, purchase orders, letters of credit, and other formal documents reflect-

groups." In paragraph 17 of plaintiffs' counterclaim joining Sears, an allegation is made (and Sears' reply admits) that certain Sears catalog merchandise is offered for sale to the public in Japan by the Seibu department store chain, and that such merchandise does not include the television sets made in Japan which are offered to Sears' U. S. catalog customers. Paragraph 17 of the Counterclaim alleges, and Sears' Reply denies, that Sears withholds such television sets from sale in Japan in order to avoid disrupting the alleged price fixing conspiracy and cartel maintained there by Japanese television manufacturers.

The FPS contains no evidence that Sears consciously assisted a high price cartel in Japan. Indeed, at page 3445, the FPS acknowledges Sears' attempts to market television sets in Japan, and cites the Nehmer Report which, at page IV–18, discusses the "exclusion of Sears," asserting that, "Sanyo and Toshiba were not allowing any sales of their television receivers through Sears into the Japanese market . . . ." However, the record reveals that what kept Sears' television receivers off the Japanese market was the nature of the merchandise and of the Japanese market. The contract between Sears and Seibu, identified in an affidavit of Mr. Norris, who was in charge of Sears' catalogue sales program with Seibu, provides that the Sears catalog merchandise to be offered for sale by Seibu in Japan is to be limited to ". . . those items displayed in a Sears catalog which SEARS, after consultation with [SEIBU], determines are (2) readily saleable or adaptable for sale in Japan. . . ." It is undisputed that the sets manufactured for Sears in Japan have tuners which will not receive a substantial portion of the television transmission in Japan and require power supplies which would result in the

sets probably not receiving any picture at all in Japan, let alone a satisfactory one. Zenith's Mr. Horn, in his deposition, admitted that a Sears set could not in good conscience be recommended for use in Japan, and Zenith conceded through its highest ranking officer, Mr. Nevin, that Sears would need television sets with different electronics for sale in Japan than those it bought for sale in the United States. *See generally* Opinion (1916 Antidumping Act), 494 F.Supp. 1190 at 1204, *et seq.* It is thus undisputed that Sears' television sets were not saleable in Japan. Moreover, Norris explained that direct delivery to customers in Japan of merchandise which Sears purchased there and did not first remove from that country would have caused Sears to lose the exemption from Japanese taxes which its Japanese buying office enjoys and which, in Mr. Norris' judgment, would have more than offset any profits Sears might have earned by such activity.

The short of it is that there are innocent and logically compelling reasons why Sears television sets were never sold by Seibu. Assuming, but by no means conceding, that all the Japanese manufacturers were conspiring in their "home market" as Zenith alleges, it is illogical to suppose that they either sought or received Sears' acquiescence or assistance, for they would have required neither. All they would have needed to do was to refuse to supply Sears with television sets which would operate satisfactorily in Japan.

328. Although plaintiffs have made some generalized allegations about the involvement of Sears in connection with non-TV products, the preclusive FPS contains no cognizable evidence of it.

ing the price at which the goods were being exported from Japan and imported into the United States by the declaration of erroneous prices, and that the "pattern of false customs declarations" was accompanied by the payment of secret rebates.[329] The third aspect of Zenith's claims about Sears' participation in the rebate scheme lies in plaintiffs' allegations about Sears' participation in legal maneuvers to thwart the U. S. Treasury Department 1921 Antidumping Act investigation.

Zenith contends that Sears' participation in the rebate conspiracy enabled Sears "to regularly sell consumer electronic products manufactured for [it] by its Japanese suppliers at prices far below levels at which Zenith and other manufacturers could compete and far below the fair market value of such products, and to achieve a level of sales far above what it would otherwise have enjoyed, but for its participation in defendants' concerted program." Plaintiffs allege that without the rebates, which reduced the actual price for television receivers below the check price, Sears could not have been competitive in the American market with respect to the sale of Sanyo and Toshiba television receivers and that the rebates afforded Sears the power to aggressively promote the Japanese manufactured television receivers in its retail outlets. The amounts of the rebates were enormous: in 1971, for instance, Sanyo alone rebated to Sears $2.47 million, and for the four years 1969 through 1972, inclusive, the rebate amount was over $7 million. As of the time of the writing of plaintiffs' FPS, Sears' sales of television receivers accounted for over 11% of the United States market. Zenith complains that it was Sanyo and Sears' hope that they would ulti-

mately seize the majority share of the U. S. market.

Description of the rebate scheme as it involves Sears, Sanyo, and Toshiba occupies almost 500 pages of the FPS. The facts are advanced through references to a large number of documents which set forth the *dramatis personae* of the scheme and detail numerous individual sales transactions. We have described in Part VII.L, *supra* the various devices by which rebates were paid by Sanyo and Toshiba to Sears, and need not repeat that description here.

The FPS description details the "double billing" and "over-under" devices also described in Part VII.L and alleged to be the means to conceal the rebates from U. S. Customs. Sears, supported by evidence, vigorously denies the allegations that it concealed the rebates, discounts, and allowances or that it deceived U. S. Customs authorities. The plaintiffs, armed with different evidence, argue vigorously that Sears did indeed practice such deception. Plaintiffs contend that Sears' participation was not just in one-on-one transactions with its principal Japanese suppliers, Sanyo and Toshiba, but rather as part of the conspiracy of all defendants to conceal the actual prices at which CEP's were exported from Japan into the United States. Plaintiffs describe this as a critical and integral component of the conspiracy, asserting it to be one of the principal means by which the conspiracy was implemented.

Even if we assume that the numerous Sears-related documents which plaintiffs have referenced in their FPS and their final summary judgment briefs, many of which were before us as DSS's at the pretrial evidentiary hearings, are admissible,[330] they

---

**329.** Much stress is placed by Zenith upon the fact that, on February 26, 1980, a federal grand jury in the Central District of California indicted Sears on charges of customs fraud arising out of the "rebate scheme" discussed at such length in this opinion. That case is still pending. Zenith's allegations in this regard are not mere litigation rhetoric; they are tinged with bitterness. Zenith devotes some ten pages of its Supplemental Reply Memorandum in Opposition to the Motion for Summary Judgment

(filed Aug. 11, 1980), to detailing the charges in the indictment and listing the alleged conspirators, most of whom are Sears, Sanyo, and Toshiba merchandising personnel.

**330.** We observe that, despite challenge, the plaintiffs have failed to lay the foundation for the admission of these documents as business records under the F.R.E. 803(6) standards enunciated in our Japanese Materials Evidentiary Opinion; they thus cannot be admitted against all parties. Many of the documents,

are not sufficient by themselves or in combination with other evidence to create a genuine issue of material fact as to the existence of a conspiracy among the various defendants, including Sears, because: (1) no direct evidence in the record reflects knowledge by Sears of the objects and purposes of the alleged "unitary" conspiracy or participation by Sears in that conspiracy;[331] (2) no circumstantial evidence has been called to our attention from which it can be inferred that Sears was a participant in any concerted activity with respect to rebates;[332] and (3) it is clear that the inference that Sears participated in a "unitary" conspiracy to maintain high prices in Japan and low prices in the United States for the purpose of destroying United States manufacturers of consumer electronics products is totally illogical and does not meet *Bogosian/Venzie* standards.

First, Sears had nothing to gain and much to lose from the crippling and destruction of the United States CEP industry. It would clearly be in Sears' economic interest as a buyer to preserve as many competing sellers as possible (including Warwick) for present and future considerations.

Second, because the Japanese manufacturing defendants are sellers and Sears is a buyer, Sears' interests cannot be aligned with those other parties who were its alleged coconspirators. It is always in a buyer's economic self-interest to obtain as low a price as possible. It is only a buyer's rejection of a better offer that is so contrary to his apparent economic self-interest that can justify an inference of conspiracy. We fail to perceive how Sears' acceptance of better offers from its Japanese vendors, especially if it played off one against the other in order to get the better deal, can lead to an inference of conspiratorial conduct.[333]

Third, although plaintiffs complain that Sears (with Sanyo's concurrence) was striving vastly to improve its market position, thus to achieve some kind of monopoly, the desire for increased market share is a normal desire of any company acting unilaterally in its own self-interest.[334] Given the foregoing facts and analysis, the only drawable inference is that Sears acted at all times in the pursuit of what it perceived to be its own economic self-interest, and totally inconsistently with any notion of conspiratorial activity.[335]

Fourth, our earlier discussion explains why no inference of conspiracy can be drawn from the facts, if true, that there were irregularities in the reporting to U.S. Customs of Sears' purchases from Sanyo

however, are doubtless admissible against Sears or against the company employing the author of the documents in the rare case when that company is a defendant.

331. Part of Zenith's claim against Sears is based on Sears' alleged knowledge that the probable result of the Japanese defendants' pricing policies would be the demise of U.S. CEP manufacturers. However, the principal *evidence offered to support this claim*, Sears document 4955, a memorandum written by a Mr. Amato, formerly the head of Sears' home entertainment purchasing department (and now deceased), does not do so. The memorandum on its face, and taken in its historical context, is at best highly ambiguous, especially in terms of its identification of the "casualties," who may have been smaller Japanese manufacturers, not U.S. manufacturers. The allegation is not otherwise supported.

332. We include all the oft-mentioned "Ex. Hall" documents, even assuming their admissibility.

333. We also note that the Japanese television sets were of undisputably better quality and availability than those which Sears had been procuring for years from Warwick, so that it was in Sears' interest to purchase them from its Japanese rather than its American suppliers. *See* Part VII.N.3, *supra*.

334. We note that Zenith's president, Mr. Nevin, testified that it was unrealistic to believe that Sears could substantially increase its market share (except "through prayer"). In any event, there are numerous indications, *see* pp. 1232–1233, *supra*, that Zenith had precisely the same intention.

335. Plaintiffs have pointed to losses incurred by Sanyo, Sears' supplier, and Sears as evidence of conspiratorial activity. We have addressed the matter of Sanyo's "losses" in Part VII.Q.5, *supra*. We do not dwell on Sears' alleged losses because there is no evidence (and no evidence from which it can be inferred) that any losses incurred by Sears in the CEP field were either deliberate or prolonged.

and Toshiba, or that Sears was a party to material falsification to Customs or to the withholding of material information from it. Participation in the rebate scheme and even falsification to Customs with the view of preserving the low net price are far more consistent with attempts to obtain the lowest possible price for Japanese CEPs and to avoid detection so as to retain the price advantage than with any predatory low price export conspiracy.

Turning to the remaining facet of plaintiffs' "rebate scheme" claims, the plaintiffs allege that in approximately mid-1970, when it became generally known in the trade that U.S. Customs and the Department of the Treasury (of which Customs is a part) were tending toward a decision to issue a notice of withholding of appraisement in the investigation of alleged dumping of television sets from Japan, Sears, in concert with other importers, took a number of actions "pursuant to the alleged conspiracy" in an attempt to halt the dumping investigation before the government discovered the alleged secret rebates which Sears and others were allegedly conspiring to conceal.[336]

However, the undisputed facts show that, at most, Sears and others with common interests: (1) discussed possible presentations before the U.S. Tariff Commission; (2) consulted jointly with respect to institution of litigation to enjoin the investigation; and (3) acted jointly in an attempt to persuade the Secretary of the Treasury and his subordinates to take certain actions in connection with the TV antidumping investiga-

tion. As we explained in Part VI.A.8 above, even if plaintiffs' allegations are accurate, the allegedly offending activity is protected and cannot be the basis for a finding of conspiracy.[337]

### 11. Motorola

Motorola needs relatively little more introduction than Sears. For many years, Motorola was known as a major U.S. producer of consumer electronic products, including television receivers. In recent years, Motorola has attained prominence in research and development and marketing of semi-conductors. Plaintiffs' claims that Motorola is involved in the "unitary" conspiracy emanate from three sources: (1) Motorola's purchase of Japanese television receivers at depressed prices and its participation in the rebate scheme, allegedly with knowledge of the overall conspiracy; (2) Motorola's sale of its consumer electronic products (Quasar) division to Matsushita; and (3) Motorola's activities in connection with certain joint ventures in Japan. We take up these matters seriatim.

During the 1960's, Motorola was interested in purchasing CEP's in Japan. It first established an office and then a wholly owned subsidiary, Motorola Service Co., Ltd. ("MSCL") there. Zenith has alleged that Motorola then became aware that check prices were established by a "major Six Company conference consisting of presidents and/or vice presidents only."[338] However, assuming that the existence and etiology of the check prices were not com-

---

**336.** Sears notes that, in this respect, the FPS relies largely upon testimony and documents obtained by depositions of non-Sears' witnesses at a time *prior* to Sears' joinder in this litigation. Sears argues that these matters are therefore inadmissible against Sears under F.R. Civ.P. 32(a). In view of our conclusion, we need not address this argument.

**337.** Sears describes all of the meetings discussed in the FPS. For example, the first two meetings—a June 2, 1970 meeting of representatives of Sears, other retail merchants, and certain Japanese manufacturers, and a June 4, 1970 meeting of attorneys for certain members of the National Retail Merchants Association,

including Sears—are asserted by Sears to be "innocuous as a matter of law." Sears also refers to a July 2, 1970 meeting of representatives of the National Retail Merchants Association, including the President of Sears, with Treasury Secretary Kennedy, seeking to persuade him to take certain action in the conduct by his Department of the television dumping investigation, as quintessentially the type of activity specifically immunized from antitrust attack by the *Pennington* decision.

**338.** Motorola is a defendant only in the *Zenith* case; NUE never stated a claim against Motorola.

mon knowledge[339] and that the documents relied upon to prove Motorola's "knowledge" are admissible, there is still no evidence from which it could be inferred that Motorola knew of the nature of the alleged unitary conspiracy.[340] Neither is such knowledge established, as plaintiffs suggest, by the fact that an employee of MSCL, one Shigemitsu ("Shiggy") Nakano had "good connections in the highest places."[341]

There is evidence from Motorola's negotiations with Sharp for the purchase by Motorola of Sharp-manufactured television receivers that Motorola was aware of the practice of rebating to circumvent MITI check prices, for that transaction involved a rebate. Problems resulting from the U.S. antidumping investigation developed in connection with payment of that rebate, and there is considerable dispute whether the rebate due from Sharp to Motorola on that transaction was ever paid. There is also dispute as to whether Motorola revealed "all" to the United States Customs Service as it (with supporting documentation) strongly affirms.[342] However, the ultimate point is that, notwithstanding Motorola's awareness and even possible participation in rebating, there is no evidence that Motorola knew of or participated in the "unitary" conspiracy. To infer from knowledge that the Japanese sold at low prices that Motorola had knowledge of a low price conspiracy to drive U.S. manufacturers out of business would be impermissible speculation.

■ Zenith argues that Motorola's purchase of Japanese CEPs at low (net) prices as the result of a rebate itself creates an inference of Motorola's complicity in the alleged conspiracy. However, as was the case with Sears, it was plainly in Motorola's interest to get the best price it could on

---

**339.** *See* discussion at p. 1247, *supra*, which suggests that they were. Even Zenith's witnesses testified that the U.S. manufacturers have known about the check prices for years.

**340.** DSS 1178 is an internal Motorola memorandum which plaintiffs submit establishes the existence of the overall conspiracy. It does not. Moreover, plaintiffs laid no foundation for the admission of the document as a business record, and it contains multiple hearsay. Neither is Motorola's knowledge of the "unitary conspiracy" established by DSS 1173, produced from Motorola's files, which is entitled "Highlights of Far East Trip, 1964." Zenith has offered the document as a business record, as an admission against Motorola, and under the residual hearsay exceptions as evidence that Motorola participated with the defendants in the conspiracy, or at least that it had knowledge of the conspiracy. What is apparently of greatest interest to plaintiff is a notation in that document that a MITI representative was reported to have pounded hard on the theme that Japanese companies doing business in the United States should not "do to the U.S. TV business what [they] did in portable radios." Zenith is apparently also interested in the general information contained in the document about the condition of the TV manufacturing business in Japan. Supposedly the trip report was prepared by Paul Stancik, Motorola's Director of Purchasing, but his deposition was never taken (although he was once subpoenaed and has always been available). Mr. Haberstich, a Motorola purchasing agent and presumably a key witness, testified at his deposition that he had never seen the document, and that he did not know whether Mr. Stancik went to Japan in 1964, whether Stancik had ever visited MITI, or whether anyone else at Motorola had ever visited MITI. When this document is measured against the standards outlined in the Japanese Materials Evidentiary Opinion, it is inadmissible. However, even if the document were admissible, nothing therein constitutes evidence tending to show that Motorola was aware of the "unitary" conspiracy alleged by the plaintiffs. Even if one assumes that Motorola is charged with knowledge of a radio conspiracy (and there is no such evidence) such an inference cannot be drawn. Plaintiffs' trenchant and repeated reliance on documents of this character is indicative of the problems with their case.

**341.** This reference, typical of plaintiffs' strained arguments, is from DSS 1173.

**342.** It is undisputed that Motorola sent a separate form of letter to the local collector of customs explaining the difference between the MITI check price and the actual selling price and requesting that the sets be appraised at the actual selling price. The plaintiffs contend that this was not "telling all." Resolution of this factual dispute is unimportant to the outcome here. Neither is it necessary to discuss the ramifications of the suit which Motorola filed against U.S. Customs in the United States Customs Court articulating Motorola's position that the duty should have been assessed at the price MSCL actually paid, *i. e.*, price less rebate.

Japanese manufactured goods.[343] Moreover, it is undisputed that: (1) in 1967, Zenith and RCA were already selling or planning to sell 14″ color television receivers; (2) Motorola did not have a 14″ set in its line; and (3) the purchase from Sharp filled that gap, enabling Motorola to respond to the competition while it developed its own domestic production capacity. By 1970, when Motorola was able to manufacture 14″ color televisions in its own production facility in the United States, it stopped purchasing from Sharp and never again purchased Japanese television receivers. Thus, because of Motorola's unique situation vis-a-vis the other defendants and alleged coconspirators, it was in Motorola's interest to purchase the television receivers from Sharp. This fact not only controverts Zenith's contention that the purchase of imported television receivers necessarily tended to destroy the domestic industry, but also closes the ring on plaintiffs' attempts to infer a Motorola role in the "unitary" conspiracy from consciously parallel interdependent action. It is plain that plaintiffs cannot pass the *Bogosian/Venzie* test as to Motorola, whose actions were undisputably in its self-interest. Motorola's conduct is inconsistent with conspiracy and points unerringly towards rational independent choice.

Apparently recognizing that there is no circumstantial evidence of Motorola's involvement in the alleged "unitary" conspiracy, Zenith asserts that Motorola became a coconspirator by virtue of the sale of its consumer electronics (Quasar) division to Matsushita.[344] We explained in Part VII. N.2, *supra*, why that sale does not help plaintiffs' case. Zenith's board chairman, Mr. Nevin, has himself conceded that Motorola "abandoned the U.S. television market because [it] could not earn adequate profits in it."

Finally, Zenith asserts that Motorola's involvement in the conspiracy is demonstrated by the ramifications of its joint ventures in Japan, principally that with Alps Electric Company, Ltd., creating Alps-Motorola, Inc. ("AMI") to engage in the manufacture and sale of tape players. Because AMI is the final vehicle through which Zenith seeks to link Motorola to the conspiracy, the uncontradicted facts respecting AMI bear recitation. As will be seen, none of these matters demonstrate a unity of purpose, design, or understanding between Motorola and the alleged conspiracy or constitute any evidence thereof.

First, none of Zenith's general conspiracy allegations pertain even remotely to AMI. Zenith does not offer evidence that any product manufactured by AMI was dumped,[345] that AMI sold anything at high prices in Japan or at low prices in the United States, or that AMI fixed prices or was a party to cartel agreements or check prices. Zenith does not claim that any "check price" was ever established for any AMI product or that AMI ever paid anyone a "secret rebate." Zenith does not claim

---

**343.** It bears noting in this regard that the purchase from Sharp referred to above was Motorola's only purchase of Japanese color television receivers, rendering Motorola's purchases insignificant in comparison with total television imports from Japan.

**344.** Zenith's arguments about Motorola's complicity stem from its allegations about the existence of "reciprocal arrangements" supposedly executed in connection with the sale which, according to Zenith, involved "shared, mutual, cross and corresponding transfers of inventions, technological information, technological know-how, buy and/or sell agreements, or co-operative marketing and sales agreements" for semiconductors and solid state devices, products which are not involved in this litigation. Zenith has adduced no facts to support the "reciprocal arrangements" theory. Under oath, both Motorola and MEI have denied such arrangements. Moreover, Motorola's semiconductor sales to MEI have declined significantly. In any event, this allegation, even if it were to be fleshed out, does not create a logical inference of conspiracy. Motorola had no motive to join a conspiracy to destroy American CEP manufacturers in return for prospective semiconductor business with MEI, given that Motorola, as is conceded, already had an active semiconductor product business with the U.S. CEP industry.

**345.** Zenith does allege that Alps and Motorola executives met in Japan to discuss a tape equipment dumping complaint.

that AMI attended any of the "conspiratorial meetings" in Japan. Moreover, despite the fact that AMI was a member of the EIAJ and was active in a number of its committees, Zenith has not identified any EIAJ meetings which AMI attended or adduced any evidence about anything AMI did or said in connection with the EIAJ.

Second, AMI, which was dissolved in 1978, manufactured a single type of consumer electronic product—tape equipment—and not television receivers.[346] Third, Motorola's joint venture is thus no different from the hundreds of other joint ventures by American companies in Japan, including those contemplated by Zenith.[347] Fourth, AMI answered four sets of Zenith's interrogatories and denied any and all involvement in the alleged conspiracy or any aspect of it. Zenith has not attempted to contradict any of those sworn assertions, and has not produced any evidence which would render the AMI venture, or any other Motorola joint venture, conspiratorial in nature.[348]

To summarize as to Motorola: (1) Zenith does not claim that Motorola sold anything in the United States at low prices; rather, Zenith would appear to maintain that Motorola was driven out of the CEP business by low prices charged by the alleged conspirators; (2) Zenith does not claim that Motorola sold anything in Japan at high prices; instead, Zenith claims that Motorola was excluded from Japan because the other defendants suspected that Motorola would disrupt the alleged conspiracy; (3) Zenith does not allege that Motorola dumped anything into the United States; (4) Zenith does not claim that Motorola engaged in price discrimination; (5) Zenith does not claim that Motorola participated in the "cartel" agreements; (6) Zenith does not claim that Motorola participated in any conspiratorial groups or associations; (7) Zenith has no evidence of knowing participation by Motorola in any rebate-related predatory low price export conspiracy; and (8) it is plain from Zenith's evidence that it would not be rational to conclude that any of Motorola's reported conduct was the product of the conspiracy alleged instead of an independent business response consistent with its economic self-interest. Plaintiffs thus have no conspiracy claim against Motorola which can survive summary judgment.

### 12. *The Sales Subsidiaries*

Plaintiffs, in an effort to link the subsidiaries to the parent companies' membership in the conspiracy, have devoted an enormous number of pages of their FPS and their summary judgment briefs to detailing

---

**346.** In fact, Zenith was AMI's best CEP customer, the largest U.S. importer of AMI's tape equipment. As the primary importer of AMI products, Zenith is hardly in a position to claim that AMI conspired to flood the United States with artificially low-priced products, because in accord with Zenith's theory, that would make *Zenith one of the conspirators!*

**347.** Zenith considered plans to establish a manufacturing facility in Japan through a joint venture with a Japanese firm. Instead, it opened its own production facility in Taiwan. Moreover, in 1972, Zenith explored the possibility of marketing its television receivers in Japan, and discussed a joint venture with C. Itoh, a large Japanese trading company. Motorola asserts that it is "incongruous" for Zenith to criticize Motorola for its joint venture with AMI in light of the fact that in February, 1977, Zenith entered into a joint venture with defendant Sony under which Zenith would market in the U.S. Sony's "Betamax" video cassette recorders. We shall not comment on this allegation.

**348.** Motorola was involved in other joint ventures. Its principal venture was an agreement, entered into in 1973, to market U.S. made large-screen color television receivers in Japan through AIWA, a subsidiary of Sony in Japan. Shortly before its U.S. television business was sold to MEI, Motorola terminated the agreement and paid Sony $250,000 in settlement. This aspect of the matter is discussed *supra* in Part VII.N.2. Additionally, Motorola had a 100% owned subsidiary in Japan, Motorola Semi-Conductor Japan, Ltd. (MSJL) and also held a 50% interest in Alps-Motorola Semiconductor, Ltd. (AMSK). MSJL, which was in business between 1968 and mid-1973, sold only semiconductors, primarily manufactured in the United States and exported to Japan. AMSK, formed in 1973 when Alps-Electric purchased a 50% interest in MSJL, made an abortive attempt to manufacture semiconductors in Japan. Neither MSJL nor AMSK sold anything outside Japan, nor exported anything for sale in the United States.

the relationships between the eight principal Japanese defendants and such of their sales subsidiaries as have also been named defendants in this case. Those sales subsidiaries are either sales companies in Japan (e. g., MET, Hitachi Kaden) or sales companies in America (e. g., MECA, TAI, HSCA, SEC, etc.).

 The law is clear that mere corporate affiliation is insufficient to establish conspiracy. *H&B Equipment Co. v. International Harvester Co.*, 577 F.2d 239 (5th Cir. 1978); *Overseas Motors, Inc. v. Import Motors, Ltd.*, 375 F.Supp. 499 (E.D.Mich. 1974), *aff'd*, 519 F.2d 119 (6th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429 (9th Cir. 1979); *DuPont Glore Forgan, Inc. v. AT&T*, 437 F.Supp. 1104 (S.D.N.Y.1977), *aff'd mem.*, 578 F.2d 1366 (2d Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 465, 58 L.Ed.2d 431 (1978). Even though affiliated firms are legally capable of conspiring among themselves, the mere fact of affiliation does not relieve plaintiffs of the burden of proving that they conspired. *H&B Equipment Co., Inc. v. International Harvester Co.*, 577 F.2d 239 (5th Cir. 1978); *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 803 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F.Supp. 841 (N.D.Cal.1979). Indeed, the principle that plaintiffs must prove that affiliates actually conspired applies to wholly-owned parent-subsidiary relationships, *DuPont Glore Forgan, Inc. v. AT&T*, 437 F.Supp. 1104 (S.D.N.Y.1977), *aff'd mem.*, 578 F.2d 1366 (2d Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 465, 58 L.Ed.2d 431 (1978), and to an unincorporated division of a parent company, *H&B Equipment Co. v. International Harvester Co.*, 577 F.2d 239 (5th Cir. 1978).

We have explained that there is no evidence tending to show that any of the subsidiaries were members of the "unitary" conspiracy. Given the legal principles we have just explained, it is clear that the evidence of corporate affiliation does not supply the missing link. We turn then to the question of agency.

 The principles relevant to deciding whether a subsidiary is the agent of its parent corporation were recently reviewed by Judge Caleb Wright in *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil Co.*, 456 F.Supp. 831, 840–41 (D.Del.1978):

Whether an agency relationship exists between a parent corporation and its subsidiary is normally a question of fact. The central factual issue is control, *i. e.*, whether the parent corporation dominates the activities of the subsidiary.

In order to determine whether or not a sufficient degree of control exists to establish an agency relationship, the Court must look to a wide variety of factors, such as stock ownership, officers and directors, financing, responsibility for day-to-day operations, arrangements for payment of salaries and expenses, and origin of subsidiary's business and assets.

(citations and footnote omitted). *See also Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979); *Pacific Can Co. v. Hewes*, 95 F.2d 42 (9th Cir. 1938); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F.Supp. 841 (N.D.Cal.1979). As Judge Wright noted, the existence of an agency relationship is a conceptually distinct question from the notion of "piercing the corporate veil." 456 F.Supp. at 839. However, the mere fact that one corporation owns a controlling interest in another does not render the subsidiary the agent of the parent:

"A corporation does not become an agent of another corporation merely because a majority of its voting shares is held by the other . . . ." Nor does the fact that a parent and a subsidiary have common officers and directors necessarily indicate an agency relationship.

456 F.Supp. at 841, *quoting* Restatement (Second) of Agency § 14 M (citations omitted).

Just as we have, in the preceding sections, analyzed the evidence against each

subsidiary and found it wanting, we have analyzed the evidence against the parents and have found no genuine issue of material fact as to their participation in the alleged conspiracy. Accordingly, given the intricacy, under the caselaw, of the agency determination, there is no point to lengthening this opinion by a detailed analysis of the web of corporate relationships adduced in the record in order to make it; hence we do not do so.[349]

R. *Preliminary Determination of Sufficiency of Conspiracy Evidence under F.R.E. 104(a)*

As we have noted, one of the purposes of the *in limine* hearings was to enable the making of a preliminary determination pursuant to F.R.E. 104(a) as to the admissibility of coconspirator statements under F.R.E. 801(d)(2)(E). We have explained in Part VI.D.6 the requisites developed by the Third Circuit for admissibility of coconspirator declarations. Under those principles, before a coconspirator statement may be introduced the court must make a factual finding by a preponderance of the evidence *aliunde* (*i. e.*, exclusive of the coconspirator statements) that a conspiracy existed and

that both the nondeclarant against whom the statement is offered and the declarant were participants in the conspiracy at the time the statement was made.[350]

Were the tenor of the voluminous record in this case other than we have described, such a preliminary determination would probably require a lengthy opinion in and of itself. However, for the reasons heretofore explained, and summarized in Part VII.S, *infra*, plaintiffs have not even adduced sufficient evidence to create a genuine issue of material fact as to the existence of an unlawful conspiracy among the defendants. *A fortiori*, there is no evidence *aliunde*, by a preponderance of the evidence or otherwise, upon which to found a preliminary determination of the existence of a conspiracy.

■ We do not, however, rest upon the "*a fortiori*" premise. Rather, having examined the record and having detailed its contents over these many pages, we simply make the factual finding that plaintiffs have not established by a preponderance of independent evidence that any of the defendants entered into an agreement or acted in concert with respect to exports to the United States in any manner which could in any way have injured the plaintiffs.[350A]

---

**349.** Our review of the record suggests that, in some cases, we might have found there was sufficient closeness or dominance in the relationship to charge the parent with the acts of the subsidiary. (We do not believe that the principle operates in reverse.)

**350.** Coconspirator statements, of course, must also have been made in furtherance of the conspiracy.

**350A.** In making this finding we have considered the letter of February 4, 1980, from William H. Roberts, Esq., one of plaintiffs' counsel, in response to our request for a listing of the categories of plaintiffs' evidence *aliunde*. That letter listed the following categories, all of which we have addressed herein.

1. Cartel Agreements Entered into by the Japanese Manufacturers of Consumer Electronic Products.
2. The Rules of Japan Machinery Exporters' Association Which Implemented the Cartel Agreements.
3. The Activities of the Defendants in Various Groups and Associations.

4. The Activities of Defendants in the Japan Light Machinery Information Center, New York, New York.
5. The Evidence Before the Fair Trade Commission of Japan, Case No. 6, 1966, Against Sanyo and Five Others.
6. Defendants' Agreement to Allocate the United States Market by Establishing the Five Company Rule and the Registration of Trademarks.
7. Schemes to Fraudulently Conceal Evidence of Their Collusive Conduct.
8. Findings of the Fair Trade Commission of Japan in 1957 Against the "Market Stabilization Council" and its Participants.
9. Findings of the United States Treasury Department and of the United States International Trade Commission.
10. The Inference to Be Drawn from Parallel, Interdependent Rebating Schemes in Which Defendants and Their Co-conspirators Participated.
11. The Inferences to be Drawn from Activities and Meetings of Groups and Associations at Which Complete, Regular Information Exchanges Took Place.
12. The Inferences to Be Drawn from Evidence of Knowledge of Defendants' Concern-

Put differently, we find that the plaintiffs have not established by a preponderance of independent evidence that any of the defendants engaged in the "unitary" conspiracy alleged by plaintiffs (or, for that matter, either the home market or export facets thereof). For these reasons also, the proffered coconspirator statements are inadmissible.

**S.** *Summary of Conclusions as to Plaintiffs' Sherman Act § 1 and Wilson Tariff Act Case as to Television Receivers*

**1.** *Introduction*

At the appropriate juncture in each of the subparts of this Part VII, in which we have examined plaintiffs' Sherman Act § 1 and Wilson Tariff Act case as to television receivers, we have moved from a review of the details of the voluminous evidence in the summary judgment record to a statement of our conclusions as to the legal sufficiency of that evidence, measured against our earlier discussion of the applicable legal principles. Because of the great length of the evidentiary review, we believe it important to summarize in one place the salient conclusions we have reached on the question whether admissible evidence sufficient to create a genuine issue of material fact supports plaintiffs' theory that the defendants and their coconspirators entered into a "unitary" conspiracy consisting of an artificially high price conspiracy in Japan designed to fund a predatory export raid on the U.S. CEP market calculated to destroy and take over that market.

We confess to some misgivings about such a summary, for it is impossible to convey in a brief description any sense: (1) of the scope of the factual record; (2) of the

many-faceted analysis of that record which has led to our ultimate conclusions; or (3) of the innumerable legal points which have impacted on those ultimate conclusions. We also are concerned that such a summary could be used as a surrogate for the opinion itself. That is an unfortunate and misleading possibility, since the opinion was crafted as an integral whole. Moreover, we are reluctant to extend this already lengthy opinion by repeating conclusions previously stated. However, because we believe that the importance of such a summary still outweighs its disadvantages, we hereby offer it.

**2.** *The Export Control Arrangements*

We begin with the export control arrangements, embodied in the MITI-related Manufacturers' Agreements and the JMEA Rules. These agreements were the cornerstone of plaintiffs' original formulation of their case—the "heart" of the alleged conspiracy. Even though the plaintiffs have ceased to place significant reliance on these arrangements themselves, except in conjunction with the "rebate scheme," the "cartel agreements" (as the plaintiffs call the Manufacturers' Agreements), as embellished by the JMEA Rules, remain plaintiffs' veritable Rosetta Stone—their quintessential evidence of defendants' opportunity and intention to conspire, providing the key to the decipherment of defendants' actions, which, in all their "protean" forms, thereby take on a conspiratorial hue. We address here the two challenged facets of the export control arrangements: the Manufacturers' Agreements, which set prices below which the signatory Japanese manufacturers, including defendants, could not

ing Export Systems, Including Rebating Schemes of Other Defendants and Co-Conspirators.
13. The Inferences to Be Drawn from Similar Conduct by Defendants in Selling Consumer Electronic Products in the United States at Prices Substantially Lower than Prices in Japan and at Below Cost.
14. The Inference to Be Drawn from Uniform and Consistent Loss of Money by Japanese Manufacturers' United States Subsidiaries.

15. The Inference from Jointly Expressed Intent by Defendants and Their Co-conspirators.
16. The Sealing Off of the Japanese Home Market from Foreign Competition.
17. The Pattern of Take-overs and Acquisitions.
18. Defendants' Discriminatory Pricing of Consumer Electronic Products to Customers in the United States.

sell in the United States, and the JMEA Five Company Rule, which purportedly limited the number of U.S. customers to which JMEA members could sell, and which plaintiffs contend constitutes an illegal customer allocation.

The Manufacturers' Agreements fix minimum or "check" prices. Even if the arrangements had in fact worked as intended, they could have served only to keep prices elevated. As competitors of defendants, plaintiffs could only be benefited by minimum prices. Although a consumer forced to pay higher prices than a free market would bring (or the Justice Department on behalf of the public) might maintain an action against manufacturers who adhered to a minimum price agreement on a price fixing theory, plaintiffs, as competing manufacturers, are unable to demonstrate any causal relationship between the alleged antitrust violation (in this instance the minimum prices) and their alleged injury. Hence they suffer no antitrust injury from such arrangements and lack standing to attack them.

Plaintiffs' argument that they possess standing to attack the Manufacturers' Agreements because of the allegedly low or depressed level at which the minimum prices were set is without merit. No matter at what level the prices were set, the parties to the agreements remained free to sell at any price which equalled or exceeded the minimum price. The agreements could have had no impact on prices except in those instances when the signatories, if left to exercise independent judgment, would have charged prices lower than the minima. In such instances, the agreements would have had the effect of raising prices. Since nothing in the agreements had the effect of lowering prices, no matter at what level the minimum prices were set, plaintiffs' contention that the minimum prices were "unduly" low is of no significance. (There is, however, no evidence that they were "unduly" low.)

The final problem with plaintiffs' attack upon the Manufacturers' Agreements is the fact that in the later stages of this case they jettisoned this argument, bottoming their case instead on the contention that the agreements were in fact disregarded by virtue of the rebate scheme. Plaintiffs' case is thus transformed into a claim that defendants agreed to violate the price fixing agreement by engaging in a scheme of secret rebates in varying amounts. However, such an agreement, if it existed, would be in intent and purpose the same as an agreement to compete, for unless there was collusion in the rebate scheme an agreement to violate a price fixing agreement by returning to the competitive status quo can only enhance competition.

Plaintiffs also claim injury as a result of the so-called "Five Company Rule" promulgated by the JMEA which, on its face purported to restrict each Japanese exporter to five U.S. customers at a given time. Plaintiffs contend that the rule constituted a horizontal market division illegal under § 1 of the Sherman Act. There are two problems with this contention.

First, the incontrovertible evidence is that the Five Company Rule did not in theory or in practice limit Japanese exporters to five customers. Nothing in the rule prohibited members of the JMEA from registering their U.S. subsidiaries as export customers, and nothing in the rule prohibited those subsidiaries from reselling products in the United States free of the Five Company Rule. Moreover, trading companies could also be listed as customers. Most Japanese manufacturing defendants followed the practice of listing a U.S. subsidiary, a trading company, or both among their customers. Some of the Japanese manufacturing defendants had in fact more than five customers at any given time.

Second, even if the Five Company Rule had worked as intended, it could alone only have had the effect of keeping prices elevated. As with minimum prices, such an effect would redound to the benefit of plaintiffs, negating the possibility of antitrust injury. Although plaintiffs have argued that the supposed customer allocation could have enabled the Japanese defendants to "concentrate" on given customers, they

have offered neither logical nor factual support for that contention. *See* discussion at n. 72 and p. 1213, *supra.* Nor have plaintiffs explained how, in the competitive United States market, the defendants could compete with United States firms but not with one another.

As we have noted above, the export control arrangements are viewed by plaintiffs as a brooding omnipresence. However, even if the Manufacturers' Agreements and associated JMEA Rules are viewed in a conspiratorial light, the law is clear that a different conspiracy, *i. e.*, one to fix prices by concerted rebate action at less than check price level, cannot be inferred therefrom. Nor is mere opportunity to conspire a basis for inferring conspiratorial activity. We discuss the "intention" reflected by the Manufacturers' Agreements *infra.*

### 3. The Alleged Japanese Home Market "War-Chesting" High Price Conspiracy

Evidentiary analysis of the home market aspect of the conspiracy will, for purposes of convenience, be divided into three facets: pricing policy, profits, and data exchange, which we take up *seriatim.* The bulk of the evidentiary foundation for plaintiffs' claims in this area comes either from documents seized by the JFTC in conjunction with the "Six Company Case" or from documents produced in discovery relating to groups and associations in Japan, primarily committees of the EIAJ. None of these materials contain direct evidence of conspiracy. Nor are any of the materials a proper basis for the drawing of inferences that any of the defendants in fact engaged in a high price home market conspiracy designed to fund a predatory export raid upon the American CEP manufacturing industry.

The evidence shows that the Japanese manufacturing defendants met sub rosa during the two-year period from 1964 to 1966, when the Japanese CEP market was over-saturated and retail prices were rapidly declining, with many accompanying business failures of retailers. There is evidence that the conferees discussed "bottom" prices. The evidence is, however, uncontradicted in the following respects: (1) the "bottom" price was not the actual retail selling price, but rather the suggested retail price; (2) there was no relationship between the "bottom" price and the actual selling price because of a plethora of rebates (and because of retailer discretion); (3) the manufacturers were free to proceed with whatever "bottom" price they wished; (4) the "bottom" price was at all events not a high price, but rather as low a price as the manufacturers could bear without letting their retail market disintegrate, *i. e.*, one consistent with protecting retail margins; and (5) the "bottom" price was sufficiently low to be logically inconsistent with plaintiffs' "war-chesting" theory.

The evidence shows that prices in Japan for both monochrome and color TV steadily declined over the period during which defendants were supposedly engaged in the high price home market conspiracy, and there is no evidence that prices rose again. There is no evidence of what plaintiffs contend to be the normal or competitive price levels in Japan for the period. There is no viable contention that a "bottom" price, as we have described it, is an artificially *high* price. In sum, there is no evidence that defendants sold at artificially high prices in Japan.

There is also no evidence which would support a claim of "war-chesting". There is evidence that the conferees in the various Six Company Case sub rosa groups discussed the fixing of wholesale and retail margins along the distribution chain. However, the uncontradicted evidence is that the trend was to *increase* the margins so as to protect the retailers from collapse. This of course would have the effect of *decreasing* the manufacturers' profit, the opposite of what plaintiffs posit in support of their war-chesting theory. Moreover, there is no evidence that the Japanese manufacturing defendants achieved high profits in connection with their CEP sales in Japan. The only evidence on the point is that the profits earned were relatively low. Thus, the data in the record on prices and profits is

totally unsupportive of plaintiffs' "war-chesting" theory.

There is also evidence of domestic data exchange among the Japanese manufacturing defendants. The bulk of the data exchange evidence can be found in documents generated by EIAJ committees, although some of it was generated under the aegis of sub rosa groups. The EIAJ compiled and disseminated a large volume of statistical information, much of which was technical information, primarily of the product safety and standardization variety. Such exchange does not give rise to an antitrust violation, either alone or in combination with other factors. There is evidence of dissemination of aggregate information related to past production, sales, and shipment figures for various products and regions, present inventory figures, and projected demand forecasts. The evidence contains a suggestion that the conferees "voted" on future production in a manner which, in plaintiffs' submission, is consistent with an agreement to limit production and fuel a high price home market conspiracy (but which is also consistent with the statements of K. Matsushita introduced by plaintiffs that what was needed was an end to market "oversaturation"). Finally, there is evidence that individual production, sales, shipment, and inventory figures of the defendant companies (presumably those from which the aggregates were compiled) found their way into the files of other companies.

The documents upon which the data dissemination claim is predicated, most of which refer to data exchange in connection with committee meetings, do not reveal who said what to whom, or which company representatives were present and/or voted on any of the proposals, or whether any of the proposals were ever implemented. Plaintiffs' data dissemination evidence is random, unfocused, and, because of plaintiffs' litigation strategy which we have described at pp. 1200–1202 *supra*, essentially unexplained. Beyond these factors, this evidence is insufficient to give rise to an inference of conspiracy for several reasons.

First, the dissemination of aggregate production and inventory statistics unidentified as to company or transaction (a fair characterization of most of plaintiffs' evidence in this area) cannot support an inference of agreement violative of Sherman § 1. Second, exchange of individual production and inventory data cannot sustain such an inference in the absence of some evidence that the information was used in aid of collusive pricing activity, or of some purpose or effect to stifle competition in the manner charged by plaintiffs, and there is none. The evidence in this area is much more akin to *Maple Flooring* than to *Container Corp., see generally* Part VI.A.5, *supra*. Third, even assuming evidence of production limitation, there is no nexus between that evidence and the high price "war-chesting" conspiracy posited by plaintiffs, because: (1) a predatory export raid could only be funded by high prices and high profit in the domestic market, of which there is no evidence; (2) there is uncontradicted evidence that the defendants pursued a policy of increasing the margins of wholesalers and retailers to protect the distribution system at the expense of high profitability; and (3) plaintiffs' data dissemination evidence is, as we have noted, helter skelter, unfocused, and too ephemeral to supply the missing links.

In sum, the plaintiffs have adduced no evidence to support their home market high price "war-chesting" conspiracy claims.[351]

### 4. The Alleged Export Conspiracy: The "Japan-side" Evidence

Plaintiffs have made it clear that they neither have nor will have any testimony supporting their contentions that the defendants engaged in an artificially low price export conspiracy, and they have based their case primarily on documents. For the nine years of this case prior to the pretrial evidentiary hearings, plaintiffs

---

**351.** Obviously, in the absence of the "unitary" conspiracy claim, we would not be considering allegations of conduct in Japan affecting only the Japanese market. *See generally* Opinion (Subject Matter Jurisdiction), 494 F.Supp. 1161 (E.D.Pa.1980).

claimed that direct evidence of defendants' coordinated predatory export pricing could be found in the Six Company Case materials and certain other documents produced in discovery reflecting activities in Japan. Virtually all of this material was excluded in the Japanese Materials Evidentiary Opinion. However, even if the Six Company Case material and the other documents relied upon were admissible, they are too cryptic and amorphous to support an export price-fixing claim. Giving the plaintiffs the benefit of all the inferences, the documents cannot be read as evidence that the defendants fixed or even exchanged information concerning export prices.

Plaintiffs have devoted tremendous energies to demonstrating that executives of the defendants were members of a large number of conventional trade associations and of trade groups which met sub rosa, and that the groups met regularly to discuss matters of common interest. Plaintiffs have enumerated the names of the committees in a manner which evokes, at least to plaintiffs, the possibility of conspiracy. These facts, however, cannot give rise to an inference that the defendants acted in concert. Moreover, plaintiffs' repeated protestations that the conferees at the meetings of the various groups and associations in Japan "weren't just whistling Dixie," and that it "belies reality" to believe that all of these meetings were not conspiratorial in nature, do not create an inference of a price-fixing conspiracy either.[352]

Plaintiffs offer evidence of the dissemination of export-related data as evidence of conspiratorial activity, but it misses the mark.[353] The only evidence of dissemination of export *price* data is that of certain average past prices. There is no evidence of exchange of detailed, individually identifiable, actual price data. There is much less evidence of the dissemination of data with respect to production, sales, shipments, and inventory than in the case of the Japanese domestic market. Moreover, while the documents suggest that there was dissemination, primarily through EIAJ committees, of data in these areas, it was essentially aggregate export data not broken down as to export to the U.S. Export demand forecasts were also made, and there are vagrant references in the documents to "voting" on export shipments of stereos and TV's.

Even assuming admissibility, that evidence does not help plaintiffs' case. Just as in the case of alleged domestic data dissemination, we have no idea who said or did what at any of the subject meetings; who was voting on what; or whether any plans or policies referenced in the "minutes" in these meetings produced by plaintiffs were ever implemented, and, if so, by whom. Because of plaintiffs' litigation strategy, there is no explanation of the export-related data dissemination documents, which are even more helter-skelter, random, and unfocused than the domestic documents. Because there is no breakdown as to company and no individual detail, and because the only statistics identifiable as export production, sales, shipment, and inventory statistics[354] are essentially aggregates, they are of no value in ascribing liability to any

---

**352.** Plaintiffs have also offered a number of basic background matters: (1) an explanation that the Japanese CEP industry has been built on borrowed (mostly U.S.) technology (Part VII.B); (2) a description of various patent licensing arrangements entered into by the Japanese manufacturing defendants with U.S. firms (Part VII.B); and (3) an exegesis of the factors which have all but closed the Japanese domestic CEP market to foreign competition, supposedly making it possible for the Japanese manufacturing defendants to carry out the home market aspect of the "unitary" conspiracy (Part VII.C). None of these factors are even remotely conspiratorial. Plaintiffs also rely upon the "combined economic power of the defendants and their cartel" (VII.E), but that "puts the rabbit in the hat." The fact that defendants are large firms, with huge assets, high sales, and great economic power is no basis for inferring a conspiracy.

**353.** For the most part the documents to which we now refer were not submitted for our consideration at the pretrial evidentiary hearings. We observe that they suffer the same flaws as the evidence excluded at those hearings, but we have nonetheless assumed their admissibility.

**354.** Many of the documents represented in the FPS as referring to export shipments refer in actuality to domestic shipments.

defendant. Any conclusion that there was a conspiracy is thus based upon speculation, not upon logical inference.

None of the aforedescribed exchange of information is of the kind that violates the Sherman Act. We concluded in Part VI.A.5 that cases which have found Sherman Act violations on account of data dissemination have either involved an exchange of detailed, individually identifiable, actual price data, a concentrated industry, and a purpose or effect to restrain competition, or some other evidence of an actual agreement to restrain trade. The plaintiffs have offered no evidence of any of these matters here. Indeed, the result would not change even if there were evidence of exchange of individual company detail on non-price matters, for, as we have explained, this kind of data exchange will not violate the Sherman Act, at least in the absence of evidence of anticompetitive purpose or effect, of which there is none.

Moreover, plaintiffs have shown no nexus between the alleged export data exchanged and the "unitary" conspiracy. Several points bear mention in this regard. First, an agreement to adjust "export" production levels might under some circumstances be helpful in keeping prices high, but such an agreement is not consistent with the main thrust of plaintiffs' export conspiracy theory, for it is illogical to assume that a group of companies which sought to flood the American market with CEP's at artificially *low* prices would agree to limit production. Second, plaintiffs have adduced no theory to explain how the kind of data dissemination alleged would be helpful to participants in a low price export conspiracy in the open, competitive U.S. CEP market in which the conspirators, as new entrants, had no power to affect either output or prices.[355] The record shows that Zenith and RCA had nearly 50% of the U.S. market and that there was competition among a large number of manufacturers. Under these circumstances, the analytical possibilities of a nex-

us between plaintiffs' evidence and the concerted predatory pricing conspiracy are nil. Third, the scenario portrayed by plaintiffs, even assuming that there were evidence to support it, cannot be a viable part of their "unitary" conspiracy theory in the absence of evidence, direct or circumstantial, of concerted pricing activity, and there is none.

### 5. Plaintiffs' Argument Based Upon Alleged International Price Discrimination

As a means of proving conspiracy by circumstantial evidence, the plaintiffs have offered comparisons of the prices which defendants charged in the United States and Japanese markets for allegedly comparable products. We ruled most of these materials inadmissible in our Expert Testimony Opinion. However, even assuming admissibility of some or all of these comparisons, evidence of price differentials between the U.S. and Japanese markets does not reflect consciously parallel interdependent business behavior, and hence is not probative of the conspiracy alleged in the complaint. Even if plaintiffs have shown sufficient evidence of consciously parallel conduct to raise a genuine issue of material fact precluding the grant of summary judgment on the parallelism and consciousness issues, they have failed to raise a genuine issue of material fact as to interdependence, or even to articulate a rational explanation of their theory of interdependence of defendants' allegedly parallel pricing. In the absence of such a genuine issue of material fact, their circumstantial evidence case collapses.

The plaintiffs have adduced no evidence of uniformity in the prices of the defendants, which were at, above, and below the check price, and which were at the highest price level in the U.S. (Sony) as well as at lower levels. The cornerstone of plaintiffs' theory is that the defendants, acting in concert, charged whatever prices were necessary "to get the sale." They have ad-

---

**355.** Plaintiffs' premise that the defendants had allocated the U.S. market via the Five Company Rule and that they were acting in concert in the U.S. market only against the U.S. CEP manufacturers and not against each other is fatally flawed for lack of supportive evidence. *See* discussion at n. 72 and p. 1213, *supra*.

duced no evidence that there was any formal agreement to price at whatever price was necessary to get the business, but contend that this pricing policy is evident from the record and that it constitutes parallel conduct from which conspiracy can be inferred.[356] However, "pricing to get the sale" fails to set forth a logical theory of interdependence; instead it describes normal competitive behavior. Under the *Bogosian/Venzie* principles explained in Part VI. D.4, *supra*, an inference of conspiracy from parallel business behavior is not permissible as a matter of law unless the plaintiffs can show that the defendants' allegedly parallel behavior was interdependent, *i. e.*, that it was inconsistent with the defendants' own economic interests.

It is not against, but rather in, one's self interest to price "to get the sale." Companies do not need to conspire to sell at a price necessary to get the sale; indeed, when competitors make their investment, marketing, and pricing decisions, they necessarily assume that the competition will price to get the business. While the result of such practices may be depression of prices in the market, it is the kind of price depressing effect which flows from normal competitive pricing behavior and is precisely that which the Sherman Act is intended to secure, not condemn.

There are other reasons for plaintiffs' inability to delineate a theory of interdependence of price differentials. While the Japanese defendants are well-established in Japan, during the pertinent times they were new entrants in the U.S. market, with unknown brand names and no goodwill or business reputations in the United States. Thus the defendants individually faced similar circumstances as new entrants in the U.S. market and could therefore be expected unilaterally to adopt similar pricing strategies to attract customers and gain consumer acceptance in this country. Such a reasonable response to the common business problems presented by the U.S. CEP market for foreign entrants does not support an inference of conspiracy.

Plaintiffs have also failed to reckon with the difference in market conditions (or, in terms of economic theory, in the level of or elasticity of the demand curve) between the American and Japanese markets. Charging lower prices in the United States than they charge for similar CEP's in Japan would in no way undermine the unilateral character of defendants' conduct. Price differences between two markets where competitive conditions and income and spending patterns and products differ are to be expected and do not support an inference that the lower price is the result of an agreement.

Although the plaintiffs have alleged that defendants deliberately sustained losses in the U.S. in the hope of taking over the U.S. CEP market and charging "monopoly" prices at a later date, there is no evidence to support that theory. Although plaintiffs have alleged that four of the defendants sold their products in the United States at prices below their costs, we ruled the only evidence offered to support that contention inadmissible in our Expert Testimony Opinion. Not only is there no evidence of any sustained losses, but a company's long-range independent economic interests may require it to operate at a loss for several years in order to become established in a new market. Additionally, there is no evidence that the defendants, after having "penetrated" the U.S. market, ever raised their prices to recoup their losses or ever earned monopoly profits. The notion that this might still happen also makes no sense, for the defendants, new entrants with still relatively small market shares, could not rationally hope to recoup their alleged losses in the United States in view of the dominant market positions held by RCA and Zenith and the ability of the European manufacturers, other far eastern companies, and major American firms swiftly to increase their United States CEP sales if higher monopoly prices were ever charged. We note in this regard that there is no evidence of high entry costs or barriers in

**356.** Plaintiffs also say that there were artificially low prices, but it appears that what makes the price artificially low is the mere fact that it will get the sale.

the CEP manufacturing and distribution industry.

In sum, plaintiffs' attempts to infer a conspiracy from "international price discrimination" founders on evidentiary grounds and fails completely as a matter of logical inference.

### 6. The Alleged Collusive Predatory Export Rebate Scheme; "Benchmark" or "Reference" Prices

Plaintiffs allege that the export facet of the "unitary" conspiracy was implemented through a "rebate scheme": that the rebates paid by the Japanese exporters to U.S. customers to evade the MITI check price were an integral part of the depressed pricing conspiracy, and that the rebates were a function of concerted activity as demonstrated by the consciously parallel interdependent action of the defendants in paying them. There is a vast record relating to plaintiffs' claims of a collusive predatory export rebate scheme, but the most important points which have been established (and these are without contradiction) are the following.

From the early 1960's on there was a broad pattern of rebating by Japanese CEP exporters to American original equipment manufacturer and private label customers designed to evade the MITI-related check-price regulations.[357] Related to that evasion was a practice of reporting to U.S. Customs a price higher than the actual export price. While this resulted in the payment of higher initial duties, in plaintiffs' submission it constituted customs fraud (by allegedly evading even higher potential dumping duties under the 1921 Antidumping Act) and facilitated the antitrust violations complained of here. Although plaintiffs' case seems to depend heavily on the notion that the "rebate scheme" was clandestine, the existence of these practices in the CEP industry and many other industries had been widely known in the United States for a number of years.

There is no evidence of parallel rebating practices. The pattern of rebating was variegated, with at least 25 different rebating techniques considered or employed by various of the defendants.[358] The evidence shows that the prices at which various CEP's were sold under the different rebate schemes were very different, that the amounts of rebates given by individual defendants differed, and hence that the net prices charged by the individual defendants were significantly different. Despite plaintiffs' contentions to the contrary, there is also no evidence that defendants had knowledge of each other's rebates except insofar as they might have learned of them from an American customer using another Japanese defendant's prices as a vehicle to extract a better bargain.[359] Not only is there no evidence that the Japanese exporters disclosed their rebate schemes to one another, but there is evidence that they sought to keep their rebates secret from the others.

There is no direct evidence in this record that there was any discussion among the defendants concerning coordination of export prices at any level, much less at dumping levels, or any evidence from which such a conclusion could be inferred. The plaintiffs contend the check price was a "benchmark" or "reference" price from which the ultimate or actual price was determined. However, that contention has no substance in the total absence of evidence (or even of any credible theory) of any relationship between such benchmark or reference price and the ultimate actual price. As we have seen, the actual prices (and the rebates) were "all over the lot," and it is illogical to infer joint conduct from disparate behavior.

**357.** We have found it unnecessary to decide whether the Manufacturers' Agreements, which establish the check prices, were compelled by the Japanese government, or whether the sovereign compulsion, act of state, or international comity doctrines are bases for non-liability.

**358.** Concomitantly, a number of techniques were employed to conceal the rebates from U.S. Customs.

**359.** There is significant evidence of the use of this stratagem by American importers.

As we have pointed out, plaintiffs maintain that the defendants, via the rebate scheme, were acting in concert to charge "whatever prices were necessary to get the sale." It may be that defendants were pricing "to get the sale," as demonstrated by their sales at, above, and below the check price, and by the documents which show them to have competed for the business of such American buyers as Sears Roebuck, J.C. Penney, Montgomery Ward, and Midland. The notion of pricing "to get the sale," however, while it may describe parallel business behavior, does not describe the consciously parallel interdependent business behavior which is necessary for an inference of conspiracy, for reasons we have already explained. It is not against, but rather in one's self interest to rebate if so doing obtains the sale, and it would be in the self-interest of American buyers (such as defendant Sears) to buy CEP's at the lowest possible price. It is not evidence of participation in a conspiracy to do so.

Plaintiffs have adduced evidence from which it could be inferred that many of the Japanese defendants and their alleged U.S. importer coconspirators kept the rebates secret, not disclosing them to United States Customs. They have, however, adduced no evidence that defendants *agreed* to conceal the rebates or to defraud Customs. Moreover, there is uncontradicted evidence that a number of defendants did disclose rebates to Customs, which nonetheless preferred to ignore the disclosures so as to collect the higher duty. In any event, such non-disclosure, even if established, would not point to conspiracy, and hence would not advance plaintiffs' case, because it would be in the self-interest of the concealing party to avoid detection.[360] While such a practice might violate the customs laws, it does not offend the antitrust laws. The caselaw is clear that covert practices, including even illegal rebates, to obtain business are consistent with, rather than contrary to, the purposes of the antitrust laws.

There is evidence that the executives of a number of defendants and their counsel met with private label customers to whom they had paid rebates to discuss the United States Treasury Department antidumping investigation. They discussed the anatomy and potential consequences of the investigation and appropriate strategies for defending against it, and they met with U.S. government officials in an attempt to deflect the investigation. However, such meetings constitute protected activity. In any event, joint response to common problems by similarly situated powers in an industry cannot form a basis for antitrust complaint.

In sum, there is no evidence, direct or circumstantial, to support any of plaintiffs' theories of the existence of a collusive predatory export rebate scheme.

### 7. The Supposed Connection Between the Alleged Domestic and Export Conspiracies

Although there is no evidence of either the home market or export aspect of plaintiffs' "unitary" conspiracy theory, plaintiffs have sought to establish their existence, or at least their relationship, by so-called "connection" documents. The term "connection," as used by the parties, refers variously to: (1) a relationship between home market and export prices; (2) a relationship between home market and export sales and profits; (3) a relationship between "domestic" and "export" groups; and (4) efforts to conceal the rebate scheme. We described plaintiffs' so-called "connection" documents at great length in Part VII.H, *supra*. Most of these documents are inadmissible, but to the extent that they may be received in evidence, they do not establish any "connection" between the domestic and export prices or markets.

Even assuming arguendo the existence of a high price "war-chesting" home market conspiracy, that is no basis, under the case law, for inferring therefrom the existence

---

360. The same proposition applies to alleged concealment from MITI, although the only document offered to establish that proposition, the celebrated Japan Victor document, was excluded in the Japanese Materials Evidentiary Opinion.

of an export conspiracy. Additionally, on the facts of this case, such an inference would be at odds with logic. It is an undisputed fact that during the period of the alleged conspiracy several of the manufacturing defendants with the greatest proportion of exports to the United States (Sharp, Sanyo, and Sony) had comparatively small shares of the CEP market in Japan. Conversely, a number of the alleged conspirators with the largest CEP sales in Japan (most notably Melco) had relatively small shares of the export market to the United States. Therefore, most of the alleged "subsidies" from the "high price" market in Japan would have been received by those conspirators who, under plaintiffs' conspiracy theory, would have needed them least.

The proposition that firms like Sanyo and Sharp would have agreed to enter into a "conspiracy" in which they were to incur sustained losses in the United States, while their coconspirators with proportionately fewer U.S. exports were receiving the greatest share of the "high price" market in Japan, is also illogical, at least in the absence of evidence of reciprocal arrangements. Another of the innumerable flaws in plaintiffs' conspiracy case is their failure to offer even the barest evidence of an arrangement by the conspirators to divide the supposed spoils of (or share the losses from) the predatory export raid or to police their arrangements. This lacuna is magnified upon recollection that the Japanese manufacturing defendants are supposedly joined in the conspiracy by many, if not most, of the other CEP manufacturers in Japan. At all events, plaintiffs' amorphous claim of connection between the domestic and export conspiracies is totally unsupported by direct or circumstantial evidence.

### 8. *Plaintiffs' "Intent" Documents*

Among the documents most highly touted by plaintiffs have been the Rationales to the various Manufacturers' Agreements and certain statements made by Japanese executives which plaintiffs interpret as evincing a predatory intent to destroy the U.S. CEP industry. These documents prove no such intent.

The Rationales, when read in their proper context, can be deemed to reflect only the concerted intention of the signatories to the Agreements that export prices not fall too low. Such an intention cannot injure Zenith. The rationales are also too general, and are susceptible to too many other inferences, to support plaintiffs' proposed use.

The executives' statements, in general terms, evince the intention of Japanese manufacturers to increase their exports and to succeed in the U.S. market. Leaving aside the question whether public statements are a likely place to find evidence of conspiracy, we note that such statements are entirely consistent with an intent to compete. The competitive system contemplates that firms will seek to increase their market share by selling quality merchandise at low prices. If one begins with the presumption of conspiracy, it is easy to interpret such statements as: (1) the CEP industry is "Japan's heritage"; (2) "further efforts should be required to retain the U.S. market"; and (3) "militarily we can never defeat the United States, but economically we can become number one in the world," as evidence of conspiracy, but that is not a legally permissible inference. Indeed, it has been demonstrated that statements of intention to be "number one" have also been made by Zenith executives. Striving to be "number one" does not, without more, violate the Sherman Act, and the statements of "intent" upon which the plaintiffs rely (all of which are amorphous or general) are just not evidence of conspiratorial intent or behavior.

### 9. *Plaintiff's Evidence Concerning the Depletion and Destruction of the U.S. CEP Industry*

Plaintiffs have offered a plethora of statistics demonstrating the increase in Japanese imports into the United States, the decline in production of U.S. television receivers, the decline in "retail price points" in the U.S., and the deterioration of the U.S. television receiver manufacturing industry, all allegedly as the result of the

defendants' activities. Plaintiffs seek to draw therefrom an inference of conspiratorial behavior. However, as we have explained in Part VII.M, such evidence is not probative of conspiracy. It is plain that the depletion of the U.S. CEP industry is as consistent with a number of other inferences, such as efficient foreign competition or inefficient U.S. management, as it is with the inference that the industry was harmed by a conspiracy among these particular defendants. In the total absence of any evidence of collusion, or of any evidence of anticompetitive activity on the part of defendants from which collusion could be inferred, it is impossible as a matter of law to infer the conspiracy alleged by plaintiffs from deterioration of the U.S. CEP industry. Such an "inference" would be mere speculation.[360a]

10. *Plaintiffs' Evidence Concerning "Defendants' Systematic Price Discrimination in the U.S."*

Plaintiffs assert that systematic price discrimination in the U.S. was an integral part of defendants' conspiratorial plan to destroy their U.S. competition. The record contains very little evidence of such price discrimination. But even if there were cognizable evidence of price discrimination, it could not help the plaintiffs, for there is no logical connection between such price discrimination and the alleged "unitary" conspiracy. First, there is no evidence of collusion in connection with alleged price discrimination. The documents rescribed in plaintiffs' FPS on the point show widely disparate patterns, and we have been cited to no authority supporting the proposition that disparate conduct gives rise to evidence of conspiracy. Second, even assuming parallel conduct, plaintiffs' primary allegation of parallel conduct—that defendants regularly charged substantially lower prices to their large preferred customers and chain stores than to other regular dealers for identical models of their CEP's—tends to demonstrate rational independent decision-making

in one's own self-interest, rather than conspiracy. Finally, there is an absence of focused evidence of sales to other types of customers below the prices set forth in defendants' answers to plaintiffs' interrogatories 45 and 46(c). The random nature of the evidence totally precludes any contention that the defendants' "price-discrimination in the U.S." is evidence of the "unitary" conspiracy.

11. *Plaintiffs' Claims Concerning Defendants' Acquisition of U.S. Manufacturers and Their Establishment of Manufacturing Facilities in the U.S.*

Plaintiffs have asserted that an important facet of the conspiracy was the "takeover and elimination by the defendants and their coconspirators of the United States manufacturers through a pattern of unlawful acquisitions, mergers, joint ventures, and the establishment of manufacturing facilities in the United States." These grandiose claims stem from evidence of but four corporate acquisitions and the establishment of eight manufacturing facilities in the United States (and three of the manufacturing facilities were acquired as a result of the corporate acquisitions). Not only is the plaintiffs' evidence thus limited, but they have adduced no evidence of collusion in connection with these matters. Moreover, the evidence in this area points only to the self-interest of the acquiring companies, acting to improve their individual efficiency or market positions.

Although plaintiffs have assailed the background of the Matsushita acquisition of the Quasar Division of Motorola, there is no evidence that any of the allegedly complicitous parties, including Sony and its subsidiary, AIWA, acted in a manner contrary to their individual self-interests. The attempt to ascribe worldwide conspiratorial overtones to the acquisition of Magnavox by Philips fails by reason of the lack of evidence that Philips was a coconspirator or that the "Philips—Matsushita cooperation

---

**360a.** Plaintiffs' reliance on *United States v. Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), in this regard is totally misplaced.

agreements" had even the remotest bearing on the conspiracy alleged by plaintiffs. And Sears' role in the continuation of the financially distressed Warwick as a viable entity, by way of the Sanyo acquisition, was plainly in its self-interest given its heavy financial investment in Warwick, which was thereby protected.

There is simply no evidence to support plaintiffs' claims that any of the acquisitions, or the establishment by any defendants of manufacturing facilities in the United States, were related to the "unitary" conspiracy.

### 12. Evidence of the Participation of Individual Defendants in the Conspiracy

We shall not attempt to summarize here our lengthy canvass of the evidence as to each defendant. Instead we note only that there is no evidence, discrete as to any of the 24 defendants, of their participation in the alleged conspiracy. Moreover, as to certain of the defendants there are reasons in addition to those noted earlier in this summary making it illogical to infer that at least certain of the defendants participated in the supposed predatory low price export conspiracy (e. g., Sony, because of its well-known position as the highest-priced seller in the U.S. market; and MC, MIC, Sears, and Motorola because of their normal desire, as *purchasers* of CEP's, to get the lowest possible price). There is also no evidence linking the sales subsidiaries of the various defendants to the conspiracy.[361]

### 13. Admissibility of Coconspirator Declarations

We have made pursuant to F.R.E. 104(a) a preliminary determination as to the admissibility of coconspirator statements under F.R.E. 801(d)(2)(E). That determination is in the nature of a factual finding that plaintiffs have not established by a preponderance of independent evidence that any of the defendants entered into an agreement or acted in concert with respect to exports to the United States in any manner which could in any way have injured the plaintiffs. Put differently, we have found that plaintiffs have not established, by the requisite degree of proof, that any of the defendants engaged in the export facet of the "unitary" conspiracy alleged by plaintiffs (or in the home market facet, either). Given this finding under the applicable Third Circuit standards, no coconspirator declarations may be admitted.

### 14. Conclusion

■ Notwithstanding their mountain of "evidence," plaintiffs have not yet stepped off home plate in their effort to establish the existence of the "unitary" conspiracy, much less come forward with the "significant probative evidence" of the conspiracy. *First National Bank of Arizona v. Cities Service Co., supra.* We have given plaintiffs the benefit of all inferences to which they are entitled and have analyzed the many facets of plaintiffs' conspiracy allegations, but have found each wanting. We have looked for direct evidence, and we have looked for circumstantial evidence from parallel business behavior and from all the potential sources, but we have found none. We have looked for evidence of when this conspiracy began and when the various parties entered it, but again we have found none. That is, we suppose, because there is no evidence of agreement or of concerted action.

As we have engaged in this analysis we have not been unmindful of plaintiffs' warning, bottomed on *Continental Ore Co. v. Union Carbide & Carbon Corp., supra,* against "fragmentation" of their case. *Continental Ore* does not, of course, prevent us from analyzing the plaintiffs' conspiracy allegations, and it is clear that by merely intoning the magic words "unitary conspiracy" or "totality of the evidence" antitrust

---

**361.** In view of the fact that the parent corporations have themselves not been linked to the conspiracy, we have found it unnecessary to engage in an analysis of plaintiffs' evidence as to the relationships between parents and subsidiaries in support of their "functional alter ego" and agency approaches.

plaintiffs cannot foreclose critical analysis. Notwithstanding these principles, in addition to analyzing the discrete aspects of plaintiffs' case, we have looked at the totality of the evidence. We have avoided "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore, supra.* In so doing we have searched for instances where one piece of evidence might inform other evidence. However, this approach has not helped the plaintiffs, for none of their evidence is probative, much less significantly probative.

Nor can plaintiffs claim any synergistic result. The comments of the Ninth Circuit in *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 746 (9th Cir. 1979), are apposite here:

> But there can be no synergistic result . . . from a number of acts none of which show causal antitrust injury to CalComp.

Nothing plus nothing times nothing still equals nothing. Summary judgment will be granted for the defendants on plaintiffs' Sherman Act § 1 and Wilson Tariff Claims concerning television receivers.

## VIII. *Plaintiffs' Evidence With Respect to Non-Television Products*

This case has long been widely known as the "Japanese TV Case," and for good reason. Television receivers are the only products addressed in NUE's complaint, and they are the heart and soul of Zenith's complaint. However, Zenith has also put before us claims concerning a number of other CEP's: radios, tape equipment, phonographs, stereo and audio instruments, and certain components. We shall take up the evidence in the record with respect to each of these products *seriatim*.[362] We note preliminarily that Zenith's non-TV product claims do not proceed from any predicate that a predatory export invasion of the U.S. market was funded by a high price home market "war-chesting" conspiracy.

### A. *Radios*

Both Zenith and NUE have alleged that defendants' "unitary" conspiracy began with the commencement of radio exports to the United States from Japan. According to plaintiffs, these exports represented the first "phase" of defendants' joint "stage-by-stage" strategy for taking over the United States CEP industry through "depressed pricing" or "artificially low prices." Notwithstanding the breadth of its claims, Zenith's "evidence" about radios stems from four sources: (1) two MITI-related export control arrangements, which affected the export of certain transistor radios; (2) the existence and alleged activities of certain "export" committees within the EIAJ and the JMEA; (3) the alleged radio-related activities of certain of the sub rosa Japanese domestic groups and associations which we have already described; and (4) inferences sought to be drawn from defendants' low prices on the U.S. market and their sharply increasing market share.

The two export control arrangements which Zenith cites in support of its radio claims are: (1) those we shall refer to as the radio export regulations, which via various extensions were in effect from July 1, 1958 through December 31, 1972; and (2) those we shall refer to as the consumer electronics export regulations, which were in effect from June 8, 1973 to August 31, 1973. These regulations are of the same basic character as those referred to in Part VII. F.1, *supra*, and our discussion there is applicable here. At various times, the regulations imposed minimum prices, maximum quantity, and customer limitation restrictions on exports of certain kinds of radios to the United States. Additionally, they required radio exporters to register their trademarks and the names of their export customers, established penalties for violation of their restrictions, and created the Radio Export Examination Committee for

---

**362.** We will take up tape equipment, phonographs, stereo and audio instruments under the general heading "Tape and Stereo Products."

certain administrative purposes.[363] The bulk of Zenith's FPS regarding radios is part rescription and part summarization and paraphrasing of the main provisions of the agreements, though there are scattered references to allegedly improper data dissemination.

■ Aided by the affidavit of Hideo Miyake, Managing Director of Matsushita Electric Trading Company, Ltd. (MET), the Matsushita defendants and others submit that, as with the similar television agreements, the export regulations upon which Zenith relies were established at the express direction of MITI pursuant to the EIT law, were instruments of foreign trade policy of the Japanese government, and as such are not subject to scrutiny under United States law. Moreover, defendants allege, since the minimum price regulations could only have had the effect of keeping prices on radios exported to the United States higher than would otherwise prevail, they are fundamentally inconsistent with Zenith's claim of a "low" price export conspiracy, and could not have caused Zenith any injury. For reasons which have been explained *supra*, we shall not herein reach the act of state, sovereign compulsion, and international comity issues implicated by defendants' contentions about the role of MITI. And for reasons stated in Parts VI.B. and VII.F, we agree with defendants' contentions as to Zenith's inability to claim injury from the minimum price agreements or export quotas.[364]

Aside from the text of the Manufacturers' Agreements themselves, the only other evidence which Zenith advances in its FPS concerning them are materials which indicate that the JMEA performed certain tasks with respect to the arrangements, such as administering certain aspects and preparing draft regulations under the aegis of MITI.[365] These facts do not change the result.

As to the EIAJ, as is the case with television receivers, Zenith presents a list of the various EIAJ (radio) committees and argues that it "conveys a sense of the variety of matters which receive joint attention by the defendants" during their EIAJ committee meetings. Three of the committees appear to have had involvement with radios: the Radio Export Committee, the Radio Business Committee, and the Radio Technical Committee of the EIAJ's Kansai Chapter.[366] Again, however, Zenith attempts to have us draw conspiratorial inferences from the mere names of the committees, from the mere fact that they met, and from the suggestion that the participants "weren't just whistling Dixie" at these meetings (and that defendants have the burden of showing that they were not conspiring). Again, this approach must fail.

It appears from the supporting documents that the principal subjects of discussion at the allegedly offending committee meetings were the check prices and export quotas for radios, along with matters of implementation of the Manufacturers' Agreements. As we have said, those matters do not result in antitrust injury to Zenith. Just as with their TV claims, plaintiffs make broad conclusory statements about conspiratorial activities, such as price fixing, which are not borne out by the documents. However, upon review of the actual documentation, which plaintiffs have not stressed, it appears that plaintiffs' case with respect to radios (and tape and stereo products as well) depends upon evidence of data dissemination which is similar in character to that adduced with respect to television receivers. The documents come from a

---

**363.** As with the TV agreements, different agreements with different provisions were in effect for varying periods of time, but all were similar in tenor.

**364.** Plaintiffs invoke the "Rationales" to the agreements as evidence of conspiratorial intent. The text of the Rationales essentially tracks that of the TV agreements, and we have explained at Part VII.I. above why the Rationales do not provide any evidence of conspiracy.

**365.** The JMEA committees dissolved when the export control arrangements terminated.

**366.** The Kansai Chapter was composed of representative companies with headquarters in the Osaka area of Japan.

variety of sources, but mostly from EIAJ committees and sub rosa groups. The principal difference between these and the TV documents is that there is far less "documentation" of the non-TV case. In evidentiary terms, however, the documents are qualitatively no different from those discussed in Parts VII.G.2(b) and (c).[367]

Indeed, we could rescribe here much of what we wrote in section VII.G.2.(b) and (c), but that would be charitable to plaintiffs' radio claims, for the data dissemination evidence referenced in the FPS with respect to radios is far more random than that advanced in plaintiffs' TV case, and is afflicted with the same problems. Plaintiffs make no cohesive presentation, and the evidence would not support one, which justifies a conclusion that there is significant evidence of data dissemination such as would violate the Sherman Act.

Some of the documents contain references to or statistics about radio exports, but those references are not limited to the United States, including instead exports throughout the world. Such references are not probative of plaintiffs' claims. In none of the charts and statistics disseminated through the EIAJ committees or the MD Group is there any evidence of exchange of identifiable price data. As with the TV documents, we have no idea from the radio documents who said what to whom or which company representatives were present and/or voted on any of the proposals, nor do we know whether any of the proposals were implemented, nor the extent of detail exchanged. There has been no deposition taken of anyone present at any such meeting. Plaintiffs attempt to interpret the documents to suit themselves, but they really do not tell us anything. We add that the plaintiffs' age-old argument that the groups and associations provided a "forum for discussion" of the levels of radio produc-

tion for the Japanese market is unavailing in the absence of any evidence as to conspiratorial activity. See Part VI.A.4, supra.

In their FPS, plaintiffs seek to draw an inference of a low price export conspiracy from: (1) the fact that the Japanese manufacturing defendants sold at such "low" prices in the U.S.; and (2) the high share of the U.S. market which they ultimately acquired.[368] These arguments track similar claims that plaintiffs have made with respect to television receivers, which we described in Parts VII.K and M, supra. We incorporate by reference what we said therein, and conclude that no inference of conspiracy can be drawn from evidence that defendants charged low prices in the U.S. (actually, plaintiffs have not really advanced a case of "international price discrimination" in radios) or from plaintiffs' evidence concerning the "depletion and destruction" of the U.S. radio industry.

In sum, as was the case with television receivers, Zenith has adduced no evidence, direct or circumstantial, tending to show any agreement among the defendants to sell radios in the U.S. at unreasonably low prices; neither has it adduced evidence of parallel radio pricing. There is no evidence that radios exported by the Japanese defendants were sold in the U.S. below competitive price levels, or below defendants' costs.

During the course of the final summary judgment argument, plaintiffs' lead counsel, Edwin P. Rome, conceded that plaintiffs had "much less" evidence with respect to non-TV products than for TV products. Without commenting here upon the strength of plaintiffs' TV claims, we observe that Mr. Rome made an understatement. He did not supply any details whatever with respect to the radio claims at the final summary judgment argument, and ra-

---

367. The "evidence" upon which Zenith relies in connection with the radio claims consists of defendants' own interrogatory answers, which do not reveal conspiratorial conduct, unidentified and unauthenticated "minutes" of meetings produced by the EIAJ and various defendants, for which, despite evidentiary challenge,

foundation was not laid and statistical documents which suffer from similar flaws. Most of the documents are probably inadmissible.

368. Plaintiffs offer statistics as to the increase in radio sales of the defendants and the decline of Zenith's radio business.

dio claims do not occupy more than a handful of pages in the 1,000 plus pages of plaintiffs' two final summary judgment briefs. In short, Zenith has offered no significant probative evidence, and there is no genuine issue of material fact, with respect to the radio claims. Accordingly, summary judgment must be granted for the defendants with respect to all claims regarding radio products.

## B. *Tape and Stereo Products*

Zenith's claims with respect to tape and stereo products are even weaker and more amorphous than its radio claims, and the FPS contains even less data as to the tape and stereo products claims. Zenith has not even formulated a claim for damages to its tape and stereo business attributable to the alleged conspiracy. Zenith's evidence respecting its tape and stereo claims consists of: (1) the export control arrangements, which for the most part did not even have price provisions; (2) the names and dates of meetings of a few trade association committees; (3) the suggestion that a few of those committees may have discussed export-related subjects based, apparently, upon random reference to the exchange of information concerning tape and stereo products; and (4) the inference Zenith seeks to draw from the increase in sales of defendants' products in the U.S. and the decline of the U.S. industry.

Zenith relies on two MITI-related export control arrangements. The first is the consumer electronics export regulation which also applied to radios, but which, as respects tape and stereo products, was in effect for only eight months in 1973, and which did not contain minimum price provisions (although it did contain export quotas). The second was the "Regulations Providing for the Terms to be Observed by Members of the Association with respect to the Export of Tape Recorders," in effect from May, 1965 through March, 1967. The principal provisions of these regulations were cus-

tomer and trademark registration requirements similar to those contained in the radio export regulations. They did not contain price or quantitative restrictions or customer limitation provisions—the provisions upon which Zenith places such heavy reliance with respect to television receivers.

None of these regulations support Zenith's low price export conspiracy claims. As we have noted, they contain no price provisions. Controlling exports to the United States by requiring exporters to register their trademarks and the names of their U.S. customers (in the case of the tape recorder export regulations) and by export quotas (in the case of the consumer electronics export regulations) could not have injured Zenith, because the only possible effect of such controls would have been to limit exports to the United States. As a competitor, Zenith could not have been hurt thereby. *See* discussion at Parts VI.B. and VII.F, *supra*.[369]

Zenith also offers a potpourri of other materials in support of its tape and stereo claims. It invokes defendants' interrogatory answers to acknowledge the existence of certain EIAJ committees which have names suggesting an interest in tape and/or stereo products. However, a review of the documents themselves referable to those committees reveals that they are not probative of a low price export conspiracy. As in the case of JMEA committees, the conferees primarily discussed the MITI-related export regulations. The documents also reflect discussion of matters such as export inspection, compliance with the quality control provisions of the tape recorder export regulations, discussion of export trends, etc., but, for reasons explained several times, *supra*, none of these matters are circumstantial evidence of the "unitary" conspiracy.

The minutes of the EIAJ Stereo Advertising Committee, the Stereo Summit Committee of the EIAJ, and the Audio Technical Committee of the Kansai Chapter of the

---

**369.** Plaintiffs invoke the Rationales to the agreements as evidence of conspiratorial intent. The text of the Rationales essentially tracks that of the TV agreements, and we have explained in Part VII.I, *supra* why the Rationales do not provide any evidence of conspiracy.

EIAJ contain no export references at all. The materials produced by defendants with respect to these committees reflect discussion of such matters as: the definition and use of words employed by various manufacturers or dealers in stereo advertisements; voluntary restraint on advertisements; discussion of the regular matrix system and standardization of the RM method of technology; a report of a study by the Four Channel Stereo Research Committee; changes in the degree of stereo signals; reports on safety, etc. Applying the legal standards discussed above, none of these matters give rise to the conspiratorial inference sought by plaintiffs.

There are random references suggesting exchange of production, shipment, and inventory statistics and demand forecasts with respect to tape and stereo equipment in a number of MD Group and EIAJ documents, including those generated by the Kansai Chapter. Zenith's submissions in this regard come from documents not proffered as DSS's during the pretrial evidentiary hearings. All of them suffer from precisely the same flaws as the materials excluded in the Japanese Materials Evidentiary Opinion, and plaintiffs have done nothing to validate them. However, even if they were admissible, they would not help Zenith, because they contain no indication of discussions relating to exports to the United States or to pricing in any market. They contain no identifiable price detail and no individual company statistics about anything. What we said about data dissemination in our discussion of plaintiffs' radio claims applies here.[370] The documents are not suggestive in any wise of the existence of a conspiracy. The random allusions to "voting" do not even begin to approach, either quantitatively or qualitatively, what we found was inadequate in the case of TV receivers, and certainly do not approach the level of "significant probative evidence" of conspiracy.

As was the case with radios, plaintiffs advance impressive statistics as to the increase in sales of Japanese tape and stereo products in the U.S. and the contemporaneous decline in U.S. industry. They also suggest that the defendants sold at low prices in the U.S. We have already explained that such evidence, even if properly presented, does not give rise to an inference of conspiracy. *See* Parts VII.M and VII.K, *supra.*

■ Again with respect to tape and stereo products, plaintiffs have adduced no evidence of an agreement among the defendants to sell at unreasonably low prices in the U.S., no evidence of parallel pricing in the U.S., no evidence of pricing below competitive levels, and no evidence of pricing below cost. Zenith has not been serious in advancing its tape and stereo claims, at least not serious enough to produce any significant probative evidence to support them. Summary judgment must be granted with respect thereto.

C. *Components; The Alleged Matsushita-Philips Component Complex and International "Industrial Cooperation" System*

Zenith's claims with respect to components are even weaker, if that is possible, than its claims with respect to other non-TV products. Initially, consistent with its other claims, Zenith alleges an agreement among Japanese component manufacturers to export components to the United States at artificially depressed pricing levels. On the other hand—and this appears to be the main thrust of its components theory—Zenith asserts that two of the participants in the alleged low price conspiracy, MEI and N.V. Philips Gloeilampenfabrieken (Philips), had an arrangement pursuant to which defendant MEC, their joint venture engaged in component manufacturing, sold components to Zenith at discriminatorily *high* prices—at least at 15% higher than the special discount at which they were sold to

---

**370.** We also incorporate by reference our earlier discussions of data dissemination, Parts VI.A.5 and VII.G.2(b) and (c).

MEI. This is of course inconsistent with the tenor of plaintiffs' main case. Also invoking certain agreements and meetings between MEI and Philips to "cooperate" in various matters, plaintiffs submit that the MEI-Philips arrangements are part of the overall conspiracy.[371]

The inconsistency of Zenith's theories is highlighted when we consider that, in connection with components, Zenith is not a seller but a purchaser. The only components that Zenith sold in any significant quantity during the period relevant to this litigation were monochrome and color picture tubes. Zenith no longer has any viable claims as a seller of components, i. e., as a competitor of defendants. Its dumping claims with respect to components, which were the only claims asserted as a competing seller, were dismissed some time ago for failure to provide dumping comparisons.[372] Moreover, Zenith makes no Robinson-Patman Act claims as a seller of components.[373] However, we nonetheless turn to an examination of the evidence affecting Zenith's components claims, starting with its conventional (depressed pricing) theory.

Zenith originally claimed that nine categories of components were relevant to the case:

(1) Capacitors;

(2) Coils, deflection yokes, and transformers;

(3) Resistors, varistors, and thermistors;

(4) Speakers;

(5) Voltage triplers;

(6) Electron discharge devices, including cathode ray tubes, diodes, and receiving tubes;

(7) Semiconductor products, including diodes, transistors, and integrated circuits;

(8) Tuners for VHF and UHF television channels; and

(9) Tape decks.[374]

Zenith does not mention a number of these components in the FPS at all (e. g., deflection yokes, varistors, thermistors, and voltage triplers), and it mentions others only in passing.[375]

Aside from the MEI-Philips connection, Zenith's components claims are bottomed upon a number of committee names and meetings, a few documents, and sales figures showing an increase in the sale of Japanese manufactured components in the U.S. The principal evidence upon which the plaintiffs apparently rely is the MITI-related Electronic Tube Manufacturers' Agreement which was in effect from December 27, 1972 through August 31, 1973. But as in the case of other Manufacturers' Agreements, the export quotas imposed under this agreement could only have had the

**371.** We have already discussed, at p. 1259 and n.280, *supra*, some weaknesses of plaintiffs' claims about the "cooperation system."

**372.** In our opinion addressed to plaintiffs' dumping claims, in which we granted summary judgment in favor of the defendants on grounds of non-comparability of products, we left open a narrow category of battery operated phonographs, tape and cassette recorders, and radios which do not receive FM transmission. 494 F.Supp. at 1242. But plaintiffs have not demonstrated in their FPS the existence anywhere in the record of any evidence that would tend to show that any of the requisites of the 1916 Antidumping Act have been met, nor of any evidence that would create a genuine issue of material fact with respect to any conspiracy claims concerning such products. Alternatively, since these matters are not even mentioned by plaintiffs in any of their voluminous post-antidumping opinion briefs, in oral argument, or in any other submission, we consider those

claims abandoned and will grant summary judgment with respect thereto.

**373.** At least no such claims were stated in the preclusive FPS.

**374.** PTO 61 (Aug. 3, 1976) at 2. Each of these broad generic categories contains an endless variety of discrete electronic devices, many of which, as we understand it, have only industrial uses and are not usable in television, radio, stereo, or tape products. In its FPS references to these categories of components, Zenith makes no attempt to specify the particular device to which it is referring or to exclude components which have only industrial uses.

**375.** For example, Braun tubes are mentioned twice (FPS at 4193, 11245) and one of the references is to Braun tubes exported to the United Kingdom; capacitors and diodes are mentioned only once each (FPS at 4074, 4331).

effect of reducing the impact of Japanese competition upon U.S. components manufacturers whose cause Zenith advocates here. Because Zenith can show no antitrust injury caused by these agreements, it has no standing to attack them.

Zenith also relies upon the existence of a number of EIAJ committees having names suggesting an interest in components. In fact, the great majority of Zenith's FPS references to components are nothing more than the name of a trade association committee, with no further discussion. We have already seen the fallacy of that approach. The matters allegedly discussed during various committee meetings lend no support to plaintiffs' claims. According to the documents referenced in the FPS, assuming their admissibility,[376] the meeting agendas dealt heavily with technical matters, product liability and safety, and research. For reasons oft-discussed above, they do not support plaintiffs' conspiracy claims.

█ The data dissemination references sprinkled over this vast record, with cryptic allusions to "voting," do not even begin to approach, either quantitatively or qualitatively, what we found was inadequate in the case of television receivers, and certainly do not approach the level of "significant probative evidence" of conspiracy. To the extent that Zenith alleges a low price export conspiracy with respect to components, it fails, for it has offered no significant evidence, direct or circumstantial, of agreement.

We turn to the other facet of plaintiffs' components claims. Zenith devotes numerous pages of its FPS to a description of the MEI-Philips agreements. Because MEC offered a 15% discount to MEI, Zenith complains that MEC sold components to Zenith at discriminatorily *high prices*! Zenith does not explain how this high price conspiracy can be a part of the low price conspiracy or how the two fit together. Nei-

ther does Zenith explain why it would allow itself to be charged discriminatorily high prices by MEC when it apparently had available to it alternative sources, i. e., components sold at the artificially low prices about which Zenith also complains. To the extent that Zenith complains that it was forced to buy its components at low Japanese prices because other U.S. component manufacturers were driven out of business, it can hardly complain. In any event, it has sustained no more injury than it has from the fixing of minimum price levels; hence it lacks standing.

Plaintiffs partially ground their components [376A] claims on the alleged "Matsushita-Philips component complex" and international "industrial cooperation" system. Plaintiffs use these labels to describe a series of agreements between MEI and Philips which were designed primarily to effect wide-ranging technical exchange and patent licensing in the components field. Auxiliary to these understandings was a network of agreements providing for trading relationships between the two companies and for discounts on sale of certain products. There were certain provisions which plaintiffs describe as "customer allocation" provisions, pursuant to which MEI agreed not to compete with certain large Philips customers. Finally, there was an agreement to the effect that Philips and Matsushita management would discuss matters of general interest, including worldwide economic trends.

Apparently, the MEI-Philips agreements are introduced to support plaintiffs' contentions that the conspiracy was of worldwide scope. However, as a review of the documents demonstrates, the industrial cooperation understandings were of a most general nature. We have referred to some of the documents offered by plaintiffs in support of their contentions in Part VII.N.5, *supra.* These documents do nothing more than evince the friendship between Philips and

---

**376.** The components documents also present problems of admissibility similar to those of the documents mentioned earlier and in the Japanese Materials Evidentiary Opinion.

**376A.** Plaintiffs have asserted a Robinson-Patman Act claim against MEC alleging price discrimination in the sale of components, which we have disposed of at n. 395, *infra.*

MEI and speak amorphously about maintaining a positive longterm relationship.[377]

The short of it is that none of plaintiffs' evidence about the MEI-Philips relationship helps its case. The heart of that relationship was the MEC components joint venture, whose activities cannot help Zenith for the reasons explained above. There is no evidence that Philips was involved in the "unitary" conspiracy, or in any other conspiracy.[378] None of the MEI-Philips agreements tend to prove such complicity. Plaintiffs have offered no significant probative evidence supporting any of their components claims, and summary judgment must be granted as to those claims.

### IX. Plaintiffs' Sherman § 2 Claims—Legal Principles and Application

#### A. Introduction; The "Individual Monopolization" Claims

In addition to their Sherman § 1 claims, plaintiffs have also charged defendants with violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.[379] Plaintiffs allege that defendants have monopolized, attempted to monopolize, and combined or conspired to monopolize the manufacture, sale, and distribution of consumer electronic products, or parts thereof, in violation of Section 2. Defendants have all, at one time or another, moved for summary judgment with respect to plaintiffs' Sherman § 2 claims. We listed the Sherman § 2 motions for discrete

consideration and heard argument on April 15, 1980. During the course of the argument it became obvious that there was confusion as to the nature of plaintiffs' Sherman § 2 claims. That confusion, the resolution of which fortunately resulted in sharpening of the issues, may be explained as follows.

Defendants commenced their argument by positing that they were each being charged with "individual" monopolization and attempted monopolization, *i.e.*, monopolization separate from plaintiffs' claims of monopolization by combination or conspiracy. They promptly pointed out that monopoly power (or at least a dangerous probability of acquiring such power) is an essential requisite of a Section 2 violation, and that, on the facts of record, as a matter of law, no one defendant alone even came close to having sufficient market share to have violated Section 2 either through monopolization or attempted monopolization. Plaintiffs responded that they were *not* asserting such "individual monopolization" claims. *See* PTO 238 at 129–31; that they had never made such claims; and that defendants had misread their complaints.[380] Instead, said plaintiffs, their theory of Sherman § 2 liability was bottomed on *American Tobacco v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), which they read as holding that if, in the

---

**377.** For example, plaintiffs rely upon documents such as MIH 029201 through 029210 which purport to be "minutes" of high level meetings involving the highest executives of Philips and MEI. But these "minutes" constitute only general (though wide-ranging) discussion of world and U.S. market conditions and do not begin to suggest conspiratorial activity of the kind suggested by plaintiffs, either alone or in conjunction with other evidence.

**378.** We have already explained, in Part VII.Q.2, *supra*, that there is no evidence of involvement by MEI in the alleged conspiracy. We have also explained, *see* n. 30, *supra*, that plaintiffs cannot proceed on a theory of a "wheel" type conspiracy.

**379.** Section 2 provides:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monop-

olize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.
15 U.S.C. § 2.

**380.** Moreover, in their April 9, 1980 "Memorandum in Opposition to Certain Defendants' Motions for Partial Summary Judgment on Issues of Monopolization and Attempted Monopolization," plaintiffs had stated, "There are no *separate* counts ... which address monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, which do not address defendants' conspiracy to monopolize."

aggregate, *i. e.*, "by combination," the defendants monopolized or attempted to monopolize, each defendant would be individually liable for monopolization or attempted monopolization.

We need not decide whether plaintiffs ever asserted individual claims of monopolization and then withdrew them, as defendants contend, or whether such claims were never asserted at all, as plaintiffs maintain. It is sufficient to say that the parties reached the understanding at the hearing that these claims were not a part of plaintiffs' case. We will consider, therefore, whether under the *American Tobacco* "aggregate" theory, and under the evidence, there is a genuine issue of material fact as to plaintiffs' monopolization claims. We will also consider, in like fashion, plaintiffs' claims of attempted monopolization and conspiracy to monopolize.

B. *Monopolization by Combination; Attempted Monopolization by Combination; Conspiracy to Monopolize*

Plaintiffs' theory that each individual defendant can be charged with monopolization by combination under § 2 of the Sherman Act (as opposed to conspiracy to monopolize) would appear to be justified by the language of the Act and by the Supreme Court's decision in *American Tobacco, supra.* Although the question before the Supreme Court in *American Tobacco* was whether "actual exclusion of competitors is necessary to the crime of monopolization ... under § 2 of the Sherman Act," 328 U.S. at 809, 66 S.Ct. at 1139, the Court's opinion supports plaintiffs' contention that when a group of firms by combination acquires or maintains the power to exclude competitors and has the intent and purpose to exercise that power, each member of the group is guilty of (or liable for) monopolization. There is no small amount of semantic confusion in the area, and it is important to

distinguish such a cause of action (which we style as monopolization by combination) from claims of "conspiracy to monopolize" and "shared" or "joint" monopoly.

■ Conspiracy to monopolize is a separate offense under § 2. As defined by Professor Sullivan, a conspiracy to monopolize requires "proof of a concerted action deliberately entered into with the specific intent to accomplish the unlawful result of achieving a monopoly"; and (2) proof of "at least one overt act in furtherance of the conspiracy." Proof of such a conspiracy does not require successful accumulation of monopoly power. In other words, conspiracy to monopolize essentially applies the law of criminal conspiracy to the monopolization context. *See* L. Sullivan, *supra*, at 132–33.

■ "Shared" monopoly, on the other hand, describes an oligopolistic market in which a relatively small number of firms collectively holds significant market power (though no single firm possesses sufficient market power to exclude competitors), but where there is no evidence of collusive behavior. The Sherman Act does not forbid such a market condition, absent evidence that the firms "combined or conspired" to achieve their monopoly power. *See generally* P. Areeda and D. Turner III *Antitrust Law* ¶ 840 et seq.

■ In contrast, plaintiffs' *American Tobacco* theory of monopolization by combination, which we have accorded vitality, posits, as we have said, that when the defendants in the aggregate have monopolized the relevant market, each individual defendant may be held liable for monopolization even though its individual market share would not otherwise support such a claim. Given the discrete character of a conspiracy, a count of conspiracy to monopolize may be pursued in addition to a monopolization count.[381] However, even

---

**381.** Professor Sullivan points out that "there is a substantial area of potential overlap between the offenses of conspiracy to restrain trade, conspiracy to monopolize, and monopolization and attempt to monopolize." L. Sullivan, *su-*

*pra*, at 133. We would add to the list of potentially overlapping offenses "monopolization by combination."

Professors Areeda and Turner point out that the § 2 prohibition against conspiracies to mo-

though under *American Tobacco* a group of defendants may be held liable for monopolization when, acting in concert, they have monopolized the relevant market, that case made it plain that there must be evidence of concerted action to support such a monopolization by combination claim.[382] Thus, while in theory monopolization by a group of firms and conspiracy to monopolize may be separate violations of the Act, in practice they must be supported by similar evidence. Moreover there is no indication either in the Act or in the case law that there is any difference between the type of evidence which will support an inference of an agreement to monopolize and that which will support an inference of collusion under § 1.[383]

In *Edward J. Sweeney & Sons v. Texaco, Inc.*, 637 F.2d 105 (3rd Cir. 1980), the defendant Texaco, Inc. was charged with violations of both § 1 (conspiracy in restraint of trade) and § 2 (conspiracy to monopolize). On appeal, the appellants' § 1 claims failed because sufficient proof of concerted action was not offered. The appellants' § 2 claims

alleging conspiracy to monopolize failed because of the failure to establish the conspiracy under § 1. *Id.* at 118. Similarly, Von Kalinowski notes that there is no indication that the words "combine" and "conspire" as used in Section 2 of the Sherman Act are distinguishable from a "combination" or "conspiracy" under Section 1 of the Act. Von Kalinowski, 16A *Business Organizations*, Antitrust Laws & Trade Reg. § 9.02 (1979). *See also* the comments of Professors Areeda and Turner, quoted in note 381, *supra*.

■ The combination which in plaintiffs' submission supports their *American Tobacco* theory of monopolization is the same conspiracy—the "unitary" conspiracy—which they claim violated § 1 of the Sherman Act. Nowhere in this most voluminous of records or in the torrent of words which has poured forth in seemingly endless colloquy over the past three years has any other theory been suggested. As we have already discussed at length above, the evidence which plaintiffs have offered to prove a Section 1 violation is insufficient to raise

---

nopolize may be redundant, given § 1, in civil litigation:

> Sherman Act § 2 also condemns those who "combine or conspire . . . to monopolize." The prohibition is curious, because, given § 1, it seems entirely redundant. Any arrangement that could be considered a combination or conspiracy to monopolize must necessarily also be an unreasonable restraint of trade offending § 1. To be sure, not all § 1 violations would constitute conspiracies to monopolize. But the key point is this: every combination or conspiracy that offends antitrust policy can easily be held to be an unreasonable restraint of trade, without the need for considering the additional complexities that flow from using the § 2 monopoly concept. There is therefore no need whatever to try to define the content of the § 2 conspiracy.

P. Areeda and D. Turner, *supra*, at 358.

**382.** As the Supreme Court stated in *American Tobacco*, referring to § 2 requirements, "[t]he trial court described this combination or conspiracy as an 'essential element' and an 'indispensable ingredient' of the offenses charged. It is, therefore, only in conjunction with such a combination or conspiracy that these cases will constitute a precedent." 328 U.S. at 798, 66 S.Ct. at 1133–1134. In other words, a finding of monopolization as charged in *American Tobacco* requires a finding of agreement among

the defendants. In that case the same circumstantial evidence of agreement supported both the § 1 conspiracy and the § 2 "combination."

**383.** Plaintiffs, in their Memorandum in Reply to Motions for Summary Judgment of Certain Defendants, Matsushita Defendants and Sears, Roebuck and Co., dated April 2, 1979, suggest at p. 90 that a "violation may be shown even though no restraint under Section 1 has been effected." However, leaving aside the question of attempt, which violates § 2 but perhaps not § 1, we find it difficult to conceive of a combination to monopolize which would not also be a combination in restraint of trade. *See* n. 381, *supra*. The cases cited by plaintiffs do not support their proposition. In *American Tobacco*, a restraint violative of § 1 was indeed present and was the same agreement which violated § 2. The footnote to which plaintiffs refer us in *United States v. Griffith*, 334 U.S. 100, 107 n. 9, 68 S.Ct. 941, 945 n. 9, 92 L.Ed. 1236 (1948), merely points out that a firm can run afoul of the "conspiracy to monopolize" provision of § 2 even if it has not acquired monopoly power. And the cited pages of *United States v. Columbia Steel*, 334 U.S. 495, 531–32, 68 S.Ct. 1107, 1126, 92 L.Ed. 1533 (1948) address *attempted* monopolization, which we agree might not necessarily violate § 1.

a genuine issue of fact as to the existence of any agreement—more particularly, of a low-price export conspiracy. Therefore, taking all plaintiffs' evidence, direct or circumstantial, there is insufficient evidence to create a factual issue as to the existence of a combination or conspiracy necessary to support a violation of § 2 under *American Tobacco*. For this reason, summary judgment must be granted for the defendants on plaintiffs' § 2 claim for monopolization.

■ Having disposed of plaintiffs' claim of actual monopolization, disposition of the claim of attempted monopolization follows as of course. Under *American Tobacco*, an attempt to monopolize by combination requires the same type of concerted action and unity of purpose as required in a claim of actual monopolization. As we have held, the plaintiffs have not offered sufficient proof of such concerted action to withstand the defendants' motions for summary judgment. Similarly, plaintiffs' claim of a conspiracy to monopolize must also fail for lack of proof of the conspiratorial element which it failed to prove under Section 1. *See Sweeney, supra.*

C. *The Question of Defendants' Aggregate U.S. Market Share of Television Receivers*

Defendants have argued with great force that their aggregate U.S. market share of television receivers is as a matter of law not large enough to justify continuance of the plaintiffs' Sherman Act § 2 claims beyond the summary judgment stage. Although we have held that plaintiffs' Sherman Act § 2 monopolization claims cannot survive summary judgment because of the total lack of evidence of agreement, and choose to rest our grant of summary judgment on plaintiffs' Sherman § 2 claims on that ground alone, we elect to extend the opinion by summarizing and commenting upon the factual record relative to the defendants' market share and the law relative to monopoly power. We do so because, in view of the potential importance of the point and the likelihood of appeal, it will be helpful for the Court of Appeals to have an overview of the record (and an identification of the problems) in this area in the event it should wish to reach this question which we do not.

■ Under the case law, market share is the prime indicator of monopoly power, although market share alone may not be dispositive. It is not clear, however, what degree of market power, either individual or aggregate, is necessary to indicate monopoly power. In *American Tobacco* an aggregate 68% of the domestic cigarette market was a sufficient share to show such power. 328 U.S. at 796, 66 S.Ct. at 1133. The Fifth Circuit has noted that "something more than 50% of the market is a prerequisite to a finding of monopoly power," *Cliff Food Stores v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969). In *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945), the Second Circuit held that 90% of the market was a monopoly, but commented that "it is doubtful whether sixty or sixty-four per cent would be enough." The Eighth Circuit has pointed out that, of "nine cases condemning monopolies under § 2 of the Act, the percentage of market share ranges from 70 per cent in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 167 68 S.Ct. 915, 934, 92 L.Ed. 1260 (1948), to 100 per cent in *United States v. Pullman Co.*, [330 U.S. 806, 67 S.Ct. 1078, 91 L.Ed. 1263 (1947)]", *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 974 (8th Cir. 1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969). *See also Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) (90%); *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (87%).

■ In order to establish the existence of market power, plaintiffs must first prove that a particular product constitutes a relevant market or submarket by showing that it is "not considered reasonably interchangeable with other ... [products] ... by a significantly large number of consumers." *Edward J. Sweeney & Sons, supra,*

637 F.2d at 117.[384] In their supplemental FPS at 11247–51, plaintiffs have set out five separate product markets: (1) television receivers, (2) components, (3) phonographs, stereo, and audio instruments, (4) tape equipment, and (5) radios.[385] There is, however, no indication in the preclusive FPS of the means by which plaintiffs intend to prove that these are relevant product markets, nor have plaintiffs indicated an intention to prove any submarkets.[386]

In terms of percentages of total unit sales of monochrome television receivers to U.S. dealers, defendants shipped 19.8% in 1967, 24.2% in 1968, 31.8% in 1969, and 36.2% in 1970. Trendex figures[387] show that defendants' market share in monochrome receivers was:

| | |
|---|---|
| 1969 | 21.8% |
| 1970 | 23.8% |
| 1971 | 32.8% |

| | |
|---|---|
| 1972 | 34.0% |
| 1973 | 33.1% |
| 1974 | 36.5% |
| 1975 | 44.0% |
| 1976 | 43.1% |
| 1977 | 49.2% |

Defendants' market share for color television receivers was:

| | |
|---|---|
| 1969 | 12.2% |
| 1970 | 16.3% |
| 1971 | 22.6% |
| 1972 | 21.5% |
| 1973 | 23.6% |
| 1974 | 24.5% |
| 1975 | 42.5% |
| 1976 | 42.1% |
| 1977 | 44.2% |

According to the Trendex figures then, the defendants' aggregate market share for television receivers never exceeded 50%, and for most years in question was far less.[388] It is thus doubtful that the plain-

**384.** There must be evidence, for example, of "industry or public recognition of the submarket as a separate economic entity, the products' peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id., quoting Brown Shoe, supra,* 370 U.S. at 325, 82 S.Ct. at 1524.

**385.** The FPS does not make clear whether these product markets are defined for purposes of Sherman 1, Sherman 2, or both. Without any clear guidance from plaintiffs, we must assume the markets are defined for both purposes. Another indication of potential product markets is found in Count IV of the Zenith complaint, which sets out six categories of CEP's which defendants ship to the United States. These six categories, not defined as relevant product markets, include all the products listed in the text, with the additional breakdown of television receivers into monochrome and color.

**386.** For example, although the FPS posits that one relevant product market is "all television receivers," plaintiffs have provided figures separately for monochrome and color receivers, as well as by screen size. Thus, were we to reach *the market share issue, it would be necessary* to determine whether television receivers of different screen sizes are different product markets or submarkets.

**387.** Plaintiffs asset that the Trendix figures are understated because they only reflect sales of the defendants' own brand names, ignoring OEM and private label purchases.

**388.** Plaintiffs also include figures for other product markets, although there are a number of problems raised by their figures. First, plaintiffs allege that radio imports in dollars from Japan represented at least 67% of the U.S. radio market in 1976. Plaintiffs have also broken down the defendants' market share in certain segments of the radio market. For example, they claim that Japanese imports represented 54% of the U.S. total sales in units of table radios from 1970 to 1976. They have not, however, attempted to prove that table radios are a relevant submarket. Citing the Nehmer Report, the plaintiffs conclude that the "cartel members' " share of the U.S. radio market was approximately 55% by 1970, excluding shipments from their offshore manufacturing facilities. This is probably the best indication of what plaintiffs assert to be defendants' market share as to radios.

Plaintiffs list within an "audio products" market a wide variety of items, including but not limited to phonographs, turntables, changers, and loudspeakers. We are supplied with market share data for some of these individual items, but not for all, nor for the (putative) relevant product market as a whole. For example, phonographs from Japan are claimed to have accounted for 90% of all phonograph imports into the U.S. during 1968–1972. Total imports accounted for 65% of the U.S. phonograph market. Therefore, we can assume that plaintiffs believe that Japanese phonographs constituted something less than 65% of the U.S. market. Plaintiffs also provide us with excerpts from the Nehmer Report which show that Japanese imports of loudspeakers and amplifiers constituted an average of 36% of the

tiffs' evidence of defendants' U.S. market share of television receivers and of certain other CEP's in certain markets (*see* n. 388, *supra*), even if aggregated according to plaintiffs' theory of monopolization by combination, is sufficient to meet the legal standards for proof of monopolization under § 2 of the Sherman Act, at least for most years in question. Were we to extend our analysis by sorting out the facts of record in this area, it is clear that we would have to grant summary judgment as to many of the plaintiffs' *American Tobacco* monopolization claims on the ground that the defendants do not have sufficient market share to make out such a case or on the ground that whatever the ultimate facts, plaintiffs have not adduced sufficient specific evidence to create a genuine issue of material fact. However, because it would take quite some time to cover all of this territory, and because, by virtue of the conclusion reached in the previous section, it is not necessary, we shall not do so. We hope that we have sufficiently charted the terrain for the reviewing court, should it wish to venture therein.

> U.S. market (in quantity) in loudspeakers from 1973 to 1976. Japanese amplifiers also held 36% of the U.S. amplifier market from 1972 to 1976. Additionally, plaintiffs' statistics purport to show that the defendants held 77.4% in 1968, 89.0% in 1970, and 87.1% in 1972 of the U.S. tape recorder market in terms of unit sales. While the Nehmer Report asserts that Japanese imports accounted for more than half of all audio products imported into the United States between 1967 and 1977, we are not told what share of the total U.S. audio market was captured by Japanese manufacturers, let alone by those who have been named as defendants.

> **389.** Zenith contends that the following defendants (individually as opposed to vicariously) have violated the Robinson-Patman Act: Matsushita Electronics Corporation of America (MECA); Matsushita Electronics Corporation (MEC); Mitsubishi International Corporation (MIC); MELCO Sales, Inc.; Toshiba America, Inc. (TAI); Hitachi Sales Corporation of America (HSCA); Sanyo Electric, Inc. (INCO); and Sharp Electronics Corporation (SEC). NUE has not asserted any Robinson-Patman Act claims.

> **390.** In addition to *Pinkerton*, Zenith relies on a number of decisions, such as *FTC v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), which, in its submission, have im-

## X. Zenith's Robinson-Patman Case—Legal Principles and Application

### A. *Introduction*

Zenith has asserted claims against certain of the defendants for price discrimination among U.S. purchasers of defendants' products allegedly in violation of the Robinson-Patman Act.[389] Although the Robinson-Patman Act, unlike Section 1 of the Sherman Act, does not contain its own conspiracy provision, and plaintiffs do not allege a conspiracy to violate the Robinson-Patman Act as a separate antitrust offense, Zenith also argues that all other defendants are vicariously liable for the violations under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), because of their participation in the alleged conspiracy. For the reasons set forth in Part VI.D.5, *supra*, as informed by the discussion herein, we need not, hence do not, reach the *Pinkerton* issue.[390] We address in this section defendants' motions for summary judgment on Zenith's Robinson-Patman claims.

> posed liability under the Robinson-Patman Act upon all coconspirators for what Zenith calls "a combination and conspiracy among sellers in which overt acts of price discrimination exist." We do not reach those legal issues related to vicarious liability for the same reasons that we do not reach the *Pinkerton* issues, *i. e.*, there is no genuine issue of material fact as to the alleged conspiracy. As a consequence of that ruling, Zenith's theory asserting vicarious liability for Robinson-Patman Act violations is unsupportable. This reason is sufficient by itself to require that summary judgment be granted for the following defendants, against whom no individual Robinson-Patman Act violations are alleged: Mitsubishi Electric Corporation; Mitsubishi Corporation; Sanyo Electric Company, Ltd.; Sanyo Electric Trading Company, Ltd.; Sanyo Manufacturing Corp.; Hitachi, Ltd.; Hitachi Kaden Hanbai Kabushiki Kaisha; Sears Roebuck & Co.; Motorola, Inc.; Matsushita Electric Industrial Company; Matsushita Electric Trading Company, Ltd.; Quasar Electronics Corp.; Toshiba Corporation; and Sharp Corporation. In addition, for the reasons stated in the text, *infra*, Zenith's claims against these defendants also fail for lack of standing and for absence of proof of competitive injury.

The Robinson-Patman Act outlaws certain discriminations in price between purchasers of commodities sold for use or resale in the United States.[391] The Supreme Court has warned against overbroad interpretations of the Robinson-Patman Act which "extend beyond the prohibitions of the Act and, in so doing, help give rise to a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation." *Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 80, 99 S.Ct. 925, 933, 59 L.Ed. 153 (1979), *quoting Automatic Canteen Co. v. FTC*, 346 U.S. 61, 63, 73 S.Ct. 1017, 1019, 97 L.Ed. 1454 (1953).

In order to make out a claim under the Act, a plaintiff must show that a defendant has made two contemporaneous sales of commodities of like grade and quality to two different customers at different prices, and must also show that the effect of the price discrimination "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition." 15 U.S.C. § 13(a).[392] Although the standard is thus one of "incipiency," *see infra*, an effect on competition which is insubstantial or *de minimis* does not satisfy the statutory requirement. *See, e. g., American Oil Co. v. FTC*, 325 F.2d 101 (7th Cir. 1963), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 (1964); *Willow Run Garden Shop, Inc. v. Mr. Christmas, Inc.*, 1973–2 Trade Cases ¶ 74,86 (D.N.J. 1973), *rev'd on other grounds*, (3d Cir. Aug. 5, 1974) (disposition noted at 500 F.2d 1401). *See generally* F. Rowe, *Price Discrimination Under the Robinson-Patman Act* (1962); L. Sullivan, *Handbook of Law of Antitrust* § 218 (1978).[393]

The parties sharply dispute whether these statutory requirements are satisfied by Zenith's proffers.[394] However, we need not

---

**391.** The Robinson-Patman Act provides in pertinent part:

> It shall be unlawful for any person engaged in commerce in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . .

15 U.S.C. § 13(a). Both Zenith and NUE originally also sought to maintain claims under the Robinson-Patman Act for price discrimination between the U.S. and Japanese markets. Judge A. Leon Higginbotham, Jr., our predecessor in this case, ruled, however, that the Robinson-Patman Act has no application unless both "legs" of the alleged price discrimination involve commodities sold for use or resale within the United States. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 244 (E.D.Pa.1975). Price discrimination between two different national markets is governed instead by the Antidumping Act of 1916, which was intended to supplement § 2 of the Clayton Act, the statutory predecessor of the Robinson-Patman Act, by extending the reach of U.S. price discrimination law to foreign commerce. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 494 F.Supp. 1190, 1213–23 (E.D. Pa.1980), *appeal pending*, No. 80–2080 (3d Cir.).

**392.** The statute provides a defense for price differences which are "justified" because of cost differences resulting from changing conditions affecting marketability, or which are necessary to meet competition.

**393.** Some courts have held that a primary-line plaintiff (*see* n. 395 *infra*) must show sales at a price below some measure of cost in order to establish injury to competition. *E. g., Pacific Eng. & Prod. Co. v. Kerr-McGee Corp.*, 551 F.2d 790 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). In addition to their contentions about standing and evidence of injury, discussed *infra*, various of the defendants have argued that without evidence of sales below cost Zenith cannot show competitive injury. We do not reach this question.

**394.** Defendants contend that Zenith has failed to provide proof of certain jurisdictional elements required by the words of the statute. Various defendants claim, for example, that Zenith has not come forth with sufficient evi-

reach most of the points raised by the parties because of the consequences which flow from Zenith's overall approach to its Robinson-Patman Act claim. As will be seen *infra*, Zenith's formulation of its Robinson-Patman claim is inextricably bound up with its conspiracy allegations. Since Zenith's standing to assert a claim under the Robinson-Patman Act and its proof of substantial injury to competition are entirely dependent upon its allegation that the defendants engaged in a low-price export conspiracy, its failure to support these allegations by evidence sufficient to create a genuine issue of material fact means that its Robinson-Patman claims must also fail.[395]

## B. Zenith's Standing to Assert Claims Under the Robinson-Patman Act

 The principles of antitrust standing under § 4 and § 16 of the Clayton Act,

---

dence of at least two different purchasers. They argue that Zenith does not have evidence of actual sales prices, as opposed to list prices, and that only actual sales prices will support a Robinson-Patman Act claim. They contend that the instances of price discrimination in plaintiff's FPS are in any event *de minimis* and could not support a finding of substantial incipient injury to competition. The Matsushita defendants claim in addition that Zenith has failed to show that the commodities were sold for use or resale within the United States. We have examined these contentions and have found that in most, although not in all, instances they are well founded. However, there is no point in adding to this lengthy opinion an extensive analysis of a plethora of financial detail when there is an alternative—and simpler—mode of resolution.

Finally, various defendants have moved for dismissal of Zenith's Robinson-Patman Act claims under F.R.Civ.P. 16 and/or 37 on the ground that Zenith refused to supply detailed information about its Robinson-Patman Act claims in answer to interrogatories or in that surrogate for incomplete discovery, the FPS, in violation of Pretrial Orders 136, 142, and 154. In view of our conclusion set forth in the text, *infra*, that there is no genuine issue of material fact with respect to the Robinson-Patman Act claims, we need not reach the Rule 37 issue. We add in this regard only that the defendants' complaints about plaintiff's failure to develop their Robinson-Patman Act claims seem justified. MC and MIC observe, for example, that Zenith's entire factual narrative addressing its Robinson-Patman Act claims against MC and MIC consists of a single paragraph in its FPS (at 7606).

**395.** Our discussion in this section will be confined to Zenith's primary-line Robinson-Patman claims, *i. e.*, those asserting injury to Zenith as a competitor, as opposed to its secondary-line claims, *i. e.*, those asserting injury as a purchaser. Zenith makes some assertions of secondary-line injury with respect to MEC's alleged discrimination in the sale of components which we have mentioned in Part VIII.C, *supra*. However, for the reasons which follow, there is no genuine issue of material fact with respect to that claim either. First, Count V of Zenith's complaint alleges price discrimination only among "*United States purchasers*," but neither MEI nor Philips, the supposed favored purchasers, are U.S. purchasers. Second, the Act requires proof that the sales on *both* sides of the alleged discrimination were for "use, consumption or resale within the United States." *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 402 F.Supp. 244 (E.D.Pa.1975) (Higginbotham, J.). Zenith has made no such showing. Zenith alleges that MEC discriminated in price between, on one hand, a *U.S. purchaser* (Zenith) and, on the other, a *Japanese "purchaser"* (MEI) and a *European "purchaser"* (Philips), and makes no attempt to show that the components allegedly "sold" to either MEI or Philips at purportedly discriminatory prices were sold for "use, consumption or resale within the United States." Thus, Zenith has failed to satisfy a fundamental jurisdictional prerequisite for its secondary-line claim. Third, Zenith has failed to set forth any evidence that MEC made actual, contemporaneous sales of products of "like grade and quality" to Zenith and MEI and/or Philips. With respect to its own purported purchases, Zenith relies upon aggregate yearly purchase statistics which do not identify individual sales transactions or even the components purchases. Moreover, Zenith does not identify actual purchases of specific components by MEI or Philips contemporaneous with purchases of components of "like grade and quality" by Zenith. Fourth, Zenith has not offered evidence of any discrimination in the actual prices at which MEC allegedly "sold" its components to Zenith, on one hand, and MEI and Philips, on the other. Zenith has advanced no evidence of the actual prices at which MEI, Philips, or even Zenith itself purchased the components involved in the alleged discriminations. Finally, Zenith does not offer any evidence that the alleged discriminations by MEC had the requisite anticompetitive effect. In this case, a showing of such effects would require proof that the alleged discriminations in component prices injured or threatened competition among manufacturers of the finished products into which the components were incorporated. Zenith has not even identified the relevant finished products or the components involved.

15 U.S.C. § 15 and § 26, which we discussed in Part VI.B, *supra*, govern claims under the Robinson-Patman Act as well as under other antitrust statutes. *See Perkins v. Standard Oil Co.*, 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969); *Chrysler Credit Corp. v. J. Truett Payne, Inc.*, 607 F.2d 1133 (5th Cir. 1979), *cert. granted,* —— U.S. ——, 101 S.Ct. 70, 66 L.Ed.2d 20 (1980); *Freedman v. Philadelphia Terminals Auction Co.*, 301 F.2d 830, 833 (3d Cir.), *cert. denied*, 371 U.S. 829, 83 S.Ct. 40, 9 L.Ed.2d 67 (1962). Zenith has steadfastly refused to attempt to show that it suffered injury specifically because of the price discriminations alleged against the defendants or to assess what the dollar amount of damages attributable to the price discrimination might be. During argument addressed to defendants' motions for summary judgment on the Robinson-Patman claims, Zenith's counsel stated:

We have submitted damage calculations in great, great detail. I do not think it is our responsibility, your Honor, nor are we obliged to try to segregate out the damage and say this represents damage flowing from one kind of overt act and another kind from a different kind of overt act. That would again be the atomization, the fragmentation which is not permitted.

PTO 252 at 109 (May 26, 1980). And in its answer to Interrogatory No. 27 of the Matsushita Defendants (filed May 25, 1979), Zenith responded that it was "impossible to attribute any specific portion of damages . . . to MEI's 'primary line' price discrimination alone."

The damages section of the FPS makes no attempt to attribute any loss to Zenith by reason of alleged Robinson-Patman Act violations, whether because of declining sales or for any other reason. Furthermore, the sections of the FPS charting the various price discriminations alleged make no attempt to show that Zenith was competing with any of the defendants for sales to any of the customers who were paying the lower price for comparable merchandise at any given time. Thus, Zenith has failed to provide any nexus between the alleged price discrepancies in the FPS and any inju-

ries Zenith may have suffered. Indeed, the only example cited in plaintiffs' Robinson-Patman brief of sales lost by Zenith to a defendant is of sales to a customer who paid the defendant the *higher* of the disparate prices. *See* PTO 252 at 55–57. In its Supplemental Memorandum in Opposition to Certain Defendants' Motions for Summary Judgment relating to Robinson-Patman Claims, filed after argument of the Robinson-Patman Motions, Zenith's only mention of injury to itself is as follows:

Injury to Zenith in its business and property under Section 4 of the Clayton Act, 15 U.S.C. § 16 [sic] (1973), in this case is clear. Defendants' combination and conspiracy and price discrimination in furtherance thereof directly affected and injured other competitors. Many competitors, such as NUE, were driven out of business.

*Id.* at 39 n.12.

Because Zenith has insisted throughout this litigation on attributing all of its injury to the unitary conspiracy and the overt acts in furtherance thereof, it has never attempted to sketch even the barest outline of a theory of how its injury was caused by the alleged Robinson-Patman violations. Instead, it has rested on the claim that since it alleges a "unitary conspiracy," within which each Robinson-Patman violation is an "overt act," it is not obliged to show that it was injured specifically by those alleged violations. Zenith has, in colloquial terms, "put all its eggs in one basket"—the "unitary" conspiracy basket.

While Zenith's approach might (or might not) have supported its standing to sue for alleged Robinson-Patman violations if it in fact had proof of a low-price export conspiracy, its approach is plainly insufficient in the absence of such a conspiracy. In the instant opinion, we award summary judgment to the defendants on the ground that the plaintiffs have not come forward with sufficient probative evidence of such a conspiracy to create a genuine issue of material fact. Because Zenith has utterly failed to make even the most minimal showing of

injury from the Robinson-Patman violations, apart from its conspiracy allegations, it has no standing under § 4 or § 16 of the Clayton Act to maintain an action to recover treble damages for those alleged violations, in the absence of a genuine issue of material fact as to the existence of a low-price export conspiracy.[396]

C. *Zenith's Failure to Show Substantial Incipient Injury to Competition*

 In addition to its failure to make an adequate showing to support its standing to seek relief for the alleged Robinson-Patman violations, Zenith has failed to adduce evidence sufficient to create a genuine issue of material fact as to a crucial requirement of the Robinson-Patman Act: proof of substantial incipient injury to competition. The statute prohibits only those price discriminations the effect of which "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition." 15 U.S.C. § 13(a). It does not require proof of actual injury to competition, but only of an incipient injury to competition. *E. g., FTC v. Morton Salt Co.,* 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). However, a Robinson-Patman plaintiff must adduce *some* causal nexus between the alleged price discrimination and injury to competition, whether actual or incipient.

If the discrimination complained of does not, cannot and will not have the defined effect of injury to or substantial lessening of competition, or tendency to create a monopoly, the Act has not been violated.... This is implicit in the very language employed by the Act. Any other construction would turn the Act into a price control law contrary to its manifest purpose.

*Whitaker Cable Corp. v. FTC,* 239 F.2d 253, 256 (7th Cir. 1956), *cert. denied,* 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed.2d 761 (1957). *See generally Rowe, supra,* at 132–39. Indeed, to read the requirement of injury to competition out of the Robinson-Patman Act, or to construe the requirement too broadly, would be unfaithful both to the very language of the Act and to the Supreme Court's warning in *Great A & P, supra,*

---

**396.** Plaintiffs' dumping claims are now before the Court of Appeals under 28 U.S.C. § 1292(b). In view of the analysis in the text, it may be that the individual dumping claims (because dumping is international price discrimination, *see* n. 391, *supra*), are also flawed for failure to provide sufficient nexus between the price discrimination of a given defendant and injury to Zenith. The problem is illustrated by the following colloquy during the deposition of Zenith's former President, John Nevin, on July 31, 1979:

Q: [By Mr. Gartland, counsel for Sharp] Is there any attempt that has been made by Zenith or will be made by Zenith to calculate the damages caused by what Zenith contends to be individual dumping by individual defendants?
A: [By Mr. Nevin] No there has not been.
Q: Do you intend to make any such calculation?
A: I wouldn't see any reason for us to make such a calculation.
Q: Well, I am not trying to pin you to what the law of conspiracy is or anything like that, Mr. Nevin, or what the law of dumping is. Isn't it conceivable that as a naked proposition that Sharp, U.S.A. alone could be charged with dumping and held responsible to a competitor that was injured?

A: It is conceivable that Sharp, U.S.A. could be, yes.
Q: Do you know whether or not Zenith has charged Sharp as an individual company with individual dumping of its own and attempted to calculate the damages sustained by Zenith by reason thereof?
A: Well, I think I have to answer both questions no. To the best of my knowledge, we have not charged Sharp with anything as an individual company. Our charges have been addressed to a group of companies, and to the best of my knowledge, we have made no attempt to say that absent Sharp's activity the rest of this damage would or would not have occurred or to assign the responsibility.
Q: I am not—
THE WITNESS: Is that accurate?
MR. CURTIS: Yes.
Q: I am just trying to ascertain whether Zenith has a separate claim different from and separate from the claim against all the other defendants for joint activities.
A: No sir. The answer to your question is no. There is no Zenith claim that has ever been brought to my attention that would be directed separately at Sharp.
Q: Is this likewise true of the other defendants individually?
A: Yes, sir.

against interpretations of the Robinson-Patman Act which contribute to "price uniformity and rigidity in open conflict with the purposes of other antitrust legislation." 440 U.S. at 80, 99 S.Ct. at 933, *quoting Automatic Canteen Co. v. FTC*, 346 U.S. 61, 63, 73 S.Ct. 1017, 1019, 97 L.Ed. 1454 (1953).

▇▇▇ Zenith has never articulated with any degree of clarity its theory of how the alleged price discriminations caused any actual or incipient injury to competition. To the extent that any such theory can be gleaned from Zenith's briefs and oral argument opposing the defendants' motions for summary judgment on Zenith's Robinson-Patman Act claims, that theory is wholly dependent on the existence of sufficient evidence of a low-price export conspiracy. At argument on the Robinson-Patman motions, for example, Zenith's counsel, Mr. Rome, waxed eloquent on the alleged injury to U.S. consumer electronics manufacturers from the alleged "unitary" conspiracy:

> Moreover, undisputed on the record of the case before you, Your Honor, is that a number of U.S. manufacturers in the consumer electronic field have gone out of business, have been destroyed. NUE itself is an example before the Court, and I contend, Your Honor, that from that fact flows necessarily the conclusion that the actions of the defendants have tended to create a monopoly. . . .

> . . . . .

> . . . We are saying that the departure, the forced compelled departure of a number of U.S. manufacturers from the field demonstrates a tendency on the part of the defendants' conduct to produce a monopoly.

> Now, additionally, Your Honor, we are talking about a situation in which, I repeat, there is a unitary conspiracy alleged by Zenith, one manifestation of which is price discrimination.

PTO 252 at 91–92 (May 26, 1980).[397] Thus Zenith's theory of the injury to competition

caused by the alleged price discrimination is based entirely on its allegation that such price discrimination was part of a conspiracy and that the conspiracy tended to create a monopoly. Zenith has pointed to *no* anticompetitive consequences of the price differentials themselves, apart from their alleged role in the alleged unitary conspiracy.

Zenith has attempted to remedy this deficiency in its Robinson-Patman claims by quoting the following language from *Perkins v. Standard Oil Co., supra*, 395 U.S. at 648, 89 S.Ct. at 1874: "If there is sufficient evidence in the record to support an inference of causation, the ultimate conclusion as to what that evidence proves is for the jury." However, Zenith has neglected to identify the evidence in this record that would "support an inference of causation" with respect to its Robinson-Patman Act claims. Neither in its briefs, at oral argument, nor in the FPS has Zenith cited any evidence that would show how or why the alleged price discriminations themselves, apart from any conspiracy, constituted any threat to competition. In the absence of sufficient evidence of the alleged conspiracy to survive the instant summary judgment motions, Zenith has no viable theory of how the alleged price differentials caused any injury to competition.

### D. *Conclusion*

To summarize, Zenith's Robinson-Patman Act claims are inextricably intertwined with its conspiracy claims. In the absence of sufficient evidence of the alleged "unitary" conspiracy, Zenith has shown no injury, hence no standing to assert a claim under the Robinson-Patman Act, either for treble damages under § 4 of the Clayton Act or for injunctive relief under § 16 of the Clayton Act. Furthermore, in the absence of such evidence, Zenith has not even the whisper of a theory of injury to competition caused by the alleged price differen-

---

**397.** *See also* Memorandum of Zenith Radio Corporation in Opposition to Certain Defendants' Motions for Partial Summary Judgment Relating to Robinson-Patman Act Claims at 15–19; Supplemental Memorandum of Zenith Radio Corporation in Opposition to Certain Defendants' Motions for Summary Judgment Relating to Robinson-Patman Act Claims at 9.

tials. Finally, as against most of the defendants, Zenith's Robinson-Patman Act claims are premised on a theory of vicarious coconspirator liability which Zenith has failed to support with sufficient evidence of conspiracy. Thus, even if one assumes that Zenith's Robinson-Patman Act claims are otherwise adequately supported to survive the summary judgment motions—a matter of some doubt but which is not decided in this opinion—Zenith has no standing to assert them, has made no showing of injury to competition, and has not provided factual support for its theory of vicarious liability. Accordingly those claims must be dismissed.

## XI. Zenith's Clayton § 7 Case—Legal Principles and Application

Zenith has also asserted claims against certain of the defendants on the basis of alleged violations of § 7 of the Clayton Act, 15 U.S.C. § 18.[398] These claims are based on the acquisition by MEI of Motorola's television business, along with its "Quasar" trademark, in 1974, and on the acquisition in 1976 by Sanyo Manufacturing Corp. of Warwick Electronics, Inc., a major supplier of private-label television receivers to Sears, Roebuck & Co.[399] As in the case of the Robinson-Patman Act claims discussed in the preceding section, Zenith alleges direct violations against some of the defendants, while contending in addition that the alleged violations of Clayton § 7 are overt acts in furtherance of the "unitary" conspiracy, and that all defendants are accordingly vicariously liable under the Pinkerton doctrine discussed at Part VI.D.5, supra.[400] We address in this section defendants' motions for summary judgment on Zenith's Clayton Act § 7 claims, and reach a conclusion almost identical to that reached with regard to the Robinson-Patman Act claims: because Zenith's Clayton § 7 claims are inextricably bound up with their allegations of a "unitary" conspiracy, and because their standing to assert a Clayton § 7 case is dependent upon proof of that conspiracy, the Clayton § 7 claims must fail as a direct result of plaintiffs' inability to support their conspiracy allegations.

Section 7 of the Clayton Act prohibits acquisitions, the effect of which "may be

---

**398.** NUE has asserted no claims under § 7 of the Clayton Act.

**399.** Zenith contends that the following defendants have directly violated § 7 of the Clayton Act: Matsushita Electric Industrial Co., Ltd. (MEI), Matsushita Electronics Corp. (MEC), Matsushita Electric Trading Co., Ltd. (MET), Matsushita Electronics Corp. of America (MECA), Motorola, Inc., Quasar Electronics Corp., Sanyo Electric Co., Ltd., Sanyo Electric Trading Co., Ltd., Sanyo Manufacturing Corp., and Sears, Roebuck & Co.

As pleaded in Count III of their complaint and counterclaim, Zenith's § 7 claims presented the additional wrinkle of two smaller conspiracies within the overall conspiracy, for, of the ten companies just named, only MEI and Sanyo, as acquiring companies, were charged with actual violations. The other companies against whom Clayton § 7 counts were specifically instituted (the MEI and Sanyo subsidiaries, Sears, and Motorola) were charged with having "conspired with each other and among themselves and with other defendants named in this complaint" to violate § 7. Zenith Complaint ¶ 61; Zenith Counterclaim ¶ 42. This allegation is distinct from the more general allegation bringing in all defendants under the Pinkerton theory. See Zenith Complaint ¶ 64; Zenith Counterclaim ¶ 45; Part VI.D.5, supra.

However, upon a challenge by the defendants named as part of the "internal" conspiracy asserting that there is no such action as a "conspiracy" to violate § 7, Zenith foreswore any attempt to maintain such a claim, adhering solely to its Pinkerton theory. Zenith's Memorandum in Opposition to Defendant's Motions for Summary Judgment Relating to the § 7 Clayton Act Claims at 46. Thus, the separate allegations were apparently for no purpose.

We note in addition that we do not understand Zenith to suggest that the acquired companies or the selling companies could be held liable on any conspiracy theory other than on the "unitary" conspiracy theory. Indeed, given the plain words of the statute and the consistent interpretation by the courts that only the acquiring companies can be held liable under § 7, they could not so contend. See e. g., Dailey v. Quality School Plan, Inc., 380 F.2d 484, 488 (5th Cir. 1967).

**400.** For the reasons set forth in that Part VI.D.5 and elaborated upon in the course of our discussion of the Robinson-Patman Act Claims, we do not reach the Pinkerton issue. Similarly, we need not consider Booth Bottling Co. v. Beverages International, Inc., 361 F.Supp. 340 (E.D.Pa.1973), which Zenith cites in support of its conspiracy theory of Clayton § 7 liability.

**1330**

substantially to lessen competition, or to tend to create a monopoly" in any line of commerce and in any section of the country.[401] As explained by the Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Congress that enacted § 7 was primarily concerned with "a fear of what was considered to be a rising tide of economic concentration in the American economy." *Id.* at 315, 82 S.Ct. at 1518. Accordingly, to stem that rising tide Congress provided "authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." *Id.* at 317, 82 S.Ct. at 1519–1520. Congress rejected the application of standards developed under the Sherman Act in cases arising under the Clayton Act, but did not set forth any specific standards for defining the relevant market or the substantiality of the effect on competition. It did, however, make clear that a merger must be "functionally viewed, in the context of a particular industry," *id.* at 321–22, 82 S.Ct. at 1521–1523. Moreover, Congress' concern is with competition, not individual competitors, *id.* at 320, 82 S.Ct. at 1521, and with probabilities, not certainties. *Id.* at 323, 82 S.Ct. at 1522–1523.

▮▮▮▮▮ To make out a § 7 case, a plaintiff must establish the relevant product and geographic markets, neither of which is at issue in this case, and must demonstrate the requisite tendency substantially to lessen competition or create a monopoly. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186,

39 L.Ed.2d 530 (1974); *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *Brown Shoe, supra.* As an affirmative defense, a defendant may assert that the acquired company was a failing company, and was therefore not a competitive force. *See United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 91 S.Ct. 1692, 29 L.Ed.2d 170 (1971); *Citizen Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); *International Shoe Co. v. FTC*, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930).[402]

We suspect that defendants may well be correct (1) that Zenith has not raised a genuine issue of material fact as to the substantial lessening of competition and (2) that Warwick was indubitably a failing company. *See* Part VII.N.3, *supra.* However, we shall not perform the substantive Clayton § 7 analysis because: (1) amidst the welter of evidence and contentions, the parties have not sufficiently sharpened these issues; (2) there is much confusion about the meaning of the "no alternative purchaser" requirement and its applicability to this case; [403] (3) the required functional market analysis is so complex (and the parties so sharply differ in their interpretations of the relevant law); and (4) we have an alternative ground for dismissal of Zenith's Clayton § 7 claims. We turn then to the alternative ground, the issue of standing.

The principles of standing under § 4 and § 16 of the Clayton Act, which we have

---

**401.** During the time period covered in this litigation, Section 7 provided in pertinent part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be *substantially to lessen* competition, or to tend to create a monopoly.
15 U.S.C. § 18.

Section 7 was amended in the Antitrust Procedural Improvements Act of 1980, P.L. No. 96–349, 49 U.S.L.W. 117. Section 6(a) of the

Act extends the reach of the anti-merger provisions beyond corporations to apply now to "persons"; moreover, the jurisdictional reach is extended not just to entities engaged in commerce, but to those involved in "any activity affecting commerce" as well.

**402.** To sustain the failing company defense, a defendant must also show not only that the acquired company was failing, but also that there was no alternative purchaser that would lessen the anti-competitive effect. *See Citizen Publishing Co., supra.*

**403.** Much of the confusion stems from the opacity of the Supreme Court's opinion in *Citizen Publishing.*

enunciated in Part VI.B, *supra,* are fully applicable to actions seeking redress for violations of § 7 of the Clayton Act. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Notwithstanding the clear import of these principles, in argument on the defendants' motions for summary judgment on Zenith's § 7 claims, Zenith's counsel took the same position on proof of injury as he did with respect to the Robinson-Patman claims:

> Sir, on the point of damage, just as we contend there may not under Continental Ore be a fragmentation of the conspiracy concept, there may not be a fragmentation of the damage concept. This is again a not unusual point advanced by defendants trying to break down into atomized constituent parts what is necessarily to be viewed as one.
>
> And under those circumstances, despite the comments of my friends, we have not undertaken to do that, nor have we in our submission, Your Honor, with great respect, an obligation to try to allocate particular damages to particular counts of the Complaint. The ultimate point that we make is that all of these facts represent one ball of wax which constituted violations of different statutes, and it would be to fall into the trap that my friends seek constantly to lay if we were obligated to do the contrary, sir.

PTO 255 at 142–43 (June 2, 1980).

Similarly, in its answer to defendants' interrogatories addressed to Count III,[404] Set No. 1, Interrogatory No. 1(e), which requested the dollar amount of damages flowing from the acquisitions, Zenith responded:

> The acquisition described in Count III was arranged and consummated pursuant to the combination and conspiracy to restrain and to monopolize domestic and foreign commerce in consumer electronic products in the manner alleged in the Complaint. Defendants' interrogatories

disregard the Complaint allegations in an improper effort to separate the acquisition from the combination and conspiracy and to require plaintiff to assign a special damage amount to the acquisition without regard to defendants' other conspiratorial activities.

Moreover, in that section of its brief addressed to the effect on competition of the contested acquisitions, Zenith warns of the effect of all Japanese defendants lumped together, stating:

> Zenith contends that the market must be viewed in light of the allegations of the Complaint. Moreover, in the absence of any factual record submitted by the defendants, the Court must view the defendants and their coconspirators as they are, i. e. as a single entity in the U. S. market. This being so, even the acquisition by the cartel and its partners in crime of a more modest share of the market would be illegal.

Zenith's Brief in Opposition to Defendants' Motions for Summary Judgment Relating to the Clayton § 7 Claims at 79.

 Thus, as with the Robinson-Patman Act Claims, Zenith has steadfastly refused to formulate any theory that would show its injury traceable to the alleged violations of § 7 of the Clayton Act. Instead, Zenith has again put all of its eggs into the "unitary" conspiracy basket. Absent proof of the alleged "unitary" conspiracy Zenith has made no showing of injury stemming from the contested acquisitions sufficient to give it standing under either § 4 or § 16 of the Clayton Act in order to separately press its Clayton § 7 claims. Because we have held that plaintiffs have not adduced sufficient evidence of conspiracy to give rise to a material issue of fact on that issue, summary judgment must be granted as to the § 7 claims as well.[405]

## XII. *Conclusion*

Can this opinion, running close to —— pages, be succinctly characterized? If it

---

**404.** Count III asserts plaintiffs' Clayton § 7 claims.

**405.** Because we have determined that there is no material factual issue with regard to plain-

tiffs' conspiracy claims, Zenith's theory asserting liability against those defendants that have not been charged with direct § 7 liability is unsupportable. That reason alone justifies dismissal of the § 7 claims against the Toshiba

can, it is by rescribing what we said at the outset: despite the fact that plaintiffs have pled a conspiracy case, they have produced no significant probative evidence that any of the defendants entered into an *agreement* or acted in concert with respect to exports to the United States that in any manner could have injured the plaintiffs.[406] The plaintiffs have filed Preliminary Pretrial Memoranda of some 410 pages, a Final Pretrial Statement of some 17,000 pages keyed to some quarter of a million documents, and thousands of pages of briefs in opposition to the defendants' summary judgment motions. Extracting from the millions of documents copied and inspected in nine years of discovery whatever could

be construed as suspicious, the plaintiffs have (figuratively) buried us in an avalanche of paper. However, to repeat, they still have not shown any significant probative evidence of an agreement.

For that reason, and for the hundreds of others spread out in this opinion, summary judgment will be granted for defendants as to all of plaintiffs' conspiracy claims (Sherman Act § 1, Sherman Act § 2, Wilson Tariff Act), and as to all claims predicated upon vicarious liability of coconspirators. Because there is also no basis to sustain plaintiffs' Clayton Act § 7 and Robinson Patman Act claims,[407] summary judgment will be granted for defendants on those claims as well.[408]

defendants, the Hitachi defendants, the Sharp defendants, MELCO, MELCO Sales, MC, MIC and Sanyo Electric, Inc.

**406.** We have also found no evidence supporting the home market facet of the "unitary" conspiracy.

**407.** As we have explained, these claims are, in the context of this case, primarily conspiracy based.

**408.** The decision to grant summary judgment, reached after the painstaking, independent review of the evidence and the law described in the parallel series (evidentiary and summary judgment) of opinions which we have filed since March, 1980, may come to the parties as no surprise. Pursuant to a Consent Order dated November 18, 1977 (the very first Order we signed after transfer of this case to our docket), in order to enable U.S. Justice Department consideration of potential antitrust violations, plaintiffs were permitted: (1) to show the Justice Department any of defendants' documents produced in this litigation that they desired; (2) to comment upon them; and (3) to explain to the Department the full import of what they believed they had uncovered. In other words, plaintiffs' counsel were permitted to, and did, cull their "best case" against defendants from the documents and present it to the Justice Department. However, after a review of the documents and presentations, the Justice Department announced that it had found *no evidence* of any violation of law. The April 12, 1978 statement of Assistant Attorney General John H. Shenefield, Chief of the Antitrust Division, describing the Department's finding to the Committee on the Judiciary of the U.S. Senate went as follows:

Shortly after I assumed my duties, about a year ago, representatives of Zenith and National Union Electric (NUE) Corporations came to me and complained that several Japanese color television receiver manufacturers were engaged in a concerted program to fix prices and predatorily destroy the American TV industry. I was aware that my predecessor, Don Baker, in a letter to Senator Kennedy, had communicated his decision not to conduct any investigation of these charges at that time.

The complainants assured me that if the Antitrust Division reviewed the pretrial discovery in the private antitrust litigation they had begun in the Eastern District of Pennsylvania 8 years before, we would conclude that a full investigation and probably prosecution of these Japanese enterprises was warranted.

Given the seriousness of the charges and the assurance that the evidence to back them up was accessible, I agreed to take a fresh look—to have the Antitrust Division undertake a preliminary investigation to determine if there was any reasonable basis for proceeding with a full investigation through compulsory process.

. . . .

For the past six months, we have inspected approximately 35,000 pages of documents, fully 5,000 untranslated from the original Japanese. More than half of these were shown to us by Zenith and NUE. *We are assured that we have seen the best evidence the complainants have so far gathered.* About 10,000 of these documents were made available for inspection by third parties in the litigation; and we reviewed approximately 4,000 documents shown to us by Japanese defendants. We have committed substantial resources to this matter. The professional

What plaintiffs have brought, it turns out after a decade, is not a real but an "ersatz" antitrust case. What plaintiffs have waged is not just litigation, but also what Judge Patrick Higginbotham has referred to as "economic war."[409] The defendants have fought back in kind, and one facet of the marketplace battle over the sale of television receivers has been fought in the legal arena under the aegis of this court.

In plaintiffs' submission, they are entitled to damages in the billions of dollars. In defendants' view, what the principal plaintiff (Zenith) seeks is a "price umbrella" to insulate it from foreign competition and to protect its already high U.S. market share. We understand Zenith's concern about the inroads by the defendants and other Japanese CEP manufacturers in the U.S. market, and its striving to maximize its profits and preserve its workers' jobs. But its proper remedy in this regard is not in the antitrust court, but in the Congress, in the U.S. International Trade Commission, and in the office of the President's Trade Nego-

tiator. Unlike the courts, these agencies are in position to balance the needs of Zenith and the other U.S. manufacturers of CEP's (and of the American labor force) with the beneficial effects of competition and free trade in CEP's upon the U.S. consumer and the U.S. economy, and to grant appropriate and meaningful relief.

We make no normative judgments on these points. Rather, we hold that, notwithstanding plaintiffs' unlimited opportunity during the final summary judgment argument (and in their voluminous briefs) to extract evidence from the towering document pile that might create a genuine issue of material fact, they have come forward with no significant probative evidence that defendants' penetration of the U.S. television receiver market is the result of an antitrust conspiracy.[410] Accordingly, summary judgment must be granted so as to put an end to this ten-year-old case which, notwithstanding all its sound and fury and the generation of tens of millions of documents and staggering legal fees, has pro-

time alone has exceeded 200 full person work days. This investigation has been conducted with the cooperation of both plaintiffs and defendants in the Pennsylvania litigation and without any pressure from or intervention by any other agency of the United States government or any official or representative of the Japanese government.

*I recently concluded a detailed review of the evidence examined. I have agreed with the investigative staff's unanimous conclusion that it does not provide any reasonable basis for conducting a full-scale Antitrust Division investigation of predatory activity by the Japanese color TV industry. In short, we found no evidence of on-going concerted activity by Japanese enterprises aimed at the United States market.*

As you are, I am aware of the check price agreements of an earlier period. However, we have no evidence that these agreements continued beyond 1973. In addition, *we found no evidence that,* even in earlier periods, *any concerted activity was intended to or did serve a predatory purpose.* In any event, at the present time, an orderly marketing agreement is in place, an effect of which will be to reduce the percentage of Japanese color TV sales in the United States in 1978 to approximately 16% of the U.S. market.

*Most importantly, in view of the charges made by Zenith and NUE, we found no evidence of concerted predatory conduct intended to destroy and supplant the U.S. color TV industry, either at an earlier period or at the present time.* Given this finding after careful investigation, I find no basis for proceeding further.

I understand that pre-trial discovery in the Pennsylvania litigation is not complete. It may be that at a trial, the plaintiffs will persuade a factfinder that there has been a violation of the antitrust laws but at this point, based on all the available evidence, we have no basis to justify commencement of a full scale investigation. (emphasis added)

We note Mr. Shenefield's conclusion only in passing, for our inquiry into plaintiffs' case in connection with the summary judgment motions has been, as is demonstrated in the preceding segments of this opinion, in the pretrial evidentiary trilogy, in the summary judgment opinions preceding them, and in the transcripts of the countless pretrial conferences, far more sustained and much greater in scope and depth.

409. Summary of Proceedings of Panel on Improvements in Pretrial and Trial Procedures in Civil Antitrust Cases, printed as Appendix C to American Bar Association Section of Antitrust Law Monograph III, "Expediting Trials and Pretrials of Antitrust Cases," at 103 (1979).

410. As we have demonstrated in Part VIII, plaintiffs have not advanced a serious case with respect to non-TV products.

duced nothing, we repeat, nothing which justifies our permitting it to go forward into a trial which will last a year or more, with countless untold further burdens and expense upon the parties, their counsel, and the court system.

Since plaintiffs' 1916 Antidumping Act claims have already been dismissed, 494 F.Supp. 1190 (E.D.Pa.1980), *appeal pending*, No. 80–2080 (3d Cir.),[411] the Order accompanying this opinion will result in the dismissal of all of plaintiffs' claims in this litigation. All that will remain of this case (subject, of course, to review by the Court of Appeals) are the counterclaims interposed by a number of defendants, the trial of which we plan to defer, pursuant to our contemporaneous Certification under Rule 54(b), until the Court of Appeals has had an opportunity to review the grant of summary judgment.

411. The antidumping opinion dismissed all but a few minor aspects of plaintiffs' 1916 Anti- dumping Act claims. The remainder of these claims are dismissed herein. See n. 372, *supra*.